## Case Information

DOUGLAS GETTEN,ESTATE OF ELLEN ELIZABETH GETTEN,JENNIFER GETTEN vs. NATURAL FOUNTAI...

D-1-GN-25-009976

Location

Travis County - District Clerk

Case Category

Civil - Other Civil

Case Type

Other Injury or Damage

Case Filed Date

11/10/2025

Judge

DISTRICT COURT 459TH

Case Status

Open

## Parties 28

| Type | Name | Nickname/Alias | Attorneys |
|---|---|---|---|
| Plaintiff | ESTATE OF LINNIE ANNE MCCOWEN | | ARNOLD, KURT BRYNILDE , Findley, Jonathan Kyle , McDaniel, Alyssa , Post, Russell Stanley |
| Plaintiff | ESTATE OF ABBY LYNN POHL | | ARNOLD, KURT BRYNILDE , Findley, Jonathan Kyle , McDaniel, Alyssa , Post, Russell Stanley |
| Plaintiff | ESTATE OF MARGARET GAFFNEY SHEEDY | | ARNOLD, KURT BRYNILDE , Findley, Jonathan Kyle , McDaniel, Alyssa , Post, Russell Stanley |
| Plaintiff | ESTATE OF MARY BARRETT STEVENS | | ARNOLD, KURT BRYNILDE , Findley, Jonathan Kyle , McDaniel, Alyssa , Post, Russell Stanley |
| Plaintiff | ESTATE OF GRETA KATHERINE TORANZO | | ARNOLD, KURT BRYNILDE , Findley, Jonathan Kyle , McDaniel, Alyssa , Post, Russell Stanley |
| Plaintiff | ESTATE OF ELLEN ELIZABETH GETTEN | | ARNOLD, KURT BRYNILDE , Findley, Jonathan Kyle , McDaniel, Alyssa , Post, Russell Stanley |
| Plaintiff | GETTEN, DOUGLAS | | ARNOLD, KURT BRYNILDE , Findley, Jonathan Kyle , McDaniel, Alyssa , Post, Russell Stanley |
| Plaintiff | GETTEN, JENNIFER | | ARNOLD, KURT BRYNILDE , Findley, Jonathan Kyle , McDaniel, Alyssa , Post, Russell Stanley |
| Plaintiff | MCCOWN, CALLIE | | ARNOLD, KURT BRYNILDE , Findley, Jonathan Kyle , McDaniel, Alyssa , Post, Russell Stanley |
| Plaintiff | MCCOWN, MICHAEL | | ARNOLD, KURT BRYNILDE , Findley, Jonathan Kyle , McDaniel, Alyssa , Post, Russell Stanley |
| Plaintiff | POHL, KRISTIN | | ARNOLD, KURT BRYNILDE , Findley, Jonathan Kyle , McDaniel, Alyssa , Post, Russell Stanley |
| Plaintiff | POHL, MATTHEW | | ARNOLD, KURT BRYNILDE , Findley, Jonathan Kyle , McDaniel, Alyssa , Post, Russell Stanley |
| Plaintiff | SHEEDY, ANDREW | | ARNOLD, KURT BRYNILDE , Findley, Jonathan Kyle , McDaniel, Alyssa , Post, Russell Stanley |
| Plaintiff | SHEEDY, ELLEN | | ARNOLD, KURT BRYNILDE , Findley, Jonathan Kyle , McDaniel, Alyssa , Post, Russell Stanley |
| Plaintiff | STEVENS, JOHNNY | | ARNOLD, KURT BRYNILDE , Findley, Jonathan Kyle , McDaniel, Alyssa , Post, Russell Stanley |
| Plaintiff | STEVENS, STACY | | ARNOLD, KURT BRYNILDE , Findley, Jonathan Kyle , McDaniel, Alyssa , Post, Russell Stanley |
| Plaintiff | TORANZO, ELLEN | | ARNOLD, KURT BRYNILDE , Findley, Jonathan Kyle , McDaniel, Alyssa , Post, Russell Stanley |
| Plaintiff | TORANZO, JORGE | | ARNOLD, KURT BRYNILDE , Findley, Jonathan Kyle , McDaniel, Alyssa , Post, Russell Stanley |
| Defendant | NATURAL FOUNTAINS PROPERTIES, INC. | | Watts, Mikal |
| Defendant | MYSTIC CAMPS FAMILY PARTNERSHIP, LTD. | | Watts, Mikal |
| Defendant | MYSTIC CAMPS MANAGEMENT, LLC | | Watts, Mikal |

| Type | Name | Nickname/Alias | Attorneys |
|---|---|---|---|
| Defendant | CAMP MYSTIC, LLC | | BALIDO, CARLOS A. , FAIR, KENNETH JASON , SPY, P. CLARK , Watts, Mikal |
| Defendant | BONNER, WILLIAM NEELY, III | | CASTAGNA, LYNN S. , SPY, P. CLARK |
| Defendant | EASTLAND, EDWARD | | BALIDO, CARLOS A. , Watts, Mikal |
| Defendant | EASTLAND, MARY LIZ | | BALIDO, CARLOS A. , Watts, Mikal |
| Defendant | EASTLAND, STACY | | BITTING, DANIEL C. |
| Defendant | EASTLAND, WILLETTA | | SPY, P. CLARK , Watts, Mikal |
| Other Parties | ESTATE OF ELLEN ELIZABETH GETTEN | | ARNOLD, KURT BRYNILDE , Findley, Jonathan Kyle , McDaniel, Alyssa , Post, Russell Stanley |

## Hearings 5

| Date/Time | Hearing Type | Judge | Location | Result |
|---|---|---|---|---|
| 3/9/2026 02:00 PM | Setting Date | | | |
| 4/13/2026 09:01 AM | Setting Date | | | Canceled - Passed by Court |
| 5/5/2026 02:00 PM | Setting Date | | | |
| 5/13/2026 09:00 AM | Setting Date | | | |
| 9/13/2027 09:01 AM | Setting Date | | | |

## Events 81

| Date | Event | Type | Comments | Documents |
|---|---|---|---|---|
| 9/13/2027 | Hearing | Setting Date | - | |
| 6/24/2026 | Filing | 5436DC | SUGGESTION OF BANKRUPTCY | SUGGESTION OF BANKRUPTCY.pdf |
| 6/15/2026 | Filing | 5415DC | NOTICE OF CHANGE OF ADDRESS | NOTICE OF CHANGE OF ADDRESS.pdf |
| 6/9/2026 | Filing | 5415DC | DEFENDANTS NOTICE OF APPEARANCE OF COUNSEL | DEFENDANTS NOTICE OF APPEARANCE OF COUNSEL.pdf |
| 6/8/2026 | Filing | 5153DC | DEFENDANTS' RESPONSE TO GETTEN PLAINTIFFS' MOTION FOR SANCTIONS | DEFENDANTS' RESPONSE TO GETTEN PLAINTIFFS' MOTION FOR SANCTIONS.pdf |
| 6/8/2026 | Filing | 5415DC | GETTEN AND BELLOWS PLAINTIFFS REPLY IN SUPPORT OF THEIR MOTION TO STRIKE DEFENDANTS AMENDED MOTIONS TO COMPEL ARBITRATION AND STAY PROCEEDINGS | GETTEN AND BELLOWS PLAINTIFFS REPLY IN SUPPORT OF THEIR MOTION TO STRIKE DEFENDANTS AMENDED MOTIO.pdf |
| 6/5/2026 | Filing | 5415DC | GETTEN AND BELLOWS PLAINTIFFS NOTICE OF FILING OF EXHIBITS 6 & 10 TO PLAINTIFFS MOTION TO STRIKE DEFENDANTS AMENDED MOTIONS TO COMPEL ARBITRATION | GETTEN AND BELLOWS PLAINTIFFS NOTICE OF FILING OF EXHIBITS 6 & 10 TO PLAINTIFFS MOTIO TO STRIKE.pdf |
| 6/3/2026 | Filing | 5153DC | GETTEN AND BELLOWS PLAINTIFFS RESPONSE TO DEFENDANTS AMENDED MOTIONS TO COMPEL ARBITRATION AND STAY PROCEEDINGS | GETTEN AND BELLOWS PLAINTIFFS RESPONSE TO DEFENDANTS AMENDED MOTIONS TO COMPEL ARBITRATION AND.pdf |
| 6/3/2026 | Filing | 5265DC | PLAINTIFFS' MOTION FOR SANCTIONS | PLAINTIFFS' MOTION FOR SANCTIONS.pdf |
| 6/3/2026 | Filing | 5153DC | DEFENDANTS RESPONSE TO THE PLAINTIFFS MOTION TO STRIKE | DEFENDANTS RESPONSE TO THE PLAINTIFFS MOTION TO STRIKE.pdf |
| 5/27/2026 | Filing | 5265DC | GETTEN AND BELLOWS PLAINTIFFS' MOTION TO STRIKE DEFENDANTS' AMENDED MOTIONS TO COMPEL ARBITRATION AND STAY PROCEEDINGS | GETTEN AND BELLOWS PLAINTIFFS' MOTION TO STRIKE DEFENDANTS' AMENDED MOTIONS TO COMPEL.pdf |
| 5/13/2026 | Hearing | Setting Date | - | |
| 5/12/2026 | Filing | 5415DC | DEFENDANTS NOTICE OF WITHDRAWAL OF MOTIONS FILED MARCH 24, 2026 TO COMPEL ARBITRATION AND MOTIONS TO STAY PROCEEDINGS | DEFENDANTS NOTICE OF WITHDRAWAL OF MOTIONS FILED MARCH 24, 2026 TO COMPEL ARBITRATIOIN AND MOTIONS.pdf |
| 5/12/2026 | Filing | 5153DC | DEFENDANTS CONSOLIDATED REPLY IN SUPPORT OF THEIR MOTIONS TO COMPEL ARBITRATION AND STAY PROCEEDINGS | DEFENDANTS CONSOLIDATED REPLY IN SUPPORT OF THEIR MOTIONS TO COMPEL ARBITRATION AND STAY.pdf |
| 5/12/2026 | Filing | 5265DC | DEFENDANTS' AMENDED MOTIONS TO COMPEL ARBITRATION AND STAY PROCEEDINGS | DEFENDANTS' AMENDED MOTIONS TO COMPEL ARBITRATION AND STAY PROCEEDINGS.pdf |
| 5/6/2026 | Filing | 5415DC | LETTER TO JUDGE REGARDINT MOTION FOR SANCTIONS HEARING | LETTER TO JUDGE REGARDINT MOTION FOR SANCTIONS HEARING.pdf |
| 5/6/2026 | Filing | 5265DC | DEFENDANT S. STACY EASTLAND'S WITHDRAWAL OF MOTION FOR SANCTIONS | DEFENDANT S. STACY EASTLAND'S WITHDRAWAL OF MOTION FOR SANCTIONS.pdf |

| Date | Event | Type | Comments | Documents |
|---|---|---|---|---|
| 5/6/2026 | Filing | 5153DC | GETTEN AND BELLOWS PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTIONS TO COMPEL ARBITRATION AND MOTIONS TO STAY | GETTEN AND BELLOWS PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTIONS TO COMPEL ARBITRATION AND MOTIONS.pdf |
| 5/6/2026 | Filing | 5415DC | NOTICE OF FILING OF AFFIDAVITS IN SUPPORT OF MOTIONS TO COMPEL ARBITRATION | NOTICE OF FILING OF AFFIDAVITS IN SUPPORT OF MOTIONS TO COMPEL ARBITRATION.pdf |
| 5/6/2026 | Filing | 5415DC | NOTICE OF APPEARANCE AS ADDITIONAL COUNSEL OF ADDITIONAL COUNSEL | NOTICE OF APPEARANCE AS ADDITIONAL COUNSEL OF ADDITIONAL COUNSEL.pdf |
| 5/5/2026 | Hearing | Setting Date | - | |
| 5/4/2026 | Filing | 5054DC | PLAINTIFFS SECOND AMENDED PETITION | PLAINTIFFS SECOND AMENDED PETITION.pdf |
| 5/1/2026 | Filing | 5153DC | PLAINTIFFS' SUPPLEMENTAL RESPONSE TO SEABORN STACY EASTLAND'S MOTION FOR SANCTIONS | PLAINTIFFS' SUPPLEMENTAL RESPONSE TO SEABORN STACY EASTLAND'S MOTION FOR SANCTIONS.pdf |
| 4/30/2026 | Filing | 5415DC | CERTIFICATE OF CONFERENCE FOR HEARING ON DEFENDANTS SEABORN STACYS EASTLAND'S MOTION FOR SANCTIONS | CERTIFICATE OF CONFERENCE FOR HEARING ON DEFENDANTS SEABORN STACYS EASTLAND'S MOTION FOR SANCTIONS.pdf |
| 4/30/2026 | Filing | 5442DC | LETTER TO COUNSEL FROM JUDGE GAMBLE | LETTER TO COUNSEL FROM JUDGE GAMBLE_AU.pdf |
| 4/28/2026 | Filing | 5153DC | PLAINTIFFS' RESPONSE TO SEABORN STACY EASTLAND'S MOTION FOR SANCTIONS | PLAINTIFFS' RESPONSE TO SEABORN STACY EASTLAND'S MOTION FOR SANCTIONS.pdf |
| 4/27/2026 | Filing | 5415DC | NOTICE OF IN-PERSON HEARING | NOTICE OF IN-PERSON HEARING.pdf |
| 4/27/2026 | Filing | 5265DC | SUPPLEMENT TO MOTION FOR SANCTIONS | SUPPLEMENT TO MOTION FOR SANCTIONS.pdf |
| 4/13/2026 | Filing | 8225DC | ORDER ALLOWING RECORDING OF COURT PROCEEDINGS | ORDER ALLOWING RECORDING OF COURT PROCEEDINGS_AU.pdf |
| 4/13/2026 | Filing | 8225DC | ORDER ALLOWING RECORDING OF COURT PROCEEDINGS | ORDER ALLOWING RECORDING OF COURT PROCEEDINGS_AU.pdf |
| 4/13/2026 | Hearing | Setting Date | - | |
| 4/9/2026 | Filing | 8225DC | ORDER ALLOWING STILL PHOTOGRAPHY OF COURT PROCEEDINGS | ORDER ALLOWING STILL PHOTOGRAPHY OF COURT PROCEEDINGS _AU.pdf |
| 4/9/2026 | Filing | 8225DC | ORDER ALLOWING RECORDING OR COURT PROCEEDING | ORDER ALLOWING RECORDING OR COURT PROCEEDING _AU.pdf |
| 4/9/2026 | Filing | 8225DC | ORDER ALLOWING AUDIO RECORDINGS OF COURT PROCEEDINGS | ORDER ALLOWING AUDIO RECORDINGS OF COURT PROCEEDINGS_AU.pdf |
| 4/1/2026 | Filing | 5442DC | LETTER TO COUNSEL FROM JUDGE GAMBLE | LETTER TO COUNSEL FROM JUDGE GAMBLE_AU.pdf |
| 3/24/2026 | Filing | 5265DC | DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY | DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY.pdf |
| 3/10/2026 | Filing | 8271DC | NOTICE OF PARTIAL NONSUIT WITHOUT PREJUDICE | NOTICE OF PARTIAL NONSUIT WITHOUT PREJUDICE.pdf |
| 3/9/2026 | Hearing | Setting Date | - | |
| 3/4/2026 | Filing | 5423DC | ASSIGNMENT LETTER - JUDGE AMY CLARK MEACHUM REGARDING JUDGE MAYA GUERRA GAMBLE | ASSIGNMENT LETTER - JUDGE AMY CLARK MEACHUM REGARDING JUDGE MAYA GUERRA GAMBLE_AU.pdf |
| 3/3/2026 | Filing | 5415DC | NOTICE OF IN-PERSON HEARING ON THE CENTRAL DOCKET | NOTICE OF IN-PERSON HEARING ON THE CENTRAL DOCKET.pdf |
| 2/11/2026 | Filing | 5415DC | VACATION LETTER | VACATION LETTER.pdf |
| 12/29/2025 | Filing | 5265DC | DEFENDANT SEABORN STACY EASTLAND'S MOTION FOR SANCTIONS | DEFENDANT SEABORN STACY EASTLAND S MOTION FOR SANCTIONS.pdf |
| 12/15/2025 | Filing | 5265DC | WILLIAM NEELY BONNER III'S MOTION TO TRANSFER VENUE | WILLIAM NEELY BONNER III'S MOTION TO TRANSFER VENUE.pdf |
| 12/15/2025 | Filing | 5150DC | DEFENDANT WILLIAM NEELY BONNER III'S ORIGINAL ANSWER TO PLAINTIFF'S FIRST AMENDED PETITION FILED SUBJECT TO DEFENDANT'S MOTION TO TRANSFER VENUE | DEFENDANT WILLIAM NEELY BONNER III'S ORIGINAL ANSWER TO PLAINTIFF'S FIRST AMENDED PETITION FILED.pdf |
| 12/12/2025 | Filing | 5265DC | CAMP MYSTIC DEFENDANTS' MOTION TO TRANSFER VENUE | CAMP MYSTIC DEFENDANTS' MOTION TO TRANSFER VENUE.pdf |
| 12/12/2025 | Filing | 5150DC | CAMP MYSTIC DEFENDANTS ORIGINAL ANSWER SUJECT TO MOTION TO TRANSFER VENUE | CAMP MYSTIC DEFENDANTS ORIGINAL ANSWER SUJECT TO MOTION TO TRANSFER VENUE.pdf |
| 12/12/2025 | Filing | 4893DC | EXECUTED SERVICE-CITATION SECRETARY OF STATE MYSTIC CAMPS MANAGEMENT, LLC | EXECUTED SERVICE-CITATION SECRETARY OF STATE MYSTIC CAMPS MANAGEMENT, LLC.pdf |

| Date | Event | Type | Comments | Documents |
|---|---|---|---|---|
| 12/12/2025 | Filing | 4893DC | EXECUTED SERVICE-CITATION THROUGH THE SECRETATY OF STATE NATURAL FOUNTAINS PROPERTIES, INC. | EXECUTED SERVICE-CITATION THROUGH THE SECRETATY OF STATE NATURAL FOUNTAINS PROPERTIES, INC..pdf |
| 12/12/2025 | Filing | 4893DC | EXECUTED SERVICE-CITATION MYSTIC CAMPS FAMILY PARTNERSHIP, LTD | EXECUTED SERVICE-CITATION MYSTIC CAMPS FAMILY PARTNERSHIP, LTD.pdf |
| 12/12/2025 | Filing | 4899DC | UNEXECUTED RETURN OF SERVICE-CITATION WILLETTA EASTLAND, A/KA TWEETY EASTLAND | UNEXECUTED RETURN OF SERVICE-CITATION WILLETTA EASTLAND, A/KA TWEETY EASTLAND.pdf |
| 12/12/2025 | Filing | 4893DC | EXECUTED SERVICE-CITATION CAMP MYSTIC, LLC | EXECUTED SERVICE-CITATION CAMP MYSTIC, LLC.pdf |
| 12/12/2025 | Filing | 4893DC | EXECUTED SERVICE-CITATION EDWARD EASTON | EXECUTED SERVICE-CITATION EDWARD EASTON.pdf |
| 12/12/2025 | Filing | 4893DC | EXECUTED SERVICE-CITATION MARY LIZ EASTLAND | EXECUTED SERVICE-CITATION MARY LIZ EASTLAND.pdf |
| 12/11/2025 | Filing | 4893DC | RETURN OF SERVICE - NATURAL FOUNTAINS PROPERTIES, INC. | RETURN OF SERVICE - NATURAL FOUNTAINS PROPERTIES, INC..pdf |
| 12/11/2025 | Filing | 4893DC | RETURN OF SERVICE - MYSTIC CAMPS FAMILY PARTNERSHIP, LTD | RETURN OF SERVICE - MYSTIC CAMPS FAMILY PARTNERSHIP, LTD.pdf |
| 12/11/2025 | Filing | 4893DC | RETURN OF SERVICE - WILLETTA EASTLAND | RETURN OF SERVICE - WILLETTA EASTLAND.pdf |
| 12/11/2025 | Filing | 4893DC | RETURN OF SERVICE - MARY L EASTLAND | RETURN OF SERVICE - MARY L EASTLAND.pdf |
| 12/11/2025 | Filing | 4893DC | RETURN OF SERVICE - CAMP MYSTICS, LLC | RETURN OF SERVICE - CAMP MYSTICS, LLC.pdf |
| 12/11/2025 | Filing | 4893DC | RETURN OF SERVICE - MYSTIC CAMPS MANAGEMENT, LLC | RETURN OF SERVICE - MYSTIC CAMPS MANAGEMENT, LLC.pdf |
| 12/11/2025 | Filing | 4893DC | RETURN OF SERVICE - EDWARD EASTLAND | RETURN OF SERVICE - EDWARD EASTLAND.pdf |
| 12/5/2025 | Filing | 5150DC | DEFENDANT STACY EASTLAND'S MOTION TO TRANSFER VENUE, ORIGINAL ANSWER TO PLAINTIFF'S FIRST AMENDED PETITION, AND SPECIAL EXCEPTIONS | DEFENDANT STACY EASTLAND'S MOTION TO TRANSFER VENUE, ORIGINAL ANSWER TO PLAINTIFF'S FIRST AMENDED.pdf |
| 11/21/2025 | Filing | 4893DC | EXECUTED RETURN SERVICE OF CITATION - WILLIAM NEELY BONNER III | EXECUTED RETURN SERVICE OF CITATION - WILLIAM NEELY BONNER III.pdf |
| 11/21/2025 | Filing | 4893DC | EXECUTED SERVICE-CITATION SEABORN STACY EASTLAND | EXECUTED SERVICE-CITATION SEABORN STACY EASTLAND.pdf |
| 11/19/2025 | Service | - | - | |
| 11/19/2025 | Service | - | - | |
| 11/18/2025 | Filing | 5415DC | PROCESS REQUEST FORM | PROCESS REQUEST FORM.pdf |
| 11/18/2025 | Filing | 5415DC | PROCESS REQUEST FORM | PROCESS REQUEST FORM.pdf |
| 11/13/2025 | Filing | 5054DC | PLAINTIFFS' FIRST AMENDED PETITION | PLAINTIFFS' FIRST AMENDED PETITION.pdf |
| 11/13/2025 | Filing | 4893DC | EXECUTED RETURN SERVICE OF CITATION - WILLIAM NEELY BONNER III | EXECUTED RETURN SERVICE OF CITATION - WILLIAM NEELY BONNER III.pdf |
| 11/13/2025 | Filing | 4893DC | EXECUTED CITATION SEABORN STACY EASTLAND | EASTLAND, SEABORN STACY - Citation.pdf |
| 11/12/2025 | Service | - | - | |
| 11/12/2025 | Service | - | - | |
| 11/12/2025 | Service | - | - | |
| 11/12/2025 | Service | - | - | |
| 11/12/2025 | Service | - | - | |
| 11/12/2025 | Service | - | - | |
| 11/12/2025 | Service | - | - | |
| 11/12/2025 | Service | - | - | |
| 11/12/2025 | Service | - | - | |
| 11/10/2025 | Filing | 5050DC | PLAINTIFF'S ORIGINAL PETITION | PLAINTIFF'S ORIGINAL PETITION.pdf |
| 11/10/2025 | Filing | 5415DC | PROCESS REQUEST FORM | PROCESS REQUEST FORM.pdf |



© 2026 Tyler Technologies, Inc. | All Rights Reserved | Version: 2026.5.4.2291

11/10/2025 11:39 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Ruben Tamez

D-1-GN-25-009976
CAUSE NO. ______________

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased,<br>by and through Douglas Getten,<br>individually and on behalf of the<br>Estate of Ellen Elizabeth Getten,<br>and Jennifer Getten<br><br>*Plaintiffs*,<br><br>v.<br><br>Natural Fountains Properties, Inc.<br>DBA Camp Mystic, Inc., Mystic<br>Camps Family Partnership, LTD.,<br>Mystic Camps Management, LLC,<br>Camp Mystic, LLC, Willetta Eastland,<br>Edward Eastland, Mary Liz Eastland,<br>Seaborn Stacy Eastland, and<br>William Neely Bonner III<br><br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT OF<br><br><br><br><br><br><br><br>TRAVIS COUNTY, TEXAS<br><br><br><br><br><br><br><br><br><br>459TH, DISTRICT COURT<br>_______ JUDICIAL DISTRICT |

**<u>PLAINTIFFS' ORIGINAL PETITION</u>**

COME NOW, Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten (collectively "Plaintiffs"), complaining of Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III (collectively, "Defendants"), and would respectfully show the Court the following:



Copy from re:SearchTX

I.

## DISCOVERY LEVEL

1. Discovery may be conducted under Level 2 of the Texas Rules of Civil Procedure.

II.

## NATURE OF THE CASE

2. Plaintiffs bring this wrongful death and survival action against Defendants for their negligence and gross negligence which resulted in the death of Ellen Elizabeth Getten on or about July 4, 2025.

III.

## PARTIES





Copy from re:SearchTX

3. Ellen Elizabeth Getten ("Ellen"), deceased, was a nine-year-old child residing in Texas at the time of her death. She is represented by her biological father, Douglas Getten, a Texas resident. He is a plaintiff in his own capacity, and he is the representative of the Estate of Ellen Elizabeth Getten.

4. Plaintiff Jennifer Getten is a resident of Texas and the biological mother of Ellen Elizabeth Getten, deceased.

5. Defendant Natural Fountains Properties, Inc. DBA Camp Mystic, Inc. ("NFP") is a domestic corporation headquartered in Texas. This Defendant may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701. This Defendant is required by the Texas Business Organizations Code Section 5.201 to maintain a registered agent in Texas, but this Defendant has failed to do so.

6. Defendant Mystic Camps Family Partnership, LTD. ("Mystic Camps FP") is a domestic limited company headquartered in Texas with its registered office located in Travis County at 2404 Scenic Drive, Austin, Texas 78703. This Defendant may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701. This Defendant is required by the Texas Business Organizations Code Section 5.201 to maintain a registered agent in Texas, but this Defendant has failed to do so.

7. Defendant Mystic Camps Management, LLC ("Mystic Camps Management") is a domestic limited liability company headquartered in Texas with its registered office located in Travis County at 2404 Scenic Drive, Austin, Texas 78703. This Defendant may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701. This Defendant is required by the Texas Business Organizations Code Section 5.201 to maintain a registered agent in Texas, but this Defendant has failed to do so.



Copy from re:SearchTX

8. Defendant Camp Mystic, LLC is a domestic limited liability company headquartered in Texas. This Defendant may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701. This Defendant is required by the Texas Business Organizations Code section 5.201 to maintain a registered agent in Texas, but this Defendant has failed to do so.

9. Defendants Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, and Camp Mystic, LLC are collectively referred to herein as "Camp Mystic."

10. Willetta ("Tweety") Eastland is an individual residing in Travis County, Texas. This Defendant may be served with process at 2404 Scenic Dr., Austin, TX 78703 or wherever she may be found.

11. Edward Eastland is an individual residing in Texas. This Defendant may be served with process at 1105 Lois St., Kerrville, TX 78028, or wherever he may be found.

12. Mary Liz Eastland is an individual residing in Texas. This Defendant may be served with process at 1105 Lois St., Kerrville, TX 78028, or wherever she may be found.

13. Seaborn Stacy Eastland ("S. Stacy Eastland") is an individual residing in Texas. This Defendant may be served with process at 232 Arborway St., Houston, TX 77057, or wherever he may be found.

14. William Neely Bonner III ("Bonner") is an individual residing in Texas. This Defendant may be served with process at 4147 Lanark Ln., Houston, TX 77057, or wherever he may be found.

15. In the event any parties are misnamed or not included herein, Plaintiffs contend this was the result of a misidentification, misnomer, and/or such parties are or were alter egos



Copy from re:SearchTX

of parties named herein. Alternatively, Plaintiffs contend any such "corporate veils" should be pierced to hold such parties properly accountable in the interest of justice.

16. Pursuant to Rule 28 of the Texas Rules of Civil Procedure, Plaintiffs are suing any partnership, unincorporated association, private corporation, or individual whose name contains the words, or who does business under the name of the Defendants.

## IV.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction as the claims asserted arise under Texas law. Additionally, Plaintiffs have been damaged in a sum far in excess of the minimum jurisdictional limits of this Court.

18. Pursuant to the forum defendant rule, this case is not removable because all Defendants are citizens of Texas with residence and/or their principal places of business in Texas. 28 U.S.C. § 1441(b), § 1332(c).

19. This Court may exercise personal jurisdiction over Defendants because they are either citizens of the State of Texas or conduct a substantial amount of business in Texas.

20. Venue is proper in Travis County, Texas because one or more Defendants reside in this county. TEX. CIV. PRAC. & REM. CODE § 15.002. Specifically, Defendant Willetta Eastland is a natural person and resides in Travis County. According to property records, the property listed as her homestead exemption is located in Travis County. Furthermore, Defendants Mystic Camps Family Partnership Ltd. and Mystic Camps Management, LLC are not natural persons and have their principal offices in Travis County.

21. Furthermore, when proper venue is established for one defendant, venue is proper for all defendants in the same action. TEX. CIV. PRAC. & REM. CODE § 15.005.



Copy from re:SearchTX

# V.

## FACTS

22. On July 4, 2025, Ellen Elizabeth Getten was a nine-year-old child at Camp Mystic – a summer camp for girls located in Hunt, Texas. Like any young, defenseless, little girl, Ellen expected to be protected while at camp. She expected to be kept safe. She, and her parents, expected she would be returned home after the summer session in the same physical condition as when she left. It was her first year at Camp Mystic, and she was excited to make new friends and have new experiences. The last thing that any parent expects is to send their child to camp, only to have to arrange a funeral rather than bring home their little girl. Yet, that is what happened to Ellen's parents, Plaintiffs Douglas and Jennifer Getten. This case is being brought to seek justice, to demand accountability, and raise awareness regarding Camp Mystic and the Defendants' actions and failures in the hopes that no parent has to ever suffer as Ellen's parents have, and that no child like Ellen has to ever die a horrific, traumatic, and preventable death at a camp again.

### *A. History of Camp Mystic*

23. Established in 1926, Camp Mystic (the "Camp") is a private summer camp for girls located along the Guadalupe River in Hunt, Texas. Richard "Dick" Eastland and his wife, Defendant Willetta "Tweety" Eastland, were the Owners and Executive Directors of Camp Mystic since 1974. Dick and Tweety Eastland were the third generation to manage the Camp since the Eastland family acquired it in 1939. The Eastland Family is now in its fourth generation of operation with Defendants Edward and Mary Liz Eastland acting as the Directors at Camp Mystic Guadalupe River. At all material times, Defendant Natural Fountains Properties, Inc. ("NFP") owned the real property where Camp Mystic operated. Defendant



Copy from re:SearchTX

Bonner is the President of Defendant NFP. Furthermore, Defendant S. Stacy Eastland has been an owner of Defendant NFP at least since 1998.

24. Since its inception, Camp Mystic has experienced numerous floods, and several of its cabins are in or near the 100-year floodplain. In fact, many of the cabins at the Camp were placed in designated flood zones, including in areas deemed by Kerr County to be extremely hazardous. This dangerous and potentially fatal flood risk had been known to Camp Mystic for nearly a century. The Guadalupe River Basin is undeniably one of the most dangerous areas in the entire country for flash floods. Camp Mystic itself has been impacted by these flash floods on numerous prior occasions, placing Defendants on repeated notice of the serious and foreseeable risk of catastrophic flooding.

25. As far back as July 1932, Camp Mystic suffered from severe flash floods. That month, a massive flood inundated Camp Mystic, washing away cabins and sweeping away property and personal belongings. The girls at the Camp at the time were directed to evacuate to higher ground moments before the deadly flood waters washed through the Camp's structures, leaving a wake of destruction in their path. By sheer luck, none of the girls died during this flood, although archived news reports described the girls having to rush to safety and being left stranded without food while a plane flew over the site dropping notes stating that help was on the way. Four people reportedly died during the flood along the river, and local authorities and camp management acknowledged that the outcome at Camp Mystic could have been much worse had the flooding occurred at night.

26. The Camp was again impacted by flooding from the Guadalupe River in 1978 when over 100 campers had to be relocated to higher ground with other staff in the middle of the night. The Camp was faced with destruction from deadly floodwater, forcing the



Copy from re:SearchTX

suspension of camp activities for several days and leaving the girls without food for a couple of days. According to Kerr County, the floodwaters almost reached the top of the dining hall stairs at the Camp. While the campers were spared from death, the flooding killed thirty-three people in Kerr County, emphasizing the very real threat of injury and death to the young girls at Camp Mystic.

27. Then again in 1984, the Camp faced flash flooding hazards and the need for evacuation. Raging waters cut off roadway access to and from the Camp, stranding campers and staffers alike in a deadly situation. In fact, Defendant Tweety Eastland was on the property and due to a medical condition, she was forced to evacuate via helicopter to escape the harrowing flood. In a mere six years' time, Camp Mystic – being operated and managed by Dick and Tweety Eastland – not only knew of the extremely hazardous flooding risks, but the Defendants actually experienced deadly floods and last-minute emergency evacuation attempts. Despite this, the Defendants did nothing to relocate facilities or cabins or inform the public and families of the real danger.

28. Because of this failure, unsuspecting parents have sent their precious daughters to Camp Mystic to spend the summer fishing, canoeing, and enjoying time with friends on the Guadalupe River for decades without any appropriate warnings about the actual dangers. Rather than informing parents of the extremely hazardous location of the activities and cabins where their daughters would be living and sleeping, the Defendants chose to remain silent and collect tuition checks for the privately owned camp for decades. The Defendants decided that expanding its for-profit camp was also more important than relocating the most at-risk cabins away from the river or attempting to better protect the vulnerable human lives that visited the Camp every summer.



Copy from re:SearchTX

29. In fact, when the Camp pursued a $5 million construction project six years ago, the Defendants chose to construct new cabins in a designated flood-risk area. The Defendants also chose to keep other cabins in the flood zone of a river basin, rather than relocate the older buildings that were in the most danger. Instead, the Defendants intentionally put young girls in a dangerous area with a long history of fatal floods. Several of the cabins that were hit hardest in the July 2025 flood were in an area identified by the Federal Emergency Management Agency (FEMA) as the highest-risk location for flooding. Some of the cabins were so close to the Guadalupe River that they were considered part of the river's floodway.




*Map from The New York Times*

30. Not only did the Defendants know that cabins and facilities were in a designated flood zone, but the Defendants also took steps to hide this risk from the public, including the campers and their parents, by leveraging appeals to FEMA to have the "100-year floodplain"



Copy from re:SearchTX

designation removed from dozens of buildings. FEMA had included Camp Mystic in a "Special Flood Hazard Area" in its National Flood Insurance map for Kerr County in 2011. This meant that Camp Mystic was required to have flood insurance and faced tighter regulations on any future construction projects on the grounds. So, not only would the removal of this designation allow the Defendants to promulgate the falsity that the facilities were "safe" from a known flood risk, but the de-designation would also allow Camp Mystic to either avoid flood insurance requirements, lower its insurance premiums, or not be faced with more stringent regulations on future construction. Said another way, the Defendants decided to put money and profits over the lives of children and transparency to parents and the public.

31. Although the Camp's pleas to FEMA resulted in several structures being removed from the designation over the past several years, many buildings remained in the flood designation area. At least twelve structures at Camp Mystic were fully within FEMA's 100-year flood plain, and more were partially in that zone. Despite this, the Defendants still did not inform Ellen or her parents of the known, deadly, flood risk. And despite this, the Defendants continued operating the Camp filled with hundreds of young girls every summer in the floodplain without implementing adequate emergency procedures, creating necessary evacuation infrastructure, or putting measures in place to protect the innocent lives in their care.

***B. July 2025 Flood***

32. On July 2, 2025, the Texas Division of Emergency Management ("TDEM") announced that it was activating state emergency response resources in anticipation of increased threats of flooding heading into the holiday weekend. This announcement was made two days prior to the catastrophic flooding that killed twenty-seven girls at Camp Mystic and



Copy from re:SearchTX

was based on the National Weather Service ("NWS") prediction that heavy rainfall with the potential to cause flash flooding was anticipated to begin on July 2, 2025, and continue for a few days.

For Immediate Distribution | July 2, 2025 | media@tdem.texas.gov

**TDEM Activates State Emergency Response Resources Ahead Of West, Central Texas Flood Threat**

The Texas Division of Emergency Management (TDEM) today announced that the agency activated state emergency response resources in anticipation of increased threats of flooding in parts of West and Central Texas heading into the holiday weekend.

"As rain and flooding threatens parts of Texas ahead of the Independence Day weekend, state emergency response resources have been activated to support local response efforts," said Texas Emergency Management Chief Nim Kidd. "Our priority remains protecting lives and property and Texans are urged to proactively prepare for potential hazards. Remember: Turn Around, Don't Drown."

According to the National Weather Service, heavy rainfall with the potential to cause flash flooding is anticipated across West Texas and the Hill Country beginning tonight and is expected to last a few days. Texans are encouraged to monitor local forecasts and avoid driving or walking into flooded areas.

*Excerpt from https://tdem.texas.gov/press-release/7-2-25*

33. Camp Mystic and its owners and directors would have been privy to this TDEM emergency response activation and should have been monitoring the weather as early as two days before the tragedy. Furthermore, the state emergency response provided additional resources to Camp Mystic to support flood response operations including but not limited to rescue boat squads and helicopters well in advance of the July 4, 2025 flood.

34. Then, at 1:18 p.m. on Thursday, July 3, 2025, the National Weather Service issued a flood watch for the south-central Texas area, including Kerr County where Camp Mystic is located. This flood watch clearly indicated there was a specific flood threat for the Camp Mystic grounds, and the conditions were ripe for a flood to occur. This notification should have put Camp Mystic and the Defendants on high alert, especially given the Defendants' familiarity with "Flash Flood Alley," and their actual knowledge surrounding how



Copy from re:SearchTX

quickly the river can rise at Camp Mystic from prior flooding events. Simply put, Camp Mystic and the Defendants had ample time to evacuate all campers and staffers and prevent otherwise inevitable injuries and death at the hand of the raging waters. At the very least, Camp Mystic had more than enough time to train, educate, and instruct counselors and campers alike of a true evacuation plan should the weather continue to grow in severity through the day and into the night. However, the Defendants chose to do nothing after this alert to protect Ellen's and the other campers' lives.

35. At 1:14 a.m. on Friday, July 4, 2025, the NWS predictably issued a flash flood warning for the area as the rain continued to fall, and the river continued to rise at a rapid rate. Staffers at Camp Mystic, including Dick and Tweety Eastland, received the flash flood warnings, but utterly failed to act in a timely manner to protect the lives of the girls in their care. Rather than activating a responsible evacuation plan, Dick Eastland spent time in his office on the property creating a "plan" with family members and others, and chose not to begin moving children from their cabins until approximately 2:30 a.m. At that time, Ellen (being one of the youngest in the camp) was housed in the Bubble Inn cabin. The camp layout and cabins are pictured in the photographs below:



Copy from re:SearchTX



*Aerial View of Camp Mystic Cabins*






Copy from re:SearchTX

*Photograph from CBS News*

36. At the time evacuations finally began, the floodwaters were rising so quickly that some girls likely never had a chance based on the Camp's "plan." Instead of requesting assistance from nearby emergency responders, the Defendants and Camp Mystic decided to evacuate only one cabin at a time. This "plan" that was created and initiated more than twelve (12) hours after the first NWS alert and approximately seventy-five minutes after Camp Mystic knew of the NWS flash flood warning alert, was wholly inadequate and purposefully left some of the youngest children in Bubble Inn completely stranded without instruction, direction, or adult emergency assistance before their tragic deaths. Critical warnings from the NWS gave the Defendants ample preliminary lead times to avoid catastrophic results – lead times that allowed camps nearby to effectively evacuate and save their campers. The Defendants, instead, chose to risk the lives of young girls by failing to act promptly and efficiently when the flash flood warning was issued.

37. As the hours ticked by after the alert, the water became too deep and too strong, and the Camp's failure to act led to utter chaos and mass panic. As the water rose, campers began climbing as high as they could within the cabins to avoid the water. These attempts would be in vain, however, as the water continued to pour into the cabins, including the cabin where Ellen was fighting for her life. Campers clung onto each other, furniture, and anything they could to avoid being swept away and out of the perceived protection of their cabins. Upon information and belief, the Defendants did not even attempt to evacuate the youngest girls in Bubble Inn until before 4:00-5:00 a.m.

38. The overpowering waters cascading through the Camp finally did the inevitable by tearing children away from the roofs, doors, furniture, trees, and hands of others that they



Copy from re:SearchTX

clung to, and propelling them down the raging river into the inescapable darkness. Ellen was one of the twenty-seven lives taken on July 4, 2025, at Camp Mystic. Her body was not recovered for two more days.

39. The horrifying nature of Ellen's untimely death cannot be overstated. The suffering her parents have gone through having to imagine their daughter, overcome by floodwaters, alone in the darkness, calling out for anyone to help, is more than any parent or person should be forced to bear. The undeniable pain, fear, desperation, horror, and distress Ellen undoubtedly experienced in the hours and minutes before her death were foreseeable and preventable had Defendants acted with reasonable care for her safety. These terrifying last moments were proximately caused by the negligence and gross negligence of the Defendants. The Defendants knew that camp facilities were located in a flood zone, knew of the history of flash flooding in Kerr County, knew of repeated prior flood events at the Camp, and received multiple alerts related to the storm, but consciously chose to do nothing but rake in profits and expose children to the heightened risk of death.

***C. The Aftermath***

40. Put simply, the devastating loss of so many young lives, including Ellen's, on July 4, 2025, was foreseeable and avoidable if proper actions were taken by the Defendants. It is clear in the aftermath of this tragedy that the Defendants were aware of the catastrophic risks that flooding at the Camp posed to human life, and despite that, they failed to develop, implement, or carry out adequate safety instructions, policies, or plans, which directly led to the deaths at the Camp.



Copy from re:SearchTX



*Douglas Getten searching Bubble Inn*

41. The Camp's written emergency instructions to campers consisted of only a single page addressing all emergencies that could arise during the camping session, with a mere seven sentences devoted to flood procedures. Camp Mystic made the conscious decision not to update its policies and procedures to prevent the death of campers despite the actual knowledge of flash flooding disasters and prior experience with necessary evacuations. Rather, the Camp maintained its seven-sentence emergency plan that provided zero aid to counselors and children during the threat of a flood. Instead, the Camp merely instructed children to await instructions over a loudspeaker, even though the Camp knew that flash floods regularly caused power failures which would render useless any loudspeaker system.

42. Unsurprisingly, on July 4th, the power did fail, so the loudspeakers could not work. The young counselors left in charge of the cabins and the children were not permitted to have their cell phones despite the known flash flood alerts the day before, and therefore, lost



Copy from re:SearchTX

all meaningful contact with adult supervisors and staff. They were then forced to make instantaneous life and death decisions for themselves and their campers on their own without proper direction or instruction. The Defendants left these teenage counselors in a vulnerable position without proper training, policies, procedures, or instruction on what to do when the inevitable occurred. Some counselors and campers resorted to primitive forms of flashlight blinking in an attempt to attract much needed help from staffers and the Eastlands.

43. Additionally, despite the location of cabins knowingly being in a flood zone and the cabins themselves flooding in prior years, Camp Mystic emergency instructions mandated that those staffers and campers in the flats "must also stay in their cabins… All cabins are constructed on high, safe locations." This statement not only creates a false sense of security in the safety of the cabins where the young girls were housed but ignores the known risk of water rising and infiltrating the cabins.



EMERGENCY INSTRUCTIONS

I. Accidents (Horse falls, falling injuries, cuts, etc.)
1. Be sure that the victim has an open airway and is breathing.
2. Do not move the victim.
3. Calm the victim.
4. Send someone for the nurse.
5. Stop bleeding with pressure directly over the injury if she has an open wound.

II. Floods

In case of flood, all campers on Senior Hill must stay in their cabins. They will be given instructions through the loud speaker. If the electricity is off, a walkie-talkie will be used. Food and other supplies will be delivered to Senior Hill by boat or truck. Campers and counselors NEVER wander away from your cabin. Those on the flats must also stay in their cabins unless told otherwise by the office. All cabins are constructed on high, safe locations.

*Excerpt from Camp Mystic Emergency Instructions*



Copy from re:SearchTX

44. The Defendants' conscious decision to rely on a plan that the Camp, its owners, operators, and management knew was outdated, unworkable, and incapable of protecting children in a predictable flood event illustrates a conscious indifference to the lives of the girls entrusted to their care. In the days after the horrific tragedy, the Defendants' indifference to the deaths, losses, and grieving of parents continued as Camp Mystic focused its communications and messaging on belonging removal from the camp rather than taking responsibility for its failures. In fact, as early as 9:37 a.m. on July 5, 2025, Camp Mystic was already communicating with parents about retrieving material items, rather than accounting for their failures.

> The gates at both camps will stay open, and families are welcome to pick up belongings. Please note that all cabins on the flats and several cabins on Senior Hill experienced severe flooding. Belongings in these areas may be significantly damaged or missing. Items at Cypress Lake were unaffected by the flooding.

*Excerpt from Camp Mystic Email dated July 5, 2025*

45. Even now, inexplicably, the Camp has refused to accept an ounce of responsibility for the deaths of the counselors and children on July 4, 2025, and instead, have informed the families of the deceased girls that **Camp Mystic Cypress Lake intends to reopen for Summer 2026**.

> Camp Mystic Cypress Lake, which sustained no damage from floodwaters, will be opening in Summer 2026. Our planning and procedures will comply with the requirements of the camp safety legislation you bravely championed.

*Excerpt from Camp Mystic Communication*



Copy from re:SearchTX

46. Promoting the reopening of a for-profit camp less than a year after that camp caused the deaths of twenty-seven young girls is not only unthinkable – it is offensive to the memories of the deceased and the families and loved ones they left behind. Rather than focusing on accountability and change, Camp Mystic instead has been publicly soliciting donations to rebuild so the Defendants can go back to business as usual.




*Excerpt from Camp Mystic Donation Page*

47. The actions of the Defendants after this unimaginable tragedy are appalling and unforgiveable. The Eastland Defendants present at the Camp not only initially hid the scope of the devastation and obvious deaths of multiple campers from worried parents but affirmatively attempted to provide false hope for many who were searching for their daughters.



Copy from re:SearchTX

The mental anguish and emotional distress that many parents, including Plaintiffs Douglas and Jennifer Getten, endured at the hands of the Defendants is unconscionable. Plaintiffs seek justice for their daughter, and accountability from the Defendants in this case.

## VI.

## CAUSES OF ACTION

### *A. Negligence and Gross Negligence against all Defendants*

48. Plaintiffs repeat and reallege each allegation contained above.

49. At all material times, Defendants owned, operated, managed, and controlled Camp Mystic where the underlying events took place. Camp Mystic was owned and operated by Defendant Camp Mystic, LLC, on real property owned by Defendant Natural Fountains Properties, Inc. Defendants were personally involved in the safe operation, maintenance, and training of individuals at the Camp. These Defendants had the legal duty to keep the premises in a state consistent with due regard for the safety of its invitees, including Ellen.

50. Defendants breached the duty owed to Plaintiffs by failing to exercise ordinary care to keep the premises and the campers safe.

51. Defendants committed negligent and grossly negligent acts and omissions, including the following:

a. Failure to implement safe evacuation plans;

b. Failure to assess and monitor flood risks;

c. Failure to timely evacuate campers when flooding was foreseeable or imminent;

d. Failure to train employees and/or counselors of emergency action plans;

e. Failure to train camp counselors of emergency action plans;



Copy from re:SearchTX

f. Failure to provide lifesaving equipment;

g. Failure to ensure camp facilities were constructed in safe locations;

h. Failure to prevent the death of Ellen Elizabeth Getten;

i. Failed to adequately staff the Camp with adequately trained oversight, management, and counselors;

j. Failure to construct, install, maintain, and/or repair cabins and/or camp facilities;

k. Failure to arrange cabins in safe locations;

l. Failure to maintain marked and accessible evacuation and/or escape routes;

m. Failure to enforce policies and procedures related to safety of campers;

n. Failure to warn Plaintiffs and/or Ellen of the dangerous condition of the camp being located in or near a known flood zone;

o. Failure to institute adequate policies and procedures that would have prevented Ellen's death from occurring;

p. Failure to take proper safety measures;

q. Failure to take preventative measures to eliminate known risks and hazards;

r. Violations of applicable rules, regulations, and standards;

s. Vicariously liable for the acts and omissions of their employees and agents; and

t. Other acts deemed negligent and grossly negligent.

52. As a direct and proximate result of Defendants' conduct, Ellen Elizabeth Getten sustained severe injuries to her body, which resulted in physical pain, suffering, discomfort, impairment, mental anguish, distress, fear, and death. Plaintiffs have suffered and will continue to suffer pecuniary and non-economic losses as a result of Ellen's death.



Copy from re:SearchTX

53. In addition, Plaintiffs are entitled to exemplary or punitive damages because the aforementioned actions of Defendants were grossly negligent. Defendants acted with flagrant and malicious disregard for Ellen's and others' health and safety. Defendants were objectively aware of the extreme risk posed by the conditions which caused Ellen's or Plaintiffs' injuries, harm, and death but did nothing to rectify them. Defendants' acts and omissions involved an extreme degree of risk considering the probability and magnitude of potential harm to Ellen, Plaintiffs, and others. Defendants had actual, subjective awareness of the risk and consciously disregarded the risk. Accordingly, Plaintiffs are entitled to and seek exemplary damages.

***B. Premises Liability against all Defendants***

54. Plaintiffs repeat and reallege each allegation contained above.

55. Defendants owned, occupied, possessed, managed, and/or controlled the area where Ellen sustained injuries and ultimately died. The condition of the area where Plaintiffs and Ellen were injured posed an unreasonable risk of harm, and Defendants had actual knowledge or reasonably should have known of the unreasonably dangerous condition. Moreover, Plaintiffs and Ellen did not have actual knowledge of the unreasonably dangerous conditions.

56. Ellen was an invitee who entered Defendants' premises with Defendants' knowledge and for Defendants' benefit. Defendants had a duty to either warn Plaintiff and Ellen of this unreasonably dangerous condition or make the unreasonably dangerous condition reasonably safe. Defendants breached this duty by failing to warn Plaintiffs and Ellen of this known unreasonably dangerous condition and by failing to make the unreasonably dangerous



Copy from re:SearchTX

condition reasonably safe. Defendants' breaches proximately caused Ellen's death as well as Plaintiffs' injuries and damages.

### *C. Joint Enterprise*

57. Plaintiffs repeat and reallege each allegation contained above.

58. At all relevant times, Defendants operated in a joint enterprise because they had: (a) an express and/or implied agreement; (b) a common purpose to be carried out by the enterprise; (c) a community of pecuniary interest in that common purpose; and (d) an equal right to direct and control the enterprise. Defendants shared control of and profits from the joint operation. In addition, Defendants, as members of the joint enterprise, committed a tort against Plaintiffs and Ellen while acting within the scope of the enterprise. Therefore, Defendants are jointly and severally liable for Plaintiffs' injuries and Ellen's death and the damages sustained therefrom.

### *D. Respondeat Superior and Agency*

59. Plaintiffs repeat and reallege each allegation contained above.

60. At all relevant times, all agents, servants, and/or employees of Defendants were working within the course and scope of their employment for Defendants and in furtherance of Defendants' operations and business.

61. For the reasons set forth above, whenever it is alleged in this Petition that Defendants did an act or thing, it is meant that Defendants themselves or their officers, agent, and/or representatives did such act or thing. Plaintiffs therefore invoke the doctrine of *Respondeat Superior* against Defendants.



Copy from re:SearchTX

62. Further, at all relevant times, any acts and/or omissions by an agent, representative or employee of Defendants occurred within the scope of the actual and apparent authority and/or ratification of Defendants. Therefore, Defendants are liable to Plaintiffs for the acts and/or omissions of any such agent, representative or employee complained of herein by virtue of such agency relationship.

### *E. Ratification*

63. Plaintiffs repeat and reallege each allegation contained above.

64. Pleading further, Defendants are liable for the negligent acts and/or omissions of other Defendants and their agents under the doctrine of ratification. Defendants approved and accepted the location of the camp facilities, and ratified each of their negligent conduct by accepting, approving, and validating such camp facility locations with full knowledge of its defects; by accepting its benefits and refusing and failing to repudiate such negligent conduct; and by failing to correct and make safe such facilities even after they acquired actual, subjective awareness of the risks of severe injury or death arising out of the facilities locations. Thus, Defendants are considered tortfeasors and are jointly and severally liable for their tortious conduct resulting in Ellen’s death and Plaintiffs’ injuries and damages therefrom.

### *F. Joint and/Vicarious Liability*

65. Plaintiffs repeat and reallege each allegation contained above.

66. For the following reasons, the Camp Mystic Defendants’ corporate forms should be disregarded to hold Defendants Tweety Eastland, Edward Eastland, Mary Liz Eastland, S. Stacy Eastland, and Neel Bonner each vicariously or jointly liable to Plaintiffs for their wrongful conduct.



Copy from re:SearchTX

67. Upon information and belief, at all relevant times, Dick and Defendant Tweety Eastland were the Owners and Executive Directors of Camp Mystic. Defendants Edward and Mary Liz Eastland were the Directors at Camp Mystic Guadalupe River where the flooding occurred. Defendant Bonner is the President of Defendant NFP. Defendant S. Stacy Eastland was an owner of Defendant NFP. Furthermore, Defendant Neel Bonner was the President of Defendant NFP. Defendants Tweety, Edward, Mary Liz, and S. Stacy Eastland, and Neel Bonner are collectively referred to herein as the "Individual Defendants." The Camp Mystic Defendants are mere shams, organized, and operated by the Individual Defendants in their individual capacities to perpetrate fraud upon Plaintiffs and potentially other unsuspecting persons.

68. The Individual Defendants are the "alter ego" of the Camp Mystic Defendants, as they were organized and operated as mere tools and/or business conduits for the Individual Defendants' personal benefit and advantage. The Individual Defendants organized the Camp Mystic Defendants in a way to limit their potential liability and maximize their personal gains from the operation of these entities. The Individual Defendants have at all times exercised total dominion and control over the Camp Mystic Defendants and have exercised such control in a manner indistinguishable from their own personal affairs. The Individual Defendants perpetuated the fraud against Plaintiffs to make money, individually, from the operation of the businesses involved in this incident. The Individual Defendants were known to be the owners, president, managers and directors of the Camp Mystic Defendants, and the ones actually in control over the facilities owned by and operations of the Camp Mystic Defendants. The Individual Defendants personally benefited from making material misrepresentations to Plaintiffs.



Copy from re:SearchTX

69. The Individual Defendants are using the Camp Mystic Defendants' corporate fictions as a means of evading an existing legal obligation, namely, civil liability for negligence and gross negligence that killed Ellen, injured Plaintiffs, and caused Plaintiffs to incur damages.

70. The Individual Defendants intentionally operated the Camp Mystic Defendants with inadequate capitalization. Specifically, the Individual Defendants organized their businesses with insufficient assets to satisfy potential debts and liabilities associated with running their businesses. The Individual Defendants used various companies to hold assets used at or by Camp Mystic so that those assets could not be used to satisfy any liabilities incurred by Camp Mystic. The Individual Defendants inadequately capitalized Camp Mystic to perpetuate the scheme. Then, the Individual Defendants underinsured Camp Mystic. In other words, the Individual Defendants undercapitalized Camp Mystic to limit potential liability. The Individual Defendants are attempting to avoid or limit Camp Mystic's liability for the death of Ellen and Plaintiffs' injuries through their scheme of undercapitalizing and underinsuring the entities—in an attempt to escape justice. Because the Individual Defendants operated Camp Mystic with inadequate capitalization, equity dictates that the Individual Defendants be held vicariously liable to Plaintiffs for all damages alleged herein.

71. The Individual Defendants, individually and through their agents, made material representations to Plaintiffs that were false when made and which the Individual Defendants knew were false or made recklessly, and/or Individual Defendants had a duty to disclose but failed to disclose material facts to Plaintiffs, knowing Plaintiffs did not know and did not have an equal opportunity to discover those facts. Specifically, the Individual Defendants made misrepresentations and/or omissions about the Camp Mystic Defendants' finances and



Copy from re:SearchTX

insurance coverages, with an intent to induce Plaintiffs into allowing their daughter to attend summer camp. Plaintiffs relied to their detriment on those misrepresentations and/or omissions.

### *G. Intentional Infliction of Emotional Distress*

72. Plaintiffs repeat and reallege each allegation contained above.

73. Intentional Infliction of Emotion Distress (IIED) involves conduct that is so outrageous and extreme that it goes beyond the bounds of decency, causing severe emotional distress to the victim. In this instance, Defendants Tweety, Edward, and Mary Liz Eastland and Camp Mystic's actions were not only intentional but were reckless and constitute IIED under Texas common law. By repeatedly communicating to Plaintiffs that there was hope that their daughter was still alive even though Camp Mystic and the owners and directors knew dead bodies had been found caused Plaintiffs to experience severe distress. Defendants' continuous lies and harassing and confusing statements to Plaintiffs and others were intentionally painful, hurtful, and humiliating.

74. Defendants Tweety, Edward, and Mary Liz Eastland and Camp Mystic acted in a manner that any reasonable person would find extreme and outrageous. This conduct was carried out in full awareness of the potential for causing emotional harm, thereby satisfying the criteria for IIED.

75. The severe emotional distress inflicted on Plaintiffs was a direct result of the Defendants' outrageous conduct. The Plaintiffs have experienced significant grief, anxiety, depression, outrage, and other mental anguish as a result of the conduct.



Copy from re:SearchTX

## VII.

## Damages

76. As a direct and proximate result of the occurrence made the basis of this lawsuit, Plaintiffs and Ellen were caused to suffer severe personal injuries, bodily injury, pain, suffering, mental anguish and death.






77. Ellen was the youngest daughter of Douglas and Jennifer Getten and loved her role as a little sister. Her older sister Gwynne was her very best friend in life, and the two girls were inseparable. Ellen was beautiful from the inside out and never met a stranger. She gave every person a hug and left her presence on everyone she interacted with. Ellen loved to dance and spend time with her parents and older sister. Her happy nature affected everyone around her and will forever be remembered and missed.

78. Plaintiffs pray for relief and judgment as follows:



Copy from re:SearchTX

a. Wrongful Death

79. Plaintiffs repeat and reallege each allegation contained above.

80. Plaintiffs, on behalf of the wrongful death beneficiaries, seek to recover the following elements of damages resulting from the death of Ellen:

- Pecuniary loss in the past and future, including but not limited to the loss of care, maintenance, guidance, nurture, support, services, advice, counsel, inheritance, and reasonable contributions of pecuniary value;
- Loss of companionship and society in the past and future, including but not limited to the loss of the positive benefits flowing from the love, comfort, companionship, and society that would have been received from Ellen, had she lived;
- Mental anguish in the past and future, including but not limited to the emotional pain, torment, and suffering experienced in the past, and to be experienced in the future, because of the death of Ellen; and,
- Any other forms of damages available to wrongful death beneficiaries.

b. Survival Action.

81. Plaintiffs repeat and reallege each allegation contained above.

82. Plaintiffs seek to recover the following elements of wrongful death and survival damages:

- Past and future pain and mental anguish, including the conscious physical pain and emotional pain, torment, and suffering experienced by Ellen before her death;



Copy from re:SearchTX

- Medical expenses;
- Funeral and burial expenses; and
- All other damages entitled to by law.

83. In addition, the actions above constitute gross negligence under Texas law and Plaintiffs are entitled to an award of exemplary damages.

84. In accordance with TEX. R. CIV. P. 47, Plaintiffs hereby state they seek monetary relief in excess of $1,000,000.00.

85. Plaintiffs and Ellen have sustained substantial and irreparable harm as a direct and proximate result of Defendants' conduct. Plaintiffs seek relief in the form of all damages available under law.

## VIII.

## NOTICE OF SELF-AUTHENTICATION

86. Pursuant to Rule 193.7 of the Texas Rules of Civil Procedure, Plaintiffs hereby give notice of the intent to use documents produced by any party hereto in any pretrial proceeding and at trial against the producing party.

## VIII.

## JURY TRIAL DEMAND

87. Plaintiffs hereby demand a trial by jury on all claims.

## IX.

## PRAYER

88. Plaintiffs pray that this citation issue and be served upon Defendants in a form and manner prescribed by law, requiring that Defendants appear and answer, and that upon



Copy from re:SearchTX

final hearing, Plaintiffs have judgment against Defendants, both jointly and severally, in a total sum in excess of the minimum jurisdictional limits of this Court, plus pre-judgment and post-judgment interests, all costs of Court, exemplary damages, and all such other and further relief, to which they may show themselves justly entitled.

Respectfully submitted,

ARNOLD & ITKIN LLP

*/s/ Kurt Arnold*

Kurt B. Arnold
SBN: 24036150
karnold@arnolditkin.com
J. Kyle Findley
SBN: 24076382
kfindley@arnolditkin.com
Kala F. Sellers
SBN: 24087519
ksellers@arnolditkin.com
John G. Grinnan
SBN: 24087633
jgrinnan@arnolditkin.com
6009 Memorial Drive
Houston, Texas 77007
Tel: 713.222.3800
Fax: 713.222.3850
e-service@arnolditkin.com

**ATTORNEYS FOR PLAINTIFFS**



Copy from re:SearchTX

**VELVA L. PRICE**
District Clerk, Travis County
Civil Division (512) 854-9457

# Process Request Form

**CASE NUMBER:** D-1-GN-25-009976 **COUCOURT:** 459th

**NAME(S) OF DOCUMENTS TO BE SERVED:** Plaintiffs' Original Petition

**FILE DATE:** 11/10/2025
Day/Month/Year

**SERVICE TO BE ISSUED ON: (Please List Exactly As The Name Appears In The Pleading To Be Served- Additional Parties on page 2)**

1. **Issue Service to:** Seaborn Stacy Eastland
   **Address of Service:** 232 Arborway St.
   **City, State & Zip:** Houston, Texas 77057
   **Agent: (if applicable)** ____________________

**TYPE OF SERVICE/PROCESS TO BE ISSUED:**

- [x] Citation
- [ ] Citation by Posting
- [ ] Citations Rule 106 Service
- [ ] Hague Convention Citation
- [ ] Secretary of State/ Highway Commission/Commissioner of Insurance Citation
- [ ] Citation by Publication: Newspaper ____________
- [ ] Show Cause
- [ ] Notice
- [ ] Temporary Restraining Order
- [ ] Temporary Protective Order
- [ ] Capias
- [ ] Attachment
- [ ] Habeas Corpus
- [ ] Subpoena
- [ ] Garnishment
- [ ] Injunction
- [ ] Sequestration
- [ ] Abstract
- [ ] Execution
- [ ] Other (Please Describe) ____________

**SERVICE BY** ***(check one)*****:**

- ○ **ATTORNEY/REQUESTER: (Email)** cdeleon@arnolditkin.com
- ○ **PROCESS SERVER: (Email)** ____________
- ○ **PICK UP: (Person/Agency Name and Phone Number)** ____________
- ○ **TRAVIS COUNTY CONSTABLE:** Please select PCT if you have a preference ○ 1 ○ 2 ○ 3 ○ 4 ○ 5
- ○ **CERTIFIED MAIL**
- ○ **OTHER,** ***explain*****:** ____________

**Requested by:**

**Name:** Kurt Arnold
**Mailing Address:** 6009 Memorial Drive
**City, state, Zip:** Houston, Texas 77007
**Phone Number:** 7132223800
**E-mail Address:** karnold@arnolditkin.com/cdeleon@arnolditkin.com

**Notes/Comments to the clerk:** ____________

Copy from re:SearchTX

## Civil Process Request Form - Additional Parties

**SERVICE TO BE ISSUED ON:** **(Please List Exactly As The Name Appears In The Pleading To Be Served)**

2. **Issue Service to:** William Neely Bonner III
   **Address of Service:** 4147 Lanark Ln
   **City, State & Zip:** Houston, Texas 77057
   **Agent:** **(if applicable)** ______

3. **Issue Service to:** ______
   **Address of Service:** ______
   **City, State & Zip:** ______
   **Agent:** **(if applicable)** ______

4. **Issue Service to:** ______
   **Address of Service:** ______
   **City, State & Zip:** ______
   **Agent:** **(if applicable)** ______

5. **Issue Service to:** ______
   **Address of Service:** ______
   **City, State & Zip:** ______
   **Agent:** **(if applicable)** ______

6. **Issue Service to:** ______
   **Address of Service:** ______
   **City, State & Zip:** ______
   **Agent:** **(if applicable)** ______

7. **Issue Service to:** ______
   **Address of Service:** ______
   **City, State & Zip:** ______
   **Agent:** **(if applicable)** ______

Copy from re:SearchTX

11/10/2025 4:57 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Rosa Oneal

**VELVA L. PRICE**
District Clerk, Travis County
Civil Division (512) 854-9457

## Process Request Form

**CASE NUMBER:** D-1-GN-25-009976 **COUCOURT:** 459th

**NAME(S) OF DOCUMENTS TO BE SERVED:** Plaintiffs' Original Petition

**FILE DATE:** 11/10/2025
Day/Month/Year

**SERVICE TO BE ISSUED ON:** **(Please List Exactly As The Name Appears In The Pleading To Be Served- Additional Parties on page 2)**

**1.** **Issue Service to:** Natural Fountains Properties, Inc. dba Camp Mystic, Inc.

**Address of Service:** 1019 Brazos Street

**City, State & Zip:** Austin, Texas 78701

**Agent:** **(if applicable)** Texas Secretary of State

**TYPE OF SERVICE/PROCESS TO BE ISSUED:**

☑ Citation ☐ Citation by Posting ☐ Citations Rule 106 Service ☐ Hague Convention Citation
☑ Secretary of State/ Highway Commission/Commissioner of Insurance Citation
☐ Citation by Publication: Newspaper ____________
☐ Show Cause ☐ Notice ☐ Temporary Restraining Order ☐ Temporary Protective Order
☐ Capias ☐ Attachment ☐ Habeas Corpus
☐ Subpoena ☐ Garnishment ☐ Injunction ☐ Sequestration ☐ Abstract ☐ Execution
☐ Other (Please Describe) ____________

**SERVICE BY** ***(check one)*****:**

◉ **ATTORNEY/REQUESTER:** **(Email)** cdeleon@arnolditkin.com
○ **PROCESS SERVER:** **(Email)** ____________
○ **PICK UP:** **(Person/Agency Name and Phone Number)** ____________
○ **TRAVIS COUNTY CONSTABLE:** Please select PCT if you have a preference ○ 1 ○ 2 ○ 3 ○ 4 ○ 5
○ **CERTIFIED MAIL**
○ **OTHER,** ***explain*****:** ____________

**Requested by:**

**Name:** Kurt Arnold
**Mailing Address:** 6009 Memorial Drive
**City, state, Zip:** Houston, Texas 77007
**Phone Number:** 7132223800
**E-mail Address:** karnold@arnolditkin.com/cdeleon@arnolditkin.com

**Notes/Comments to the clerk:** ____________

Copy from re:SearchTX

## Civil Process Request Form - Additional Parties

**SERVICE TO BE ISSUED ON:** **(Please List Exactly As The Name Appears In The Pleading To Be Served)**

**2.** **Issue Service to:** Mystic Camps Family Partnership, LTD
**Address of Service:** 1019 Brazos Street
**City, State & Zip:** Austin, Texas 78707
**Agent:** **(if applicable)** Texas Secretary of State

**3.** **Issue Service to:** Mystic Camps Management, LLC
**Address of Service:** 1019 Brazos Street
**City, State & Zip:** Austin, Texas 78701
**Agent:** **(if applicable)** Texas Secretary of State

**4.** **Issue Service to:** Camp Mystic, LLC
**Address of Service:** 1019 Brazos Street
**City, State & Zip:** Austin, Texas 78701
**Agent:** **(if applicable)** Texas Secretary of State

**5.** **Issue Service to:** Willetta Eastland
**Address of Service:** 2404 Scenic Dr
**City, State & Zip:** Austin, Texas 78703
**Agent:** **(if applicable)** ______

**6.** **Issue Service to:** Edward Eastland
**Address of Service:** 1105 Lois St.
**City, State & Zip:** Kerrville, Texas 78028
**Agent:** **(if applicable)** ______

**7.** **Issue Service to:** Mary Liz Eastland
**Address of Service:** 1105 Lois St
**City, State & Zip:** Kerrville, Texas 78028
**Agent:** **(if applicable)** ______

Copy from re:SearchTX

11/13/2025 1:33 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Susan Poodiack

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten | § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III | § | |
| *Defendants*. | § | 459th JUDICIAL DISTRICT |

**PLAINTIFFS' FIRST AMENDED PETITION**

COME NOW, Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten; Linnie Anne McCown, Deceased, by and through Michael McCown, individually and on behalf of the Estate of Linnie Anne McCown, and Callie McCown; Abby Lynn Pohl, Deceased, by and through Matthew Pohl, individually and on behalf of the Estate of Abby Lynn Pohl, and Kristin Pohl; Margaret Gaffney Sheedy, Deceased, by and through Andrew Sheedy, individually and on behalf of the Estate of Margaret Gaffney Sheedy, and Ellen Sheedy; Mary Barrett Stevens, Deceased, by and through Johnny Stevens, individually and on behalf of the Estate of Mary Barrett Stevens, and Stacy Stevens; and, Greta Katherine Toranzo, Deceased, by and through Jorge Toranzo, individually and on behalf of the Estate of Greta Katherine Toranzo, and Ellen



Copy from re:SearchTX

Toranzo (collectively "Plaintiffs"), complaining of Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III (collectively, "Defendants"), and would respectfully show the Court the following:

## I.

## DISCOVERY LEVEL

1. Discovery may be conducted under Level 2 of the Texas Rules of Civil Procedure.

## II.

## NATURE OF THE CASE

2. Plaintiffs bring this wrongful death and survival action against Defendants for their negligence and gross negligence which resulted in the deaths of Ellen Elizabeth Getten, Linnie Anne McCown, Abby Lynn Pohl, Margaret Gaffney Sheedy, Mary Barrett Stevens, and Greta Katherine Toranzo on or about July 4, 2025.

## III.

## PARTIES



Copy from re:SearchTX



3. Ellen Elizabeth Getten ("Ellen"), deceased, was a nine-year-old child residing in Texas at the time of her death. She is represented by her biological father, Douglas Getten, a Texas resident. He is a plaintiff in his own capacity, and he is the representative of the Estate of Ellen Elizabeth Getten.

4. Plaintiff Jennifer Getten is a resident of Texas and the biological mother of Ellen Elizabeth Getten, deceased.





Copy from re:SearchTX

5. Linnie Anne McCown ("Linnie"), deceased, was an eight-year-old child residing in Texas at the time of her death. She is represented by her biological father, Michael McCown, a Texas resident. He is a plaintiff in his own capacity, and he is the representative of the Estate of Linnie Anne McCown.

6. Plaintiff Callie McCown is a resident of Texas and the biological mother of Linnie Anne McCown, deceased.



7. Abby Lynn Pohl ("Abby"), deceased, was an eight-year-old child residing in Texas at the time of her death. She is represented by her biological father, Matthew Pohl, a Texas resident. He is a plaintiff in his own capacity, and he is the representative of the Estate of Abby Lynn Pohl.

8. Plaintiff Kristin Pohl is a resident of Texas and the biological mother of Abby Lynn Pohl, deceased.



Copy from re:SearchTX



9. Margaret Gaffney Sheedy ("Margaret"), deceased, was an eight-year-old child residing in Texas at the time of her death. She is represented by her biological father, Andrew Sheedy, a Texas resident. He is a plaintiff in his own capacity, and he is the representative of the Estate of Margaret Gaffney Sheedy.

10. Plaintiff Ellen Sheedy is a resident of Texas and the biological mother of Margaret Gaffney Sheedy, deceased.





Copy from re:SearchTX

11. Mary Barrett Stevens ("Mary"), deceased, was an eight-year-old child residing in Texas at the time of her death. She is represented by her biological father, Johnny Stevens, a Texas resident. He is a plaintiff in his own capacity, and he is the representative of the Estate of Mary Barrett Stevens.

12. Plaintiff Stacy Stevens is a resident of Texas and the biological mother of Mary Barrett Stevens, deceased.



13. Greta Katherine Toranzo ("Greta"), deceased, was a ten-year-old child residing in Texas at the time of her death. She is represented by her biological father, Jorge Toranzo, a Texas resident. He is a plaintiff in his own capacity, and he is the representative of the Estate of Greta Katherine Toranzo.

14. Plaintiff Ellen Toranzo is a resident of Texas and the biological mother of Greta Katherine Toranzo, deceased.

15. Defendant Natural Fountains Properties, Inc. DBA Camp Mystic, Inc. ("NFP") is a domestic corporation headquartered in Texas. This Defendant may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701. This



Copy from re:SearchTX

Defendant is required by the Texas Business Organizations Code Section 5.201 to maintain a registered agent in Texas, but this Defendant has failed to do so.

16. Defendant Mystic Camps Family Partnership, LTD. ("Mystic Camps FP") is a domestic limited company headquartered in Texas with its registered office located in Travis County at 2404 Scenic Drive, Austin, Texas 78703. This Defendant may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701. This Defendant is required by the Texas Business Organizations Code Section 5.201 to maintain a registered agent in Texas, but this Defendant has failed to do so.

17. Defendant Mystic Camps Management, LLC ("Mystic Camps Management") is a domestic limited liability company headquartered in Texas with its registered office located in Travis County at 2404 Scenic Drive, Austin, Texas 78703. This Defendant may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701. This Defendant is required by the Texas Business Organizations Code Section 5.201 to maintain a registered agent in Texas, but this Defendant has failed to do so.

18. Defendant Camp Mystic, LLC is a domestic limited liability company headquartered in Texas. This Defendant may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701. This Defendant is required by the Texas Business Organizations Code section 5.201 to maintain a registered agent in Texas, but this Defendant has failed to do so.

19. Defendants Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, and Camp Mystic, LLC are collectively referred to herein as "Camp Mystic."



Copy from re:SearchTX

20. Willetta (“Tweety”) Eastland is an individual residing in Travis County, Texas. This Defendant may be served with process at 2404 Scenic Dr., Austin, TX 78703 or wherever she may be found.

21. Edward Eastland is an individual residing in Texas. This Defendant may be served with process at 1105 Lois St., Kerrville, TX 78028, or wherever he may be found.

22. Mary Liz Eastland is an individual residing in Texas. This Defendant may be served with process at 1105 Lois St., Kerrville, TX 78028, or wherever she may be found.

23. Seaborn Stacy Eastland (“S. Stacy Eastland”) is an individual residing in Texas. This Defendant may be served with process at 232 Arborway St., Houston, TX 77057, or wherever he may be found.

24. William Neely Bonner III (“Neel Bonner”) is an individual residing in Texas. This Defendant may be served with process at 4147 Lanark Ln., Houston, TX 77057, or wherever he may be found.

25. In the event any parties are misnamed or not included herein, Plaintiffs contend this was the result of a misidentification, misnomer, and/or such parties are or were alter egos of parties named herein. Alternatively, Plaintiffs contend any such “corporate veils” should be pierced to hold such parties properly accountable in the interest of justice.

26. Pursuant to Rule 28 of the Texas Rules of Civil Procedure, Plaintiffs are suing any partnership, unincorporated association, private corporation, or individual whose name contains the words, or who does business under the name of the Defendants.



Copy from re:SearchTX

## IV.

## JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction as the claims asserted arise under Texas law. Additionally, Plaintiffs have been damaged in a sum far in excess of the minimum jurisdictional limits of this Court.

28. Pursuant to the forum defendant rule, this case is not removable because all Defendants are citizens of Texas with residence and/or their principal places of business in Texas. 28 U.S.C. § 1441(b), § 1332(c).

29. This Court may exercise personal jurisdiction over Defendants because they are either citizens of the State of Texas or conduct a substantial amount of business in Texas.

30. Venue is proper in Travis County, Texas because one or more Defendants reside in this county. TEX. CIV. PRAC. & REM. CODE § 15.002. Specifically, Defendant Willetta Eastland is a natural person and resides in Travis County. According to property records, the property listed as her homestead exemption is located in Travis County. Furthermore, Defendants Mystic Camps Family Partnership Ltd. and Mystic Camps Management, LLC are not natural persons and have their principal offices in Travis County.

31. Furthermore, when proper venue is established for one defendant, venue is proper for all defendants in the same action. TEX. CIV. PRAC. & REM. CODE § 15.005.

## V.

## FACTS

32. On July 4, 2025, Ellen Elizabeth Getten was a nine-year-old child at Camp Mystic – a summer camp for girls located in Hunt, Texas. It was her first year at Camp Mystic, and she was excited to make new friends and have new experiences.



Copy from re:SearchTX

33. Linnie Anne McCown was eight years old when she attended Camp Mystic and tragically lost her life. She was anticipating returning home from Camp and starting third grade at her elementary school. Her parents had no idea she would never be able to add her vibrant energy to her school community ever again.

34. Abby Lynn Pohl was eight years old when she went to Camp Mystic with her two older sisters. Her parents expected two pick up three beautiful, happy girls at the end of the summer camp session, but instead, were only able to bring home two daughters.

35. Margaret Gaffney Sheedy was also eight years old when her life was cut tragically short at Camp Mystic. One of her greatest joys was being a friend, and she was ready to bring her kindness and creativity to all of the girls she met at Camp that summer.

36. Mary Barrett Stevens, affectionately known as “May May” by those closest to her, was also only eight years old when she attended Camp Mystic. She lived life to the fullest, and she was ready to try new things during her first year at Camp with the utmost excitement and energy.

37. Greta Katherine Toranzo was ten years old when she was taken from this Earth while at Camp Mystic. It was her third summer at Camp, and she was excited to be reunited with friends and counselors, enjoying games and nature for a few weeks before school.

38. Like all young, defenseless, little girls, these children expected to be protected while at camp. They expected to be kept safe. They, and their parents, expected they would be returned home after the summer session in the same physical condition as when they left. The last thing that any parent expects is to send their child to camp, only to have to arrange a funeral rather than bring home their little girl. Yet, that is what happened to these girls’ parents. This case is being brought to seek justice, to demand accountability, and raise awareness regarding



Copy from re:SearchTX

Camp Mystic and the Defendants' actions and failures in the hopes that no parent has to ever suffer as these parents have, and that no child like Ellen, Linnie, Abby, Margaret, Mary or Greta, has to ever die a horrific, traumatic, and preventable death at a camp again.

### *A. History of Camp Mystic*

39. Established in 1926, Camp Mystic (the "Camp") is a private summer camp for girls located along the Guadalupe River in Hunt, Texas. Richard "Dick" Eastland and his wife, Defendant Willetta "Tweety" Eastland, were the Owners and Executive Directors of Camp Mystic since 1974. Dick and Tweety Eastland were the third generation to manage the Camp since the Eastland family acquired it in 1939. The Eastland Family is now in its fourth generation of operation with Defendants Edward and Mary Liz Eastland acting as the Directors at Camp Mystic Guadalupe River. At all material times, Defendant Natural Fountains Properties, Inc. ("NFP") owned the real property where Camp Mystic operated. Defendant Bonner is the President of Defendant NFP. Furthermore, Defendant S. Stacy Eastland has been an owner of Defendant NFP at least since 1998.

40. Since its inception, Camp Mystic has experienced numerous floods, and several of its cabins are in or near the 100-year floodplain. In fact, many of the cabins at the Camp were placed in designated flood zones, including in areas deemed by Kerr County to be extremely hazardous. This dangerous and potentially fatal flood risk had been known to Camp Mystic for nearly a century. The Guadalupe River Basin is undeniably one of the most dangerous areas in the entire country for flash floods. Camp Mystic itself has been impacted by these flash floods on numerous prior occasions, placing Defendants on repeated notice of the serious and foreseeable risk of catastrophic flooding.



Copy from re:SearchTX

41. As far back as July 1932, Camp Mystic suffered from severe flash floods. That month, a massive flood inundated Camp Mystic, washing away cabins and sweeping away property and personal belongings. The girls at the Camp at the time were directed to evacuate to higher ground moments before the deadly flood waters washed through the Camp's structures, leaving a wake of destruction in their path. By sheer luck, none of the girls died during this flood, although archived news reports described the girls having to rush to safety and being left stranded without food while a plane flew over the site dropping notes stating that help was on the way. Four people reportedly died during the flood along the river, and local authorities and camp management acknowledged that the outcome at Camp Mystic could have been much worse had the flooding occurred at night.

42. The Camp was again impacted by flooding from the Guadalupe River in 1978 when over 100 campers had to be relocated to higher ground with other staff in the middle of the night. The Camp was faced with destruction from deadly floodwater, forcing the suspension of camp activities for several days and leaving the girls without food for a couple of days. According to Kerr County, the floodwaters almost reached the top of the dining hall stairs at the Camp. While the campers were spared from death, the flooding killed thirty-three people in Kerr County, emphasizing the very real threat of injury and death to the young girls at Camp Mystic.

43. Then again in 1984, the Camp faced flash flooding hazards and the need for evacuation. Raging waters cut off roadway access to and from the Camp, stranding campers and staffers alike in a deadly situation. In fact, Defendant Tweety Eastland was on the property and due to a medical condition, she was forced to evacuate via helicopter to escape the harrowing flood. In a mere six years' time, Camp Mystic – being operated and managed by



Copy from re:SearchTX

Dick and Tweety Eastland – not only knew of the extremely hazardous flooding risks, but the Defendants actually experienced deadly floods and last-minute emergency evacuation attempts. Despite this, the Defendants did nothing to relocate facilities or cabins or inform the public and families of the real danger.

44. Because of this failure, unsuspecting parents have sent their precious daughters to Camp Mystic to spend the summer fishing, canoeing, and enjoying time with friends on the Guadalupe River for decades without any appropriate warnings about the actual dangers. Rather than informing parents of the extremely hazardous location of the activities and cabins where their daughters would be living and sleeping, the Defendants chose to remain silent and collect tuition checks for the privately owned camp for decades. The Defendants decided that expanding its for-profit camp was also more important than relocating the most at-risk cabins away from the river or attempting to better protect the vulnerable human lives that visited the Camp every summer.

45. In fact, when the Camp pursued a $5 million construction project six years ago, the Defendants chose to construct new cabins in a designated flood-risk area. The Defendants also chose to keep other cabins in the flood zone of a river basin, rather than relocate the older buildings that were in the most danger. Instead, the Defendants intentionally put young girls in a dangerous area with a long history of fatal floods. Several of the cabins that were hit hardest in the July 2025 flood were in an area identified by the Federal Emergency Management Agency (FEMA) as the highest-risk location for flooding. Some of the cabins were so close to the Guadalupe River that they were considered part of the river's floodway.



Copy from re:SearchTX




*Map from The New York Times*

46. Not only did the Defendants know that cabins and facilities were in a designated flood zone, but the Defendants also took steps to hide this risk from the public, including the campers and their parents, by leveraging appeals to FEMA to have the "100-year floodplain" designation removed from dozens of buildings. FEMA had included Camp Mystic in a "Special Flood Hazard Area" in its National Flood Insurance map for Kerr County in 2011. This meant that Camp Mystic was required to have flood insurance and faced tighter regulations on any future construction projects on the grounds. So, not only would the removal of this designation allow the Defendants to promulgate the falsity that the facilities were "safe" from a known flood risk, but the de-designation would also allow Camp Mystic to either avoid flood insurance requirements, lower its insurance premiums, or not be faced with more stringent regulations on future construction. Said another way, the Defendants decided to put money and profits over the lives of children and transparency to parents and the public.



Copy from re:SearchTX

47. Although the Camp's pleas to FEMA resulted in several structures being removed from the designation over the past several years, many buildings remained in the flood designation area. At least twelve structures at Camp Mystic were fully within FEMA's 100-year flood plain, and more were partially in that zone. Despite this, the Defendants still did not inform the Plaintiffs of the known, deadly, flood risk. And despite this, the Defendants continued operating the Camp filled with hundreds of young girls every summer in the floodplain without implementing adequate emergency procedures, creating necessary evacuation infrastructure, or putting measures in place to protect the innocent lives in their care.

### ***B. July 2025 Flood***

48. On July 2, 2025, the Texas Division of Emergency Management ("TDEM") announced that it was activating state emergency response resources in anticipation of increased threats of flooding heading into the holiday weekend. This announcement was made two days prior to the catastrophic flooding that killed twenty-seven girls at Camp Mystic and was based on the National Weather Service ("NWS") prediction that heavy rainfall with the potential to cause flash flooding was anticipated to begin on July 2, 2025, and continue for a few days.



Copy from re:SearchTX

For Immediate Distribution | July 2, 2025 | media@tdem.texas.gov

**TDEM Activates State Emergency Response Resources Ahead Of West, Central Texas Flood Threat**

The Texas Division of Emergency Management (TDEM) today announced that the agency activated state emergency response resources in anticipation of increased threats of flooding in parts of West and Central Texas heading into the holiday weekend.

"As rain and flooding threatens parts of Texas ahead of the Independence Day weekend, state emergency response resources have been activated to support local response efforts," said Texas Emergency Management Chief Nim Kidd. "Our priority remains protecting lives and property and Texans are urged to proactively prepare for potential hazards. Remember: Turn Around, Don't Drown."

According to the National Weather Service, heavy rainfall with the potential to cause flash flooding is anticipated across West Texas and the Hill Country beginning tonight and is expected to last a few days. Texans are encouraged to monitor local forecasts and avoid driving or walking into flooded areas.

*Excerpt from https://tdem.texas.gov/press-release/7-2-25*

49. Camp Mystic and its owners and directors would have been privy to this TDEM emergency response activation and should have been monitoring the weather as early as two days before the tragedy. Furthermore, the state emergency response provided additional resources to Camp Mystic to support flood response operations including but not limited to rescue boat squads and helicopters well in advance of the July 4, 2025, flood.

50. Then, at 1:18 p.m. on Thursday, July 3, 2025, the National Weather Service issued a flood watch for the south-central Texas area, including Kerr County where Camp Mystic is located. This flood watch clearly indicated there was a specific flood threat for the Camp Mystic grounds, and the conditions were ripe for a flood to occur. This notification should have put Camp Mystic and the Defendants on high alert, especially given the Defendants' familiarity with "Flash Flood Alley," and their actual knowledge surrounding how quickly the river can rise at Camp Mystic from prior flooding events. Simply put, Camp Mystic and the Defendants had ample time to evacuate all campers and staffers and prevent otherwise inevitable injuries and death at the hand of the raging waters. At the very least, Camp Mystic



Copy from re:SearchTX

had more than enough time to train, educate, and instruct counselors and campers alike of a true evacuation plan should the weather continue to grow in severity through the day and into the night. However, the Defendants chose to do nothing after this alert to protect Ellen's and the other campers' lives.

51. At 1:14 a.m. on Friday, July 4, 2025, the NWS predictably issued a flash flood warning for the area as the rain continued to fall, and the river continued to rise at a rapid rate. Staffers at Camp Mystic, including Dick and Tweety Eastland, received the flash flood warnings, but utterly failed to act in a timely manner to protect the lives of the girls in their care. Rather than activating a responsible evacuation plan, Dick Eastland spent time in his office on the property creating a "plan" with family members and others, and chose not to begin moving children from their cabins until approximately 2:30 a.m. At that time, many of the youngest in the camp were housed in the Bubble Inn cabin. The camp layout and cabins are pictured in the photographs below:





Copy from re:SearchTX

*Aerial View of Camp Mystic Cabins*




*Photograph from CBS News*

52. At the time evacuations finally began, the floodwaters were rising so quickly that some girls likely never had a chance based on the Camp's "plan." Instead of requesting assistance from nearby emergency responders, the Defendants and Camp Mystic decided to evacuate only one cabin at a time. This "plan" that was created and initiated more than twelve (12) hours after the first NWS alert and approximately seventy-five minutes after Camp Mystic knew of the NWS flash flood warning alert, was wholly inadequate and purposefully left some of the youngest children in Bubble Inn completely stranded without instruction, direction, or adult emergency assistance before their tragic deaths. Critical warnings from the NWS gave



Copy from re:SearchTX

the Defendants ample preliminary lead times to avoid catastrophic results – lead times that allowed camps nearby to effectively evacuate and save their campers. The Defendants, instead, chose to risk the lives of young girls by failing to act promptly and efficiently when the flash flood warning was issued.

53. As the hours ticked by after the alert, the water became too deep and too strong, and the Camp's failure to act led to utter chaos and mass panic. As the water rose, campers began climbing as high as they could within the cabins to avoid the water. These attempts would be in vain, however, as the water continued to pour into the cabins, including the cabin where several girls were fighting for their lives. Campers clung onto each other, furniture, and anything they could to avoid being swept away and out of the perceived protection of their cabins. Upon information and belief, the Defendants did not even attempt to evacuate the youngest girls in Bubble Inn until before 4:00-5:00 a.m.

54. The overpowering waters cascading through the Camp finally did the inevitable by tearing children away from the roofs, doors, furniture, trees, and hands of others that they clung to, and propelling them down the raging river into the inescapable darkness. Ellen, Linnie, Abby, Margaret, Mary, and Greta were some of the twenty-seven lives taken on July 4, 2025, at Camp Mystic. Many of their bodies were not recovered for several days.

55. The horrifying nature of these girls' untimely deaths cannot be overstated. The suffering their parents have gone through having to imagine their daughters, overcome by floodwaters, alone in the darkness, calling out for anyone to help, is more than any parent or person should be forced to bear. The undeniable pain, fear, desperation, horror, and distress the girls undoubtedly experienced in the hours and minutes before their deaths were foreseeable and preventable had Defendants acted with reasonable care for their safety. These



Copy from re:SearchTX

terrifying last moments were proximately caused by the negligence and gross negligence of the Defendants. The Defendants knew that camp facilities were located in a flood zone, knew of the history of flash flooding in Kerr County, knew of repeated prior flood events at the Camp, and received multiple alerts related to the storm, but consciously chose to do nothing but rake in profits and expose children to the heightened risk of death.

***C. The Aftermath***

56. Put simply, the devastating loss of so many young lives on July 4, 2025, was foreseeable and avoidable if proper actions were taken by the Defendants. It is clear in the aftermath of this tragedy that the Defendants were aware of the catastrophic risks that flooding at the Camp posed to human life, and despite that, they failed to develop, implement, or carry out adequate safety instructions, policies, or plans, which directly led to the deaths at the Camp.



*Douglas Getten searching Bubble Inn*



Copy from re:SearchTX

57. The Camp's written emergency instructions to campers consisted of only a single page addressing all emergencies that could arise during the camping session, with a mere seven sentences devoted to flood procedures. Camp Mystic made the conscious decision not to update its policies and procedures to prevent the death of campers despite the actual knowledge of flash flooding disasters and prior experience with necessary evacuations. Rather, the Camp maintained its seven-sentence emergency plan that provided zero aid to counselors and children during the threat of a flood. Instead, the Camp merely instructed children to await instructions over a loudspeaker, even though the Camp knew that flash floods regularly caused power failures which would render useless any loudspeaker system.

58. Unsurprisingly, on July 4th, the power did fail, so the loudspeakers could not work. The young counselors left in charge of the cabins and the children were not permitted to have their cell phones despite the known flash flood alerts the day before, and therefore, lost all meaningful contact with adult supervisors and staff. They were then forced to make instantaneous life and death decisions for themselves and their campers on their own without proper direction or instruction. The Defendants left these teenage counselors in a vulnerable position without proper training, policies, procedures, or instruction on what to do when the inevitable occurred. Some counselors and campers resorted to primitive forms of flashlight blinking in an attempt to attract much needed help from staffers and the Eastlands.

59. Additionally, despite the location of cabins knowingly being in a flood zone and the cabins themselves flooding in prior years, Camp Mystic emergency instructions mandated that those staffers and campers in the flats "must also stay in their cabins… All cabins are constructed on high, safe locations." This statement not only creates a false sense of security



Copy from re:SearchTX

in the safety of the cabins where the young girls were housed but ignores the known risk of water rising and infiltrating the cabins.



EMERGENCY INSTRUCTIONS

I. Accidents (Horse falls, falling injuries, cuts, etc.)
1. Be sure that the victim has an open airway and is breathing.
2. Do not move the victim.
3. Calm the victim.
4. Send someone for the nurse.
5. Stop bleeding with pressure directly over the injury if she has an open wound.

II. Floods

In case of flood, all campers on Senior Hill must stay in their cabins. They will be given instructions through the loud speaker. If the electricity is off, a walkie-talkie will be used. Food and other supplies will be delivered to Senior Hill by boat or truck. Campers and counselors NEVER wander away from your cabin. Those on the flats must also stay in their cabins unless told otherwise by the office. All cabins are constructed on high, safe locations.

*Excerpt from Camp Mystic Emergency Instructions*

60. The Defendants' conscious decision to rely on a plan that the Camp, its owners, operators, and management knew was outdated, unworkable, and incapable of protecting children in a predictable flood event illustrates a conscious indifference to the lives of the girls entrusted to their care. In the days after the horrific tragedy, the Defendants' indifference to the deaths, losses, and grieving of parents continued as Camp Mystic focused its communications and messaging on belonging removal from the Camp rather than taking responsibility for its failures. In fact, as early as 9:37 a.m. on July 5, 2025, Camp Mystic was already communicating with parents about retrieving material items, rather than accounting for their failures.



Copy from re:SearchTX

> The gates at both camps will stay open, and families are welcome to pick up belongings. Please note that all cabins on the flats and several cabins on Senior Hill experienced severe flooding. Belongings in these areas may be significantly damaged or missing. Items at Cypress Lake were unaffected by the flooding.

*Excerpt from Camp Mystic Email dated July 5, 2025*

61. Even now, inexplicably, the Camp has refused to accept an ounce of responsibility for the deaths of the counselors and children on July 4, 2025, and instead, have informed the families of the deceased girls that **Camp Mystic Cypress Lake intends to reopen for Summer 2026**.

> Camp Mystic Cypress Lake, which sustained no damage from floodwaters, will be opening in Summer 2026. Our planning and procedures will comply with the requirements of the camp safety legislation you bravely championed.

*Excerpt from Camp Mystic Communication*

62. Promoting the reopening of a for-profit camp less than a year after that camp caused the deaths of twenty-seven young girls is not only unthinkable – it is offensive to the memories of the deceased and the families and loved ones they left behind. Rather than focusing on accountability and change, Camp Mystic instead has been publicly soliciting donations to rebuild so the Defendants can go back to business as usual.



Copy from re:SearchTX




*Excerpt from Camp Mystic Donation Page*

63. The actions of the Defendants after this unimaginable tragedy are appalling and unforgiveable. The Eastland Defendants present at the Camp not only initially hid the scope of the devastation and obvious deaths of multiple campers from worried parents but affirmatively attempted to provide false hope for many who were searching for their daughters.



Copy from re:SearchTX



*Matthew Pohl in Bubble Inn*

64. The mental anguish and emotional distress that many parents, including the Plaintiffs in this case, endured at the hands of the Defendants is unconscionable. Plaintiffs seek justice for their daughters, and accountability from the Defendants in this case.

## VI.

## CAUSES OF ACTION

### *A. Negligence and Gross Negligence against all Defendants*

65. Plaintiffs repeat and reallege each allegation contained above.

66. At all material times, Defendants owned, operated, managed, and controlled Camp Mystic where the underlying events took place. Camp Mystic was owned and operated by Defendant Camp Mystic, LLC, on real property owned by Defendant Natural Fountains



Copy from re:SearchTX

Properties, Inc. Defendants were personally involved in the safe operation, maintenance, and training of individuals at the Camp. These Defendants had the legal duty to keep the premises in a state consistent with due regard for the safety of its invitees, including Ellen.

67. Defendants breached the duty owed to Plaintiffs by failing to exercise ordinary care to keep the premises and the campers safe.

68. Defendants committed negligent and grossly negligent acts and omissions, including the following:

a. Failure to implement safe evacuation plans;

b. Failure to assess and monitor flood risks;

c. Failure to timely evacuate campers when flooding was foreseeable or imminent;

d. Failure to train employees and/or counselors of emergency action plans;

e. Failure to train camp counselors of emergency action plans;

f. Failure to provide lifesaving equipment;

g. Failure to ensure camp facilities were constructed in safe locations;

h. Failure to prevent the deaths of Ellen, Linnie, Abby, Margaret, Mary, and Greta;

i. Failed to adequately staff the Camp with adequately trained oversight, management, and counselors;

j. Failure to construct, install, maintain, and/or repair cabins and/or camp facilities;

k. Failure to arrange cabins in safe locations;

l. Failure to maintain marked and accessible evacuation and/or escape routes;

m. Failure to enforce policies and procedures related to safety of campers;



Copy from re:SearchTX

n. Failure to warn Plaintiffs of the dangerous condition of the camp being located in or near a known flood zone;

o. Failure to institute adequate policies and procedures that would have prevented the deaths from occurring;

p. Failure to take proper safety measures;

q. Failure to take preventative measures to eliminate known risks and hazards;

r. Violations of applicable rules, regulations, and standards;

s. Vicariously liable for the acts and omissions of their employees and agents; and

t. Other acts deemed negligent and grossly negligent.

69. As a direct and proximate result of Defendants' conduct, Ellen, Linnie, Abby, Margaret, Mary, and Greta sustained severe injuries to their bodies, which resulted in physical pain, suffering, discomfort, impairment, mental anguish, distress, fear, and death. Plaintiffs have suffered and will continue to suffer pecuniary and non-economic losses as a result of these children's deaths.

70. In addition, Plaintiffs are entitled to exemplary or punitive damages because the aforementioned actions of Defendants were grossly negligent. Defendants acted with flagrant and malicious disregard for Plaintiffs' and others' health and safety. Defendants were objectively aware of the extreme risk posed by the conditions which caused Plaintiffs' injuries, harm, and deaths but did nothing to rectify them. Defendants' acts and omissions involved an extreme degree of risk considering the probability and magnitude of potential harm to the girls, Plaintiffs, and others. Defendants had actual, subjective awareness of the risk and consciously disregarded the risk. Accordingly, Plaintiffs are entitled to and seek exemplary damages.



Copy from re:SearchTX

### *B. Premises Liability against all Defendants*

71. Plaintiffs repeat and reallege each allegation contained above.

72. Defendants owned, occupied, possessed, managed, and/or controlled the area where Ellen, Linnie, Abby, Margaret, Mary, and Greta sustained injuries and ultimately died. The condition of the area where Plaintiffs were injured posed an unreasonable risk of harm, and Defendants had actual knowledge or reasonably should have known of the unreasonably dangerous condition. Moreover, Plaintiffs did not have actual knowledge of the unreasonably dangerous conditions.

73. Ellen, Linnie, Abby, Margaret, Mary, and Greta were invitees who entered Defendants' premises with Defendants' knowledge and for Defendants' benefit. Defendants had a duty to either warn Plaintiffs and the girls of this unreasonably dangerous condition or make the unreasonably dangerous condition reasonably safe. Defendants breached this duty by failing to warn Plaintiffs and the girls of this known unreasonably dangerous condition and by failing to make the unreasonably dangerous condition reasonably safe. Defendants' breaches proximately caused the deaths, as well as Plaintiffs' injuries and damages.

### *C. Joint Enterprise*

74. Plaintiffs repeat and reallege each allegation contained above.

75. At all relevant times, Defendants operated in a joint enterprise because they had: (a) an express and/or implied agreement; (b) a common purpose to be carried out by the enterprise; (c) a community of pecuniary interest in that common purpose; and (d) an equal right to direct and control the enterprise. Defendants shared control of and profits from the joint operation. In addition, Defendants, as members of the joint enterprise, committed a tort



Copy from re:SearchTX

against Plaintiffs while acting within the scope of the enterprise. Therefore, Defendants are jointly and severally liable for Plaintiffs' injuries and the deaths and the damages sustained therefrom.

***D. Respondeat Superior and Agency***

76. Plaintiffs repeat and reallege each allegation contained above.

77. At all relevant times, all agents, servants, and/or employees of Defendants were working within the course and scope of their employment for Defendants and in furtherance of Defendants' operations and business.

78. For the reasons set forth above, whenever it is alleged in this Petition that Defendants did an act or thing, it is meant that Defendants themselves or their officers, agent, and/or representatives did such act or thing. Plaintiffs therefore invoke the doctrine of *Respondeat Superior* against Defendants.

79. Further, at all relevant times, any acts and/or omissions by an agent, representative or employee of Defendants occurred within the scope of the actual and apparent authority and/or ratification of Defendants. Therefore, Defendants are liable to Plaintiffs for the acts and/or omissions of any such agent, representative or employee complained of herein by virtue of such agency relationship.

***E. Ratification***

80. Plaintiffs repeat and reallege each allegation contained above.

81. Pleading further, Defendants are liable for the negligent acts and/or omissions of other Defendants and their agents under the doctrine of ratification. Defendants approved and accepted the location of the camp facilities, and ratified each of their negligent conduct by accepting, approving, and validating such camp facility locations with full knowledge of its



Copy from re:SearchTX

defects; by accepting its benefits and refusing and failing to repudiate such negligent conduct; and by failing to correct and make safe such facilities even after they acquired actual, subjective awareness of the risks of severe injury or death arising out of the facilities locations. Thus, Defendants are considered tortfeasors and are jointly and severally liable for their tortious conduct resulting in the deaths and Plaintiffs' injuries and damages therefrom.

### *F. Joint and/Vicarious Liability*

82. Plaintiffs repeat and reallege each allegation contained above.

83. For the following reasons, the Camp Mystic Defendants' corporate forms should be disregarded to hold Defendants Tweety Eastland, Edward Eastland, Mary Liz Eastland, S. Stacy Eastland, and Neel Bonner each vicariously or jointly liable to Plaintiffs for their wrongful conduct.

84. Upon information and belief, at all relevant times, Dick and Defendant Tweety Eastland were the Owners and Executive Directors of Camp Mystic. Defendants Edward and Mary Liz Eastland were the Directors at Camp Mystic Guadalupe River where the flooding occurred. Defendant Bonner is the President of Defendant NFP. Defendant S. Stacy Eastland was an owner of Defendant NFP. Furthermore, Defendant Neel Bonner was the President of Defendant NFP. Defendants Tweety, Edward, Mary Liz, and S. Stacy Eastland, and Neel Bonner are collectively referred to herein as the "Individual Defendants." The Camp Mystic Defendants are mere shams, organized, and operated by the Individual Defendants in their individual capacities to perpetrate fraud upon Plaintiffs and potentially other unsuspecting persons.

85. The Individual Defendants are the "alter ego" of the Camp Mystic Defendants, as they were organized and operated as mere tools and/or business conduits for the Individual



Copy from re:SearchTX

Defendants' personal benefit and advantage. The Individual Defendants organized the Camp Mystic Defendants in a way to limit their potential liability and maximize their personal gains from the operation of these entities. The Individual Defendants have at all times exercised total dominion and control over the Camp Mystic Defendants and have exercised such control in a manner indistinguishable from their own personal affairs. The Individual Defendants perpetuated the fraud against Plaintiffs to make money, individually, from the operation of the businesses involved in this incident. The Individual Defendants were known to be the owners, president, managers and directors of the Camp Mystic Defendants, and the ones actually in control over the facilities owned by and operations of the Camp Mystic Defendants. The Individual Defendants personally benefited from making material misrepresentations to Plaintiffs.

86. The Individual Defendants are using the Camp Mystic Defendants' corporate fictions as a means of evading an existing legal obligation, namely, civil liability for negligence and gross negligence that killed Ellen, Linnie, Abby, Margaret, Mary, and Greta, injured Plaintiffs, and caused Plaintiffs to incur damages.

87. The Individual Defendants intentionally operated the Camp Mystic Defendants with inadequate capitalization. Specifically, the Individual Defendants organized their businesses with insufficient assets to satisfy potential debts and liabilities associated with running their businesses. The Individual Defendants used various companies to hold assets used at or by Camp Mystic so that those assets could not be used to satisfy any liabilities incurred by Camp Mystic. The Individual Defendants inadequately capitalized Camp Mystic to perpetuate the scheme. Then, the Individual Defendants underinsured Camp Mystic. In other words, the Individual Defendants undercapitalized Camp Mystic to limit potential liability.



Copy from re:SearchTX

The Individual Defendants are attempting to avoid or limit Camp Mystic's liability for the deaths and Plaintiffs' injuries through their scheme of undercapitalizing and underinsuring the entities—in an attempt to escape justice. Because the Individual Defendants operated Camp Mystic with inadequate capitalization, equity dictates that the Individual Defendants be held vicariously liable to Plaintiffs for all damages alleged herein.

88. The Individual Defendants, individually and through their agents, made material representations to Plaintiffs that were false when made and which the Individual Defendants knew were false or made recklessly, and/or Individual Defendants had a duty to disclose but failed to disclose material facts to Plaintiffs, knowing Plaintiffs did not know and did not have an equal opportunity to discover those facts. Specifically, the Individual Defendants made misrepresentations and/or omissions about the Camp Mystic Defendants' finances and insurance coverages, with an intent to induce Plaintiffs into allowing their daughters to attend summer camp. Plaintiffs relied to their detriment on those misrepresentations and/or omissions.

***G. Intentional Infliction of Emotional Distress***

89. Plaintiffs repeat and reallege each allegation contained above.

90. Intentional Infliction of Emotion Distress (IIED) involves conduct that is so outrageous and extreme that it goes beyond the bounds of decency, causing severe emotional distress to the victim. In this instance, Defendants Tweety, Edward, and Mary Liz Eastland and Camp Mystic's actions were not only intentional but were reckless and constitute IIED under Texas common law. By repeatedly communicating to Plaintiffs that there was hope that their daughter was still alive even though Camp Mystic and the owners and directors knew dead bodies had been found caused Plaintiffs to experience severe distress. Defendants'



Copy from re:SearchTX

continuous lies and harassing and confusing statements to Plaintiffs and others were intentionally painful, hurtful, and humiliating.

91. Defendants Tweety, Edward, and Mary Liz Eastland and Camp Mystic acted in a manner that any reasonable person would find extreme and outrageous. This conduct was carried out in full awareness of the potential for causing emotional harm, thereby satisfying the criteria for IIED.

92. The severe emotional distress inflicted on Plaintiffs was a direct result of the Defendants' outrageous conduct. The Plaintiffs have experienced significant grief, anxiety, depression, outrage, and other mental anguish as a result of the conduct.

## VII.

## DAMAGES

93. As a direct and proximate result of the occurrence made the basis of this lawsuit, Plaintiffs were caused to suffer severe personal injuries, bodily injury, pain, suffering, mental anguish and death.



Copy from re:SearchTX





94. Ellen was the youngest daughter of Douglas and Jennifer Getten and loved her role as a little sister. Her older sister Gwynne was her very best friend in life, and the two girls were inseparable. Ellen was beautiful from the inside out and never met a stranger. She gave every person a hug and left her presence on everyone she interacted with. Ellen loved to dance and spend time with her parents and older sister. Her happy nature affected everyone around her and will forever be remembered and missed.



Copy from re:SearchTX





95. Linnie was the only daughter of Michael and Callie McCown. She was the middle child of her two brothers, and she loved her role as the only girl sibling in the family. She had an uncanny ability to make everyone around her feel special and was known for her empathy and warm hugs. Linnie loved the people in her life with all of her heart, and her family will forever miss her.



Copy from re:SearchTX





96. Abby was the youngest daughter of Matthew and Kristin Pohl and was known for being the tiny comedian of the family. She was small but mighty, and she filled every room with warm and radiant laughter and love. While her life on Earth was far too short, her parents like to think of her in Heaven entertaining the angels until they see her again.



Copy from re:SearchTX





97. Margaret was a self-assured and independent little girl who loved to get up every morning ready to seize the day. She was the only daughter of Andrew and Ellen Sheedy and was adored by her two brothers. The Sheedy home is much quieter now without the daily sounds of Margaret's dancing footsteps and upbeat music. Her parents try to take comfort in knowing that Margaret skipped through the gates of Heaven with the same beaming smile and grace she displayed every day on Earth.



Copy from re:SearchTX





98. Mary was the oldest child of three who loved being a big sister to her younger siblings. She was a natural leader and showed love and kindness to everyone she met. She had a contagious laugh and a witty sense of humor that could never be replaced. Her parents miss her radiant smile, the sparkle in her eyes, and the pure joy she brought to her family every day.



Copy from re:SearchTX





99. Greta was a caring big sister to her little brother and a friend to everyone she met. She had a generous heart and loved helping younger children during her short time on Earth. Greta had a joy that was both fierce and gentle, and she radiated pure happiness with her infectious smile. She will forever be her parents' brightest light, and her absence leaves a void that cannot be filled.

100. Plaintiffs pray for relief and judgment as follows:

a. <u>Wrongful Death</u>

101. Plaintiffs repeat and reallege each allegation contained above.

102. Plaintiffs, on behalf of the wrongful death beneficiaries, seek to recover the following elements of damages resulting from the deaths of Ellen, Linnie, Abby, Margaret, Mary, and Greta:

- Pecuniary loss in the past and future, including but not limited to the loss of care, maintenance, guidance, nurture, support, services, advice, counsel, inheritance, and reasonable contributions of pecuniary value;



Copy from re:SearchTX

- Loss of companionship and society in the past and future, including but not limited to the loss of the positive benefits flowing from the love, comfort, companionship, and society that would have been received from Ellen, Linnie, Abby, Margaret, Mary, and Greta, had they lived;
- Mental anguish in the past and future, including but not limited to the emotional pain, torment, and suffering experienced in the past, and to be experienced in the future, because of the deaths of Ellen, Linnie, Abby, Margaret, Mary, and Greta; and,
- Any other forms of damages available to wrongful death beneficiaries.

b. Survival Action.

103. Plaintiffs repeat and reallege each allegation contained above.

104. Plaintiffs seek to recover the following elements of wrongful death and survival damages:

- Past and future pain and mental anguish, including the conscious physical pain and emotional pain, torment, and suffering experienced by Ellen, Linnie, Abby, Margaret, Mary, and Greta before their deaths;
- Medical expenses;
- Funeral and burial expenses; and,
- All other damages entitled to by law.

105. In addition, the actions above constitute gross negligence under Texas law and Plaintiffs are entitled to an award of exemplary damages.



Copy from re:SearchTX

106. In accordance with TEX. R. CIV. P. 47, Plaintiffs hereby state they seek monetary relief in excess of $1,000,000.00.

107. Plaintiffs have sustained substantial and irreparable harm as a direct and proximate result of Defendants' conduct. Plaintiffs seek relief in the form of all damages available under law.

## VIII.

## NOTICE OF SELF-AUTHENTICATION

108. Pursuant to Rule 193.7 of the Texas Rules of Civil Procedure, Plaintiffs hereby give notice of the intent to use documents produced by any party hereto in any pretrial proceeding and at trial against the producing party.

## VIII.

## JURY TRIAL DEMAND

109. Plaintiffs hereby demand a trial by jury on all claims.

## IX.

## PRAYER

110. Plaintiffs pray that this citation issue and be served upon Defendants in a form and manner prescribed by law, requiring that Defendants appear and answer, and that upon final hearing, Plaintiffs have judgment against Defendants, both jointly and severally, in a total sum in excess of the minimum jurisdictional limits of this Court, plus pre-judgment and post-judgment interests, all costs of Court, exemplary damages, and all such other and further relief, to which they may show themselves justly entitled.



Copy from re:SearchTX

Respectfully submitted,

ARNOLD & ITKIN LLP

*/s/ Kurt Arnold*

Kurt B. Arnold
SBN: 24036150
karnold@arnolditkin.com
J. Kyle Findley
SBN: 24076382
kfindley@arnolditkin.com
Kala F. Sellers
SBN: 24087519
ksellers@arnolditkin.com
John G. Grinnan
SBN: 24087633
jgrinnan@arnolditkin.com
6009 Memorial Drive
Houston, Texas 77007
Tel: 713.222.3800
Fax: 713.222.3850
e-service@arnolditkin.com

**ATTORNEYS FOR PLAINTIFFS**



Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Crystal DeLeon on behalf of Kurt Arnold
Bar No. 24036150
cdeleon@arnolditkin.com
Envelope ID: 108015891
Filing Code Description: Amended Filing
Filing Description: PLAINTIFFS' FIRST AMENDED PETITION
Status as of 11/14/2025 2:15 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Crystal DeLeon | | cdeleon@arnolditkin.com | 11/13/2025 1:33:44 PM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 11/13/2025 1:33:44 PM | SENT |

Copy from re:SearchTX

11/13/2025 4:21 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Norma Ybarra

**CAUSE NO. D-1-GN-25-009976**

| | | |
|---|---|---|
| ELLEN ELIZABETH GETTEN, DECEASED, BY AND THROUGH DOUGLAS GETTEN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ELLEN ELIZABETH GETTEN, AND JENNIFER GETTEN<br>**PLAINTIFF** | § § § § § | IN THE 459TH DISTRICT COURT |
| VS. | § § | TRAVIS COUNTY, TEXAS |
| NATURAL FOUNTAINS PROPERTIES, INC. DBA CAMP MYSTIC, INC., MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC, CAMP MYSTIC, LLC, WILLETTA EASTLAND, EDWARD EASTLAND, MARY LIZ EASTLAND, SEABORN STACY EASTLAND, AND WILLIAM NEELY BONNER III<br>**DEFENDANT** | § § § | |

**RETURN OF SERVICE**

**On Wednesday, November 12, 2025 AT 5:55 PM**, CITATION, PLAINTIFF'S ORIGINAL PETITION, PROCESS REQUEST FORM, LAWYER REFERRAL SERVICE for service on SEABORN STACY EASTLAND came to hand.

**On Thursday, November 13, 2025 AT 3:02 PM, I, Eric M Jimenez, PERSONALLY DELIVERED THE ABOVE-NAMED DOCUMENTS TO:** SEABORN STACY EASTLAND, 232 ARBORWAY STREET, HOUSTON, HARRIS COUNTY, TX 77057.

My name is Eric M Jimenez. My e-mail address is info@easy-serve.com. I am at least 18 years old. I am in all ways competent to make this statement, and this statement is based on personal knowledge. I am not a party to this case and have no interest in its outcome. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, Texas on Thursday, November 13, 2025.

*Eric M Jimenez*

Eric M Jimenez
1201 Louisiana Street, Suite 370
Houston, TX 77002

JBCC Registration# PSC-2021 expires May 31, 2026

GETTEN

Doc ID: 343249_2

# CITATION

## THE STATE OF TEXAS

**CAUSE NO. D-1-GN-25-009976**

DOUGLAS GETTEN; JENNIFER GETTEN AND THE ESTATE OF ELLEN ELIZABETH GETTEN , PLAINTIFF(S)

vs.

NATURAL FOUNTAINS PROPERTIES, INC.D/B/A CAMP MYSTIC, INC.; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD.; MYSTIC CAMPS MANAGEMENT, LLC; CAMP MYSTIC, LLC; WILLETTA EASTLAND; EDWARD EASTLAND; MARY LIZ EASTLAND; SEABORN STACY EASTLAND; WILLIAM NEELY BONNER, III , DEFENDANT(S)

TO: **SEABORN STACY EASTLAND**
**232 ARBORWAY STREET**
**HOUSTON TX 77057**
**OR WHEREVER FOUND**

Defendant, in the above styled and numbered cause:
**YOU HAVE BEEN SUED. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org."**

Attached is a copy of the **PLAINTIFF'S ORIGINAL PETITION** in the above styled and numbered cause, which was filed on **NOVEMBER 10, 2025** in the **459TH DISTRICT COURT** of Travis County, Austin, Texas.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office, **NOVEMBER 12, 2025**

REQUESTED BY:
**KURT BRYNILDE ARNOLD**
**6009 MEMORIAL DR**
**HOUSTON, TX 77007**

Velva L Price
Travis County District Clerk
Civil Family Court Facility (CFCF)
1700 Guadalupe Street, P.O. Box 679003 (78767)
Austin TX 78701

**Ruben Tamez, Deputy**

## RETURN

Came to hand on the _____ day of ________________, ________ at ________ o'clock ____M., and executed at __________________________________________________ within the County of ______________________ on the _____ day of ________________, ________, at ________ o'clock ____M., by delivering to the within named _________________________________________________________, each in person, a true copy of this citation together with the **PLAINTIFF'S ORIGINAL PETITION** accompanying pleading, having first attached such copy of such citation to such copy of pleading and endorsed on such copy of citation the date of delivery.

Service Fee: $ ________

____________________________________________
Sheriff / Constable / Authorized Person

Sworn to and subscribed before me this the
_____ day of ________________, ________.

By:________________________________________

____________________________________________
Printed Name of Server

______________________________ County, Texas

________________________________________
Notary Public, THE STATE OF TEXAS
**D-1-GN-25-009976**

**SERVICE FEE NOT PAID**

11/13/2025 10:22 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Eva Fairchild

**CAUSE NO. D-1-GN-25-009976**

| | | |
|---|---|---|
| ELLEN ELIZABETH GETTEN, DECEASED, BY AND THROUGH DOUGLAS GETTEN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ELLEN ELIZABETH GETTEN, AND JENNIFER GETTEN<br>**PLAINTIFF** | §<br>§<br>§<br>§<br>§ | IN THE 459TH DISTRICT COURT<br><br>TRAVIS COUNTY, TEXAS |
| VS. | § | |
| NATURAL FOUNTAINS PROPERTIES, INC. DBA CAMP MYSTIC, INC., MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC, CAMP MYSTIC, LLC, WILLETTA EASTLAND, EDWARD EASTLAND, MARY LIZ EASTLAND, SEABORN STACY EASTLAND, AND WILLIAM NEELY BONNER III<br>**DEFENDANT** | §<br>§<br>§<br>§ | |

**RETURN OF SERVICE**

**On Wednesday, November 12, 2025 AT 5:54 PM**, CITATION, PLAINTIFF'S ORIGINAL PETITION, PROCESS REQUEST FORM, LAWYER REFERRAL SERVICE for service on WILLIAM NEELY BONNER III came to hand.

**On Wednesday, November 12, 2025 AT 7:11 PM, I, Eric M Jimenez, PERSONALLY DELIVERED THE ABOVE-NAMED DOCUMENTS TO:** WILLIAM NEELY BONNER III, 4147 LANARK LANE, HOUSTON, HARRIS COUNTY, TX 77025.

My name is Eric M Jimenez. My e-mail address is info@easy-serve.com. I am at least 18 years old. I am in all ways competent to make this statement, and this statement is based on personal knowledge. I am not a party to this case and have no interest in its outcome. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, Texas on Thursday, November 13, 2025.

*Eric M Jimenez*

Eric M Jimenez
1201 Louisiana Street, Suite 370
Houston, TX 77002

JBCC Registration# PSC-2021 expires May 31, 2026

GETTEN

Doc ID: 343249_1

CITATION

THE STATE OF TEXAS

**CAUSE NO. D-1-GN-25-009976**

DOUGLAS GETTEN; JENNIFER GETTEN AND THE ESTATE OF ELLEN ELIZABETH GETTEN , PLAINTIFF(S)

vs.

NATURAL FOUNTAINS PROPERTIES, INC.D/B/A CAMP MYSTIC, INC; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD.; MYSTIC CAMPS MANAGEMENT, LLC; CAMP MYSTIC, LLC; WILLETTA EASTLAND; EDWARD EASTLAND; MARY LIZ EASTLAND; SEABORN STACY EASTLAND; WILLIAM NEELY BONNER, III , DEFENDANT(S)

TO: **WILLIAM NEELY BONNER III**
**4147 LANARK LANE**
**HOUSTON TX 77057**
**OR WHEREVER FOUND**

Defendant, in the above styled and numbered cause:
**YOU HAVE BEEN SUED. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org."**

Attached is a copy of the **PLAINTIFF'S ORIGINAL PETITION** in the above styled and numbered cause, which was filed on **NOVEMBER 10, 2025** in the **459TH DISTRICT COURT** of Travis County, Austin, Texas.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office, **NOVEMBER 12, 2025**

REQUESTED BY:
**KURT BRYNILDE ARNOLD**
**6009 MEMORIAL DR**
**HOUSTON, TX 77007**

Velva L Price
Travis County District Clerk
Civil Family Court Facility (CFCF)
1700 Guadalupe Street, P.O. Box 679003 (78767)
Austin TX 78701

**Ruben Tamez, Deputy**

RETURN

Came to hand on the _____ day of ________________, ________ at ________ o'clock ____M., and executed at ______________________________________________ within the County of ______________________ on the _____ day of ________________, ________, at ________ o'clock ____M., by delivering to the within named ____________________________________________________, each in person, a true copy of this citation together with the **PLAINTIFF'S ORIGINAL PETITION** accompanying pleading, having first attached such copy of such citation to such copy of pleading and endorsed on such copy of citation the date of delivery.

Service Fee: $ ________

____________________________________________
Sheriff / Constable / Authorized Person

Sworn to and subscribed before me this the
_____ day of ________________, ________.

By:__________________________________________

____________________________________________
Printed Name of Server

______________________________ County, Texas

________________________________________
Notary Public, THE STATE OF TEXAS
**D-1-GN-25-009976**

**SERVICE FEE NOT PAID**

11/18/2025 11:04 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Rosa Oneal

**VELVA L. PRICE**
District Clerk, Travis County
Civil Division (512) 854-9457

# Process Request Form

**CASE NUMBER:** D-1-GN-25-009976 **COUCOURT:** 459th

**NAME(S) OF DOCUMENTS TO BE SERVED:** Plaintiffs' Original Petition

**FILE DATE:** 11/10/2025
Day/Month/Year

**SERVICE TO BE ISSUED ON: (Please List Exactly As The Name Appears In The Pleading To Be Served- Additional Parties on page 2)**

1. **Issue Service to:** Natural Fountains Properties, Inc. dba Camp Mystic, Inc.
   **Address of Service:** 1019 Brazos Street
   **City, State & Zip:** Austin, Texas 78701
   **Agent: (if applicable)** Texas Secretary of State

**TYPE OF SERVICE/PROCESS TO BE ISSUED:**

- [x] Citation
- [ ] Citation by Posting
- [ ] Citations Rule 106 Service
- [ ] Hague Convention Citation
- [x] Secretary of State/ Highway Commission/Commissioner of Insurance Citation
- [ ] Citation by Publication: Newspaper
- [ ] Show Cause
- [ ] Notice
- [ ] Temporary Restraining Order
- [ ] Temporary Protective Order
- [ ] Capias
- [ ] Attachment
- [ ] Habeas Corpus
- [ ] Subpoena
- [ ] Garnishment
- [ ] Injunction
- [ ] Sequestration
- [ ] Abstract
- [ ] Execution
- [ ] Other (Please Describe)

**SERVICE BY** ***(check one)*****:**

- ○ **ATTORNEY/REQUESTER: (Email)** cdeleon@arnolditkin.com
- ○ **PROCESS SERVER: (Email)**
- ○ **PICK UP: (Person/Agency Name and Phone Number)**
- ○ **TRAVIS COUNTY CONSTABLE:** Please select PCT if you have a preference ○ 1 ○ 2 ○ 3 ○ 4 ○ 5
- ○ **CERTIFIED MAIL**
- ○ **OTHER,** ***explain*****:**

**Requested by:**

**Name:** Kurt Arnold
**Mailing Address:** 6009 Memorial Drive
**City, state, Zip:** Houston, Texas 77007
**Phone Number:** 7132223800
**E-mail Address:** karnold@arnolditkin.com/cdeleon@arnolditkin.com

**Notes/Comments to the clerk:**

Copy from re:SearchTX

## Civil Process Request Form - Additional Parties

**SERVICE TO BE ISSUED ON:** **(Please List Exactly As The Name Appears In The Pleading To Be Served)**

**2.** **Issue Service to:** Mystic Camps Family Partnership, LTD
**Address of Service:** 1019 Brazos Street
**City, State & Zip:** Austin, Texas 78707
**Agent:** **(if applicable)** Texas Secretary of State

**3.** **Issue Service to:** Mystic Camps Management, LLC
**Address of Service:** 1019 Brazos Street
**City, State & Zip:** Austin, Texas 78701
**Agent:** **(if applicable)** Texas Secretary of State

**4.** **Issue Service to:** Camp Mystic, LLC
**Address of Service:** 1019 Brazos Street
**City, State & Zip:** Austin, Texas 78701
**Agent:** **(if applicable)** Texas Secretary of State

**5.** **Issue Service to:** Willetta Eastland
**Address of Service:** 2404 Scenic Dr
**City, State & Zip:** Austin, Texas 78703
**Agent:** **(if applicable)** ______

**6.** **Issue Service to:** Edward Eastland
**Address of Service:** 1105 Lois St.
**City, State & Zip:** Kerrville, Texas 78028
**Agent:** **(if applicable)** ______

**7.** **Issue Service to:** Mary Liz Eastland
**Address of Service:** 1105 Lois St
**City, State & Zip:** Kerrville, Texas 78028
**Agent:** **(if applicable)** ______

Copy from re:SearchTX

11/18/2025 11:01 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Rosa Oneal

**VELVA L. PRICE**
District Clerk, Travis County
Civil Division (512) 854-9457

# Process Request Form

**CASE NUMBER:** D-1-GN-25-009976 **COUCOURT:** 459th

**NAME(S) OF DOCUMENTS TO BE SERVED:** Plaintiffs' Original Petition

**FILE DATE:** 11/10/2025
Day/Month/Year

**SERVICE TO BE ISSUED ON:** **(Please List Exactly As The Name Appears In The Pleading To Be Served- Additional Parties on page 2)**

1. **Issue Service to:** Natural Fountains Properties, Inc. dba Camp Mystic, Inc.
   **Address of Service:** 1019 Brazos Street
   **City, State & Zip:** Austin, Texas 78701
   **Agent:** **(if applicable)** Texas Secretary of State

**TYPE OF SERVICE/PROCESS TO BE ISSUED:**

☑ Citation ☐ Citation by Posting ☐ Citations Rule 106 Service ☐ Hague Convention Citation
☑ Secretary of State/ Highway Commission/Commissioner of Insurance Citation
☐ Citation by Publication: Newspaper ____________
☐ Show Cause ☐ Notice ☐ Temporary Restraining Order ☐ Temporary Protective Order
☐ Capias ☐ Attachment ☐ Habeas Corpus
☐ Subpoena ☐ Garnishment ☐ Injunction ☐ Sequestration ☐ Abstract ☐ Execution
☐ Other (Please Describe) ____________

**SERVICE BY** ***(check one)*****:**

○ **ATTORNEY/REQUESTER:** **(Email)** cdeleon@arnolditkin.com
○ **PROCESS SERVER:** **(Email)** ____________
○ **PICK UP:** **(Person/Agency Name and Phone Number)** ____________
○ **TRAVIS COUNTY CONSTABLE:** Please select PCT if you have a preference ○ 1 ○ 2 ○ 3 ○ 4 ○ 5
○ **CERTIFIED MAIL**
○ **OTHER,** ***explain*****:** ____________

**Requested by:**

**Name:** Kurt Arnold
**Mailing Address:** 6009 Memorial Drive
**City, state, Zip:** Houston, Texas 77007
**Phone Number:** 7132223800
**E-mail Address:** karnold@arnolditkin.com/cdeleon@arnolditkin.com

**Notes/Comments to the clerk:** ____________

Copy from re:SearchTX

## Civil Process Request Form - Additional Parties

**SERVICE TO BE ISSUED ON:** **(Please List Exactly As The Name Appears In The Pleading To Be Served)**

**2.** **Issue Service to:** Mystic Camps Family Partnership, LTD
**Address of Service:** 1019 Brazos Street
**City, State & Zip:** Austin, Texas 78707
**Agent:** **(if applicable)** Texas Secretary of State

**3.** **Issue Service to:** Mystic Camps Management, LLC
**Address of Service:** 1019 Brazos Street
**City, State & Zip:** Austin, Texas 78701
**Agent:** **(if applicable)** Texas Secretary of State

**4.** **Issue Service to:** Camp Mystic, LLC
**Address of Service:** 1019 Brazos Street
**City, State & Zip:** Austin, Texas 78701
**Agent:** **(if applicable)** Texas Secretary of State

**5.** **Issue Service to:** Willetta Eastland
**Address of Service:** 2404 Scenic Dr
**City, State & Zip:** Austin, Texas 78703
**Agent:** **(if applicable)** ____________________

**6.** **Issue Service to:** Edward Eastland
**Address of Service:** 1105 Lois St.
**City, State & Zip:** Kerrville, Texas 78028
**Agent:** **(if applicable)** ____________________

**7.** **Issue Service to:** Mary Liz Eastland
**Address of Service:** 1105 Lois St
**City, State & Zip:** Kerrville, Texas 78028
**Agent:** **(if applicable)** ____________________

Copy from re:SearchTX

11/21/2025 6:36 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Eva Fairchild

**CAUSE NO. D-1-GN-25-009976**

| | | |
|---|---|---|
| ELLEN ELIZABETH GETTEN, DECEASED BY AND THROUGH DOUGLAS GETTEN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ELLEN ELIZABETH GETTEN, AND JENNIFER GETTEN **PLAINTIFF** | § § § § § | IN THE 459TH DISTRICT COURT<br>TRAVIS COUNTY, TEXAS |
| VS. | § § | |
| NATURAL FOUNTAINS PROPERTIES, INC. ET AL **DEFENDANT** | § § § | |

**RETURN OF SERVICE**

**On Wednesday, November 19, 2025 AT 3:48 PM**, CITATION, PLAINTIFFS' FIRST AMENDED PETITION for service on WILLIAM NEELY BONNER III came to hand.

**On Thursday, November 20, 2025 AT 8:55 AM, I, Jayme Chacon, PERSONALLY DELIVERED THE ABOVE-NAMED DOCUMENTS TO:** WILLIAM NEELY BONNER III, 4147 LANARK LANE, HOUSTON, HARRIS COUNTY, TX 77057.

My name is Jayme Chacon. My e-mail address is info@easy-serve.com. I am at least 18 years old. I am in all ways competent to make this statement, and this statement is based on personal knowledge. I am not a party to this case and have no interest in its outcome. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, Texas on Thursday, November 20, 2025.

*Jayme Chacon*

Jayme Chacon
1201 Louisiana Street, Suite 370
Houston, TX 77002

JBCC Registration# PSC-2516 expires February 28, 2027

Getten, Douglas--FW: D-1-GN-25-009976

Doc ID: 343543_2

Copy from re:SearchTX

CITATION

THE STATE OF TEXAS

**CAUSE NO. D-1-GN-25-009976**

DOUGLAS GETTEN; ESTATE OF ELLEN ELIZABETH GETTEN; JENNIFER GETTEN; ESTATE OF LINNIE ANNE MCCOWEN; MICHAEL MCCOWN , PLAINTIFF(S)

vs.

NATURAL FOUNTAINS PROPERTIES, INC.; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD.; MYSTIC CAMPS MANAGEMENT, LLC; CAMP MYSTIC, LLC; WILLETTA EASTLAND; EDWARD EASTLAND; MARY LIZ EASTLAND; SEABORN STACY EASTLAND; WILLIAM NEELY BONNER, III , DEFENDANT(S)

TO: **WILLIAM NEELY BONNER III**
**4147 LANARK LANE**
**HOUSTON TX 77057**

Defendant, in the above styled and numbered cause:
**YOU HAVE BEEN SUED. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org."**

Attached is a copy of the **PLAINTIFFS' FIRST AMENDED PETITION** in the above styled and numbered cause, which was filed on **NOVEMBER 13, 2025** in the **459TH DISTRICT COURT** of Travis County, Austin, Texas.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office, **NOVEMBER 19, 2025**

REQUESTED BY:
**KURT BRYNILDE ARNOLD**
**6009 MEMORIAL DR**
**HOUSTON, TX 77007**

Velva L Price
Travis County District Clerk
Civil Family Court Facility (CFCF)
1700 Guadalupe Street, P.O. Box 679003 (78767)
Austin TX 78701

**Rosa Oneal, Deputy**

**RETURN**

Came to hand on the _____ day of ________________, ________ at ________ o'clock ____M., and executed at ___________________________________________________ within the County of ______________________ on the _____ day of ________________, ________, at ________ o'clock ____M., by delivering to the within named __________________________________________________________, each in person, a true copy of this citation together with the **PLAINTIFFS' FIRST AMENDED PETITION** accompanying pleading, having first attached such copy of such citation to such copy of pleading and endorsed on such copy of citation the date of delivery.

Service Fee: $ ________

____________________________________________
Sheriff / Constable / Authorized Person

Sworn to and subscribed before me this the _____ day of ________________, ________.

By:__________________________________________

____________________________________________
Printed Name of Server

______________________________ County, Texas

________________________________________
Notary Public, THE STATE OF TEXAS
**D-1-GN-25-009976**

**SERVICE FEE NOT PAID**

Copy from re:SearchTX

11/21/2025 3:16 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Nancy Ramirez

**CAUSE NO. D-1-GN-25-009976**

| | | |
|---|---|---|
| ELLEN ELIZABETH GETTEN, DECEASED BY AND THROUGH DOUGLAS GETTEN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF ELLEN ELIZABETH GETTEN, AND JENNIFER GETTEN<br>**PLAINTIFF** | §<br>§<br>§<br>§<br>§<br>§ | IN THE 459TH DISTRICT COURT<br><br>TRAVIS COUNTY, TEXAS |
| VS. | § | |
| NATURAL FOUNTAINS PROPERTIES, INC. ET AL<br>**DEFENDANT** | §<br>§<br>§ | |

**RETURN OF SERVICE**

**On Wednesday, November 19, 2025 AT 3:42 PM**, CITATION, PLAINTIFFS' FIRST AMENDED PETITION for service on SEABORN STACY EASTLAND came to hand.

**On Friday, November 21, 2025 AT 12:15 PM, I, Jayme Chacon, PERSONALLY DELIVERED THE ABOVE-NAMED DOCUMENTS TO:** SEABORN STACY EASTLAND, 232 ARBORWAY STREET, HOUSTON, HARRIS COUNTY, TX 77057.

My name is Jayme Chacon. My e-mail address is info@easy-serve.com. I am at least 18 years old. I am in all ways competent to make this statement, and this statement is based on personal knowledge. I am not a party to this case and have no interest in its outcome. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, Texas on Friday, November 21, 2025.

*Jayme Chacon*

Jayme Chacon
1201 Louisiana Street, Suite 370
Houston, TX 77002

JBCC Registration# PSC-2516 expires February 28, 2027

Getten, Douglas--FW: D-1-GN-25-009976

Doc ID: 343543_1

Copy from re:SearchTX

CITATION

THE STATE OF TEXAS

**CAUSE NO. D-1-GN-25-009976**

DOUGLAS GETTEN; ESTATE OF ELLEN ELIZABETH GETTEN; JENNIFER GETTEN; ESTATE OF LINNIE ANNE MCCOWEN; MICHAEL MCCOWN , PLAINTIFF(S)

vs.

NATURAL FOUNTAINS PROPERTIES, INC.; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD.; MYSTIC CAMPS MANAGEMENT, LLC; CAMP MYSTIC, LLC; WILLETTA EASTLAND; EDWARD EASTLAND; MARY LIZ EASTLAND; SEABORN STACY EASTLAND; WILLIAM NEELY BONNER, III , DEFENDANT(S)

TO: **SEABORN STACY EASTLAND**
**232 ARBORWAY STREET**
**HOUSTON TX 77057**

Defendant, in the above styled and numbered cause:
**YOU HAVE BEEN SUED. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org."**

Attached is a copy of the **PLAINTIFFS' FIRST AMENDED PETITION** in the above styled and numbered cause, which was filed on **NOVEMBER 13, 2025** in the **459TH DISTRICT COURT** of Travis County, Austin, Texas.

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office, **NOVEMBER 19, 2025**

REQUESTED BY:
**KURT BRYNILDE ARNOLD**
**6009 MEMORIAL DR**
**HOUSTON, TX 77007**

Velva L Price
Travis County District Clerk
Civil Family Court Facility (CFCF)
1700 Guadalupe Street, P.O. Box 679003 (78767)
Austin TX 78701

**Rosa Oneal, Deputy**

**RETURN**

Came to hand on the _____ day of _______________, ________ at ________ o'clock ____M., and executed at _____________________________________________ within the County of ___________________ on the _____ day of _______________, ________, at ________ o'clock ____M., by delivering to the within named ___________________________________________________, each in person, a true copy of this citation together with the **PLAINTIFFS' FIRST AMENDED PETITION** accompanying pleading, having first attached such copy of such citation to such copy of pleading and endorsed on such copy of citation the date of delivery.

Service Fee: $ ________

______________________________________
Sheriff / Constable / Authorized Person

Sworn to and subscribed before me this the

_____ day of _______________, ________.

By:______________________________________

______________________________________
Printed Name of Server

______________________________ County, Texas

______________________________________
Notary Public, THE STATE OF TEXAS
**D-1-GN-25-009976**

**SERVICE FEE NOT PAID**

Copy from re:SearchTX

12/5/2025 5:04 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Susan Schmidt

**CAUSE NO. D-1-GN-25-009976**

| | | |
|---|---|---|
| **Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten** | § | **IN THE DISTRICT COURT OF** |
| ***Plaintiffs,*** | § | |
| **v.** | § | **TRAVIS COUNTY, TEXAS** |
| **Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III** | § | |
| ***Defendants.*** | § | **459TH JUDICIAL DISTRICT** |

**DEFENDANT STACY EASTLAND'S MOTION TO TRANSFER VENUE, ORIGINAL ANSWER TO PLAINTIFF'S FIRST AMENDED PETITION, AND SPECIAL EXCEPTIONS**

Defendant Stacy Eastland ("Stacy") files this Motion to Transfer Venue, Original Answer, and Special Exceptions to Plaintiffs' First Amended Petition and shows the Court as follows:

**STACY EASTLAND HAS HAD NOTHING TO DO WITH CAMP MYSTIC SINCE 2012**

Stacy Eastland's only connection with Camp Mystic was that, from 1998 until August, 2007, he was a director of Natural Fountains Properties ("NFP"), the entity that owned the land on which Camp Mystic operated. And from 2005 until the end of 2012, he was a minority shareholder of NFP, owning approximately 22% of the company.

Stacy was removed as a director and officer of NFP in August, 2007 and has not served

X

NFP as a director or officer or in any other capacity since August 2007.

And in November 2012, Stacy transferred all his rights, title and interest in NFP stock back to the company. *See* the Irrevocable Stock Powers and Certificates attached as Exhibit 1. Since then, he has held no ownership interest in NFP, and he has had no formal or informal involvement in NFP and no formal or informal involvement with Camp Mystic in any way. In fact, he has not set foot in Kerr County since 2012.

Despite Stacy having had no involvement with the camp since 2012, Plaintiffs have included him in this suit without specifying any acts or omissions allegedly by Stacy relating to the tragedy caused by the July 4, 2005 unprecedented flood. Stacy does not belong in this suit and linking his name to this tragedy is grossly unfair and misleading.

**MOTION TO TRANSFER VENUE**

Stacy specifically denies that venue over any claims against him is proper in Travis County. Stacy does not reside in Travis County and none of the events allegedly giving rise to Plaintiffs' claims occurred in Travis County.

Stacy further specifically denies the venue is proper pursuant Tex. Civ. Prac. & Rem. Code section 15.005. In particular, he specifically denies that any claims against him arise out of the same transaction, occurrence or series of transactions or occurrences as the claims against the other Defendants.

As stated above, Stacy had no involvement with the camp since 2012, had no involvement in the events surrounding the July 4, 2025 flood and had no involvement in the alleged appeal of the flood plain designation. Because no claims against Stacy arise out of the same transaction or occurrence as the claims against the other Defendants, Travis County venue is not proper for Stacy.

Stacy pleads that venue is proper in Kerr County, as the county in which all of the events allegedly giving rise to the claims occurred. Plaintiffs should dismiss the suit against Stacy because he had no involvement with the camp or the events of July 4, 2025. But if Plaintiffs do not do so, this Court should transfer the suit against Stacy to Kerr County.

## ORIGINAL ANSWER TO PLAINTIFF'S FIRST AMENDED PETITION

Stacy generally denies each and every allegation in the Petition and demands strict proof thereof. Stacy reserves the right to plead further and with greater particularity as the case progresses.

## SPECIAL EXCEPTIONS

Stacy specially excepts to Petition as a whole in that it does not identify any acts or omissions by Stacy giving rise to any claims against Stacy. There is no allegation that Stacy had any notice of flooding conditions on or before July 4, 2025 flood or that he had any involvement or responsibility in the response to the flooding conditions.

Stacy specially excepts to the allegation in the last sentence of paragraph 43 that "despite this [alleged knowledge of flooding risk], the Defendants did nothing to relocate facilities or cabins or inform the public and families of the real danger." This allegation provides no facts showing that that at any time-– and certainly not at any time after 2012-–Stacy had any obligation to relocate facilities or cabins or inform the public and facilities of the allegedly real danger.

Stacy specially excepts to the allegations in paragraph 44 that "Rather than informing the parents of the extremely hazardous location of the activities and cabins where their daughters would be living and sleeping, the Defendants chose to sign it and collect tuition checks for the privately owned camp for decades." This allegation provides no facts showing that Stacy had any obligation to inform the parents of the allegedly hazardous location of the activities and cabins at

any time, and certainly not after 2012. This allegation provides no facts indicating that Stacy ever received tuition checks for the privately owned camp. He did not.

Stacy further specially excepts to the statement in paragraph 44 that “the Defendants decided that expanding its for–profit camp was more important than relocating the most at–risk cabins away from the river or attempting to better protect the vulnerable human lives that visited the Camp every summer." These allegations provide no facts showing that Stacy had any part in the decision to expand the camp rather than relocating the allegedly most at-risk cabins.

Stacy specially excepts to all the allegations in paragraph 45 of the petition. These allegations provide no facts showing the Stacy had any involvement or role whatsoever in the $5 million construction project or the other Defendants’ alleged decisions referred to in this paragraph.

Stacy specially excepts to the allegations in paragraph 46 in their entirety. These allegations provide no facts showing that Stacy had any knowledge about cabins and facilities a federal floodplain or took any steps to appeal to FEMA to have the hundred year floodplain designation removed from any buildings or had any involvement in the acts alleged in this paragraph.

Stacy specially excepts to the allegations in paragraph 47 that Defendants did not inform Plaintiffs of the known, deadly flood risk and “continued operating the camp filled with hundreds of young girls every summer in the floodplain without implementing adequate emergency procedures, creating necessary evacuation infrastructure, or putting measures in place to protect the innocent lives in their care.” These allegations provide no facts showing that Stacy at any time, and certainly not after 2012, had any role in operating the camp including implementing adequate emergency procedures, creating necessary evacuation infrastructure, or putting measures

in place to protect the innocent lives…."

Stacy specially excepts to all that the allegations in paragraph 50 in their entirety as they provide no facts indicating that Stacy had notice of any specific flood threat or had any ability or obligation to do anything in response to any such notice.

Stacy specially excepts to all the allegations in paragraph 52 in their entirety because they provide no facts indicating that Stacy had any role in the alleged decision to evacuate only one cabin at a time. Further, Stacy specially excepts to the last sentence in paragraph 52 claiming that "the Defendants, instead, chose to risk the lives of young girls by failing to act promptly and efficiently when the flash flood warning was issued. This allegation provides no facts showing that Stacy had any role in the alleged decisions by the other Defendants.

Stacy specially excepts to the last sentence in paragraph 53 that "the Defendants did not even attempt to evacuate the youngest girls on Bubble Inn until 4:00-5:00 AM. This allocation provides no facts showing that Stacy had any ability or obligation to evacuate the girls in Bubble Inn.

Stacy specially excepts to the allegations in paragraph 55 in their entirety. They provide no facts showing that Stacy had any ability or obligation to act in response to the flood.

Stacy specially excepts to the allegations in paragraph 56 in their entirety. They do not provide any facts indicating that Stacy had any awareness of the catastrophic risks of flooding or had any ability or obligation to develop implement or carry out adequate safety instructions policies or plans.

Stacy specially excepts to the allegation in paragraph 58 that "the Defendants left these teenage counselors in a vulnerable position without proper training, policies, procedures, or instruction on what to do with the inevitable occurred." These allegations provide no facts

showing that Stacy had any ability or obligation to train teenage counselors at that camp at any time and certainly not after 2012.

Stacy specially excepts to the allegations in paragraph 60 in their entirety. These allegations refer to “Defendants conscious decision" and “Defendants’ indifference" without specifying any acts or omissions by Stacy in connection with the emergency plan, which he had nothing to do with. The allegations provide no facts showing that Stacy had anything to do with the Camp officials’ acts or omissions after the flooding tragedy. He did not.

Stacy specially excepts to the allegations in paragraphs 61 and 62 in their entirety. They provide no facts showing that Stacy had anything to do with the decision to reopen Camp Mystic Cypress Creek or to publicly solicit donations to rebuild “so the Defendants can go back to business as usual."

Stacy specially excepts to the allegations in paragraph 63 in their entirety. They refer to “the actions of Defendants" without specifying any action by Stacy in connection with the tragic flooding.

Stacy specially excepts to the allegations in paragraph 66 that “at all material times, Defendants owned, operated, managed, and controlled Mystic….". This allegation provides no facts showing that Stacy had any role in owning, operating, managing and controlling Mystic when the underlying events took place. Stacy further expressly accepts to the allegations that “Defendants were personally involved in the safe operation, maintenance and training of individuals at the Camp" and "these Defendants had the legal duty to keep the premises in a state consistent with due regard for the safety of its invitees….". These allegations provide no facts showing that Stacy was personally involved in the safe operation, maintenance training of individuals at the camp or that Stacy had any legal duty to keep the premises in a state consistent

with due regard for the safety of its invitees."

Stacy specially excepts to the allegations in paragraph 67 that “Defendants breached the duty owed to Plaintiffs…". This allegation does not provide any facts showing Stacy had or breached any duty to Plaintiffs.

Stacy specially excepts to the allegations in paragraph 68 that “Defendants committed negligent and grossly negligent acts and omissions. The allegations do not specify any negligent or grossly negligent acts or omissions by Stacy. There were none.

Stacy specially excepts to the allegations in paragraph 69 in their entirety. They do not provide any facts showing that as a direct and proximate result of any conduct by Stacy, Ellen, Linnie, Abby, Margaret, Mary and Greta sustained severe injuries to their bodies…

Stacy specially excepts to the allegations in paragraph 70 in their entirety. These allegations do not provide any facts showing that any actions or omissions by Stacy were grossly negligent, were with flagrant and malicious disregard for Plaintiffs’ and others’ health and safety. The allegations do not provide any facts showing that Stacy was objectively aware of the extreme risk posed by the conditions which caused Plaintiffs’ injuries. Nor do they provide any facts showing that any acts or omissions by Stacy involved an extreme degree of risk, considering the probability and magnitude of potential harm to the girls. And Plaintiffs do not provide any fact showing that Stacy had actual, subjective awareness of the risk consciously disregarded at risk.

Stacy specially excepts to the allegations in paragraph 72 and 73 in their entirety because they provide no facts indicating that Stacy owned, occupied, possessed, managed or controlled the area where the Plaintiffs sustained injuries or that these were Stacy's premises the Plaintiffs entered with Stacy's knowledge and for Stacy's benefit. Stacy has no ownership or control over the premises.

Stacy specially excepts to the allegations in paragraph 75 in their entirety. These allegations provide no facts indicating that Stacy operated in a joint enterprise with any other defendant or that Stacy shared control of and profits from the joint operation. They offer no facts showing that Stacy is a member of any joint enterprise that committed any torts.

Stacy specially excepts to the allegations in paragraph 77-79 in their entirety. The allegations provide no facts identifying any agents, servants or employees of Stacy who were working within the scope and course of employment for Stacy in connection with any of the acts or omissions complained of.

Stacy specially excepts to the allegations in paragraph 81 in their entirety. They provide no facts showing that Stacy approved and accepted location of facilities or ratified any negligent conduct by any other person.

Stacy specially excepts to the allegations in paragraph 84 that he was an owner of defendant NFP. The allegation does not state when he was an owner NFP. As shown above, Stacy has not been an owner of since 2012. The allegation does not provide any facts to show that Stacy should be held individually liable for any conduct by NFP when he is not had any ownership interest in it or any other role with in it for the last 13 years.

Stacy specially excepts to the allegations in paragraph 85 their entirety. They do not provide any facts showing the Stacy organized the Camp Mystic Defendants at all, much less in a way to limit their potential liability and maximize his personal gains. The allegations provide no facts showing that Stacy has at all times exercised total dominion and control over the Camp Mystic Defendants and has exercised such control in a manner indistinguishable from his own personal affairs. The allegations in paragraph 85 provide no facts showing that Stacy had any ownership interest in or any role in any of the corporate Defendants.

Stacy specially excepts to the allegations in paragraph 86 in their entirety because they do not provide any facts showing that Stacy is using the Camp Mystic Defendants corporate fictions as a means of evading an existing legal obligation.

Stacy specially excepts to the allegations in paragraph 87 in their entirety. They do not identify any facts showing that in the Stacy intentionally operated the Camp Mystic Defendants at all much less with inadequate capitalization. Nor do the allegations provide any facts that he used various companies to hold assets used at or by Camp Mystic so that those assets cannot be used to satisfy any liabilities incurred by Camp Mystic. Nor do the allegations provide any facts showing Stacy underinsured Camp Mystic.

Stacy specially excepts to the allegations in paragraph 88 in that they do not specify any representations Stacy made to Plaintiffs at all, much less any representations that were false when made and which he knew were false or made recklessly. In addition, the allegations do not specify any misrepresentations or omissions Stacy made about the Camp Mystic Defendants' finances and insurance coverages with an intent to induce Plaintiffs to allow their daughters to attend summer camp.

The Court should grant the foregoing special exceptions and order Plaintiffs to replead. Because Plaintiffs will be unable to replead to state any facts showing Stacy's involvement in any of the allegations above, the Court should then dismiss the suit against Stacy with prejudice.

## RULE 193.7 NOTICE

Pursuant to Rule 193.7 of the Texas Rules of Civil Procedure, Stacy hereby gives notice that all documents produced by Plaintiffs will be used at any pretrial proceeding or at the trial of this matter.

**REQUEST FOR RELIEF**

Defendant Stacy Eastland asks this Court to dismiss all claims against him and in the alternative transfer venue to Kerr County, award him his reasonable and necessary attorney's fees, and grant him any and all further relief to which he may be justly entitled.

Respectfully submitted,

**FERGUSON BRASWELL FRASER KUBASTA PC**
BY: */s/ Daniel C Bitting*____________________________
Daniel C. Bitting
State Bar No. 02362480
**dbitting@fbfk.law**
4301 Westbank Dr., Building A, Suite 225
Austin, Texas 78746
(512) 703-1400
(972) 378-9115 Facsimile

**ATTORNEY FOR DEFENDANT STACY EASTLAND**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been served on all counsel of record, as listed below, on the 5th day of December 2025.

# EXHIBIT 1

# IRREVOCABLE STOCK POWER

**FOR VALUE RECEIVED**, I S. STACY EASTLAND ("Transferor"), hereby SELL, ASSIGN AND TRANSFER unto NATURAL FOUNTAINS PROPERTIES, INC., One Thousand One Hundred Thirty-Eight (1,138) shares of the Common Stock of NATURAL FOUNTAINS PROPERTIES, INC., a Texas corporation (the "Company"), standing in the name of the Transferor on the books of said Company, represented by Certificate Number 4, herewith and do hereby irrevocably constitute and appoint ________________ as attorney-in-fact for the Transferor to transfer the said stock on the books of said Company with full power of substitution in the premises.

**DATED:** November 15, 2012.

TRANSFEROR

S. S. E.
S. STACY EASTLAND

SIGNATURE GUARANTEED
MEDALLION GUARANTEED
GOLDMAN, SACHS & CO
Adriane Schulte
AUTHORIZED SIGNATURE
GS943
Z0000059
NYSE Inc. MEDALLION SIGNATURE PROGRAM

SIGNATURE GUARANTEED:

Goldman Sachs & Co.
Type or Print Name of Bank, Trust Company or Broker)

By: Adriane Schulte
Type or Print Name: ADRIANE SCHULTE
Title: Vice President

SEE RESTRICTIONS ON REVERSE SIDE

ORGANIZED UNDER THE LAWS OF THE STATE OF TEXAS

NUMBER 4

SHARES -1138-

# NATURAL FOUNTAINS PROPERTIES, INC.

COMMON STOCK

The Corporation is Authorized to Issue 100,000 Shares Common Stock – Par Value $2.56 Per Share

This Certifies that S. Stacy Eastland is the owner of One thousand one hundred thirty eight fully paid and non-assessable Shares of the Common Stock of NATURAL FOUNTAINS PROPERTIES, INC. transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and to be sealed with the Seal of the Corporation.

Dated June 1, 1998

Dick Eastland
PRESIDENT

ANY SALE, ASSIGNMENT, TRANSFER, PLEDGE OR OTHER DISPOSITION OF THE SHARES OF STOCK REPRESENTED BY THIS CERTIFICATE IS RESTRICTED BY AND SUBJECT TO THE TERMS AND PROVISIONS OF AN AGREEMENT OF SHAREHOLDERS DATED AS OF JUNE 1, 1998, AMONG THE CORPORATION AND CERTAIN SHAREHOLDERS OF THE CORPORATION. A COPY OF SUCH AGREEMENT IS ON FILE AT THE CORPORATION'S PRINCIPAL PLACE OF BUSINESS AND REGISTERED OFFICE AND MAY BE OBTAINED WITHOUT CHARGE UPON WRITTEN REQUEST TO THE CORPORATION AT ITS PRINCIPAL PLACE OF BUSINESS OR REGISTERED OFFICE. BY ACCEPTANCE OF THIS CERTIFICATE THE HOLDER HEREOF AGREES TO BE BOUND BY THE TERMS OF SUCH AGREEMENT.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations. Additional abbreviations may also be used though not in the list.

TEN COM - as tenants in common
TEN ENT - as tenants by the entireties
JT TEN - as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT - ........................ Custodian .............. (Minor)
under Uniform Gifts to Minors Act ...................................... (State)

PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF ASSIGNEE

*For value received, the undersigned hereby sells, assigns and transfers unto* ..........................

........................................ PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS OF ASSIGNEE ........................................

..........................................................................................

.......................................................................................... *Shares*

*represented by the within Certificate, and hereby irrevocably constitutes and appoints* ..........................

.......................................................................................... *Attorney to transfer the said*

*Shares on the books of the within-named Corporation with full power of substitution in the premises.*

*Dated,* ..............................................

*In presence of* ..............................................

..............................................

NOTICE: The signature to this assignment must correspond with the name as written upon the face of the certificate in every particular without alteration or enlargement, or any change whatever.

# IRREVOCABLE STOCK POWER

**FOR VALUE RECEIVED,** I S. STACY EASTLAND, TRUSTEE OF THE S. STACY EASTLAND QSS TRUST ("Transferor"), hereby SELL, ASSIGN AND TRANSFER unto NATURAL FOUNTAINS PROPERTIES, INC., One Thousand Eight Hundred Sixty-Two (1,862) shares of the Common Stock of NATURAL FOUNTAINS PROPERTIES, INC., a Texas corporation (the "Company"), standing in the name of the Transferor on the books of said Company, represented by Certificate Numbers 12 and 16, herewith and do hereby irrevocably constitute and appoint ________________ as attorney-in-fact for the Transferor to transfer the said stock on the books of said Company with full power of substitution in the premises.

**DATED:** November 15, 2012.

TRANSFEROR

S. S. [signature]
S. STACY EASTLAND, TRUSTEE OF THE
S. STACY EASTLAND QSS TRUST

SIGNATURE GUARANTEED:

Goldman Sachs & Co.
Type or Print Name of Bank, Trust Company or Broker)

By: Adriane Schulte [signature]
Type or Print Name: ADRIANE SCHULTEA
Title: Vice President

SIGNATURE GUARANTEED
MEDALLION GUARANTEED
GOLDMAN, SACHS & CO.
Adriane Schulte [signature]
AUTHORIZED SIGNATURE
GS043 Z0000059
NYSE, INC. MEDALLION SIGNATURE PROGRAM

SEE RESTRICTIONS ON REVERSE SIDE

ORGANIZED UNDER THE LAWS OF THE STATE OF TEXAS

NUMBER 12

SHARES 537

# NATURAL FOUNTAINS PROPERTIES, INC.

COMMON STOCK

The Corporation is Authorized to Issue 100,000 Shares Common Stock - Par Value $2.56 Per Share

**This Certifies that** S. Stacy Eastland, Trustee of the S. Stacy Eastland QSS Trust *is the owner of* Five Hundred Thirty-Seven *fully paid and non-assessable Shares*

of the Common Stock of NATURAL FOUNTAINS PROPERTIES, INC.

*transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.*

**In Witness Whereof,** *the said Corporation has caused this Certificate to be signed by its duly authorized officers and to be sealed with the Seal of the Corporation.*

*Dated* March 18, 2005

PRESIDENT

ANY SALE, ASSIGNMENT, TRANSFER, PLEDGE OR OTHER DISPOSITION OF THE SHARES OF STOCK REPRESENTED BY THIS CERTIFICATE IS RESTRICTED BY AND SUBJECT TO THE TERMS AND PROVISIONS OF AN AGREEMENT OF SHAREHOLDERS DATED AS OF JUNE 1, 1998, AMONG THE CORPORATION AND CERTAIN SHAREHOLDERS OF THE CORPORATION. A COPY OF SUCH AGREEMENT IS ON FILE AT THE CORPORATION'S PRINCIPAL PLACE OF BUSINESS AND REGISTERED OFFICE AND MAY BE OBTAINED WITHOUT CHARGE UPON WRITTEN REQUEST TO THE CORPORATION AT ITS PRINCIPAL PLACE OF BUSINESS OR REGISTERED OFFICE. BY ACCEPTANCE OF THIS CERTIFICATE THE HOLDER HEREOF AGREES TO BE BOUND BY THE TERMS OF SUCH AGREEMENT.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations. Additional abbreviations may also be used though not in the list.

TEN COM - as tenants in common
TEN ENT - as tenants by the entireties
JT TEN - as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT - ........................ Custodian ............. (Minor)
under Uniform Gifts to Minors Act ..................................... (State)

PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF ASSIGNEE

*For value received, the undersigned hereby sells, assigns and transfers unto*

..........................................................................................
PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS OF ASSIGNEE

..........................................................................................

.......................................................................................... *Shares*

*represented by the within Certificate, and hereby irrevocably constitutes and appoints* ..............................

.......................................................................................... *Attorney to transfer the said Shares on the books of the within-named Corporation with full power of substitution in the premises.*

*Dated,* ..........................................................................

*In presence of* ..........................................................................................

..........................................................................................

NOTICE: The signature to this assignment must correspond with the name as written upon the face of the certificate in every particular without alteration or enlargement, or any change whatever.

SEE RESTRICTIONS ON REVERSE SIDE

ORGANIZED UNDER THE LAWS OF THE STATE OF TEXAS

NUMBER 16

SHARES 1,325

# NATURAL FOUNTAINS PROPERTIES, INC.

COMMON STOCK

The Corporation is Authorized to Issue 100,000 Shares Common Stock - Par Value $2.56 Per Share

This Certifies that S. Stacy Eastland, Trustee of the S. Stacy Eastland QSS Trust is the owner of One Thousand Three Hundred Twenty-Five fully paid and non-assessable Shares of the Common Stock of NATURAL FOUNTAINS PROPERTIES, INC. transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and to be sealed with the Seal of the Corporation.

Dated November 19, 2010

PRESIDENT

Liberty Legal® 802 State St. So. Houston TX 77587

ANY SALE, ASSIGNMENT, TRANSFER, PLEDGE OR OTHER DISPOSITION OF THE SHARES OF STOCK REPRESENTED BY THIS CERTIFICATE IS RESTRICTED BY AND SUBJECT TO THE TERMS AND PROVISIONS OF AN AGREEMENT OF SHAREHOLDERS DATED AS OF JUNE 1, 1998, AMONG THE CORPORATION AND CERTAIN SHAREHOLDERS OF THE CORPORATION. A COPY OF SUCH AGREEMENT IS ON FILE AT THE CORPORATION'S PRINCIPAL PLACE OF BUSINESS AND REGISTERED OFFICE AND MAY BE OBTAINED WITHOUT CHARGE UPON WRITTEN REQUEST TO THE CORPORATION AT ITS PRINCIPAL PLACE OF BUSINESS OR REGISTERED OFFICE. BY ACCEPTANCE OF THIS CERTIFICATE THE HOLDER HEREOF AGREES TO BE BOUND BY THE TERMS OF SUCH AGREEMENT.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations. Additional abbreviations may also be used though not in the list.

TEN COM - as tenants in common
TEN ENT - as tenants by the entireties
JT TEN - as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT - ........................ Custodian .............. (Minor)
under Uniform Gifts to Minors Act .................................... (State)

*For value received, the undersigned hereby sells, assigns and transfers unto*

PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF ASSIGNEE

..............................................................................................

PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS OF ASSIGNEE

.............................................................................................. *Shares*

..............................................................................................

*represented by the within Certificate, and hereby irrevocably constitutes and appoints* ..............................

.............................................................................. *Attorney to transfer the said Shares on the books of the within-named Corporation with full power of substitution in the premises.*

*Dated,* ..........................................................................

*In presence of* ..............................................................................

..............................................................................

NOTICE: The signature to this assignment must correspond with the name as written upon the face of the certificate in every particular without alteration or enlargement, or any change whatever.

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacob Mendoza on behalf of Daniel Bitting
Bar No. 2362480
jmendoza@fbfk.law
Envelope ID: 108795470
Filing Code Description: Answer/Response
Filing Description: DEFENDANT STACY EASTLAND'S MOTION TO TRANSFER VENUE, ORIGINAL ANSWER TO PLAINTIFF'S FIRST AMENDED PETITION, AND SPECIAL EXCEPTIONS
Status as of 12/7/2025 1:43 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Crystal DeLeon | | cdeleon@arnolditkin.com | 12/5/2025 5:04:53 PM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 12/5/2025 5:04:53 PM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 12/5/2025 5:04:53 PM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 12/5/2025 5:04:53 PM | SENT |

12/11/2025 4:56 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Eva Fairchild

# RETURN OF SERVICE

**State of Texas** **County of Travis** **459th Judicial District Court**

Case Number: D-1-GN-25-009976

Plaintiffs:
**Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten and Jennifer Getten**

vs.

Defendants:
**Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III**

For:
Arnold & Itkin, LLP
6009 Memorial Drive
Houston, TX 77007

Received by Markus Edvard Fagerberg on the 19th day of November, 2025 at 3:12 pm to be served on **Camp Mystic, LLC by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Travis County, TX 78701**.

I, Markus Edvard Fagerberg, do hereby affirm that on the **19th day of November, 2025** at **3:45 pm, I:**

served **Camp Mystic, LLC** through **The Texas Secretary of State,** by personally delivering **Two True Copies of the Citation and Plaintiffs' First Amended Petition with $55.00 Texas Secretary of State Fee Attached**, and with the date of service endorsed thereon by me, to: **Venita Moss**, as **Authorized Agent** for **The Texas Secretary of State** at the address of **1019 Brazos Street, Austin, Travis County, TX 78701**.

I certify that I am over the age of 18, I am not a party to the suit, and I am a disinterested person with no interest in the outcome of the suit. The facts stated in this declaration are within my personal knowledge and are true and correct. I delivered the listed documents with the date of service endorsed thereon by me and informed the recipient of the contents therein, in compliance with state statutes.

My name is Markus Edvard Fagerberg. I am at least 18 years old. My work address is 1100 Nueces, Austin, TX 78701, United States of America. I declare under penalty of perjury that the foregoing is true and correct. Executed in Travis County, State of Texas, on November 19, 2025 by Markus Edvard Fagerberg, declarant.

**Markus Edvard Fagerberg**
PSC- 23308; Exp. 09/30/2027

**Austin Process LLC**
**1100 Nueces**
**Austin, TX 78701**
**(512) 480-8071**

Our Job Serial Number: MST-2025010677
Ref: Getten v. Mystic

Copyright © 1992-2025 DreamBuilt Software, LLC. - Process Server's Toolbox V9.0e

Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nikole Zermeno on behalf of Kurt Arnold
Bar No. 24036150
nzermeno@arnolditkin.com
Envelope ID: 109012758
Filing Code Description: EXECUTED SERVICE
Filing Description: RETURN OF SERVICE - EDWARD EASTLAND
Status as of 12/12/2025 3:37 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Crystal DeLeon | | cdeleon@arnolditkin.com | 12/11/2025 4:56:44 PM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 12/11/2025 4:56:44 PM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 12/11/2025 4:56:44 PM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 12/11/2025 4:56:44 PM | SENT |

Copy from re:SearchTX

12/11/2025 4:56 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Eva Fairchild

# RETURN OF SERVICE

**State of Texas** **County of Travis** **459th Judicial District Court**

Case Number: D-1-GN-25-009976

Plaintiffs:
**Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten and Jennifer Getten**

vs.

Defendants:
**Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III**

For:
Arnold & Itkin, LLP
6009 Memorial Drive
Houston, TX 77007

Received by James Clinton Ellison on the 19th day of November, 2025 at 3:20 pm to be served on **Edward Eastland, 1105 Lois Street, Kerrville, Kerr County, TX 78028**.

I, James Clinton Ellison, being duly sworn, depose and say that on the **19th day of November, 2025 at 4:50 pm, I:**

**INDIVIDUALLY/PERSONALLY** delivered a true and correct copy of the **Citation and Plaintiffs' First Amended Petition** with the date of service endorsed thereon by me, to: **Edward Eastland** at the address of: **1105 Lois Street, Kerrville, Kerr County, TX 78028**.

I certify that I am over the age of 18, I am not a party to the suit, and I am a disinterested person with no interest in the outcome of the suit. The facts stated in this declaration are within my personal knowledge and are true and correct. I delivered the listed documents with the date of service endorsed thereon by me and informed the recipient of the contents therein, in compliance with state statutes.

*My name is James Ellison. I am at least 18 years old. My work address is* 281 E Lacey Oak Pkwy Kerrville Tx *United States of America. I declare under penalty of perjury that the foregoing is true and correct. Executed in Kerr County, State of Texas on November 19, 2025 by James Ellison, declarant.*

James Clinton Ellison

**James Clinton Ellison**
PSC-3085; Exp. 09/30/2027

**Austin Process LLC**
**1100 Nueces**
**Austin, TX 78701**
**(512) 480-8071**

Our Job Serial Number: MST-2025010676
Ref: Getten v. Mystic

Copyright © 1992-2025 DreamBuilt Software, LLC. - Process Server's Toolbox V9.0e

Copy from re:SearchTX

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nikole Zermeno on behalf of Kurt Arnold
Bar No. 24036150
nzermeno@arnolditkin.com
Envelope ID: 109012758
Filing Code Description: EXECUTED SERVICE
Filing Description: RETURN OF SERVICE - EDWARD EASTLAND
Status as of 12/12/2025 3:37 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Crystal DeLeon | | cdeleon@arnolditkin.com | 12/11/2025 4:56:44 PM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 12/11/2025 4:56:44 PM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 12/11/2025 4:56:44 PM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 12/11/2025 4:56:44 PM | SENT |

Copy from re:SearchTX

12/11/2025 4:56 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Eva Fairchild

# RETURN OF SERVICE

**State of Texas** **County of Travis** **459th Judicial District Court**

Case Number: D-1-GN-25-009976

Plaintiffs:
**Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, Individually and on behalf of the Estate of Ellen Elizabeth Getten and Jennifer Getten**

vs.

Defendants:
**Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III**

For:
Arnold & Itkin, LLP
6009 Memorial Drive
Houston, TX 77007

Received by James Clinton Ellison on the 19th day of November, 2025 at 3:28 pm to be served on **Mary Liz Eastland, 1105 Lois Street, Kerrville, Kerr County, TX 78028**.

I, James Clinton Ellison, being duly sworn, depose and say that on the **19th day of November, 2025 at 4:50 pm, I:**

**INDIVIDUALLY/PERSONALLY** delivered a true and correct copy of the **Citation and Plaintiffs' First Amended Petition** with the date of service endorsed thereon by me, to: **Mary Liz Eastland** at the address of: **1105 Lois Street, Kerrville, Kerr County, TX 78028.**

I certify that I am over the age of 18, I am not a party to the suit, and I am a disinterested person with no interest in the outcome of the suit. The facts stated in this declaration are within my personal knowledge and are true and correct. I delivered the listed documents with the date of service endorsed thereon by me and informed the recipient of the contents therein, in compliance with state statutes.

*My name is James Ellison. I am at least 18 years old. My work address is* 281 E. Lacey Oak Pkwy Kerrville Tx*, United States of America. I declare under penalty of perjury that the foregoing is true and correct. Executed in Kerr County, State of Texas on November 19, 2025 by James Ellison, declarant.*

James Clinton Ellison

**James Clinton Ellison**
PSC-3085; Exp. 09/30/2027

**Austin Process LLC**
**1100 Nueces**
**Austin, TX 78701**
**(512) 480-8071**

Our Job Serial Number: MST-2025010678
Ref: Getten v. Mystic

Copyright © 1992-2025 DreamBuilt Software, LLC. - Process Server's Toolbox V9.0e

Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nikole Zermeno on behalf of Kurt Arnold
Bar No. 24036150
nzermeno@arnolditkin.com
Envelope ID: 109012758
Filing Code Description: EXECUTED SERVICE
Filing Description: RETURN OF SERVICE - EDWARD EASTLAND
Status as of 12/12/2025 3:37 PM CST

Case Contacts

| **Name** | **BarNumber** | **Email** | **TimestampSubmitted** | **Status** |
|---|---|---|---|---|
| Crystal DeLeon | | cdeleon@arnolditkin.com | 12/11/2025 4:56:44 PM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 12/11/2025 4:56:44 PM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 12/11/2025 4:56:44 PM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 12/11/2025 4:56:44 PM | SENT |

Copy from re:SearchTX

12/11/2025 4:56 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Eva Fairchild

# RETURN OF SERVICE

**State of Texas** **County of Travis** **459th Judicial District Court**

Case Number: D-1-GN-25-009976

Plaintiffs:
**Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten and Jennifer Getten**

vs.

Defendants:
**Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III**

For:
Arnold & Itkin, LLP
6009 Memorial Drive
Houston, TX 77007

Received by Markus Edvard Fagerberg on the 19th day of November, 2025 at 3:12 pm to be served on **Mystic Camps Family Partnership, Ltd. by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Travis County, TX 78701**.

I, Markus Edvard Fagerberg, do hereby affirm that on the **19th day of November, 2025** at **3:45 pm, I:**

served **Mystic Camps Family Partnership, Ltd.** through **The Texas Secretary of State,** by personally delivering **Two True Copies of the Citation and Plaintiffs' First Amended Petition with $55.00 Texas Secretary of State Fee Attached**, and with the date of service endorsed thereon by me, to: **Venita Moss**, as **Authorized Agent** for **The Texas Secretary of State** at the address of **1019 Brazos Street, Austin, Travis County, TX 78701**.

I certify that I am over the age of 18, I am not a party to the suit, and I am a disinterested person with no interest in the outcome of the suit. The facts stated in this declaration are within my personal knowledge and are true and correct. I delivered the listed documents with the date of service endorsed thereon by me and informed the recipient of the contents therein, in compliance with state statutes.

My name is Markus Edvard Fagerberg. I am at least 18 years old. My work address is 1100 Nueces, Austin, TX 78701, United States of America. I declare under penalty of perjury that the foregoing is true and correct. Executed in Travis County, State of Texas, on November 19, 2025 by Markus Edvard Fagerberg, declarant.

**Markus Edvard Fagerberg**
PSC- 23308; Exp. 09/30/2027

**Austin Process LLC**
**1100 Nueces**
**Austin, TX 78701**
**(512) 480-8071**

Our Job Serial Number: MST-2025010673
Ref: Getten v. Mystic

Copyright © 1992-2025 DreamBuilt Software, LLC. - Process Server's Toolbox V9.0e

Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nikole Zermeno on behalf of Kurt Arnold
Bar No. 24036150
nzermeno@arnolditkin.com
Envelope ID: 109012758
Filing Code Description: EXECUTED SERVICE
Filing Description: RETURN OF SERVICE - EDWARD EASTLAND
Status as of 12/12/2025 3:37 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Crystal DeLeon | | cdeleon@arnolditkin.com | 12/11/2025 4:56:44 PM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 12/11/2025 4:56:44 PM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 12/11/2025 4:56:44 PM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 12/11/2025 4:56:44 PM | SENT |

Copy from re:SearchTX

12/11/2025 4:56 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Eva Fairchild

# RETURN OF SERVICE

**State of Texas** **County of Travis** **459th Judicial District Court**

Case Number: D-1-GN-25-009976

Plaintiffs:
**Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten and Jennifer Getten**

vs.

Defendants:
**Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III**

For:
Arnold & Itkin, LLP
6009 Memorial Drive
Houston, TX 77007

Received by Markus Edvard Fagerberg on the 19th day of November, 2025 at 3:12 pm to be served on **Mystic Camps Management, LLC by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Travis County, TX 78701**.

I, Markus Edvard Fagerberg, do hereby affirm that on the **19th day of November, 2025** at **3:45 pm, I:**

served **Mystic Camps Management, LLC** through **The Texas Secretary of State,** by personally delivering **Two True Copies of the Citation and Plaintiffs' First Amended Petition with $55.00 Texas Secretary of State Fee Attached**, and with the date of service endorsed thereon by me, to: **Venita Moss, as Authorized Agent** for **The Texas Secretary of State** at the address of **1019 Brazos Street, Austin, Travis County, TX 78701**.

I certify that I am over the age of 18, I am not a party to the suit, and I am a disinterested person with no interest in the outcome of the suit. The facts stated in this declaration are within my personal knowledge and are true and correct. I delivered the listed documents with the date of service endorsed thereon by me and informed the recipient of the contents therein, in compliance with state statutes.

My name is Markus Edvard Fagerberg. I am at least 18 years old. My work address is 1100 Nueces, Austin, TX 78701, United States of America. I declare under penalty of perjury that the foregoing is true and correct. Executed in Travis County, State of Texas, on November 19, 2025 by Markus Edvard Fagerberg, declarant.

**Markus Edvard Fagerberg**
PSC- 23308; Exp. 09/30/2027

**Austin Process LLC**
**1100 Nueces**
**Austin, TX 78701**
**(512) 480-8071**

Our Job Serial Number: MST-2025010675
Ref: Getten v. Mystic

Copyright © 1992-2025 DreamBuilt Software, LLC. - Process Server's Toolbox V9.0e

Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nikole Zermeno on behalf of Kurt Arnold
Bar No. 24036150
nzermeno@arnolditkin.com
Envelope ID: 109012758
Filing Code Description: EXECUTED SERVICE
Filing Description: RETURN OF SERVICE - EDWARD EASTLAND
Status as of 12/12/2025 3:37 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Crystal DeLeon | | cdeleon@arnolditkin.com | 12/11/2025 4:56:44 PM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 12/11/2025 4:56:44 PM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 12/11/2025 4:56:44 PM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 12/11/2025 4:56:44 PM | SENT |

Copy from re:SearchTX

12/11/2025 4:56 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Eva Fairchild

# RETURN OF SERVICE

**State of Texas** | **County of Travis** | **459th Judicial District Court**

Case Number: D-1-GN-25-009976

Plaintiffs:
**Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten and Jennifer Getten**

vs.

Defendants:
**Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III**

For:
Arnold & Itkin, LLP
6009 Memorial Drive
Houston, TX 77007

Received by Markus Edvard Fagerberg on the 19th day of November, 2025 at 3:12 pm to be served on **Natural Fountains Properties, Inc. by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Travis County, TX 78701.**

I, Markus Edvard Fagerberg, do hereby affirm that on the **19th day of November, 2025** at **3:45 pm, I:**

served **Natural Fountains Properties, Inc.** through **The Texas Secretary of State**, by personally delivering **Two True Copies of the Citation and Plaintiffs' First Amended Petition with $55.00 Texas Secretary of State Fee Attached**, and with the date of service endorsed thereon by me, to: **Venita Moss**, as **Authorized Agent** for **The Texas Secretary of State** at the address of **1019 Brazos Street, Austin, Travis County, TX 78701.**

I certify that I am over the age of 18, I am not a party to the suit, and I am a disinterested person with no interest in the outcome of the suit. The facts stated in this declaration are within my personal knowledge and are true and correct. I delivered the listed documents with the date of service endorsed thereon by me and informed the recipient of the contents therein, in compliance with state statutes.

My name is Markus Edvard Fagerberg. I am at least 18 years old. My work address is 1100 Nueces, Austin, TX 78701, United States of America. I declare under penalty of perjury that the foregoing is true and correct. Executed in Travis County, State of Texas, on November 19, 2025 by Markus Edvard Fagerberg, declarant.

**Markus Edvard Fagerberg**
PSC- 23308; Exp. 09/30/2027

**Austin Process LLC**
**1100 Nueces**
**Austin, TX 78701**
**(512) 480-8071**

Our Job Serial Number: MST-2025010672
Ref: Getten v. Mystic

Copyright © 1992-2025 DreamBuilt Software, LLC. - Process Server's Toolbox V9.0e

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nikole Zermeno on behalf of Kurt Arnold
Bar No. 24036150
nzermeno@arnolditkin.com
Envelope ID: 109012758
Filing Code Description: EXECUTED SERVICE
Filing Description: RETURN OF SERVICE - EDWARD EASTLAND
Status as of 12/12/2025 3:37 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Crystal DeLeon | | cdeleon@arnolditkin.com | 12/11/2025 4:56:44 PM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 12/11/2025 4:56:44 PM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 12/11/2025 4:56:44 PM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 12/11/2025 4:56:44 PM | SENT |

Copy from re:SearchTX

RETURN OF SERVICE

12/11/2025 4:56 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Eva Fairchild

**State of Texas** **County of Travis** **459th Judicial District Court**

Case Number: D-1-GN-25-009976

Plaintiffs:
**Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten and Jennifer Getten**

vs.

Defendants:
**Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III**

For:
Arnold & Itkin, LLP
6009 Memorial Drive
Houston, TX 77007

Received by James Clinton Ellison on the 19th day of November, 2025 at 3:33 pm to be served on **Willetta Eastland, A/K/A Tweety Eastland, 200 Coronado Circle, Kerrville, Kerr County, TX 78028**.

I, James Clinton Ellison, do hereby affirm that on the **24th day of November, 2025 at 3:40 pm, I:**

**INDIVIDUALLY/PERSONALLY** delivered a true and correct copy of the **Citation and Plaintiffs' First Amended Petition** with the date of service endorsed thereon by me, to: **Willetta Eastland, A/K/A Tweety Eastland** at the address of: **1105 Lois Street, Kerrville, Kerr County, TX 78028**.

*I certify that I am over the age of 18, I am not a party to the suit, and I am a disinterested person with no interest in the outcome of the suit. The facts stated in this declaration are within my personal knowledge and are true and correct. I delivered the listed documents with the date of service endorsed thereon by me and informed the recipient of the contents therein, in compliance with state statutes.*

*My name is James Ellison. I am at least 18 years old. My work address is , United States of America. I declare under penalty of perjury that the foregoing is true and correct. Executed in Kerr County, State of Texas on November 24, 2025 by James Ellison, declarant.*

James Clinton Ellison

**James Clinton Ellison**
PSC-3085; Exp. 09/30/2027

**Austin Process LLC**
**1100 Nueces**
**Austin, TX 78701**
**(512) 480-8071**

Our Job Serial Number: MST-2025010680
Ref: Getten v. Mystic

Copyright © 1992-2025 DreamBuilt Software, LLC - Process Server's Toolbox V9.0e

Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nikole Zermeno on behalf of Kurt Arnold
Bar No. 24036150
nzermeno@arnolditkin.com
Envelope ID: 109012758
Filing Code Description: EXECUTED SERVICE
Filing Description: RETURN OF SERVICE - EDWARD EASTLAND
Status as of 12/12/2025 3:37 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Crystal DeLeon | | cdeleon@arnolditkin.com | 12/11/2025 4:56:44 PM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 12/11/2025 4:56:44 PM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 12/11/2025 4:56:44 PM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 12/11/2025 4:56:44 PM | SENT |

Copy from re:SearchTX

12/12/2025 9:28 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Candy Schmidt

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten; Linnie Anne McCown, Deceased, by and through Michael McCown, individually and on behalf of the Estate of Linnie Anne McCown, and Callie McCown; Abby Lynn Pohl, Deceased, by and through Matthew Pohl, Individually and on behalf of the Estate of Abby Lynn Pohl, and Kristin Pohl; Margaret Gaffney Sheedy, Deceased, by and through Andrew Sheedy, individually and on behalf of the Estate of Margaret Gaffney Sheedy, and Ellen Sheedy; Mary Barrett Stevens, Deceased, by and through Johnny Stevens, individually and on behalf of the Estate of Mary Barrett Stevens, and Stacy Stevens; Greta Katherine Toranzo, Deceased, by and through Jorge Toranzo, Individually and on behalf of the Estate of Greta Katherine Toranzo, and Ellen Toranzo | § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III | § | |
| *Defendants*. | § | 459th JUDICIAL DISTRICT |

**CAMP MYSTIC DEFENDANTS' MOTION TO TRANSFER VENUE**

TO THE HONORABLE JUDGE OF SAID COURT:

Come now NATURAL FOUNTAINS PROPERTIES, INC. DBA CAMP MYSTIC, INC; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC; CAMP MYSTIC, LLC; WILLETTA EASTLAND, EDWARD EASTLAND; and MARY LIZ EASTLAND, hereinafter referred to as CAMP MYSTIC DEFENDANTS and files this Motion to Transfer Venue and would respectfully show the Court as follows:

## I. INTRODUCTION

1. This lawsuit arises out of the July 4, 2025, historic catastrophic flood in Hunt, Kerr County, Texas. Travis County is not the proper venue for this case. None of the acts out of which this lawsuit arose occurred in Travis County. Plaintiff has no viable claims against Defendants Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC. At the time of the July 4, 2025, flood Defendant, Willetta "Tweety" Eastland, was residing at Camp Mystic in Kerr County, Texas. Edward Eastland and Mary Liz Eastland are both residents of Kerr County, Texas.

2. To sustain venue in Travis County, there must be a valid cause of action against a Travis County resident defendant. In this case there is not. If this case goes to trial in Travis County, it will be tried in a county of improper venue. Trial in an improper venue is automatically harmful and reversible error. For these reasons, the case must be transferred to Kerr County, the only proper venue for this matter to be tried.

3. Defendants specifically deny the venue facts as alleged by Plaintiffs. Defendants specifically deny that Mystic Camps Family Partnership, Ltd. is a proper party to this litigation. Defendants specifically deny that Mystic Camps Family Partnership, Ltd. had any employee, much less employees with decision making authority, in Travis County on July 4, 2025, the date of the catastrophic flooding giving rise to this lawsuit.

4. Defendants specifically deny that Mystic Camps Management, LLC is a proper party to this litigation. Defendants specifically deny that Mystic Camps Management, LLC had any employee, much less employees with decision making authority, in Travis County on July 4, 2025, the date of the catastrophic flooding giving rise to this lawsuit.

5. Defendants specifically deny the cause of action against Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC arises from the same transaction or occurrence as Plaintiffs' cause of action against the proper Defendants, Camp Mystic, LLC and Natural Fountains Properties, Inc.

6. The case should also be transferred to Kerr County for the convenience of the parties and, in particular, the third-party witnesses. All relevant events in this lawsuit took place in Kerr County. Potential witnesses include camp staff members who reside in Kerr County and local Kerr County officials. Furthermore, a site visit may be necessary so that the factfinder can see and appreciate the layout of the property and its elevations and the extent of the flood's damage. In contrast, there is no particular relevance of Travis County to this case; substantially all of the events or occurrences that give rise to the Plaintiffs' suit took place in Kerr County.

7. Defendants specifically deny that Willeta Eastland was physically residing in Travis County on July 4, 2025, the date of the catastrophic flooding giving rise to this lawsuit. Willetta Eastland was living in Kerr County at the time of this horrific flood.

## II. BACKGROUND

8. Plaintiffs allege causes of action against Defendants including negligence, gross negligence, and premises liability, among others as a result of the catastrophic flooding that occurred on July 4, 2025, in Hunt, Kerr County, Texas. The historic flood resulted in the loss of more than one hundred lives, and is the subject of a separately filed lawsuit pending in Kerr County in Cause Number 25476A, *Christie Floyd et. al v. Davis Investment Ventures, LLC d/b/a The Davis Companies*.

9. Plaintiffs correctly assert that Camp Mystic ("the Camp") was operated by Camp Mystic, LLC, which leased the property upon which the Camp operates from Natural Fountain Properties, Inc. These are the only two entities which had any role in ownership, possession, or control over Camp Mystic.

10. Mystic Camps Family Partnership, Ltd. is a holding company that has no role in ownership, possession or control over Camp Mystic. It does not have any employees or agents with decision making authority. It does not have any role in camp operations.

11. Mystic Camps Management, LLC is a holding company that has no role in ownership, possession or control over Camp Mystic. It does not have any employees or agents with decision making authority. It does not have any role in camp operations.

~~12.~~ Willetta Eastland is the widow of Richard "Dick" Eastland, who also perished in the flood. Willetta Eastland was a resident of Hunt, Kerr County, Texas at the time of the incident. Willetta Eastland was not residing in Travis County at the time of the incident. Willetta Eastland is a resident of Kerr County at the time of the filing of this Motion to Transfer Venue.

13. Plaintiffs filed this suit in Travis County. Their venue choice rests on their incorrect allegation that Mystic Camps Family Partnership, Ltd and Mystic Camps Management, LLC are proper parties to this lawsuit. These entities are not proper parties to the suit. Neither entity has any role in ownership, possession, or control over Camp Mystic. Neither entity has any employees. These entities exist purely for estate planning purposes of Willetta Eastland and Richard Eastland as a means of passing on the legacy of their life's work to their children. In that regard, the facts giving rise to Plaintiffs' claims have no connection to Travis County. The catastrophic flood event giving rise to Plaintiffs' claims occurred in Kerr County. The principal office of the Camp operates in Kerr County. All of the Eastlands resided at Camp Mystic, Kerr County, Texas, at the time of the July 4, 2025 flood. Accordingly, and as set forth more fully below, Defendants respectfully request the Court grant their Motion to Transfer Venue and Order this matter transferred to the District Court in Kerr County.

## III. ARGUMENT & AUTHORITIES

### A. Motion to Transfer Venue Standard

14. Plaintiffs have the initial right to choose venue. However, an improper choice waives that right and gives a defendant the right to have the suit transferred to a proper venue. *Wilson v. Tex. Parks & Wildlife Dep't*, 886 S.W.2d 259, 260 & n.1 (Tex. 1994); *Union Carbide Corp. v. Loftin*, 256 S.W.3d 869, 874 (Tex. App.—Beaumont 2008, pet. dism'd). "Proper" venue is defined by statute as: "(1) the venue required by the mandatory provisions of Subchapter B ['Mandatory Venue'] or another statute prescribing

mandatory venue; or (2) if Subdivision (1) does not apply, the venue provided by [the general venue rule] or Subchapter C [‘Permissive Venue’].” TEX. CIV. PRAC. & REM. CODE § 15.001(b).

15. A defendant challenges a plaintiff’s improper venue choice through a motion to transfer venue. TEX. R. CIV. P. 86. Once challenged, the burden then shifts to the plaintiff to prove that venue is maintainable in the county of suit. TEX. R. CIV. P. 87(3)(a). If the plaintiff fails to meet this burden, the trial court must transfer the lawsuit to another specified county of proper venue. *See* TEX. CIV. PRAC. & REM. CODE § 15.063; *Wilson*, 886 S.W.2d at 260.

**B. Travis is an Improper County of Venue Because None of the Proper Defendants are Situated in Travis County.**

16. Plaintiffs’ choice of venue is improper because none of the proper defendants in this suit have a principal office in Travis County. Specifically, Plaintiffs’ venue allegations are that Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC’s principal place of business are in Travis County, and that Willetta Eastland resides in Travis County. Defendants expressly deny these allegations. Tex. R. Civ. P. 87(3)(a).

17. Venue is improper in Travis County because the venue defendant must be a material defendant for venue, based on that defendant’s residence, to be proper. *See, e.g., T.S. Lankford & Sons, Inc. v. Harry Eldridge Co., Inc.*, 359 S.W.2d 663 (Tex. Civ. App. Texarkana 1962, writ dism’d) (there must be proof of a valid cause of action against the resident defendant to sustain venue against residents and nonresidents); *Union Pacific Railroad Co. v. Cezar*, 293 S.W.3d 800 (Tex. App. - Beaumont 2009, no pet.) (the sole defendant who was alleged to reside in the venue county was not a proper venue defendant, thus, because “trial in a county of improper venue is never harmless error,” the court concluded that the case should be reversed and transferred to a proper county for a new trial) *Pines of Westbury, Ltd. v. Paul Michael Const., Inc.*, 993 S.W.2d 291 (Tex. App. Eastland 1999, no writ) (summary judgment in favor of only venue defendant destroyed proper venue and made denial of another defendant’s earlier motion to transfer improper). As these cases demonstrate, if there is no valid claim against the alleged venue

defendants, venue is improper in the county of suit, and on appeal, the case must be reversed and remanded for a new trial in the proper county of venue.

**i. Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC, are not proper parties and cannot serve as a basis to establish venue.**

18. The principal offices of Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC should not be used to establish venue in Travis County because they are improper parties in this lawsuit. Neither of these entities has any employees. They do not own, operate, or control Camp Mystic, nor do they have any other connection to the facts underlying this lawsuit.

19. The county of a defendant's principal office in the state, if the defendant is not a natural person, is a permissible county of venue. TEX. CIV. PRAC. & REM. CODE §15.002(a)(3). A "principal office" is defined as a principal office of a corporation in which the decision makers for the organization within this state conduct the daily affairs of the organization. The mere presence of an agency or a representative does not establish a principal office. TEX. CIV. PRAC. & REM. CODE §15.001(a). The Texas Supreme Court has concluded that a corporation may have more than one principal office. *In re Missouri Pacific Railroad Co.*, 998 S.W.2d 212, 217 (Tex. 1999). Specifically, to establish venue based upon a principal office, a plaintiff must show: (1) the employees in the county where the lawsuit was filed are "decision makers" for the company and (2) the employees in the county where the lawsuit was filed have "substantially equal responsibility and authority" relative to other company officials within the state. *Id*.

20. The case law makes it clear that there must be evidence that corporate decision makers exist to establish venue against the corporation. Here, there are no such corporate decision makers and no principal place of business for Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC because there is no business for either entity to conduct. Mystic Camps Family Partnership, Ltd. is a holding company that has no employees, that owns no real property, and has no role in Camp operations. Mystic Camps Management, LLC is a holding company that has no employees, that owns no real property, and has no role in Camp operations. Plaintiffs' strategic decision to include these entities in the suit was purely for venue purposes based on the mailing address of these holding companies.

**ii. Plaintiffs' live pleading establishes venue is improper in Travis County.**

21. There is no dispute that the events which brought about this litigation occurred in Hunt, Kerr County, Texas. Plaintiffs' pleadings correctly assert that the Camp is operated by Camp Mystic, LLC and the property is owned by Natural Fountains Properties, Inc. Both of these entities operate their place of business in Kerr County, where the Camp is located. Plaintiffs assert no facts which demonstrate Mystic Camps Family Partnership, Ltd. or Mystic Camps Management, LLC had a role in Camp operations or in the alleged acts or omissions giving rise to Plaintiffs' causes of actions.

22. Despite conceding that the Eastland family have controlled the operations of Camp Mystic, located in Kerr County, Texas, for generations, and alleging Willetta Eastland was involved in acts or omissions that occurred in Kerr County, Texas, Plaintiffs improperly seek to establish venue in Travis County. It is clear from the facts that the only proper venue for this case is in Kerr County, where the two entities responsible for Camp Mystic operations and control of Camp Mystic property maintain their principal place of business, and where administration of the estate of Richard Eastland is pending.

**C. In the alternative, this case should be transferred to Kerr County for the convenience of the parties and witnesses.**

23. Under Texas Civil Practice and Remedies Code Section 15.002, a court may transfer venue to another county of proper venue for the convenience of the parties and the witnesses and in the interests of justice. As discussed above, substantially all of the relevant events that make up the basis of this suit took place in Kerr County, Texas. The flooding took place there and the relevant acts of the proper Defendants took place there.

24. Beyond the Eastland family members, other relevant non-party witnesses also reside and work in Kerr County. Potential witnesses include camp staff that live in Kerr County, who might be called upon to testify about camp conditions and procedures. They also include local Kerr County officials, who might be called upon to testify about conditions on July 4th, emergency responses, systems for notification and warning, and the causes and effects of the July 4th flood. None of them have any particular relation to Travis County.

25. It may also be necessary or advisable for the factfinder to make a site visit in order to truly understand the camp layout and elevation, to see the relationships between the Guadalupe River and various camp buildings, and to understand the effects of the flooding, in a way that maps and two-dimensional representations cannot convey. Such a visit will only be possible if the case is transferred to Kerr County.

26. Finally, there is no prejudice to the Plaintiffs for the case to be transferred to Kerr County. The Plaintiffs reside in numerous places around the state, and there is no particular connection between Travis County and the events of July 4th. The Court should therefore transfer the case to Kerr County for the convenience of the parties and witnesses and in the interests of justice.

## IV. SUMMARY AND CONCLUSION

27. Plaintiffs improperly seek to fix venue in Travis County based on the joinder of two corporate entities who have no employees, no principal place of business, no decision making employees, and no connection to the facts underlying this lawsuit. None of the acts out of which this lawsuit arose occurred in Travis County. Accordingly, venue in Travis County is improper and maintenance of this suit in Travis County constitutes harmful and reversible error. Even if this case were properly in Travis County, it should be transferred to Kerr County, as substantially all of the witnesses reside there and substantially all of the events took place there. For these reasons, this matter must be transferred to Kerr County.

**WHEREFORE, PREMISES CONSIDERED,** Defendants request that this matter be set for hearing with notice to all parties, and that after such hearing, that the Court grant Defendant's Motion to Transfer Venue, and transfer the above styled and numbered cause to Kerr County, Texas. Defendants further pray that any costs of court incurred before the transfer be taxed against Plaintiffs and for such other and further relief, at law or in equity, to which Defendants may show themselves justly entitled.

Respectfully submitted,

**RAY | PEÑA | MCCHRISTIAN, P.C.**
9601 McAllister Freeway, Suite 901
San Antonio, Texas 78216
P: (210) 341-3554
F: (210) 341-3557

By: */s/ Jeff Ray*
JEFF RAY
State Bar No. 16604400
jray@raylaw.com
*Attorney for Camp Mystic, LLC*

**WATTS LAW FIRM LLP**
110 Tributary Ranch Road
Mountain Home, Texas 78058
P: (512) 479-0500

*/s/Mikal Watts*
MIKAL WATTS
State Bar No. 20981820
mikal@wattsllp.com
*Attorney for Natural Fountains Properties, Inc. DBA Camp Mystic, Inc.; Willetta Eastland; Mystic Camps Family Partnership, Ltd.; and Mystic Camps Management, LLC*

**CASTAGNA SCOTT LLP**
1120 S. Capital of Texas Highway
Building 2, Suite 300
Austin, Texas 78746
512/329-3290
888/255-0132 fax

*/s/ Lynn S. Castagna*
LYNN S. CASTAGNA
State Bar No. 03980520
Lynn@texasdefense.com
*Attorney for Edward Eastland and Mary Liz Eastland*

**WRIGHT CLOSE BARGER & GUZMAN, LLP**
One Riverway, Suite 2200
Houston, Texas 77056
Telephone: (713) 572-4321
Facsimile: (713) 572-4320

*/s/Thomas C. Wright*
Thomas C. Wright
State Bar No. 22059400
wright@wrightclosebarger.com
Jessica Z. Barger
State Bar No. 24032706
barger@wrightclosebarger.com
Kenneth J. Fair
State Bar No. 24007171
fair@wrightclosebarger.com
*Attorneys for Camp Mystic, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument has been served to all counsel of record in accordance with Texas Rule of Civil Procedure 21 on December 12, 2025.

*/s/ Jeff Ray*
**JEFF RAY**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Linda Gonzales on behalf of Jeff Ray
Bar No. 16604400
lgonzales@raylaw.com
Envelope ID: 109065637
Filing Code Description: Motion (No Fee)
Filing Description: CAMP MYSTIC DEFENDANTS' MOTION TO TRANSFER VENUE
Status as of 12/14/2025 3:09 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jeff Ray | | jray@raylaw.com | 12/12/2025 9:28:10 PM | SENT |
| Crystal DeLeon | | cdeleon@arnolditkin.com | 12/12/2025 9:28:10 PM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 12/12/2025 9:28:10 PM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 12/12/2025 9:28:10 PM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 12/12/2025 9:28:10 PM | SENT |
| Katherine Estrada | | kestrada@raylaw.com | 12/12/2025 9:28:10 PM | SENT |
| Laura Rua | | lrua@raylaw.com | 12/12/2025 9:28:10 PM | SENT |
| Linda Gonzales | | lgonzales@raylaw.com | 12/12/2025 9:28:10 PM | SENT |
| Mikal Watts | | mikal@wattsllp.com | 12/12/2025 9:28:10 PM | SENT |
| Kenneth Fair | | fair@wrightclosebarger.com | 12/12/2025 9:28:10 PM | SENT |
| Tom Wright | | wright@wrightclosebarger.com | 12/12/2025 9:28:10 PM | SENT |
| Jessica Barger | | barger@wrightclosebarger.com | 12/12/2025 9:28:10 PM | SENT |
| Larry Matthys | | lmatthys@raylaw.com | 12/12/2025 9:28:10 PM | SENT |
| Lynn Castagna | | lynn@texasdefense.com | 12/12/2025 9:28:10 PM | SENT |
| Suzanne Goss | | goss@wrightclosebarger.com | 12/12/2025 9:28:10 PM | SENT |

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten; Linnie Anne McCown, Deceased, by and through Michael McCown, individually and on behalf of the Estate of Linnie Anne McCown, and Callie McCown; Abby Lynn Pohl, Deceased, by and through Matthew Pohl, Individually and on behalf of the Estate of Abby Lynn Pohl, and Kristin Pohl; Margaret Gaffney Sheedy, Deceased, by and through Andrew Sheedy, individually and on behalf of the Estate of Margaret Gaffney Sheedy, and Ellen Sheedy; Mary Barrett Stevens, Deceased, by and through Johnny Stevens, individually and on behalf of the Estate of Mary Barrett Stevens, and Stacy Stevens; Greta Katherine Toranzo, Deceased, by and through Jorge Toranzo, Individually and on behalf of the Estate of Greta Katherine Toranzo, and Ellen Toranzo | § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III | § | |
| *Defendants*. | § | 459th JUDICIAL DISTRICT |

**CAMP MYSTIC DEFENDANTS' ORIGINAL ANSWER SUBJECT TO MOTION TO TRANSFER VENUE**

TO THE HONORABLE JUDGE OF SAID COURT:

Come now NATURAL FOUNTAINS PROPERTIES, INC. DBA CAMP MYSTIC, INC; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC; CAMP MYSTIC, LLC; WILLETTA EASTLAND, EDWARD EASTLAND; and MARY LIZ EASTLAND, hereinafter referred to as CAMP MYSTIC DEFENDANTS, and file their Original Answer to Plaintiffs' Original Petition filed subject to their Motions to Transfer Venue, and would respectfully state the following:

## I. TRCP 92 DEFENSES

1. Camp Mystic defendants, pursuant to Texas Rule of Civil Procedure 92, invoke the protections available to them under Texas Law and demand legally sufficient proof of the accusations asserted against them by a preponderance of the legal evidence or clear and convincing evidence where required by Texas law, as opposed to speculation or conjecture. Camp Mystic defendants respectfully request that the Court hold Plaintiffs to the burden required by the laws and the constitution of the State of Texas.

## II. BACKGROUND AND AFFIRMATIVE DEFENSES

Camp Mystic defendants answer and provide background information and affirmative defenses in response to Plaintiffs' pleadings.

2. On the morning of July 4, 2025, the most devasting flood known in the history of Kerr County, TX occurred. Extreme rainfall and massive surges of rapidly moving floodwaters devastated Kerr County, and the communities of Hunt, Ingram, and Kerrville, Texas. At least 135 people lost their lives, including 28 lives lost at Camp Mystic. Weather data from multiple scientific sources confirmed and determined that a convergence of severe weather systems, rather than continuing to move through the area (as was anticipated by weather and radar information),

literally stopped and sat upstream and over Camp Mystic and surrounding areas, pouring over 100 billion gallons of water in the Kerr County area within hours.




USGS Stage Data



3. Notably, over 10 billion gallons of water fell in less than 3 hours in the South Fork of the Guadalupe River, upstream from Camp Mystic. This volume of water that fell in the South Fork is more than the amount of water that flows over Niagara Falls during the same time period.

USGS Flow Data




4. The Guadalupe River rose dramatically to more than 26 feet in less than 45 minutes. Kerrville recorded a rise in the Guadalupe River at over 32 feet in 1.5 hours. Camp Mystic, as well as other residences, experienced catastrophic and sudden flooding, combined with rapidly moving water that overwhelmed the camp, residences, and communities. As the chart below reveals, the gallons per second of rainfall was negligible at midnight. The gallons of rainfall per second at 3:00 AM had increased in intensity but would not have been expected to come near or reach any structures at Camp Mystic. Dramatically, and unexpectedly, according to weather

data, shortly before 3:30 AM, the rainfall became catastrophic, unprecedented, and quickly overwhelmed the Kerr County area. The graphic below charts the unprecedented sudden rainfall event.




| | |
|---|---|
| 12:00 AM | 53 |
| 3:00 AM | 264 |
| 3:30 AM | 125,000 |

5. The graphic below is provided by the National Oceanic and Atmospheric Administration (NOAA). A NOAA National Water Protection Service Gauge data visibly demonstrates the sudden and dramatic rise in the surge of water that overwhelmed Camp Mystic, residences and communities within its destructive path. During the critical times of evacuating all campers, Camp Mystic was hit with a sudden and overwhelming surge of water that engulfed the camp. Within a matter of moments, water levels at the Guadalupe River rose from less than 5 feet to over 20 feet. Further, the flood waters continued to violently rise to higher and higher levels, cresting at over 34 feet.







6. Scientific data further confirmed that this catastrophic flooding far exceeded any prior flood recorded in the Camp Mystic area by significant magnitudes. The historical data demonstrates that prior flood history, including the floods of 1932, 1978, and 1984 and 1987, were

all below the elevations of Camp Mystic's Twins and Bubble Inn cabins, and below the 100-year floodplain. Twins Cabin has been in existence since at least 1927. Neither of these cabins had experienced previous flooding. On July 4, 2025, flood waters suddenly rose not only to the floor elevations of these cabins, but to the ceilings and beyond. Kerr County Engineers and officials documented and confirmed that the devasting flood is clearly beyond a 1,000-year flood event, completely off the charts, and never anticipated.




7. Camp Mystic defendants therefore deny Plaintiffs' allegations that the cabins where the children, counselors and camp director perished had experienced prior flooding. These allegations are false.

8. Camp Mystic was not provided with an evacuation notification until well after the sudden swell and surge of water had already engulfed the camp and lives were lost. Emergency personnel requested Code Red alerts at 4:22 AM; however, the authorization for such alert was not issued until 40 minutes later, at approximately 5:02 AM. Regardless, Camp Mystic had suffered catastrophic flooding and loss of lives long before the evacuation alert.

9. Camp Mystic and surrounding residences were not provided with sirens, flood warning systems, or floodwater monitoring systems that could have provided warnings of the

surging waters moving toward Camp Mystic. Despite recommendations and proposals for state-of-the-art warning systems, warning systems along the waterways were not provided. Along with other camp directors in the area, Dick Eastland—who died while trying to rescue campers from the raging floodwaters, —advocated for such systems to be put in place.

Gmail

Dick Eastland [redacted]

**Old Kerr County Flood system map**

4 messages

**Dick Eastland** [redacted] Thu, Aug 23, 2018 at 11:22 AM

To: [redacted]

Cc: [redacted]

Dear Matt,

Enjoyed visiting with you yesterday. I hope you got my text but the quality of the map picture was poor. Attached is a better copy of the old Flood System while on the UGRA board in the late 1980s and early 90s. So glad GBRA took over this system and the real time rain gages are fantastic. The only limitations are the river level sensors upstream. During major flood events that info can be crucial to buy precious time before it hits downstream. Back in the old days there was a level sensor at location #9 (South Fork Ranch) but it was removed years ago. To me that is the most critical as it will buy us about 30 minutes during an event. Location #13 at West Perkins would be good as well. We have been here for some critical big floods including 1978, 1984, 2000 and many others.

I am also attaching an old 1988 UGRA report we had commissioned years ago for your info.

Hope this info is useful. Thanks, Dick [redacted]

10. Weather alerts that were provided were issued after 1:14 AM. The notification was flash flood warning alerts for Highway 39. Highway 39 is located adjacent to the Guadalupe River around Camp Mystic, other camps, residences, and Hunt, TX.

Fri, Jul 4 at 1:14 AM

CodeRED Weather Warning: The NWS has issued a Flash Flood Warning for your HIGHWAY 39 location from 1:14 AM July 4 until 4:15 AM July 4.

11. The flash flood warning of 1:14 AM was not an evacuation notice or evacuation alert. It was not a life-threatening situation notice. There were no alerts to evacuate or leave the area before the sudden and unexpected rush of floodwater occurred.

12. While Camp Mystic was already engulfed by the surging waters at 3:35 AM, the National Weather Service issued a warning at 3:35 AM, noting an Emergency Alert flash flood warning that was a dangerous and life-threatening situation. The Emergency Alert continued to warn people not to attempt to travel.




13. Camp Mystic had already begun evacuations from the cabins near 3:00 AM and prior to the 3:35 A.M. warning. Over 150 campers and counselors had been evacuated before the sudden surge and rise of rapid floodwaters came through the camp. As images demonstrate below, by the time the 3:35 AM flash flood life-threatening warning was issued, Camp Mystic was already experiencing the sudden surge and rise of rapid floodwaters that went from ground level to levels that reached ceilings and beyond in several cabins.

14. The photograph below was taken at 3:23 AM and shows campers continuing to evacuate to the Rec Center.




The photograph below demonstrates that within a few minutes, the water level rose rapidly during the evacuations.



15. Plaintiffs' accusations that Camp Mystic defendants were warned to evacuate and did virtually nothing, is false.

16. Plaintiffs' accusations that Dick Eastland, deceased, Edward Eastland, and other Camp Mystic personnel failed to monitor weather conditions is also false. On the contrary, camp personnel monitored the weather. Dick Eastland and others monitored weather information multiple times from a camp weather station, through the internet, and through other communications. Some cell phone data shown below from Dick Eastland's cell phone is just one example of ongoing monitoring of the weather by the camp.

| | |
|---|---|
| com.chaney.MyAcuRite | **Start time:** 7/4/2025 1:00:23 AM(UTC-5)<br><br>**End time:** 7/4/2025 1:01:41 AM(UTC-5) |
| com.geoterrestrial.noaaradar | **Start time:** 7/4/2025 12:56:36 AM(UTC-5)<br><br>**End time:** 7/4/2025 1:00:22 AM(UTC-5) |
| com.chaney.MyAcuRite | **Start time:** 7/4/2025 12:55:15 AM(UTC-5)<br><br>**End time:** 7/4/2025 12:56:08 AM(UTC-5) |
| com.geoterrestrial.noaaradar | **Start time:** 7/4/2025 12:53:06 AM(UTC-5)<br><br>**End time:** 7/4/2025 12:55:10 AM(UTC-5) |
| com.chaney.MyAcuRite | **Start time:** 7/4/2025 12:42:38 AM(UTC-5)<br><br>**End time:** 7/4/2025 12:45:18 AM(UTC-5) |

| | |
|---|---|
| com.chaney.MyAcuRite | **Start time:** 7/4/2025 1:15:44 AM(UTC-5)<br><br>**End time:** 7/4/2025 1:16:25 AM(UTC-5) |
| com.apple.weather | **Start time:** 7/4/2025 1:13:44 AM(UTC-5)<br><br>**End time:** 7/4/2025 1:15:11 AM(UTC-5) |
| com.geoterrestrial.noaaradar | **Start time:** 7/4/2025 1:13:08 AM(UTC-5)<br><br>**End time:** 7/4/2025 1:13:40 AM(UTC-5) |

| | | | |
|---|---|---|---|
| com.chaney.MyAcuRite | **Start time:** 7/4/2025 2:06:10 AM(UTC-5)<br><br>**End time:** 7/4/2025 2:06:18 AM(UTC-5) | com.chaney.MyAcuRite | **Start time:** 7/4/2025 2:26:54 AM(UTC-5)<br><br>**End time:** 7/4/2025 2:26:56 AM(UTC-5) |
| com.chaney.MyAcuRite | **Start time:** 7/4/2025 2:06:05 AM(UTC-5)<br><br>**End time:** 7/4/2025 2:06:07 AM(UTC-5) | com.chaney.MyAcuRite | **Start time:** 7/4/2025 2:13:01 AM(UTC-5)<br><br>**End time:** 7/4/2025 2:14:59 AM(UTC-5) |
| com.chaney.MyAcuRite | **Start time:** 7/4/2025 2:03:55 AM(UTC-5)<br><br>**End time:** 7/4/2025 2:06:05 AM(UTC-5) | com.geoterrestrial.noaaradar | **Start time:** 7/4/2025 2:12:21 AM(UTC-5)<br><br>**End time:** 7/4/2025 2:13:01 AM(UTC-5) |

17. No weather service, no radar, and no governmental agency anticipated, forecasted nor expected the more than 1,000 year unprecedented and historic flood of July 4, 2025. The weather data demonstrates that the July 4, 2025 sudden flooding far exceeded any previous flood in the area.

18. Camp Mystic is regulated by the State of Texas through inspections of its facility, policies, and procedures. Two days prior to July 4, 2025, state inspections by DSHS were again conducted, and no deficiencies or violations were cited or noted.

TEXAS DEPARTMENT OF STATE HEALTH SERVICES
Consumer Protection Division
PO Box 149347, Austin, TX 78714
(512) 834-6660

| | | | |
|---|---|---|---|
| Facility Name | CAMP MYSTIC INC | License Type | Youth Camp License |
| Facility Address | 2689 HWY 39 HUNT TX 78024 | License Number | 133010 |
| Inspection Type | Discretionary/Special | Inspection Number | 15818 |
| Inspector | ZAMARRIPA, MARICELA | Inspection Date | 07/02/2025 |

This notice is to acknowledge that the Texas Department of State Health Services (DSHS) conducted an inspection of or visited your business on the date listed above. The information that has been gathered is subject to further department review, and you may receive additional correspondence as a result.

There is no deficiency/violation cited or noted within the scope of this inspection/visit.

19. Plaintiffs' accusation that the Twins and Bubble Inn cabins are within the 100-year FEMA determined flood zone is false. Engineering surveys confirm that all cabin floor elevations are above the FEMA determined elevations, including the Twins and Bubble Inn cabins.

Below is an illustration of the FEMA base flood elevation levels shaded in green.




FEMA BASE FLOOD ELEVATION
100-YEAR (1% AEP)

**CAMP MYSTIC**
HUNT, TEXAS

The illustrations below show the contrast between the FEMA base flood elevations and the historic flood levels of July 4, 2025, shaded in green.




The illustration below further shows the historic flooding level of July 4, 2025 compared to the FEMA base flood elevation.



The accusation that Camp Mystic somehow changed or altered the FEMA determined 100-year floodplain elevation is false. 100-year Floodplain elevation altitudes are set and determined by FEMA. These elevations have not changed. Any engineering or surveying professional who has performed such a survey confirms that elevations of structures are above the 100-year floodplain. FEMA confirmed that the surveys were correct. Plaintiffs were offered the opportunity to conduct surveys and inspections to confirm these elevations and findings that FEMA has also confirmed.

**DETERMINATION**

| LOT | BLOCK/ SECTION | SUBDIVISION | STREET | OUTCOME WHAT IS REMOVED FROM THE SFHA | FLOOD ZONE | 1% ANNUAL CHANCE FLOOD ELEVATION (NAVD 88) | LOWEST ADJACENT GRADE ELEVATION (NAVD 88) | LOWEST LOT ELEVATION (NAVD 88) |
|---|---|---|---|---|---|---|---|---|
| -- | -- | -- | 2689 Highway 39 | Structure (Building 13) | X (shaded) | 1838.5 feet | 1843.5 feet | -- |

**Special Flood Hazard Area (SFHA)** - The SFHA is an area that would be inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood).

ADDITIONAL CONSIDERATIONS (Please refer to the appropriate section on Attachment 1 for the additional considerations listed below.)

DETERMINATION TABLE (CONTINUED)
PORTIONS REMAIN IN THE FLOODWAY

This document provides the Federal Emergency Management Agency's determination regarding a request for a Letter of Map Amendment for the property described above. Using the information submitted and the effective National Flood Insurance Program (NFIP) map, we have determined that the structure(s) on the property(ies) is/are not located in the SFHA, an area inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood). This document amends the effective NFIP map to remove the subject property from the SFHA located on the effective NFIP map; therefore, the Federal mandatory flood insurance requirement does not apply. However, the lender has the option to continue the flood insurance requirement to protect its financial risk on the loan.

This determination is based on the flood data presently available. The enclosed documents provide additional information regarding this determination. If you have any questions about this document, please contact the FEMA Mapping and Insurance eXchange (FMIX) toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, LOMC Clearinghouse, 3601 Eisenhower Avenue, Suite 500, Alexandria, VA 22304-6426.

Luis V. Rodriguez, P.E., Director
Engineering and Modeling Division
Federal Insurance and Mitigation Administration

20. Unlike Camp Mystic, according to the Texas Water Development Board, there are millions of people in Texas who live near or within a 100-year floodplain map. These structures

include houses, dormitories, living quarters and related housing. These structures have been deemed to be reasonably safe and adequate for housing.






21. Plaintiffs' accusations that Camp Mystic has experienced floods similar to the magnitude of July 4, 2025, are false. As previously noted, scientific data clearly demonstrates that prior floods, including the floods of 1932, 1978, and 1985, were well below the elevations of Camp Mystic's Twins and Bubble Inn cabins, and well below the 100-year floodplain. Twins Cabin, in existence since at least 1927, has no flooding history. Bubble Inn, adjacent to Twins, likewise has no flooding history. Plaintiffs' accusation that the cabins where the children, counselors, and Dick Eastland perished had experienced prior flooding is false.

22. Pleading further, Plaintiffs' damages were caused directly and exclusively by the violence of nature, without human intervention or cause, and could not have been prevented by reasonable foresight or care. Specifically, the damages for which Plaintiffs seek recovery were caused by a more than 1,000-year flood event which occurred on July 4, 2025.

23. The flood event underlying this lawsuit was an event not proximately caused by the negligence of any party to the occurrence.

24. Plaintiffs' damages were the result of independent, intervening, superseding, or supervening factors, occurrences, or conditions that were not caused by Camp Mystic, LLC.

25. Camp Mystic Defendants plead and rely upon the legislative limitations on damages under Texas law as set forth in all applicable provisions of the Texas Civil Practice and Remedies Code, including but not limited to Section 41.0105.

26. Camp Mystic defendants plead and rely upon the legislative limitations of liability and damages available under Chapter 75 of the Texas Civil Practice and Remedies Code.

27. Camp Mystic defendants plead and rely upon the provisions of Civil Practice and Remedies Code Sec. 171 applicable to this matter and assert all defenses available under these sections.

28. Camp Mystic defendants plead their compliance with FEMA's Letter of Map Amendment (LOMA), and as such, are excluded from FEMA's "floodplain," as defined in Section 762.001(4) of the Texas Health & Safety Code. Any allegation alleging Camp Mystic's role concerning FEMA's Letter of Map Amendment is therefore preempted by the Supremacy Clause of Article VI, Clause 2 of the United States Constitution.

29. Camp Mystic defendants hereby invoke the doctrine of comparative fault under applicable law, and request a determination of percentage of any responsibility among responsible third parties, any settling persons, and parties. Camp Mystic defendants plead any and all provisions of Chapters 32 and 33 of the Texas Civil Practice and Remedies Code applicable to this action.

30. Under Texas law, any award of prejudgment interest must be governed and limited by the provisions of Chapter 304, Subchapter B of the Texas Finance Code.

31. Camp Mystic defendants assert the affirmative defenses of waiver and release.

32. Camp Mystic defendants assert, where applicable, the exclusive remedy under Section 408.001 of the Texas Labor Code.

33. Defendants assert that Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC, are not liable in the capacity in which they have been sued.

34. Camp Mystic defendants reserve the right to assert such other defenses as continuing investigation and discovery may reveal, and the right to amend or supplement this Answer at any time.

35. Camp Mystic defendants further plead that any exemplary damages, if plead and found, must be capped under applicable Texas law, and the Due Process Clause of the United States and Texas Constitutions.

WHEREFORE, PREMISES CONSIDERED, Defendant Camp Mystic defendants pray for judgment in their favor, that Defendants recover costs, and for such other and further relief to which they may show themselves justly entitled.

Respectfully submitted,

**WATTS LAW FIRM LLP**
110 Tributary Ranch Road
Mountain Home, Texas 78058
P: (512) 479-0500

*/s/Mikal Watts*
MIKAL WATTS
State Bar No. 20981820
mikal@wattsllp.com
*Attorney for Natural Fountains Properties, Inc. DBA Camp Mystic, Inc.; Willetta Eastland; Mystic Camps Family*

*Partnership, Ltd.; and Mystic Camps Management, LLC*

**RAY | PEÑA, P.C.**
9601 McAllister Freeway, Suite 901
San Antonio, Texas 78216
P: (210) 341-3554
F: (210) 341-3557

*/s/ Jeff Ray*
JEFF RAY
State Bar No. 16604400
jray@raylaw.com
*Attorney for Camp Mystic, LLC*

**CASTAGNA SCOTT LLP**
1120 S. Capital of Texas Highway
Building 2, Suite 300
Austin, Texas 78746
512/329-3290
888/255-0132 fax

*/s/ Lynn S. Castagna*
LYNN S. CASTAGNA
State Bar No. 03980520
Lynn@texasdefense.com
*Attorney for Edward Eastland and Mary Liz Eastland*

**WRIGHT CLOSE BARGER & GUZMAN, LLP**
One Riverway, Suite 2200
Houston, Texas 77056
Telephone: (713) 572-4321
Facsimile: (713) 572-4320

*/s/Thomas C. Wright*
Thomas C. Wright
State Bar No. 22059400
wright@wrightclosebarger.com
Jessica Z. Barger
State Bar No. 24032706
barger@wrightclosebarger.com
Kenneth J. Fair

State Bar No. 24007171
fair@wrightclosebarger.com
*Attorneys for Camp Mystic, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument has been served to all counsel of record in accordance with Texas Rule of Civil Procedure 21 on December 12, 2025.

*/s/ Jeff Ray*
**JEFF RAY**

12/12/2025 12:29 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Nancy Ramirez

# AFFIDAVIT OF SERVICE

**State of Texas** **County of Travis** **459th Judicial District Court**

Case Number: D-1-GN-25-009976

Plaintiffs:
**Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten and Jennifer Getten**

vs.

Defendants:
**Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III**

For:
Arnold & Itkin, LLP
6009 Memorial Drive
Houston, TX 77007

Received by James Clinton Ellison on the 13th day of November, 2025 at 10:48 am to be served on **Edward Eastland, 1105 Lois Street, Kerrville, Kerr County, TX 78028.**

I, James Clinton Ellison, being duly sworn, depose and say that on the **13th day of November, 2025** at **1:10 pm, I:**

**INDIVIDUALLY/PERSONALLY** delivered a true and correct copy of the **Citation and Plaintiffs' Original Petition** with the date of service endorsed thereon by me, to: **Edward Eastland** at the address of: **1105 Lois Street, Kerrville, Kerr County, TX 78028.**

I certify that I am over the age of 18, I am not a party to the suit, and I am a disinterested person with no interest in the outcome of the suit. The facts stated in this affidavit are within my personal knowledge and are true and correct. I delivered the listed documents with the date of service endorsed thereon by me and informed the recipient of the contents therein, in compliance with state statutes.

Subscribed and Sworn to before me on the ~~14th~~ 17th LB day of November, 2025 by the affiant who is personally known to me.

Laraine Bohnert
NOTARY PUBLIC

LARAINE BOHNERT
Notary ID #6751669
My Commission Expires
July 22, 2028

James C Ellison
**James Clinton Ellison**
PSC-3085; Exp. 09/30/2027

**Austin Process LLC**
**1100 Nueces**
**Austin, TX 78701**
**(512) 480-8071**

Our Job Serial Number: MST-2025010477
Ref: Getten v. Mystic

Copyright © 1992-2025 DreamBuilt Software, LLC - Process Server's Toolbox V9.0e

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nikole Zermeno on behalf of Kyle Findley
Bar No. 24076382
nzermeno@arnolditkin.com
Envelope ID: 109039885
Filing Code Description: EXECUTED SERVICE
Filing Description: EXECUTED SERVICE-CITATION MYSTIC CAMPS FAMILY PARTNERSHIP, LTD
Status as of 12/18/2025 10:23 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Crystal DeLeon | | cdeleon@arnolditkin.com | 12/12/2025 12:29:56 PM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 12/12/2025 12:29:56 PM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 12/12/2025 12:29:56 PM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 12/12/2025 12:29:56 PM | SENT |

Copy from re:SearchTX

12/12/2025 12:29 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Nancy Ramirez

# AFFIDAVIT OF SERVICE

**State of Texas** **County of Travis** **459th Judicial District Court**

Case Number: D-1-GN-25-009976

Plaintiffs:
**Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, Individually and on behalf of the Estate of Ellen Elizabeth Getten and Jennifer Getten**

vs.

Defendants:
**Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III**

For:
Arnold & Itkin, LLP
6009 Memorial Drive
Houston, TX 77007

Received by James Clinton Ellison on the 13th day of November, 2025 at 10:49 am to be served on **Mary Liz Eastland, 1105 Lois Street, Kerrville, Kerr County, TX 78028**.

I, James Clinton Ellison, being duly sworn, depose and say that on the **14th day of November, 2025 at 2:45 pm, I:**

**INDIVIDUALLY/PERSONALLY** delivered a true and correct copy of the **Citation and Plaintiffs' Original Petition** with the date of service endorsed thereon by me, to: **Mary Liz Eastland** at the address of: **1105 Lois Street, Kerrville, Kerr County, TX 78028**.

I certify that I am over the age of 18, I am not a party to the suit, and I am a disinterested person with no interest in the outcome of the suit. The facts stated in this affidavit are within my personal knowledge and are true and correct. I delivered the listed documents with the date of service endorsed thereon by me and informed the recipient of the contents therein, in compliance with state statutes.

Subscribed and Sworn to before me on the ~~14th~~ 17th LB day of November, 2025 by the affiant who is personally known to me.

Laraine Bohnert
NOTARY PUBLIC

LARAINE BOHNERT
Notary ID #6751669
My Commission Expires
July 22, 2028

J C Ellison
**James Clinton Ellison**
PSC-3085; Exp. 09/30/2027

**Austin Process LLC**
**1100 Nueces**
**Austin, TX 78701**
**(512) 480-8071**

Our Job Serial Number: MST-2025010476
Ref: Getten v. Mystic

Copyright © 1992-2025 DreamBuilt Software, LLC. - Process Server's Toolbox V9.0e

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nikole Zermeno on behalf of Kyle Findley
Bar No. 24076382
nzermeno@arnolditkin.com
Envelope ID: 109039885
Filing Code Description: EXECUTED SERVICE
Filing Description: EXECUTED SERVICE-CITATION MYSTIC CAMPS FAMILY PARTNERSHIP, LTD
Status as of 12/18/2025 10:23 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Crystal DeLeon | | cdeleon@arnolditkin.com | 12/12/2025 12:29:56 PM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 12/12/2025 12:29:56 PM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 12/12/2025 12:29:56 PM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 12/12/2025 12:29:56 PM | SENT |

Copy from re:SearchTX

12/12/2025 12:29 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Nancy Ramirez

# RETURN OF SERVICE

**State of Texas** **County of Travis** **459th Judicial District Court**

Case Number: D-1-GN-25-009976

Plaintiffs:
**Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten and Jennifer Getten**

vs.

Defendants:
**Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III**

For:
Arnold & Itkin, LLP
6009 Memorial Drive
Houston, TX 77007

Received by Markus Edvard Fagerberg on the 12th day of November, 2025 at 3:24 pm to be served on **Mystic Camps Management, LLC by serving through the Secretary of State, Jane Nelson, or Her Agent/Successor, 1019 Brazos Street, Austin, Travis County, TX 78701**.

I, Markus Edvard Fagerberg, being duly sworn, depose and say that on the **12th day of November, 2025** at **3:50 pm, I:**

served **Mystic Camps Management, LLC** through **The Texas Secretary of State,** by personally delivering **Two True Copies of the Citation and Plaintiffs' Original Petition with $55.00 Texas Secretary of State Fee Attached**, and with the date of service endorsed thereon by me, to: **Venita Moss,** as **Authorized Agent** for **The Texas Secretary of State** at the address of **1019 Brazos Street, Austin, Travis County, TX 78701**.

I certify that I am over the age of 18, I am not a party to the suit, and I am a disinterested person with no interest in the outcome of the suit. The facts stated in this declaration are within my personal knowledge and are true and correct. I delivered the listed documents with the date of service endorsed thereon by me and informed the recipient of the contents therein, in compliance with state statutes.

*My name is Markus Edvard Fagerberg. I am at least 18 years old. My work address is 1100 Nueces, Austin, TX 78701, United States of America. I declare under penalty of perjury that the foregoing is true and correct. Executed in Travis County, State of Texas, on November 12, 2025 by Markus Edvard Fagerberg, declarant.*

**Markus Edvard Fagerberg**
PSC- 23308; Exp. 09/30/2027

**Austin Process LLC**
**1100 Nueces**
**Austin, TX 78701**
**(512) 480-8071**

Our Job Serial Number: MST-2025010457
Ref: Getten v. Mystic

Copyright © 1992-2025 DreamBuilt Software, LLC. - Process Server's Toolbox V9.0e

Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nikole Zermeno on behalf of Kyle Findley
Bar No. 24076382
nzermeno@arnolditkin.com
Envelope ID: 109039885
Filing Code Description: EXECUTED SERVICE
Filing Description: EXECUTED SERVICE-CITATION MYSTIC CAMPS FAMILY PARTNERSHIP, LTD
Status as of 12/18/2025 10:23 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Crystal DeLeon | | cdeleon@arnolditkin.com | 12/12/2025 12:29:56 PM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 12/12/2025 12:29:56 PM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 12/12/2025 12:29:56 PM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 12/12/2025 12:29:56 PM | SENT |

Copy from re:SearchTX

12/12/2025 12:29 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Nancy Ramirez

# RETURN OF SERVICE

**State of Texas** **County of Travis** **459th Judicial District Court**

Case Number: D-1-GN-25-009976

Plaintiffs:
**Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten and Jennifer Getten**

vs.

Defendants:
**Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III**

For:
Arnold & Itkin, LLP
6009 Memorial Drive
Houston, TX 77007

Received by Lucas Joseph McGill on the 13th day of November, 2025 at 9:00 am to be served on **Natural Fountains Properties, Inc. by serving through the Secretary of State, Jane Nelson, or Her Agent/Successor, 1019 Brazos Street, Austin, Travis County, TX 78701**.

I, Lucas Joseph McGill, do hereby affirm that on the **13th day of November, 2025** at **10:54 am, I:**

served **Natural Fountains Properties, Inc.** through **The Texas Secretary of State,** by personally delivering **Two True Copies of the Citation and Plaintiffs' Original Petition with $55.00 Texas Secretary of State Fee Attached**, and with the date of service endorsed thereon by me, to: **Michael Orta,** as **Authorized Agent** for **The Texas Secretary of State** at the address of **1019 Brazos Street, Austin, Travis County, TX 78701**.

I certify that I am over the age of 18, I am not a party to the suit, and I am a disinterested person with no interest in the outcome of the suit. The facts stated in this declaration are within my personal knowledge and are true and correct. I delivered the listed documents with the date of service endorsed thereon by me and informed the recipient of the contents therein, in compliance with state statutes.

*My name is Lucas Joseph McGill. I am at least 18 years old. My work address is 1100 Nueces, Austin, TX 78701, United States of America. I declare under penalty of perjury that the foregoing is true and correct. Executed in Travis County, State of Texas, on November 13, 2025 by Lucas Joseph McGill, declarant.*

**Lucas Joseph McGill**
PSC-16408; Exp. 02/28/2027

**Austin Process LLC**
**1100 Nueces**
**Austin, TX 78701**
**(512) 480-8071**

Our Job Serial Number: MST-2025010464
Ref: Getten v. Mystic

Copyright © 1992-2025 DreamBuilt Software, LLC. - Process Server's Toolbox V9.0e

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nikole Zermeno on behalf of Kyle Findley
Bar No. 24076382
nzermeno@arnolditkin.com
Envelope ID: 109039885
Filing Code Description: EXECUTED SERVICE
Filing Description: EXECUTED SERVICE-CITATION MYSTIC CAMPS FAMILY PARTNERSHIP, LTD
Status as of 12/18/2025 10:23 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Crystal DeLeon | | cdeleon@arnolditkin.com | 12/12/2025 12:29:56 PM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 12/12/2025 12:29:56 PM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 12/12/2025 12:29:56 PM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 12/12/2025 12:29:56 PM | SENT |

Copy from re:SearchTX

12/12/2025 12:29 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Nancy Ramirez

# DECLARATION OF DUE DILIGENCE

**State of Texas** **County of Travis** **459th Judicial District Court**

Case Number: D-1-GN-25-009976

Plaintiffs:
**Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten and Jennifer Getten**

vs.

Defendants:
**Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III**

For:
Arnold & Itkin, LLP
6009 Memorial Drive
Houston, TX 77007

Received by James Clinton Ellison on the 14th day of November, 2025 at 11:04 am to be served on **Willetta Eastland, A/K/A Tweety Eastland, 200 Coronado Cir, Kerrville, Kerr County, TX 78028**.

I, James Clinton Ellison, being duly sworn, depose and say that I:

**NON-SERVED** the **Citation and Plaintiffs' Original Petition.** After diligent efforts to locate **Willetta Eastland at 200 Coronado Cir, Kerrville, Kerr County, TX 78028**, I was unable to verify whether or not **Willetta Eastland** can be found at this address. The specifics of my efforts are reflected below.

**Additional Information pertaining to this Service:**
11/14/2025 Attempted service at 200 Coronado Cir, Kerrville, TX 78028. belongs to Willetta Eastland's brother. He indicates his sister has been staying out at Camp Mystic (not at his house), but right now she is out-of-state. He thought she may be back in several days. I gave him my contact information, and he agreed he would get that information to his sister.

When I served Mary Liz Eastland, she confirmed that Willetta Eastland , A/K/A Tweety Eastland, was out-of-state and was tentatively schedule to return to Kerrville next Friday, 21 Nov. Their schedules are pretty hectic right now with flood related activities. They also took my contact information to pass to Willetta Eastland. I also asked them to let me know if her return date gets changed or cancelled.

I certify that I am over the age of 18, I am not a party to the suit, and I am a disinterested person with no interest in the outcome of the suit. The facts stated in this affidavit are within my personal knowledge and are true and correct. My name is James Clinton Ellison. I am at least 18 years old. My work address is 281 E-Lacey Oak Pkwy Kerrville TX 78028, United States of America. I declare under penalty of perjury that the foregoing is true and correct. Executed in Kerr County on 19 Nov 2025 2025 by James Clinton Ellison, declarant.

James Clinton Ellison
**James Clinton Ellison**
PSC-3085; Exp. 09/30/2027

**Austin Process LLC**
**1100 Nueces**
**Austin, TX 78701**
**(512) 480-8071**

Our Job Serial Number: MST-2025010513
Ref: Getten v. Mystic

Copyright © 1992-2025 DreamBuilt Software, LLC - Process Server's Toolbox V9.0e

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nikole Zermeno on behalf of Kyle Findley
Bar No. 24076382
nzermeno@arnolditkin.com
Envelope ID: 109039885
Filing Code Description: EXECUTED SERVICE
Filing Description: EXECUTED SERVICE-CITATION MYSTIC CAMPS FAMILY PARTNERSHIP, LTD
Status as of 12/18/2025 10:23 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Crystal DeLeon | | cdeleon@arnolditkin.com | 12/12/2025 12:29:56 PM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 12/12/2025 12:29:56 PM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 12/12/2025 12:29:56 PM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 12/12/2025 12:29:56 PM | SENT |

Copy from re:SearchTX

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten; Linnie Anne McCown, Deceased, by and through Michael McCown, individually and on behalf of the Estate of Linnie Anne McCown, and Callie McCown; Abby Lynn Pohl, Deceased, by and through Matthew Pohl, Individually and on behalf of the Estate of Abby Lynn Pohl, and Kristin Pohl; Margaret Gaffney Sheedy, Deceased, by and through Andrew Sheedy, individually and on behalf of the Estate of Margaret Gaffney Sheedy, and Ellen Sheedy; Mary Barrett Stevens, Deceased, by and through Johnny Stevens, individually and on behalf of the Estate of Mary Barrett Stevens, and Stacy Stevens; Greta Katherine Toranzo, Deceased, by and through Jorge Toranzo, Individually and on behalf of the Estate of Greta Katherine Toranzo, and Ellen Toranzo | § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III | § | |
| *Defendants*. | § | 459th JUDICIAL DISTRICT |

**WILLIAM NEELY BONNER III'S MOTION TO TRANSFER VENUE**

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now Defendant WILLIAM NEELY BONNER, III and files this Motion to Transfer Venue and would respectfully show the Court as follows:

## I. BACKGROUND AND INTRODUCTION

1. This lawsuit arises out of the July 4, 2025, historic catastrophic flooding in Kerr County, Texas. Travis County is not the proper venue for this case. None of the acts out of which this lawsuit arose occurred in Travis County. William Neely Bonner III ("Bonner") has no connection to the facts underlying this lawsuit other than his title as President of Natural Fountains Properties, Inc., one of the named corporate defendants. Bonner is not a resident of Travis County, Texas.

2. To sustain venue in Travis County, there must be a valid cause of action against a Travis County resident defendant. In this case there is not.

3. The case should further be transferred to Kerr County for the convenience of the parties and, in particular, the third-party witnesses. All or substantially all relevant events in this lawsuit took place in Kerr County. Potential witnesses include residents of Kerr County, responders, witnesses, camp staff members who reside in Kerr County and local Kerr County officials. The location of the property is in Kerr County, Texas, and any inspections or viewing of the property would be in Kerr County. In contrast, there is no particular relevance of Travis County to this case; substantially all of the events or occurrences that give rise to the Plaintiffs' suit took place in Kerr County.

## II. ARGUMENT & AUTHORITIES

### A. Motion to Transfer Venue Standard

4. Plaintiffs have the initial right to choose venue. However, an improper choice waives that right and gives a defendant the right to have the suit transferred to a proper venue. *Wilson v. Tex. Parks & Wildlife Dep't*, 886 S.W.2d 259, 260 & n.1 (Tex. 1994); *Union Carbide Corp. v. Loftin*, 256 S.W.3d 869, 874 (Tex. App.—Beaumont 2008, pet. dism'd). "Proper" venue is defined by statute as: "(1) the venue required by the mandatory provisions of Subchapter B ['Mandatory Venue'] or another statute prescribing mandatory venue; or (2) if Subdivision (1) does not apply, the venue provided by [the general venue rule] or Subchapter C ['Permissive Venue']." TEX. CIV. PRAC. & REM. CODE § 15.001(b).

5. A defendant challenges a plaintiff's improper venue choice through a motion to transfer venue. TEX. R. CIV. P. 86. Once challenged, the burden then shifts to the plaintiff to prove that venue is maintainable in the county of suit. TEX. R. CIV. P. 87(3)(a). If the plaintiff fails to meet this burden, the trial court must transfer the lawsuit to another specified county of proper venue. *See* TEX. CIV. PRAC. & REM. CODE § 15.063; *Wilson*, 886 S.W.2d at 260.

**B. This case should be transferred to Kerr County for the convenience of the parties and witnesses.**

6. Under Texas Civil Practice and Remedies Code Section 15.002, a court may transfer venue to another county of proper venue for the convenience of the parties and the witnesses and in the interests of justice. As discussed above, substantially all of the relevant events that make up the basis of this suit took place in Kerr County, Texas. The flooding took place there and the relevant acts of the proper Defendants took place there.

7. Beyond the Eastland family members, other relevant non-party witnesses also reside and work in Kerr County. Potential witnesses include camp staff that live in Kerr County, who might be called upon to testify about camp conditions and procedures. They also include local Kerr County officials, who might be called upon to testify about conditions on July 4th, emergency responses, systems for notification and warning, and the causes and effects of the July 4th flood. None of them have any particular relation to Travis County.

8. It may also be necessary or advisable for the factfinder to make a site visit in order to truly understand the camp layout and elevation, to see the relationships between the Guadalupe River and various camp buildings, and to understand the effects of the flooding, in a way that maps and two-dimensional representations cannot convey. Such a visit will only be possible if the case is transferred to Kerr County.

9. Finally, there is no prejudice to the Plaintiffs for the case to be transferred to Kerr County. The Plaintiffs reside in numerous places around the state, and there is no particular connection between Travis County and the events of July 4th. The Court should therefore transfer the case to Kerr County for the convenience of the parties and witnesses and in the interests of justice.

## III. SUMMARY AND CONCLUSION

10. Plaintiffs improperly seek to fix venue in Travis County. None of the acts out of which this lawsuit arose occurred in Travis County. Accordingly, venue in Travis County is improper and maintenance of this suit in Travis County constitutes harmful and reversible error. Even if this case were properly in Travis County, it should be transferred to Kerr County, as substantially all of the witnesses reside there and substantially all of the events took place there. For these reasons, this matter must be transferred to Kerr County.

**WHEREFORE, PREMISES CONSIDERED,** William Neely Bonner III requests that this matter be set for hearing with notice to all parties, and that after such hearing, that the Court grant Defendant's Motion to Transfer Venue, and transfer the above styled and numbered cause to Kerr County, Texas. Defendant further prays that any costs of court incurred before the transfer be taxed against Plaintiffs and for such other and further relief, at law or in equity, to which Defendant may show himself justly entitled.

Respectfully submitted,

**CASTAGNA SCOTT LLP**
1120 S. Capital of Texas Highway
Building 2, Suite 300
Austin, Texas 78746
512/329-3290
888/255-0132 fax

*/s/ Lynn S. Castagna*
LYNN S. CASTAGNA
State Bar No. 03980520
Lynn@texasdefense.com
*Attorney for William Neely Bonner, III*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served to all counsel of record in accordance with Texas Rule of Civil Procedure 21 on December 15, 2025.

*/s/ Lynn S. Castagna*
**LYNN S. CASTAGNA**

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten; Linnie Anne McCown, Deceased, by and through Michael McCown, individually and on behalf of the Estate of Linnie Anne McCown, and Callie McCown; Abby Lynn Pohl, Deceased, by and through Matthew Pohl, Individually and on behalf of the Estate of Abby Lynn Pohl, and Kristin Pohl; Margaret Gaffney Sheedy, Deceased, by and through Andrew Sheedy, individually and on behalf of the Estate of Margaret Gaffney Sheedy, and Ellen Sheedy; Mary Barrett Stevens, Deceased, by and through Johnny Stevens, individually and on behalf of the Estate of Mary Barrett Stevens, and Stacy Stevens; Greta Katherine Toranzo, Deceased, by and through Jorge Toranzo, Individually and on behalf of the Estate of Greta Katherine Toranzo, and Ellen Toranzo | § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III | § | |
| *Defendants*. | § | 459th JUDICIAL DISTRICT |

**DEFENDANT WILLIAM NEELY BONNER III'S ORIGINAL ANSWER TO PLAINTIFF'S FIRST AMENDED PETITION FILED SUBJECT TO DEFENDANT'S MOTION TO TRANSFER VENUE**

To the Honorable District Court Judge:

Defendant William Neely Bonner III ("Bonner") files this Original Answer filed subject to his Motion to Transfer Venue, and would respectfully state the following:

## I. TRCP 92 DEFENSES

1. Bonner, pursuant to Texas Rule of Civil Procedure 92, invokes the protections available to him under Texas law, and demands legally sufficient proof of the accusations asserted against him by a preponderance of the legal evidence or clear and convincing evidence where required by Texas law, as opposed to speculation or conjecture. Bonner respectfully requests that the Court hold Plaintiffs to the burden required by the laws and constitution of the State of Texas.

## II. AFFIRMATIVE DEFENSES

2. Plaintiffs' damages were caused directly and exclusively by the violence of nature, without human intervention or cause, and could not have been prevented by reasonable foresight or care. Specifically, the damages for which Plaintiffs seek recovery were caused by a more than 1,000-year flood event which occurred on July 4, 2025.

3. The flood event underlying this lawsuit was an event not proximately caused by the negligence of any party to the occurrence.

4. Plaintiffs' damages were the result of independent, intervening, superseding, or supervening factors, occurrences, or conditions that were not caused by Bonner.

5. Bonner pleads and relies upon the legislative limitations on damages under Texas law as set forth in all applicable provisions of the Texas Civil Practice and Remedies Code, including but not limited to Section 41.0105.

6. Bonner pleads and relies upon the legislative limitations of liability and damages available under Chapter 75 of the Texas Civil Practice and Remedies Code.

7. Bonner pleads and relies upon the provisions of Civil Practice and Remedies Code Sec. 171 applicable to this matter and assert all defenses available under these sections.

8. Bonner hereby invokes the doctrine of comparative fault under applicable law, and request a determination of percentage of any responsibility among responsible third parties, any settling persons, and parties. Bonner pleads any and all provisions of Chapters 32 and 33 of the Texas Civil Practice and Remedies Code applicable to this action.

9. Under Texas law, any award of prejudgment interest must be governed and limited by the provisions of Chapter 304, Subchapter B of the Texas Finance Code.

10. Bonner asserts the affirmative defenses of waiver and release.

11. Bonner reserves the right to assert such other defenses as continuing investigation and discovery may reveal, and the right to amend or supplement this Answer at any time.

12. Bonner further pleads that any exemplary damages, if plead and found, must be capped under applicable Texas law, and the Due Process Clause of the United States and Texas Constitutions.

WHEREFORE, PREMISES CONSIDERED, Defendant William Neely Bonner III prays for judgment in his favor, that he recover his costs, and for such other and further relief to which he may show himself justly entitled.

Respectfully submitted,

**CASTAGNA SCOTT LLP**
1120 S. Capital of Texas Highway
Building 2, Suite 300
Austin, Texas 78746
512/329-3290
888/255-0132 fax

*/s/ Lynn S. Castagna*
LYNN S. CASTAGNA
State Bar No. 03980520

Lynn@texasdefense.com
*Attorney for William Neely Bonner, III*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument has been served to all counsel of record in accordance with Texas Rule of Civil Procedure 21 on December 15, 2025.

*/s/ Lynn S. Castagna*
LYNN S. CASTAGNA

# RETURN OF SERVICE

**State of Texas** **County of Travis** **459th Judicial District Court**

Case Number: D-1-GN-25-009976

Plaintiffs:
**Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten and Jennifer Getten**

vs.

Defendants:
**Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III**

For:
Arnold & Itkin, LLP
6009 Memorial Drive
Houston, TX 77007

Received by Markus Edvard Fagerberg on the 12th day of November, 2025 at 3:24 pm to be served on **Camp Mystic, LLC by serving through the Secretary of State, Jane Nelson, or Her Agent/Successor, 1019 Brazos Street, Austin, Travis County, TX 78701**.

I, Markus Edvard Fagerberg, being duly sworn, depose and say that on the **12th day of November, 2025** at **3:50 pm, I:**

served **Camp Mystic, LLC** through **The Texas Secretary of State,** by personally delivering **Two True Copies of the Citation and Plaintiffs' Original Petition with $55.00 Texas Secretary of State Fee Attached**, and with the date of service endorsed thereon by me, to: **Venita Moss,** as **Authorized Agent** for **The Texas Secretary of State** at the address of **1019 Brazos Street, Austin, Travis County, TX 78701**.

I certify that I am over the age of 18, I am not a party to the suit, and I am a disinterested person with no interest in the outcome of the suit. The facts stated in this declaration are within my personal knowledge and are true and correct. I delivered the listed documents with the date of service endorsed thereon by me and informed the recipient of the contents therein, in compliance with state statutes.

*My name is Markus Edvard Fagerberg. I am at least 18 years old. My work address is 1100 Nueces, Austin, TX 78701, United States of America. I declare under penalty of perjury that the foregoing is true and correct. Executed in Travis County, State of Texas, on November 12, 2025 by Markus Edvard Fagerberg, declarant.*

**Markus Edvard Fagerberg**
PSC- 23308; Exp. 09/30/2027

**Austin Process LLC**
**1100 Nueces**
**Austin, TX 78701**
**(512) 480-8071**

Our Job Serial Number: MST-2025010456
Ref: Getten v. Mystic

Copyright © 1992-2025 DreamBuilt Software, LLC. - Process Server's Toolbox V9.0e

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nikole Zermeno on behalf of Kyle Findley
Bar No. 24076382
nzermeno@arnolditkin.com
Envelope ID: 109039885
Filing Code Description: EXECUTED SERVICE
Filing Description: EXECUTED SERVICE-CITATION MYSTIC CAMPS FAMILY PARTNERSHIP, LTD
Status as of 12/18/2025 10:23 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Crystal DeLeon | | cdeleon@arnolditkin.com | 12/12/2025 12:29:56 PM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 12/12/2025 12:29:56 PM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 12/12/2025 12:29:56 PM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 12/12/2025 12:29:56 PM | SENT |

Copy from re:SearchTX

# RETURN OF SERVICE

**State of Texas** **County of Travis** **459th Judicial District Court**

Case Number: D-1-GN-25-009976

Plaintiffs:
**Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten and Jennifer Getten**

vs.

Defendants:
**Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III**

For:
Arnold & Itkin, LLP
6009 Memorial Drive
Houston, TX 77007

Received by Markus Edvard Fagerberg on the 12th day of November, 2025 at 3:24 pm to be served on **Mystic Camps Family Partnership, LTD. by serving through the Secretary of State, Jane Nelson, or Her Agent/Successor, 1019 Brazos Street, Austin, Travis County, TX 78701**.

I, Markus Edvard Fagerberg, being duly sworn, depose and say that on the **12th day of November, 2025** at **3:50 pm, I:**

served **Mystic Camps Family Partnership, LTD.** through **The Texas Secretary of State,** by personally delivering **Two True Copies of the Citation and Plaintiffs' Original Petition with $55.00 Texas Secretary of State Fee Attached**, and with the date of service endorsed thereon by me, to: **Venita Moss,** as **Authorized Agent** for **The Texas Secretary of State** at the address of **1019 Brazos Street, Austin, Travis County, TX 78701**.

I certify that I am over the age of 18, I am not a party to the suit, and I am a disinterested person with no interest in the outcome of the suit. The facts stated in this declaration are within my personal knowledge and are true and correct. I delivered the listed documents with the date of service endorsed thereon by me and informed the recipient of the contents therein, in compliance with state statutes.

*My name is Markus Edvard Fagerberg. I am at least 18 years old. My work address is 1100 Nueces, Austin, TX 78701, United States of America. I declare under penalty of perjury that the foregoing is true and correct. Executed in Travis County, State of Texas, on November 12, 2025 by Markus Edvard Fagerberg, declarant.*

**Markus Edvard Fagerberg**
PSC- 23308; Exp. 09/30/2027

**Austin Process LLC**
**1100 Nueces**
**Austin, TX 78701**
**(512) 480-8071**

Our Job Serial Number: MST-2025010459
Ref: Getten v. Mystic

Copyright © 1992-2025 DreamBuilt Software, LLC. - Process Server's Toolbox V9.0e

Copy from re:SearchTX

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nikole Zermeno on behalf of Kyle Findley
Bar No. 24076382
nzermeno@arnolditkin.com
Envelope ID: 109039885
Filing Code Description: EXECUTED SERVICE
Filing Description: EXECUTED SERVICE-CITATION MYSTIC CAMPS FAMILY PARTNERSHIP, LTD
Status as of 12/18/2025 10:23 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Crystal DeLeon | | cdeleon@arnolditkin.com | 12/12/2025 12:29:56 PM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 12/12/2025 12:29:56 PM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 12/12/2025 12:29:56 PM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 12/12/2025 12:29:56 PM | SENT |

Copy from re:SearchTX

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten; Linnie Anne McCown, Deceased, by and through Michael McCown, individually and on behalf of the Estate of Linnie Anne McCown, and Callie McCown; Abby Lynn Pohl, Deceased, by and through Matthew Pohl, Individually and on behalf of the Estate of Abby Lynn Pohl, and Kristin Pohl; Margaret Gaffney Sheedy, Deceased, by and through Andrew Sheedy, individually and on behalf of the Estate of Margaret Gaffney Sheedy, and Ellen Sheedy; Mary Barrett Stevens, Deceased, by and through Johnny Stevens, individually and on behalf of the Estate of Mary Barrett Stevens, and Stacy Stevens; Greta Katherine Toranzo, Deceased, by and through Jorge Toranzo, Individually and on behalf of the Estate of Greta Katherine Toranzo, and Ellen Toranzo | § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III | § | |
| *Defendants*. | § | 459th JUDICIAL DISTRICT |

**DEFENDANT SEABORN STACY EASTLAND'S MOTION FOR SANCTIONS**

Defendant Seaborn Stacy Eastland ("Stacy") files this Motion for Sanctions ("Motion") against Plaintiffs and their attorneys and respectfully shows the Court as follows:

## I.
## Summary

Even though Stacy Eastland has had nothing to do with Camp Mystic since 2012, Plaintiffs sued him, accusing him of having some unspecified role in the tragic death of 27 young girls and counselors in the unprecedented July 4, 2025 flood.

Plaintiffs' allegations lump Stacy in with other defendants who were involved with the camp without specifying any acts or omissions *by Stacy* related to this tragedy. Minimal investigation would have revealed that Stacy has not been involved with the camp for over a decade and had nothing to do with the tragic events of July 4, 2025. But plaintiffs and their lawyers apparently did no investigation at all into Stacy's role with the camp before suing him for this tragic event. Or even worse, they sued him knowing that he had not been involved with the camp for years.

Moreover, Stacy's lawyers put Plaintiffs' lawyers on notice of his lack of involvement with the camp since 2012 and provided evidence showing that Stacy transferred all his stock in Natural Fountains Properties ("NFP")--the owner of the camp land--back to NFP in 2012. Despite this notice and evidence, Plaintiffs have refused to drop Stacy from the suit and continue to maintain the groundless claims against him.

Plaintiffs' filing and maintenance of the suit against Stacy violates Tex. Civ. Prac. & Rem. Code § 10.001 (3). That statute provides that the signing of a pleading constitutes a certificate that to the signatory's best knowledge, information and belief formed after reasonable inquiry, each allegation or other factual contention in the pleading or motion has evidentiary support…." Thus, Stacy is entitled to sanctions under Tex. Civ. Prac. & Rem. Code § 10.002. The sanctions should

include an order striking all allegations against Stacy from the lawsuit and requiring Plaintiffs and their counsel to pay his reasonable expenses and attorney's fees and pay him for inconvenience, harassment and out-of-pocket expenses caused by the litigation.

In addition, the allegations violate Tex. R. Civ. P. 13, which provides that the signatures of attorneys or parties constitute a certificate by them that they have read the pleading and that to the best of their knowledge information and belief formed after reasonable inquiry, the pleading is not groundless and brought in bad faith or groundless and brought for the purpose of harassment. Accordingly, Stacy is entitled to an award of sanctions for violation of rule 13. The sanctions should include, without limitation, an order striking with prejudice all pleadings pertaining to Stacy and awarding Stacy his reasonable expenses and attorney's fees incurred responding to the petition.

## II.
## Facts

Plaintiffs filed their Original Petition on November 10, 2025. They filed their First Amended Petition on November 13, 2025, adding additional plaintiffs.

The Petition does not specify any acts or omissions by Stacy. Rather, it contains allegations against "Defendants" collectively, including Stacy:

> *"Despite this [alleged knowledge of flooding risk],* ***the Defendants*** *did nothing to relocate facilities or cabins or inform the public and families of the real danger."* Paragraph 43.

> *"Rather than informing the parents of the extremely hazardous location of the activities and cabins where their daughters would be living and sleeping,* ***the***

***Defendants*** *chose to remain silent and collect tuition checks for the privately owned camp for decades."* Paragraph 44

*"**The Defendants** decided that expanding its [sic] for–profit camp was more important than relocating the most at–risk cabins away from the river or attempting to better protect the vulnerable human lives that visited the Camp every summer."* Paragraph 44

*"**[T]he Defendants** did not inform the Plaintiffs of the known, deadly flood risk" and "continued operating the camp filled with hundreds of young girls every summer in the floodplain without implementing adequate emergency procedures, creating necessary evacuation infrastructure, or putting measures in place to protect the innocent lives in their care."* Paragraph 47

*"**The Defendants**, instead, chose to risk the lives of young girls by failing to act promptly and efficiently when the flash flood warning was issued."* Paragraph 52

*"**[T]he Defendants** did not even attempt to evacuate the youngest girls in Bubble Inn until 4:00-5:00 AM."* Paragraph 53

*"**The Defendants** left these teenage counselors in a vulnerable position without proper training, policies, procedures, or instruction on what to do with the inevitable occurred."* Paragraph 58

*"Camp Mystic instead has been publicly soliciting donations to rebuild "so **the Defendants** can go back to business as usual."* Paragraph 62

*"The actions of **the Defendants** after this unimaginable tragedy are appalling and unforgiveable."* Paragraph 63

*"At all material times, **Defendants** owned, operated, managed, and controlled Camp Mystic…."* Paragraph 66

*"**Defendants** were personally involved in the safe operation, maintenance and training of individuals at the Camp."* Paragraph 66

*"These **Defendants** had the legal duty to keep the premises in a state consistent with due regard for the safety of its [sic] invitees…."* Paragraph 66

*"**Defendants** breached the duty owed to Plaintiffs…."* Paragraph 67

*"**Defendants** committed negligent and grossly negligent acts and omissions…."* Paragraph 68

These allegations falsely implicate Stacy in alleged acts and omissions that he had nothing to do with.

Plaintiffs served Stacy with the First Amended petition on two separate occasions, creating confusion as to his answer date. On November 26, 2025 Stacy's counsel, Dan Bitting, emailed Plaintiffs' counsel, asking for clarification of the answer date. Bitting added:

> Second, Stacy Eastland transferred his stock in NFP back to the company in 2012. He has had no formal or informal involvement with the camp since that time. I would like to know your basis for including him in this lawsuit, because I believe there is none.

*See* November 26, 2025 email from Dan Bitting to Kurt Arnold, Kyle Findley, Kala Sellers, and John Grinnan in the email string attached as Exhibit 1. None of the four counsel for Plaintiffs responded to Bitting's November 26, 2025 email.

On December 5, 2025 Stacy filed his Motion to Transfer Venue, Original Answer and Special Exceptions. He attached to the answer an Irrevocable Stock Powers and Certificates showing that he had transferred all his rights, title and interest in NFP's stock back to the company in November 2012.

Having not heard from Plaintiffs' counsel, Bitting emailed them again on December 11, 2005. He stated:

> As the answer and exhibits show, Stacy Eastland transferred all his ownership interests in Natural Fountains Properties ("NFP") back to the company at the end of 2012. He has not had any involvement with NFP or Camp Mystic since then. Of course, even if he still were a stockholder in NFP, that standing alone would not be a basis to sue him for the recent tragic events. But given his lack of ownership in NFP and his lack of any other involvement with the camp since 2012, any claims against him are groundless. There is absolutely no basis to have him in this lawsuit.
>
> Giving you the benefit of the doubt, I assume that you were unaware of Stacy's lack of ownership interest in NFP and lack of involvement with the camp since 2012. But with knowledge of Stacy's lack of involvement since 2012, continuing the litigation against Stacy would constitute bringing groundless claims either in bad faith and/or for the purpose of harassment. Thus, these claims are sanctionable under Tex. R. Civ. P. 13. I have not filed a motion for sanctions to this point because, as noted, I was giving you the benefit of the doubt. But I do demand that you immediately drop Stacy from the suit. Please let me know by end of business on tomorrow if and when you will nonsuit the claims against Stacy. Otherwise, I will take appropriate action.

*See id*.

The next day, December 12, 2025, Plaintiffs' counsel, Kyle Findley, responded. He claimed to have documents showing that Stacy still has some sort of financial interest in NFP and offered to talk through this issue. Bitting quickly replied, asking for the documents and offering times to talk. Findley never responded to Bitting's reply and never provided the documents allegedly showing that Stacey still has some financial interest in NFP. (Of course,

even if Stacy did have some financial interest in an NFP, that standing alone would not be a basis to include him in this lawsuit. But he does not have such an interest.)

In short, despite being on notice of Stacy's lack of ownership interest in NFP and lack of involvement with the camp since 2012, Plaintiffs have maintained the suit against Stacy. Despite multiple requests from Stacy's counsel, Plaintiffs' counsel have never identified any basis for continuing to keep Stacy in the suit. There is none.

## III.
## The Court should sanction Plaintiffs and their counsel for filing claims against Stacy without any evidentiary support, in violation of Tex. Civ. Prac. & Rem. Code §10.001.

Under Tex. Civ. Prac. & Rem. Code § 10.001, the signer of a pleading or motion certifies that *each* allegation or other factual contention in a pleading has evidentiary support, to the signatory's best knowledge, information, and belief, formed after reasonable inquiry. The statute dictates that each claim and each allegation be individually evaluated for support. That an allegation or claim is alleged against several defendants—so-called "group pleadings"—does not relieve the party from meeting the express requirements of Chapter 10. Each claim against each defendant must satisfy Chapter 10. Likewise, alternative pleading under Texas Rule of Civil Procedure 48 does not excuse noncompliance with Chapter 10." *Low v. Henry*, 221 S.W.3d 609, 614-15 (Tex. 2007); *Powell v. Grimes*, No. 01-23-00129-CV, 2025 WL 626428, at *9-12 (Tex. App.—Houston [1st Dist.] Feb. 27, 2025, no pet. h.) (explaining that to determine groundlessness under Chapter 10 of the Texas Civil Practice & Remedies Code, the trial court "must objectively ask whether the party and counsel made a reasonable inquiry into the legal and factual bases of the claim at the time the document in question was filed).

Here, Plaintiffs and their counsel could not have believed, based on reasonable inquiry, that the allegations against Stacy had evidentiary support. Plaintiffs and their counsel did not make

any inquiry at all, much a less reasonable inquiry, into Stacy's involvement with the acts and omissions complained of in the Petition. Any inquiry at all would have revealed that Stacy has had no involvement with Camp Mystic since November 2012, when he transferred his stock in NFP back to the company. Any inquiry at all would have revealed that Stacy had absolutely no involvement in the alleged acts and omissions relating to the tragic July 4, 2025, flood. Yet Plaintiffs included Stacy as a defendant, lumping him in with the other defendants that were involved with Camp Mystic in connection with the flood.

Plaintiffs' allegations and claims against Stacy are groundless. That fact alone warrants sanctions, as unlike Tex. R. Civ. P. 13, Chapter 10 does not require bad faith or harassment. After providing notice and an opportunity for Plaintiffs to respond per Tex. Civ. Prac. & Rem. Code § 10.003, this Court should issue sanctions against Plaintiffs and their counsel. The sanctions should include an order striking all allegations against Stacy, dismissing the claims against him with prejudice, and requiring Plaintiffs and their attorneys to pay Stacy's reasonable and necessary attorney's fees and to pay him for inconvenience, harassment and out-of-pocket expenses caused by the litigation.

## IV.
## The Court should sanction Plaintiffs and their counsel for filing a pleading against Stacy that is groundless and brought in bad faith and/or groundless and brought for the purpose of harassment, in violation of Tex. R. Civ. P. 13.

Texas Rule of Civil Procedure 13 authorizes a trial court to impose sanctions against an attorney, a represented party, or both, who file a pleading that is either (1) groundless and brought in bad faith; or (2) groundless and brought for the purpose of harassment. One purpose of the rule is to check abuses in the pleading process—that is, to ensure that at the time the challenged pleading was filed, the litigant's position was factually grounded and legally tenable. To determine whether rule 13 sanctions are proper, the trial court must examine the facts and circumstances in

existence at the time the pleading was filed. Groundless turns on the legal merits of a claim. Reasonable inquiry means the amount of examination that is reasonable under the circumstances of the case. A party acts in bad faith when discovery puts him on notice that his understanding of the facts may be incorrect and he does not make reasonable inquiry into the facts before filing a pleading. Improper motive is an essential element of bad faith. Bad faith is not simply bad judgment or negligence but means the conscious doing of a wrong for dishonest, discriminatory, or malicious purpose. A party cannot avoid rule 13 sanctions by claiming he was not actually aware of the facts making his claim groundless when he has not made reasonable inquiry, nor can a party avoid rule 13 sanctions by claiming he was not acting with malicious or discriminatory purpose in bringing the claim. *Robson v. Gilbreath*, 267 S.W.3d 401, 405-07 (Tex. App.—Austin 2008, pet. denied).

As shown above, Plaintiffs and their counsel could not have made any inquiry into the bases for any claims against Stacy because any inquiry would have disclosed the lack of such bases. And Plaintiffs have brought these groundless claims in bad faith and/or for the purpose of harassment. That Plaintiffs have maintained their claims against Stacy even after being put on notice of his lack of involvement with Camp Mystic since 2012 demonstrates their bad faith and intent to harass Stacy.

This Court should issue sanctions against Plaintiffs and their counsel, including an order striking all allegations against Stacy, dismissing the claims against him with prejudice, and requiring Plaintiffs and their attorneys to pay Stacy's reasonable and necessary attorney's fees.

## V.
## <u>Request for Relief</u>

Stacy asks the Court to provide the notice required under Tex. Civ. Prac. & Rem. Code § 10.003 and thereafter issue sanctions as requested above and grant him such other and further relief to which he may be entitle.

Respectfully submitted,

**FERGUSON BRASWELL FRASER KUBASTA PC**

BY:
*/s/Dan Bitting*______________________________
Dan Bitting
State Bar No. 02362480
**dbitting@fbfk.law**
4301 Westbank Dr., Building A, Suite 225
Austin, Texas 78746
(512) 703-1400 Telephone
(972) 378-9115 Facsimile

**ATTORNEY FOR DEFENDANT**
**STACY EASTLAND**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document was served on all counsel of record, via e-service, pursuant to the Texas Rules of Civil Procedure on December 29, 2025.

*/s/ Dan Bitting*____________________
Dan Bitting

EXHIBIT 1

**From:** Dan Bitting <dbitting@fbfk.law>
**Sent:** Friday, December 12, 2025 3:02 PM
**To:** Kyle Findley <KFindley@ArnoldItkin.com>; Kurt Arnold <karnold@ArnoldItkin.com>; Kala Sellers <ksellers@arnolditkin.com>; John Grinnan <jgrinnan@ArnoldItkin.com>
**Cc:** Jacob Mendoza <jmendoza@fbfk.law>; Camp Team <camp@arnolditkin.com>
**Subject:** Re: Cause no. D-1-GN-25-009976, Geffen, et al v. Stacy Eastland, et al

Obviously I'd like to see those documents, Kyle.

I'm available Monday afternoon; Tuesday morning or Tuesday 4:00 pm
Or later.

**DAN BITTING**
Attorney / Shareholder
FBFK Law

**FBFK LAW**
(512) 703-1400 Office
4301 Westbank Drive, Building A, Suite 225
Austin, TX 78746
dbitting@fbfk.law
www.fbfk.law | Pay Your Bill

The FBFK Way - Our Culture of Service and Success

Members of LEInternational

IMPORTANT/CONFIDENTIAL: This message contains information from the law firm of Ferguson Braswell Fraser Kubasta PC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. If you have received this communication in error, please notify us immediately at our Dallas telephone number: (972) 378-9111.

---

**From:** Kyle Findley <KFindley@ArnoldItkin.com>
**Sent:** Friday, December 12, 2025 1:40:20 PM
**To:** Dan Bitting <dbitting@fbfk.law>; Kurt Arnold <karnold@ArnoldItkin.com>; Kala Sellers <ksellers@arnolditkin.com>; John Grinnan <jgrinnan@ArnoldItkin.com>
**Cc:** Jacob Mendoza <jmendoza@fbfk.law>; Camp Team <camp@arnolditkin.com>

**Subject:** RE: Cause no. D-1-GN-25-009976, Geffen, et al v. Stacy Eastland, et al

Hey Dan – thanks for the email.

We have documents that indicate that Stacy still has some sort of financial interest in NFP. Happy to talk through it and run this issue down. I am wrapped up traveling today.

I am available most of the day on Monday or Tuesday of next week.

Let me know a good time.

Thanks,
Kyle

**Kyle Findley**
Trial Lawyer

**From:** Dan Bitting <dbitting@fbfk.law>
**Sent:** Thursday, December 11, 2025 2:21 PM
**To:** Kurt Arnold <karnold@ArnoldItkin.com>; Kyle Findley <KFindley@ArnoldItkin.com>; Kala Sellers <ksellers@arnolditkin.com>; John Grinnan <jgrinnan@ArnoldItkin.com>
**Cc:** Jacob Mendoza <jmendoza@fbfk.law>
**Subject:** RE: Cause no. D-1-GN-25-009976, Geffen, et al v. Stacy Eastland, et al

Counsel, you never responded to this email. (If I have missed an email, let me know.) Accordingly, last Friday I filed a motion to transfer venue, original answer and special exceptions on behalf of Stacy Eastland. You should have been e–served with this pleading.

As the answer and exhibits show, Stacy Eastland transferred all his ownership interests in Natural Fountains Properties ("NFP") back to the company at the end of 2012. He has not had any involvement with NFP or Camp Mystic since then. Of course, even if he still were a stockholder in NFP, that standing alone would not be a basis to sue him for the recent tragic events. But given his lack of ownership in NFP and his lack of any other involvement with the camp since 2012, any claims against him are groundless. There is absolutely no basis to have him in this lawsuit.

Giving you the benefit of the doubt, I assume that you were unaware of Stacy's lack of ownership interest in NFP and lack of involvement with the camp since 2012. But with knowledge of Stacy's lack of involvement since 2012, continuing the litigation against Stacy would constitute bringing groundless claims either in bad faith and/or for the purpose of harassment. Thus, these claims are sanctionable under Tex. R. Civ. P. 13. I have not filed a motion for sanctions to this point because, as noted, I was giving you the benefit of the doubt. But I do demand that you immediately drop Stacy from the suit. Please let me know by end of business on tomorrow if and when you will nonsuit the claims against Stacy. Otherwise, I will take appropriate action.

I look forward to your response.

Thanks,

Dan Bitting

**DAN BITTING**
Attorney / Shareholder
FBFK Law

**FBFK LAW**
(512) 703-1400 Office
4301 Westbank Drive, Building A, Suite 225
Austin, TX 78746
dbitting@fbfk.law
www.fbfk.law | Pay Your Bill

The FBFK Way - Our Culture of Service and Success

Members of LEInternational

IMPORTANT/CONFIDENTIAL: This message contains information from the law firm of Ferguson Braswell Fraser Kubasta PC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. If you have received this communication in error, please notify us immediately at our Dallas telephone number: (972) 378-9111.

**From:** Dan Bitting
**Sent:** Wednesday, November 26, 2025 11:50 AM
**To:** karnold@arnolditkin.com; kfindley@arnolditkin.com; ksellers@arnolditkin.com; jgrinnan@arnolditkin.com
**Cc:** Jacob Mendoza <jmendoza@fbfk.law>
**Subject:** Cause no. D-1-GN-25-009976, Geffen, et al v. Stacy Eastland, et al

Counsel, I represent Stacy Eastland in this lawsuit.

First, I would like to confirm his answer date. There is some confusion because apparently he was served twice with the same petition, the first amended petition. Can we agree that his answer is due by the end of business on Monday, December 15, 2025?

Second, Stacy Eastland transferred his stock in NFP back to the company in 2012. He has had no formal or informal involvement with the camp since that time. I would like to know your basis for including him in this lawsuit, because I believe there is none.

Thank you for your cooperation and please give me call with any questions.

Dan Bitting

**DAN BITTING**
Attorney / Shareholder
FBFK Law

**FBFK LAW**
(512) 703-1400 Office
4301 Westbank Drive, Building A, Suite 225
Austin, TX 78746
dbitting@fbfk.law
www.fbfk.law | Pay Your Bill

The FBFK Way - Our Culture of Service and Success

Members of LEInternational

IMPORTANT/CONFIDENTIAL: This message contains information from the law firm of Ferguson Braswell Fraser Kubasta PC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. If you have received this communication in error, please notify us immediately at our Dallas telephone number: (972) 378-9111.

2/11/2026 9:26 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Melissa Romero

FBFK
THE NEW GUARD

DAN BITTING
DBITTING@FBFK.LAW
PHONE (512) 703-1436

February 11, 2026

***VIA E-FILE***

Travis County District Court
1700 Guadalupe Street
Austin, Texas 78701

Re: No. D-1-GN-25-009976, Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten; Linnie Anne McCown, Deceased, by and through Michael McCown, individually and on behalf of the Estate of Linnie Anne McCown, and Callie McCown; Abby Lynn Pohl, Deceased, by and through Matthew Pohl, Individually and on behalf of the Estate of Abby Lynn Pohl, and Kristin Pohl; Margaret Gaffney Sheedy, Deceased, by and through Andrew Sheedy, individually and on behalf of the Estate of Margaret Gaffney Sheedy, and Ellen Sheedy; Mary Barrett Stevens, Deceased, by and through Johnny Stevens, individually and on behalf of the Estate of Mary Barrett Stevens, and Stacy Stevens; Greta Katherine Toranzo, Deceased, by and through Jorge Toranzo, Individually and on behalf of the Estate of Greta Katherine Toranzo, and Ellen Toranzo v. Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner IIII, In the District Court No. 459th, Travis County

Dear Clerk:

Please be advised that I will be on vacation on the following dates:

**February 12, through February 18, 2026**
**April 16, through April 20, 2026**

By copy of this letter, we are advising opposing counsel of our unavailability during the dates indicated above. We hereby request that you do not schedule any matters for hearing or any other setting during the dates indicated above.

Thank you for your assistance.

Sincerely,

**FERGUSON BRASWELL FRASER KUBASTA PC**

By: ______________________________
Daniel C. Bitting

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacob Mendoza on behalf of Daniel Bitting
Bar No. 2362480
jmendoza@fbfk.law
Envelope ID: 111113320
Filing Code Description: No Fee Documents
Filing Description: VACATION LETTER
Status as of 2/17/2026 10:48 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jeff Ray | | jray@raylaw.com | 2/11/2026 9:26:57 AM | SENT |
| Crystal DeLeon | | cdeleon@arnolditkin.com | 2/11/2026 9:26:57 AM | SENT |
| A. Arnold | | arnold@arnoldfreemanlaw.com | 2/11/2026 9:26:57 AM | SENT |
| Christopher Freeman | | cfreeman@arnoldfreemanlaw.com | 2/11/2026 9:26:57 AM | SENT |
| Abby Heath | | aheath@arnoldfreemanlaw.com | 2/11/2026 9:26:57 AM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 2/11/2026 9:26:57 AM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 2/11/2026 9:26:57 AM | SENT |
| Katherine Estrada | | kestrada@raylaw.com | 2/11/2026 9:26:57 AM | SENT |
| Laura Rua | | lrua@raylaw.com | 2/11/2026 9:26:57 AM | SENT |
| Linda Gonzales | | lgonzales@raylaw.com | 2/11/2026 9:26:57 AM | SENT |
| Mikal Watts | | mikal@wattsllp.com | 2/11/2026 9:26:57 AM | SENT |
| Kenneth Fair | | fair@wrightclosebarger.com | 2/11/2026 9:26:57 AM | SENT |
| Tom Wright | | wright@wrightclosebarger.com | 2/11/2026 9:26:57 AM | SENT |
| Jessica Barger | | barger@wrightclosebarger.com | 2/11/2026 9:26:57 AM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 2/11/2026 9:26:57 AM | SENT |
| Larry Matthys | | lmatthys@raylaw.com | 2/11/2026 9:26:57 AM | SENT |
| Lynn Castagna | | lynn@texasdefense.com | 2/11/2026 9:26:57 AM | SENT |
| Suzanne Goss | | goss@wrightclosebarger.com | 2/11/2026 9:26:57 AM | SENT |
| Eva Castaneda | | ecastaneda@arnolditkin.com | 2/11/2026 9:26:57 AM | SENT |

3/3/2026 5:14 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Stephanie Garza

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten; Linnie Anne McCown, Deceased, by and through Michael McCown, individually and on behalf of the Estate of Linnie Anne McCown, and Callie McCown; Abby Lynn Pohl, Deceased, by and through Matthew Pohl, Individually and on behalf of the Estate of Abby Lynn Pohl, and Kristin Pohl; Margaret Gaffney Sheedy, Deceased, by and through Andrew Sheedy, individually and on behalf of the Estate of Margaret Gaffney Sheedy, and Ellen Sheedy; Mary Barrett Stevens, Deceased, by and through Johnny Stevens, individually and on behalf of the Estate of Mary Barrett Stevens, and Stacy Stevens; Greta Katherine Toranzo, Deceased, by and through Jorge Toranzo, Individually and on behalf of the Estate of Greta Katherine Toranzo, and Ellen Toranzo | § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III | § | |
| *Defendants*. | § | 459th JUDICIAL DISTRICT |

**NOTICE OF IN-PERSON HEARING ON THE CENTRAL DOCKET**

PLEASE TAKE NOTICE that a Hearing on *Defendant Stacy Eastland's Motion for*

*Sanctions* has been set for **Monday, March 9, 2026 at 2:00 p.m.** on the Central Docket in the Travis County Civil District Courts and is estimated to take less than 2 hours.

This hearing will take place **in-person** at the Travis County Civil and Family Courts Facility (TCCF) located at 1700 Guadalupe Street, Austin, Texas 78701. Since several cases may be scheduled at the same time, your case may be called later in the day, and you must be available when your case is called.

Please note that this case is **not** specially assigned to a particular judge under the Travis County Local Rules, so the parties must check the docket setting prior to each proceeding, either online at https://www.traviscountytx.gov/courts/files/dockets/civil-district or in person at the TCCF in order to determine the courtroom assigned for the proceeding.

Assignments will be posted on Friday of the week before the proceeding. Questions about case assignments or locations for proceedings should be directed to the office of the Court Administrator for the Civil District Courts at (512) 854-2484, not to a particular court.

Respectfully submitted,

**FERGUSON BRASWELL FRASER KUBASTA PC**

*/s/ Dan Bitting*
Dan Bitting
State Bar No. 02362480
**dbitting@fbfk.law**
4301 Westbank Dr., Building A, Suite 225
Phone: (512) 703-1400
Facsimile: 972-378-9115

**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I certify that on this 3rd day of March 2026, this document was served in accordance with the Texas Rules of Civil Procedure, via e-service.

/s/ *Dan Bitting*
Dan Bitting

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacob Mendoza on behalf of Daniel Bitting
Bar No. 2362480
jmendoza@fbfk.law
Envelope ID: 111961356
Filing Code Description: Notice
Filing Description: NOTICE OF IN-PERSON HEARING ON THE CENTRAL DOCKET
Status as of 3/4/2026 11:56 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jeff Ray | | jray@raylaw.com | 3/3/2026 5:14:34 PM | SENT |
| Crystal DeLeon | | cdeleon@arnolditkin.com | 3/3/2026 5:14:34 PM | SENT |
| A. Arnold | | arnold@arnoldfreemanlaw.com | 3/3/2026 5:14:34 PM | SENT |
| Christopher Freeman | | cfreeman@arnoldfreemanlaw.com | 3/3/2026 5:14:34 PM | SENT |
| Abby Heath | | aheath@arnoldfreemanlaw.com | 3/3/2026 5:14:34 PM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 3/3/2026 5:14:34 PM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 3/3/2026 5:14:34 PM | SENT |
| Katherine Estrada | | kestrada@raylaw.com | 3/3/2026 5:14:34 PM | SENT |
| Laura Rua | | lrua@raylaw.com | 3/3/2026 5:14:34 PM | SENT |
| Linda Gonzales | | lgonzales@raylaw.com | 3/3/2026 5:14:34 PM | SENT |
| Mikal Watts | | mikal@wattsllp.com | 3/3/2026 5:14:34 PM | SENT |
| Kenneth Fair | | fair@wrightclosebarger.com | 3/3/2026 5:14:34 PM | SENT |
| Tom Wright | | wright@wrightclosebarger.com | 3/3/2026 5:14:34 PM | SENT |
| Jessica Barger | | barger@wrightclosebarger.com | 3/3/2026 5:14:34 PM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 3/3/2026 5:14:34 PM | SENT |
| Larry Matthys | | lmatthys@raylaw.com | 3/3/2026 5:14:34 PM | SENT |
| Lynn Castagna | | lynn@texasdefense.com | 3/3/2026 5:14:34 PM | SENT |
| Suzanne Goss | | goss@wrightclosebarger.com | 3/3/2026 5:14:34 PM | SENT |
| Eva Castaneda | | ecastaneda@arnolditkin.com | 3/3/2026 5:14:34 PM | SENT |

03/04/2026 04:41:09 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976

**AMY CLARK MEACHUM**
**Local Administrative Judge**
**DISTRICT COURTS**

**Civil and Family Courts Facility**
**P. O. Box 1748**
**Austin, TX 78767**

**(512) 854-9305**
**FAX (512) 854-9332**

March 4, 2026

Kurt Arnold
J. Kyle Findley
Kala F. Sellers
John G. Grinnan
ARNOLD & ITKIN, LLP
6009 Memorial Dr.
Houston, TX 77007
*Via email: e-service@arnolditkin.com*

Thomas C. Wright
Jessica Z. Barger
Kenneth J. Fair
WRIGHT CLOSE BARGER & GUZMAN, LLP
1 Riverway, Suite 2200
Houston, TX 77056
*Via email: wright@wrightclosebarger.com*
*Via email: barger@wrightclosebarger.com*
*Via email: fair@wrightclosebarger.com*

Mikal Watts
WATTS LAW FIRM LLP
110 Tributary Ranch Rd.
Mountain Home, TX 78058
*Via email: mikal@wattsllp.com*

Jeff Ray
RAY PENA P.C.
9601 McAllister Fwy., Suite 901
San Antonio, TX 78216
*Via email: jray@raylaw.com*

Lynn S. Castagna
CASTAGNA SCOTT LLP
1120 S. Capital of TX Hwy, Bldg. 2, Suite 300
Austin, TX78746
*Via email: lynn@texasdefense.com*

Daniel C. Bitting
FERGUSON BRASWELL FRASER KUBASTA PC
4301 Westbank Dr., Bldg. A, Suite 225
Austin, TX 78746
*Via email: dbitting@fbfk.law*

Re: Cause No. D-1-GN-25-009976; Ellen Elizabeth Getten, et al v. Camp Mystic, Inc., et al. *in the 459th Judicial District, Travis County, Texas*

Dear Counsel:

The above case will be assigned to JUDGE MAYA GUERRA GAMBLE according to Chapters 2.6 of our Local Rules. Please refer to Chapter 2.6 of our Local Rules for the proper method of proceeding from this point.

Thank you.

Sincerely,

AMY CLARK MEACHUM
Local Administrative Judge
Travis County, Texas

ACM/ral
xc: Ms. Velva Price, District Clerk

3/10/2026 10:04 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Stefany Vega juarez

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten | § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III | § | |
| *Defendants*. | § | 459th JUDICIAL DISTRICT |

**NOTICE OF PARTIAL NONSUIT WITHOUT PREJUDICE**

Plaintiffs[1] give written notice of their nonsuit without prejudice as to Defendant Seaborn Stacy Eastland pursuant to Texas Rule of Civil Procedure 162. This is a partial nonsuit as it applies to Defendant Seaborn Stacy Eastland only and does not affect any of Plaintiffs' claims against the other defendants in this action. This nonsuit is effective immediately upon filing.

---

[1] Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten; Linnie Anne McCown, Deceased, by and through Michael McCown, individually and on behalf of the Estate of Linnie Anne McCown, and Callie McCown; Abby Lynn Pohl, Deceased, by and through Matthew Pohl, individually and on behalf of the Estate of Abby Lynn Pohl, and Kristin Pohl; Margaret Gaffney Sheedy, Deceased, by and through Andrew Sheedy, individually and on behalf of the Estate of Margaret Gaffney Sheedy, and Ellen Sheedy; Mary Barrett Stevens, Deceased, by and through Johnny Stevens, individually and on behalf of the Estate of Mary Barrett Stevens, and Stacy Stevens; and, Greta Katherine Toranzo, Deceased, by and through Jorge Toranzo, individually and on behalf of the Estate of Greta Katherine Toranzo, and Ellen Toranzo (collectively "Plaintiffs").

Respectfully submitted,

ARNOLD & ITKIN LLP

*/s/ Kyle Findley*

Kurt B. Arnold
SBN: 24036150
karnold@arnolditkin.com
J. Kyle Findley
SBN: 24076382
kfindley@arnolditkin.com
Kala F. Sellers
SBN: 24087519
ksellers@arnolditkin.com
John G. Grinnan
SBN: 24087633
jgrinnan@arnolditkin.com
6009 Memorial Drive
Houston, Texas 77007
Tel: 713.222.3800
Fax: 713.222.3850
e-service@arnolditkin.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been forwarded to all counsel of record in accordance with the Texas Rules of Civil Procedure on March 10, 2026.

*/s/ Kyle Findley*
Kyle Findley

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Eva Castaneda on behalf of Kyle Findley
Bar No. 24076382
ecastaneda@arnolditkin.com
Envelope ID: 112216683
Filing Code Description: FINAL OR PARTIAL DISPOSITION ORDER
Filing Description: NOTICE OF PARTIAL NONSUIT WITHOUT PREJUDICE
Status as of 3/12/2026 3:03 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jeff Ray | | jray@raylaw.com | 3/10/2026 10:04:37 AM | SENT |
| Crystal DeLeon | | cdeleon@arnolditkin.com | 3/10/2026 10:04:37 AM | SENT |
| A. Arnold | | arnold@arnoldfreemanlaw.com | 3/10/2026 10:04:37 AM | SENT |
| Christopher Freeman | | cfreeman@arnoldfreemanlaw.com | 3/10/2026 10:04:37 AM | SENT |
| Abby Heath | | aheath@arnoldfreemanlaw.com | 3/10/2026 10:04:37 AM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 3/10/2026 10:04:37 AM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 3/10/2026 10:04:37 AM | SENT |
| Katherine Estrada | | kestrada@raylaw.com | 3/10/2026 10:04:37 AM | SENT |
| Laura Rua | | lrua@raylaw.com | 3/10/2026 10:04:37 AM | SENT |
| Linda Gonzales | | lgonzales@raylaw.com | 3/10/2026 10:04:37 AM | SENT |
| Mikal Watts | | mikal@wattsllp.com | 3/10/2026 10:04:37 AM | SENT |
| Kenneth Fair | | fair@wrightclosebarger.com | 3/10/2026 10:04:37 AM | SENT |
| Tom Wright | | wright@wrightclosebarger.com | 3/10/2026 10:04:37 AM | SENT |
| Jessica Barger | | barger@wrightclosebarger.com | 3/10/2026 10:04:37 AM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 3/10/2026 10:04:37 AM | SENT |
| Larry Matthys | | lmatthys@raylaw.com | 3/10/2026 10:04:37 AM | SENT |
| Lynn Castagna | | lynn@texasdefense.com | 3/10/2026 10:04:37 AM | SENT |
| Suzanne Goss | | goss@wrightclosebarger.com | 3/10/2026 10:04:37 AM | SENT |
| Eva Castaneda | | ecastaneda@arnolditkin.com | 3/10/2026 10:04:37 AM | SENT |

3/24/2026 4:12 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Candy Schmidt

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten; Linnie Anne McCown, Deceased, by and through Michael McCown, individually and on behalf of the Estate of Linnie Anne McCown, and Callie McCown; Abby Lynn Pohl, Deceased, by and through Matthew Pohl, Individually and on behalf of the Estate of Abby Lynn Pohl, and Kristin Pohl; Margaret Gaffney Sheedy, Deceased, by and through Andrew Sheedy, individually and on behalf of the Estate of Margaret Gaffney Sheedy, and Ellen Sheedy; Mary Barrett Stevens, Deceased by and through Johnny Stevens, individually and on behalf of the Estate of Mary Barrett Stevens, and Stacy Stevens; Greta Katherine Toranzo, Deceased, by and through Jorge Toranzo, Individually and on behalf of the Estate of Greta Katherine Toranzo, and Ellen Toranzo | § | IN THE DISTRICT COURT OF |
| *Plaintiffs,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

**DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY**

Copy from re:SearchTX

Defendants Natural Fountains Properties, Inc. ("Natural Fountains"),[1] Mystic Camps Family Partnership, Ltd. (the "Family Partnership"), Mystic Camps Management, LLC, Camp Mystic, LLC ("Camp Mystic"), Willetta Eastland, Edward Eastland, Mary Liz Eastland, and William Neely Bonner, III (collectively "Defendants") file this Motion to Compel Arbitration and Motion to Stay, respectfully showing the Court the following:

## I. Introduction

This case arises from the tragic loss of Ellen Elizabeth Getten, Linnie Anne McCown, Abby Lynn Pohl, Magaret Gaffney Sheedy, Mary Barrett Stevens, and Greta Katherine Toranzo, during the July 2025 flooding of the Guadalupe River while they were attending summer camp at Camp Mystic. Several other lives were lost in the historic flood, including Camp Mystic's Director, Dick Eastland, as he was trying to save the campers. The girls' parents have asserted claims arising out of these events.

When Plaintiffs registered their daughters to attend camp that year, one parent for each of the girls signed a Participation Agreement as part of that registration. *See* Getten Participation Agreement at 3 (signed by Jennifer Getten) (attached as Exhibit A-9); McCown Participation Agreement at 3 (signed by Callie McCown) (attached as Exhibit A-10); Pohl Participation Agreement at 3 (signed by Kristin Pohl) (attached as Exhibit A-11); Sheedy Participation Agreement at 3 (signed by Ellen Sheedy) (attached as Exhibit A-12); Stevens Participation Agreement at 3 (signed by Stacy Stevens) (attached as Exhibit A-13); Toranzo Participation Agreement at 3 (signed by Ellen Kolpin Toranzo) (attached as Exhibit A-14).

[1] Defendant Natural Fountains Properties, Inc. is incorrectly named as Defendant Natural Fountains Properties, Inc. d/b/a Camp Mystic, Inc.



Copy from re:SearchTX

The Participation Agreement contains an arbitration clause, requiring the arbitration of all claims that arise "out of or in connection with this Agreement." *See* Exhs. A-9–14 at 2. The arbitration clause also requires any arbitration to be conducted in accordance with the American Arbitration Association's Commercial Rules. *Id.*

When a contract contains an arbitration clause, a court must resolve two questions: (1) whether the parties entered into an arbitration agreement and (2) who decides whether the plaintiff's claims are arbitrable: an arbitrator or the court. The first question is easily resolved. Camp Mystic and Natural Fountains, and therefore their owners, members, directors, and employees, unmistakably entered into the Participation Agreement with Plaintiffs.

The Participation Agreement's incorporation of the AAA's rules resolves the second question. Under black letter Texas and federal law, incorporation of the AAA rules reflects unambiguous intent that the arbitrator—not the Court—must determine whether Plaintiffs' claims are arbitrable. Defendants' motion to compel must therefore be granted on that basis.

Pending the outcome of arbitration, Defendants request a stay of these proceedings.

## II. Background Facts

As part of the registration process to attend camp at Camp Mystic, parents or legal guardians of the campers must sign a Participation Agreement. *See, generally*, Exhs. A-9–14. The Agreement highlights the various risks of attending camp, including the risk of serious injury due to floods and other camp hazards:

> Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning) . . . all manner of other injuries or illness which, in extraordinary cases, may be serious.

Exhs. A-9–14 at 1.



Copy from re:SearchTX

The Agreement also contains an arbitration clause, which states:

> Binding Arbitration: . . .
>
> All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.
>
> The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding.
>
> This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Exhs. A-9–14 at 2.

Defendants Willetta Eastland, Edward Eastland, and Mary Liz Eastland (the "Eastlands") worked for Camp Mystic in the summer of 2025 and at all relevant times. *See* Declaration of George Albritton Eastland at ¶¶ 2-3 (attached as Exhibit A). William Neely Bonner, III ("Bonner") was President of Natural Fountains in the summer of 2025 and at all relevant times. *See* Exh. A at ¶ 4.



Copy from re:SearchTX

## III. <u>Legal Standard</u>

Under both the Federal Arbitration Act ("FAA") and the Texas Arbitration Act ("TAA"), when a party moves to compel arbitration, a court must resolve two related questions: (1) whether the parties entered into any arbitration agreement at all, and (2) whether the parties delegated to the arbitrator the issue of who determines a claim's arbitrability. *See IQ Prods. Co. v. WD-40 Co.*, 871 F.3d 344, 348 (5th Cir. 2017); *see also RSL Funding, LLC v. Newsome*, 569 S.W.3d 116, 120 (Tex. 2018).

"When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc*., 586 U.S. 63, 68 (2019) (holding that a court may not override a delegation clause even if the court thinks that the arbitrability of the claims "is wholly groundless."); *see also Robinson v. Home Owners Mgmt. Enters., Inc.*, 590 S.W.3d 518, 532 (Tex. 2019) (noting that a court has *no* discretion to deny a motion to compel arbitration that contains a delegation clause).

Because the arbitration agreement here incorporates the AAA rules, that is in effect a delegation to the arbitrator to determine arbitrability. *See TotalEnergies E&P USA, Inc. v. MP Gulf of Mex., LLC*, 667 S.W.3d 694, 711 (Tex. 2023), *reh'g denied* (June 9, 2023) ("[A]n agreement to arbitrate in accordance with the AAA or similar rules **<u>clearly and unmistakably delegates arbitrability issues to the arbitrator</u>**.") (emphasis added).



Copy from re:SearchTX

## IV. <u>Argument</u>

The Participation Agreement contains a valid arbitration clause between Plaintiffs and the named released and indemnified parties in the Participation Agreement, which includes Camp Mystic, Natural Fountains, and their respective owners, members, directors, and employees. Because all of the Eastlands worked for Camp Mystic and Bonner was president of Natural Fountains at all relevant times, Texas law permits them to invoke the arbitration clause as well.

The Family Partnership and Mystic Camps Management LLC (collectively the "Holding Companies") and Natural Fountains are also entitled to invoke the arbitration clause under equitable estoppel principles.

### A. The FAA governs the arbitration clause

The arbitration clause is governed by the FAA because the Participation Agreement is a written contract involving interstate commerce. *See* Exhs. A-9–14; *see also Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 573 (1997). When an arbitration clause falls within the FAA's scope, the FAA supplies the governing law and requires enforcement according to its terms.

Courts may presume that both the FAA and the TAA apply when an arbitration agreement does not specify which applies. *See Moody Nat'l Grapevine MT, LP v. TIC Grapevine 2, LP*, 651 S.W.3d 450, 455 (Tex. App.—Houston [14th Dist.] 2022, pet. denied). But that does not limit a movant to the TAA or require satisfaction of additional state-law requirements. A party seeking to compel arbitration may choose to invoke the FAA rather than the TAA when an arbitration agreement is silent. *See Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 98 n.64 (Tex. 2011) ("The TAA and the FAA may both be applicable to an agreement, absent the parties' choice of one or the other.").



Copy from re:SearchTX

Here, the Participation Agreement is in writing and governs camping activities that are open to campers across state lines. The FAA therefore applies and requires enforcement of the arbitration clause.

To the extent the TAA would impose additional requirements for personal injury claims, such as a counsel signature requirement, those requirements do not limit enforcement under the FAA. Texas courts have recognized that such provisions are preempted where they conflict with the FAA's mandate to enforce arbitration clauses according to their terms. *See In re Nexion Health at Humble, Inc.*, 173 S.W.3d 67, 69 (Tex. 2005), *as supplemented on denial of reh'g* (Oct. 14, 2005) ("The TAA interferes with the enforceability of the arbitration agreement by adding an additional requirement—the signature of a party's counsel—to arbitration agreements in personal injury cases. . . . Thus, the TAA is preempted by the FAA.").

**B. There is a valid agreement to arbitrate in the Participation Agreement**

The Participation Agreement contains a valid agreement to arbitration. Whether a valid arbitration agreement exists is, at this stage, simply a "question of contract formation only—did the parties form a valid agreement to arbitrate some set of claims." *IQ Products Co.*, 871 F.3d at 348. For this question, the only issue before the court is whether there is a valid agreement to arbitrate any possible claim; the court is *not* determining whether a plaintiff's specific claims fall within the scope of an arbitration clause. *See id.*

The Participation Agreement contains a valid arbitration clause:

> Binding Arbitration: . . .
>
> All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall



Copy from re:SearchTX

> be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.
>
> . . . .

Exhs. A-9–14 at 2. The Participation Agreement is signed by one parent for each of the campers. *See* Exhs. A-9–14 at 3.

To be enforceable under the FAA, the Participation Agreement need only be in writing and affect interstate commerce. *See* 9 U.S.C.A. § 2. "The law presumes the existence of an arbitration agreement, and any doubts regarding the existence or scope of an agreement are resolved in favor of arbitration." *In re Border Steel, Inc.*, 229 S.W.3d 825, 832 (Tex. App.—El Paso 2007, no pet.). Because the Participation Agreement is in writing and affects interstate commerce, it is valid and enforceable. *See* Exhs. A-9–14; *see also Camps Newfound/Owatonna, Inc.*, 520 U.S. at 573.

**1. Camp Mystic, Natural Fountains, the Family Partnership, the Eastlands, and Bonner may enforce the arbitration clause with Plaintiffs**

Camp Mystic, Natural Fountains, the Family Partnership, the Eastlands, and Bonner are party to the arbitration clause. *See* Exhs. A-9–14 at 1-3. The agreement states that "[i]n consideration of the services of Camp Mystic, I, parent, acknowledge and agree as follows . . .". *See* Exhs. A-9–14 at 1. The agreement thereafter states that the parent agrees to indemnify and release Camp Mystic, Natural Fountains, and their respective owners, members, directors, officers, employees, contractors and volunteers. Exhs. A-9–14 at 2. For the arbitration clause, the agreement states that "[t]he parties hereto"—as defined in the release to include Camp Mystic, Natural Fountains, and their members, officers, employees, and directors—also agree to submit all claims to binding arbitration. Exhs. A-9–14 at 2.



Copy from re:SearchTX

The Family Partnership is the owner of Camp Mystic and Natural Fountains. *See* Exh. A at ¶ 5. The Eastlands are members or employees of Camp Mystic. *See* Exh. A at ¶ 2-3. Bonner is the President of Natural Fountains. *See* Exh. A at ¶ 4. The Participation Agreement therefore includes (1) Camp Mystic and Natural Fountains, as named parties, (2) the Family Partnership, as the owner of Camp Mystic and Natural Fountains, (3) and the Eastlands and Bonner, as directors, officers, members, or employees of Camp Mystic or Natural Fountains, and these parties may invoke its arbitration clause.

Because one parent signed the Participation Agreements on behalf of each minor daughter, all Plaintiffs are bound by the arbitration agreement they consented to in the Participation Agreement. *See* Exh. A-9 at 3 (signed by Jennifer Getten); Exh. A-10 at 3 (signed by Callie McCown); Exh. A-11 at 3 (signed by Kristin Pohl); Exh. A-12 at 3 (signed by Ellen Sheedy); Exh. A-13 at 3 (signed by Stacy Stevens); Exh. A-14 at 3 (signed by Ellen Kolpin Toranzo).

Texas Family Code § 151.001(a)(7) grants parents comprehensive authority, including "the right to represent the child in legal action and to make other decisions of substantial legal significance concerning the child." TEX. FAM. CODE § 151.001(a)(7). The Texas Supreme Court in *Ha* established that "as a general matter, parents may sign arbitration agreements on behalf of their children" based on this statutory provision. *Ha*, 660 S.W.3d at 534 (Tex. 2023). The court emphasized that "fit parents are presumed to act in their children's best interests" and have both the authority and duty to make important legal decisions for their minor children. *Id.*

Recent Texas appellate decisions have consistently held that a single parent can bind minor children to arbitration agreements. In *Pearland Urban Air, LLC v. Cerna*, the court held that an arbitration agreement signed by a mother on behalf of her minor son constituted a valid agreement binding the child, even though he did not personally sign the agreement. 693 S.W.3d 711, 716



Copy from re:SearchTX

(Tex. App.—Houston [14th Dist.] 2024), *aff'd sub nom. Cerna as Next Friend of R.W. v. Pearland Urban Air, LLC*, 714 S.W.3d 585 (Tex. 2025). Similarly, in *BFS Group LLC v. De Leon*, the court reaffirmed that "as a general matter, a parent may sign an arbitration agreement on behalf of the parent's child, and only in 'rare case[s]' is such an agreement unenforceable." No. 14-24-00548-CV, 2025 WL 2394091, at *12 (Tex. App.—Houston [14th Dist.] Aug. 19, 2025, pet. filed) (quoting TEX. FAMILY CODE ANN. § 151.001(a)(7)).

Because one parent Plaintiff executed the Participation Agreement on behalf of each minor daughter, all parent Plaintiffs are bound by the arbitration agreement. *See Pearland Urban Air, LLC*, 693 S.W.3d at 716. There is therefore a valid and enforceable arbitration agreement among Camp Mystic, Natural Fountains, the Family Partnership, the Eastlands, Bonner, and all Plaintiffs.

**2. The Eastlands, as employees of Camp Mystic, and Bonner, as an agent of Natural Fountains, may invoke the arbitration clause**

The Eastlands, as employees, agents, or representatives of Camp Mystic, and Bonner, as President of Natural Fountains, are also entitled to arbitrate Plaintiffs' claims under Texas law. *See* Exh. A at ¶¶ 2-4. The Austin Court of Appeals has extended arbitration clauses to all agents and employees of a signatory:

> When the principal is bound by the terms of a valid arbitration agreement, its agents, employees, and representatives are also covered by the agreement.

*SEB, Inc. v. Campbell*, No. 03-10-00375-CV, 2011 WL 749292, at *4 (Tex. App.—Austin Mar. 2, 2011, no pet.) (mem. op.); *see also Design Tech Homes of Tex., LLC v. Siemens*, No. 03-23-00735-CV, 2025 WL 62967, at *6 n.3 (Tex. App.—Austin Jan. 10, 2025, no pet.); *Ascendant Anesthesia PLLC v. Abazi*, 348 S.W.3d 454, 462 (Tex. App.—Dallas 2011, no pet.).

This is consistent with the Texas Supreme Court's conclusion that employees may invoke an employer's arbitration clause when a plaintiff's claims against the employee arise out of actions



Copy from re:SearchTX

taken by the employee on behalf of the employer. *In re Merrill Lynch Tr. Co. FSB*, 235 S.W.3d 185, 190 (Tex. 2007) (noting that plaintiffs cannot avoid arbitration clauses by artfully suing individual agents of an entity with whom they've agreed to arbitrate in order to avoid arbitrating their claims.).

Plaintiffs have sued the Eastlands and Bonner for their alleged actions taken due on behalf of Camp Mystic and Natural Fountains. *See* Plaintiffs' First Amended Petition at 9-33. Accordingly, as employees, agents, or representatives of a party to the arbitration agreement, the Eastlands and Bonner are entitled to arbitrate Plaintiffs' claims against them, as well. *SEB, Inc.*, 2011 WL 749292 at *4.

**3. The Holding Companies and Natural Fountains are entitled to compel arbitration under intertwined claims estoppel**

Because the Plaintiffs' claims against the Holding Companies and Natural Fountains are factually intertwined with the Participation Agreement, they may also invoke its arbitration clause. Federal law recognizes that non-signatories to an arbitration clause may compel arbitration under an intertwined claims estoppel theory, which applies when "(1) they have a close relationship with a signatory to a contract with an arbitration agreement and (2) the claims are intimately founded in and intertwined with the underlying contract obligations." *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 640 (Tex. 2018) (quotations omitted) (quoting *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995)).

While the Texas Supreme Court did not find it necessary to adopt that theory in *Jody James Farms*, the Fifth Circuit has predicted that Texas will adopt the equitable estoppel theory. *See Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 610 (5th Cir. 2016). And the Court should do so here. The Holding Companies and Natural Fountains have a close relationship with Camp Mystic, and Plaintiffs' claims against them are intertwined with the Participation Agreement's underlying



Copy from re:SearchTX

contractual release of claims. *See* Exh. A at ¶¶ 5-6. Under the intertwined claims estoppel theory, the Holding Companies and Natural Fountains are entitled to have Plaintiffs' claims resolved in arbitration, as well.

### C. The arbitration clause delegates the issue of arbitrability to the arbitrator by incorporating the AAA's rules

The Participation Agreement's arbitration clause requires the arbitrator, not the Court, to determine whether Plaintiffs' claims are arbitrable because it incorporates the AAA's rules by reference. The Court must therefore compel this case to arbitration for that determination.

When an arbitration clause incorporates the AAA's rules by reference, this reflects unmistakable intent that the arbitrator, not the Court, must determine whether the plaintiff's claims are subject to arbitration. *See TotalEnergies E&P USA, Inc. v. MP Gulf of Mex., LLC*, 667 S.W.3d 694, 711 (Tex. 2023), *reh'g denied* (June 9, 2023) ("[A]n agreement to arbitrate in accordance with the AAA or similar rules **clearly and unmistakably delegates arbitrability issues to the arbitrator**.") (emphasis added); *see also Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) ("[T]he express adoption of these [AAA] rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.").

This is because the AAA's rules require that an arbitrator determine all threshold issues, including the arbitrability of a plaintiff's claims:

> R-7(a): The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement ***or to the arbitrability of any claim or counterclaim***.

*See* AAA's Commercial Arbitration Rules at 13 (attached as Exhibit B) (emphasis added).

The United States Supreme Court has instructed that, under the FAA, when a contract delegates the threshold issue of arbitrability to the arbitrator, a court may *not* override the clause's



Copy from re:SearchTX

delegation of that issue even if the court believes that the argument that a plaintiff's claims are arbitrable is "wholly groundless":

> When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless.

*Henry Schein, Inc.*, 586 U.S. 63, 68 (2019).

Here, the Participation Agreement incorporates the AAA's Commercial Rules by reference. *See* Exhs. A-9–14 at 2 ("All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement . . . . shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association."). The clause does not merely reference the AAA's rules. Instead, it states that any dispute arising out of or in connection with the Participation Agreement "shall be determined in accordance" with those rules. *Id.* The clause's incorporation of the AAA's rules is dispositive on *who* decides whether Plaintiffs' claims are arbitrable: the arbitrator, not the Court, must make that threshold determination. *See TotalEnergies E&P USA, Inc.*, 667 S.W.3d at 711.

Defendants therefore respectfully request that the Court grant this motion to compel arbitration so that the arbitrator may determine the arbitrability of Plaintiffs' claims and all other jurisdictional issues, including "any objections with respect to the existence, scope, or validity of the arbitration agreement . . . ." *See* Exh. B at 13.



Copy from re:SearchTX

## V. Motion to Stay

Defendants also request that the Court stay all of the proceedings in this matter pending the outcome of arbitration. *See* 9 U.S.C. § 3; *see also* TEX. CIV. PRAC. & REM. CODE § 171.021(c).

If a court determines that a party's claims are subject to arbitration, then under both the FAA and TAA, the court must stay all proceedings on those arbitrable claims pending the outcome of the arbitration. *See* 9 U.S.C. § 3 (stating that when an issue is referrable to arbitration, a court must stay proceedings on the issue until after the arbitration has concluded); TEX. CIV. PRAC. & REM. CODE § 171.021(c) (stating that a court is required to sign an order staying proceedings pending the outcome of arbitration); *see also Hill v. GE Power Sys., Inc.*, 282 F.3d 343, 347 (5th Cir. 2002) (FAA); *Cash Am. Int'l v. Exchange Servs.*, 83 S.W.2d 183, 186–87 (Tex. App.—Amarillo 2002, no pet.) (TAA).

If the Court grants Defendants' motion to compel arbitration, the Court is required by both the FAA and TAA to stay all proceedings pending the outcome of the arbitration. Defendants therefore respectfully request that the Court grant Defendants' motion to stay pending the outcome of the parties' arbitration.

## VI. Conclusion

Defendants Natural Fountains Properties, Inc., Mystic Camps Family Partnership, Ltd., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, and William Neely Bonner, III therefore respectfully request that the Court grant this motion to compel arbitration and stay all proceedings against Defendants pending the outcome of arbitration.



Copy from re:SearchTX

Respectfully submitted,

**RAY | PEÑA, P.C.**
9601 McAllister Freeway, Suite 901
San Antonio, Texas 78216
P: (210) 341-3554
F: (210) 341-3557

*/s/ Jeff Ray*
JEFF RAY
State Bar No. 16604400
jray@raylaw.com
*Attorney for Camp Mystic, LLC*

**WATTS LAW FIRM LLP**
110 Tributary Ranch Road
Mountain Home, Texas 78058
P: (512) 479-0500

*/s/ Mikal Watts*
MIKAL WATTS
State Bar No. 20981820
mikal@wattsllp.com
*Attorney for Natural Fountains Properties, Inc.; Willetta Eastland; Mystic Camps Family Partnership, Ltd., and Mystic Camps Management, LLC*

**CASTAGNA SCOTT LLP**
1120 S. Capital of Texas Highway
Building 2, Suite 300
Austin, Texas 78746
512/329-3290
888/255-0132 fax

*/s/ Lynn S. Castagna*
LYNN S. CASTAGNA
State Bar No. 03980520
Lynn@texasdefense.com
*Attorney for Edward Eastland, Mary Liz Eastland, and William Neely Bonner III*



Copy from re:SearchTX

**WRIGHT CLOSE BARGER & GUZMAN, LLP**
One Riverway, Suite 2200
Houston, Texas 77056
Telephone: (713) 572-4321
Facsimile: (713) 572-4320

*/s/ Thomas C. Wright*
Thomas C. Wright
State Bar No. 22059400
wright@wcbglaw.com
Jessica Z. Barger
State Bar No. 24032706
barger@wcbglaw.com
Kenneth J. Fair
State Bar No. 24007171
fair@wcbglaw.com
Joshua Fiveson
State Bar No. 24093438
jfiveson@wcbglaw.com
*Attorneys for Camp Mystic, LLC*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was served upon all known counsel of record via electronic means in accordance with the Texas Rules of Civil Procedure on this the 24th day of March, 2026.

*/s/ Thomas C. Wright*
Thomas C. Wright



Copy from re:SearchTX

# EXHIBIT A

Copy from re:SearchTX

# DECLARATION OF GEORGE ALBRITTON EASTLAND

My name is George Albritton Eastland. My date of birth is September 26, 1978. My address is 186 Felix Fisher Road S., Hunt, Texas 78024. I am over the age of 21 and am in all respects capable of making this declaration. In compliance with Texas Civil Practice and Remedies Code § 132.001, I declare under penalty of perjury that I have personal knowledge of the facts stated herein and declare them to be true and correct.

1. My family and I have worked for Camp Mystic, LLC ("Camp Mystic") for many years.

2. My brother and his wife are Edward Eastland ("Edward") and Mary Liz Eastland ("Mary Liz"). Edward, Mary Liz, and I were employed by Camp Mystic in 2025 when the events underlying this suit occurred. Edward, Mary Liz, and I were Directors of Camp Mystic at that time and remain Directors.

3. My mother is Willetta Eastland ("Tweety"), and my father was Richard Eastland ("Dick"). Tweety served as a Co-Executive Director of Camp Mystic with Dick in 2025 when the events underlying this suit occurred. Tweety and Dick were also managing members of Camp Mystic at that time.

4. I know William Neely Bonner, III ("Neel"). Neel is the current President of Natural Fountains Properties, Inc. and was its President in 2025 when the events underlying this suit occurred.

5. Mystic Camps Family Partnership, LTD., is the owner of Camp Mystic, LLC, and of Natural Fountains Properties, Inc.

6. Mystic Camps Management, LLC is the general partner of Mystic Camps Family Partnership, LTD.

Copy from re:SearchTX

7. Attached as Exhibit A are true and correct copies of Participation Agreements that were signed as part of campers' enrollment at Camp Mystic.

Executed in Hunt, Kerr County, Texas, on this, the 22nd day of March, 2026.

Signature: George A. Eastland

Printed Name: George Albritton Eastland



Copy from re:SearchTX

# Participation Agreement 2025

for Cile Steward, 2025 Season

Participation Agreement for Cile Steward:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Cile Steward, (Cile), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Cile.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Cile and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from the nearest hospital/emergency center if a need were to arise to receive emergency care.



Copy from re:SearchTX

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Cile, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Cile MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Cile, use interviews with and photographic images of Cile, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the



Copy from re:SearchTX

remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Cile, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Cile, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

**Signature** Catherine C. Williams
(06/15/2025)

# Participation Agreement 2025

for Eloise Peck, 2025 Season

Participation Agreement for Eloise Peck:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Eloise Peck, (Eloise), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Eloise.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Eloise and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Eloise, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Eloise MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Eloise, use interviews with and photographic images of Eloise, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Eloise, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Eloise, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

**Signature** Missy Rogers Peck
(02/21/2025)

# Participation Agreement 2025

for Wynne Naylor, 2025 Season

Participation Agreement for Wynne Naylor:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Wynne Naylor, (Wynne), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Wynne.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Wynne and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Wynne, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Wynne MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Wynne, use interviews with and photographic images of Wynne, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Wynne, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Wynne, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Alli Naylor (04/14/2025)

# Participation Agreement 2025

for Hadley Hanna, 2025 Season

Participation Agreement for Hadley Hanna:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Hadley Hanna, (Hadley), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Hadley.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Hadley and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Hadley, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Hadley MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Hadley, use interviews with and photographic images of Hadley, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Hadley, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Hadley, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Carrie Hanna (04/13/2025)

## Participation Agreement 2025

for Virginia Hollis, 2025 Season

Participation Agreement for Virginia Hollis:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Virginia Hollis, (Virginia), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Virginia.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Virginia and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Virginia, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Virginia MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Virginia, use interviews with and photographic images of Virginia, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Virginia, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Virginia, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Lacey Hollis (03/20/2025)



Copy from re:SearchTX

## Participation Agreement 2025

for Janie Hunt, 2025 Season

Participation Agreement for Janie Hunt:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Janie Hunt, (Janie), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Janie.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Janie and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Janie, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Janie MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Janie, use interviews with and photographic images of Janie, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Janie, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Janie, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Anne L Hunt (05/19/2025)

# Participation Agreement 2025

for Lucy Dillon, 2025 Season

Participation Agreement for Lucy Dillon:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Lucy Dillon, (Lucy), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Lucy.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Lucy and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Lucy, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Lucy MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Lucy, use interviews with and photographic images of Lucy, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the



Copy from re:SearchTX

remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Lucy, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Lucy, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Lisa Dillon (05/30/2025)

# Participation Agreement 2025

for Kellyanne Lytal, 2025 Season

Participation Agreement for Kellyanne Lytal:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Kellyanne Lytal, (Kellyanne), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Kellyanne.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Kellyanne and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Kellyanne, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Kellyanne MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Kellyanne, use interviews with and photographic images of Kellyanne, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Kellyanne, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Kellyanne, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Malorie Lytal (02/22/2025)

# Participation Agreement 2025

for Ellen Getten, 2025 Season

Participation Agreement for Ellen Getten:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Ellen Getten, (Ellen), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Ellen.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Ellen and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Ellen, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Ellen MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Ellen, use interviews with and photographic images of Ellen, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Ellen, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Ellen, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Jennifer Getten (05/30/2025)



Copy from re:SearchTX

# Participation Agreement 2025

for Linnie McCown, 2025 Season

Participation Agreement for Linnie McCown:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Linnie McCown, (Linnie), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Linnie.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Linnie and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Linnie, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Linnie MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Linnie, use interviews with and photographic images of Linnie, including videotape, for its website, brochures and other, including promotional, materials.

**Linnie McCown**, Jan 6, 2017 (9.01) Page: 3

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Linnie, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Linnie, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Callie McCown (05/31/2025)



Copy from re:SearchTX

# Participation Agreement 2025

for Abby Pohl, 2025 Season

Participation Agreement for Abby Pohl:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Abby Pohl, (Abby), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Abby.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Abby and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from the nearest hospital/emergency center if a need were to arise to receive emergency care.



Copy from re:SearchTX

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Abby, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Abby MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Abby, use interviews with and photographic images of Abby, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the



Copy from re:SearchTX

remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Abby, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Abby, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Kristin Pohl (03/24/2025)



Copy from re:SearchTX

# Participation Agreement 2025

for Margaret Sheedy, 2025 Season

Participation Agreement for Margaret Sheedy:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Margaret Sheedy, (Margaret), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Margaret.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Margaret and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Margaret, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Margaret MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Margaret, use interviews with and photographic images of Margaret, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Margaret, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Margaret, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

**Signature** Ellen Sheedy (04/28/2025)

# Participation Agreement 2025

for Mary Stevens, 2025 Season

Participation Agreement for Mary Stevens:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Mary Stevens, (Mary), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Mary.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Mary and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from the nearest hospital/emergency center if a need were to arise to receive emergency care.



Copy from re:SearchTX

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Mary, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Mary MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Mary, use interviews with and photographic images of Mary, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the



Copy from re:SearchTX

remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Mary, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Mary, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

**Signature** Stacy Stevens (04/27/2025)

# Participation Agreement 2025

for Greta Toranzo, 2025 Season

Participation Agreement for Greta Toranzo:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Greta Toranzo, (Greta), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Greta.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Greta and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Greta, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Greta MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Greta, use interviews with and photographic images of Greta, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Greta, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Greta, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

**Signature** Ellen Kolpin Toranzo
(05/30/2025)



Copy from re:SearchTX

# Participation Agreement 2025

for Margaret Bellows, 2025 Season

Participation Agreement for Margaret Bellows:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Margaret Bellows, (Margaret), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Margaret.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Margaret and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Margaret, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Margaret MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Margaret, use interviews with and photographic images of Margaret, including videotape, for its website, brochures and other, including promotional, materials.

**Margaret Bellows**, Oct 27, 2016 (9.03) Page: 3

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Margaret, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Margaret, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

**Signature** Patricia Bellows
(06/20/2025)


Copy from re:SearchTX

# Participation Agreement 2025

for Lila Bonner, 2025 Season

Participation Agreement for Lila Bonner:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Lila Bonner, (Lila), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Lila.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Lila and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from the nearest hospital/emergency center if a need were to arise to receive emergency care.



Copy from re:SearchTX

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Lila, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Lila MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Lila, use interviews with and photographic images of Lila, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the



Copy from re:SearchTX

remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Lila, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Lila, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

**Signature** Caitlin Bonner (02/21/2025)



Copy from re:SearchTX

# Participation Agreement 2024

for Chloe Childress, 2024 Season

Participation Agreement for Chloe Childress:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Chloe Childress, (Chloe), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Chloe.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Chloe and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Chloe, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Chloe MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Chloe, use interviews with and photographic images of Chloe, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Chloe, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Chloe, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

| | |
|---|---|
| Signature | Wendie Childress<br>(03/31/2024) |



Copy from re:SearchTX

# Participation Agreement 2025

for Molly DeWitt, 2025 Season

Participation Agreement for Molly DeWitt:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Molly DeWitt, (Molly), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Molly.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Molly and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Molly, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Molly MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Molly, use interviews with and photographic images of Molly, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Molly, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Molly, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Ryan DeWitt (06/03/2025)



Copy from re:SearchTX

# Participation Agreement 2024

for Katherine Ferruzzo, 2024 Season

Participation Agreement for Katherine Ferruzzo:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Katherine Ferruzzo, (Katherine), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Katherine.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Katherine and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Katherine, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Katherine MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Katherine, use interviews with and photographic images of Katherine, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Katherine, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Katherine, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Andrea Ferruzzo (04/07/2024)



Copy from re:SearchTX

# Participation Agreement 2025

for Lainey Landry, 2025 Season

Participation Agreement for Lainey Landry:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Lainey Landry, (Lainey), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Lainey.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Lainey and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Lainey, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Lainey MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Lainey, use interviews with and photographic images of Lainey, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Lainey, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Lainey, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Natalie Landry (05/14/2025)

# Participation Agreement 2025

for Blakely McCrory, 2025 Season

Participation Agreement for Blakely McCrory:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Blakely McCrory, (Blakely), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Blakely.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Blakely and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Blakely, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Blakely MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Blakely, use interviews with and photographic images of Blakely, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Blakely, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Blakely, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

**Signature** Lindsey McLeod McCrory
(06/09/2025)

# Participation Agreement 2025

for Mary Kate Jacobe, 2025 Season

Participation Agreement for Mary Kate Jacobe:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Mary Kate Jacobe, (Mary Kate), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Mary Kate.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Mary Kate and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Mary Kate, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Mary Kate MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Mary Kate, use interviews with and photographic images of Mary Kate, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Mary Kate, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Mary Kate, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Samantha Jacobe (06/17/2025)

# EXHIBIT B

Copy from re:SearchTX

COMMERCIAL

# Commercial

## Arbitration Rules and Mediation Procedures

**Including Procedures for Large, Complex Commercial Disputes**

American Arbitration Association®

Available online at **adr.org/commercial**
Rules Amended and Effective September 1, 2022

Copy from re:SearchTX

If you would like to speak to a member of the AAA Commercial Team, please visit **https://go.adr.org/commercial-contact.html**.



Copy from re:SearchTX

# Table of Contents


Important Notice . . . . . . . . . . 7

Introduction . . . . . . . . . . 7

Standard Arbitration Clause . . . . . . . . . . 8

Administrative Fees . . . . . . . . . . 8

Mediation . . . . . . . . . . 8

Large, Complex Cases . . . . . . . . . . 9

Commercial Arbitration Rules . . . . . . . . . . 10

R-1. Agreement of Parties* . . . . . . . . . . 10
R-2. AAA, Delegation of Duties, Conduct of Parties, Administrative Review Council . . 11
R-3. National Roster of Arbitrators . . . . . . . . . . 11
R-4. Filing Requirements and Procedures . . . . . . . . . . 11
R-5. Answers and Counterclaims . . . . . . . . . . 13
R-6. Changes of Claim . . . . . . . . . . 14
R-7. Jurisdiction . . . . . . . . . . 14
R-8. Consolidation and Joinder . . . . . . . . . . 15
R-9. Interpretation and Application of Rules . . . . . . . . . . 17
R-10. Mediation . . . . . . . . . . 17
R-11. Administrative Conference . . . . . . . . . . 17
R-12. Fixing of Locale . . . . . . . . . . 17
R-13. Appointment from National Roster . . . . . . . . . . 18
R-14. Direct Appointment by Party . . . . . . . . . . 19
R-15. Appointment of Chairperson by Party-Appointed Arbitrators, Parties, or the AAA . . . . . . . . . . 19
R-16. Nationality of Arbitrator . . . . . . . . . . 20
R-17. Number of Arbitrators . . . . . . . . . . 20
R-18. Disclosure . . . . . . . . . . 20
R-19. Disqualification of Arbitrator . . . . . . . . . . 21
R-20. Communication with Arbitrator . . . . . . . . . . 21
R-21. Vacancies . . . . . . . . . . 22
R-22. Preliminary Hearing . . . . . . . . . . 22
R-23. Pre-Hearing Exchange and Production of Information . . . . . . . . . . 22




Copy from re:SearchTX

R-24. Enforcement Powers of Arbitrator . . . . . 23
R-25. Date, Time, Place, and Method of Hearing . . . . . 23
R-26. Attendance at Hearing . . . . . 24
R-27. Representation . . . . . 24
R-28. Oaths . . . . . 24
R-29. Official Record of Proceedings . . . . . 24
R-30. Interpreters . . . . . 25
R-31. Postponements . . . . . 25
R-32. Arbitration in the Absence of a Party or Representative . . . . . 25
R-33. Conduct of Proceedings . . . . . 25
R-34. Dispositive Motions . . . . . 26
R-35. Evidence . . . . . 26
R-36. Evidence by Written Statements and Post-Hearing Filing of Documents or Other Evidence . . . . . 26
R-37. Inspection or Investigation . . . . . 27
R-38. Interim Measures . . . . . 27
R-39. Emergency Measures of Protection . . . . . 27
R-40. Closing of Hearing . . . . . 29
R-41. Reopening of Hearing . . . . . 29
R-42. Waiver of Rules . . . . . 29
R-43. Extensions of Time . . . . . 29
R-44. Serving of Notice and Communications . . . . . 30
R-45. Confidentiality . . . . . 30
R-46. Majority Decision . . . . . 30
R-47. Time of Award . . . . . 31
R-48. Form of Award . . . . . 31
R-49. Scope of Award . . . . . 31
R-50. Award Upon Settlement – Consent Award . . . . . 32
R-51. Delivery of Award to Parties . . . . . 32
R-52. Modification of Award . . . . . 32
R-53. Release of Documents for Judicial Proceedings . . . . . 32
R-54. Applications to Court and Exclusion of Liability . . . . . 32
R-55. Administrative Fees . . . . . 33
R-56. Expenses . . . . . 33
R-57. Neutral Arbitrator's Compensation . . . . . 33
R-58. Deposits . . . . . 34



Copy from re:SearchTX

R-59. Remedies for Nonpayment . . . 34
R-60. Sanctions . . . 35

Preliminary Hearing Procedures . . . 36
P-1. General . . . 36
P-2. Checklist . . . 36

Expedited Procedures . . . 39
E-1. Limitation on Extensions . . . 39
E-2. Changes of Claim or Counterclaim . . . 39
E-3. Serving of Notice . . . 39
E-4. Appointment and Qualifications of Arbitrator . . . 39
E-5. Discovery, Motions, and Conduct of Proceedings . . . 40
E-6. Proceedings on Documents and Procedures for the Resolution of Disputes Through Document Submission . . . 40
E-7. Date, Time, Place, and Method of Hearing . . . 41
E-8. The Hearing . . . 41
E-9. Time of Award . . . 41
E-10. Arbitrator's Compensation . . . 41

Procedures for Large, Complex Commercial Disputes . . . 42
L-1. Administrative Conference . . . 42
L-2. Arbitrators . . . 42
L-3. Management of Proceedings . . . 43

Administrative Fee Schedule . . . 43

Commercial Mediation Procedures . . . 44
M-1. Agreement of Parties* . . . 44
M-2. Initiation of Mediation . . . 44
M-3. Representation . . . 45
M-4. Appointment of the Mediator . . . 45
M-5. Mediator's Impartiality and Duty to Disclose . . . 45
M-6. Vacancies . . . 46
M-7. Duties and Responsibilities of the Mediator . . . 46
M-8. Responsibilities of the Parties . . . 47
M-9. Privacy . . . 47
M-10. Confidentiality . . . 47



Copy from re:SearchTX

M-11. No Stenographic Record . . . . . . . . . . 48
M-12. Termination of Mediation . . . . . . . . . . 48
M-13. Exclusion of Liability . . . . . . . . . . 48
M-14. Interpretation and Application of Procedures . . . . . . . . . . 48
M-15. Deposits . . . . . . . . . . 49
M-16. Expenses . . . . . . . . . . 49
M-17. Cost of the Mediation . . . . . . . . . . 49



Copy from re:SearchTX

# Commercial Arbitration Rules and Mediation Procedures

(Including Procedures for Large, Complex Commercial Disputes)

## Important Notice

These rules and any amendment of them shall apply in the form in effect at the time the administrative filing requirements are met for a demand for arbitration or submission agreement received by the AAA®. To ensure that you have the most current information, see our web site at www.adr.org.

## Introduction

Each year, many millions of business transactions take place. Occasionally, disagreements develop over these business transactions. Many of these disputes are resolved by arbitration, the voluntary submission of a dispute to an impartial person or persons for final and binding determination. Arbitration has proven to be an effective way to resolve these disputes privately, promptly, and economically.

The American Arbitration Association® (AAA), a not-for-profit, public service organization, offers a broad range of dispute resolution services to business executives, attorneys, individuals, trade associations, unions, management, consumers, families, communities, and all levels of government. Services are available through AAA headquarters in New York and through offices located in major cities throughout the United States. Hearings may be held at locations convenient for the parties and are not limited to cities with AAA offices. In addition, the AAA serves as a center for education and training, issues specialized publications, and conducts research on various forms of alternative dispute resolution.



Copy from re:SearchTX

## Standard Arbitration Clause

The parties can provide for arbitration of future disputes by inserting the following clause into their contracts:

> *Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.*

Arbitration of existing disputes may be accomplished by use of the following:

> *We, the undersigned parties, hereby agree to submit to arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules the following Controversy: (describe briefly). We further agree that the above controversy be submitted to (one) (three) arbitrator(s). We further agree that we will faithfully observe this agreement and the rules, that we will abide by and perform any award rendered by the arbitrator(s), and that a judgment of any court having jurisdiction may be entered on the award.*

The services of the AAA are generally concluded with the transmittal of the award. Although there is voluntary compliance with the majority of awards, judgment on the award can be entered in a court having appropriate jurisdiction if necessary.

## Administrative Fees

The AAA charges a filing fee based on the amount of the claim or counterclaim. This fee information, which is included with these rules, allows the parties to exercise control over their administrative fees. The fees cover AAA administrative services; they do not cover arbitrator compensation or expenses, if any, reporting services, or any post-award charges incurred by the parties in enforcing the award.

## Mediation

Subject to the right of any party to opt out, in cases where a claim or counterclaim exceeds $100,000, the Rules provide that the parties shall mediate their dispute upon the administration of the arbitration or at any time when the arbitration is pending. In mediation, the neutral mediator assists the parties in reaching a



Copy from re:SearchTX

settlement but does not have the authority to make a binding decision or award. Mediation is administered by the AAA in accordance with its Commercial Mediation Procedures. There is no additional filing fee where parties to a pending arbitration attempt to mediate their dispute under the AAA's auspices.

Although these rules include a mediation procedure that will apply to many cases, parties may still want to incorporate mediation into their contractual dispute settlement process. Parties can do so by inserting the following mediation clause into their contract in conjunction with a standard arbitration provision:

> *If a dispute arises out of or relates to this contract, or the breach thereof, and if the dispute cannot be settled through negotiation, the parties agree first to try in good faith to settle the dispute by mediation administered by the American Arbitration Association under its Commercial Mediation Procedures before resorting to arbitration, litigation, or some other dispute resolution procedure.*

If the parties want to use a mediator to resolve an existing dispute, they can enter into the following submission agreement:

> *The parties hereby submit the following dispute to mediation administered by the American Arbitration Association under its Commercial Mediation Procedures. (The clause may also provide for the qualifications of the mediator(s), method of payment, locale of meetings, and any other item of concern to the parties.)*

## Large, Complex Cases

Unless the parties agree otherwise, the Procedures for Large, Complex Commercial Disputes, which appear in this pamphlet, will be applied to all cases administered by the AAA under the Commercial Arbitration Rules in which the disclosed claim or counterclaim of any party is at least $1,000,000 exclusive of claimed interest, arbitration fees and costs. The key features of these Procedures include:

> A highly qualified, trained Roster of Neutrals;

> A mandatory preliminary hearing with the arbitrators, which may be conducted by teleconference or other electronic means;

> Broad arbitrator authority to order and control the exchange of information, including depositions;

> A presumption that hearings will proceed on a consecutive or block basis.



Copy from re:SearchTX

# Commercial Arbitration Rules

## R-1. Agreement of Parties*

**(a)** The parties shall be deemed to have made these Rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules or for arbitration by the AAA of a domestic commercial dispute without specifying particular rules. These Rules and any amendment to them shall apply in the form in effect at the time the administrative requirements are met for a Demand for Arbitration or Submission Agreement received by the AAA. Any disputes regarding which AAA rules shall apply shall be decided by the AAA. The parties, by written agreement, may vary the procedures set forth in these Rules. After appointment of the arbitrator, such modifications may be made only with the consent of the arbitrator.

**(b)** Unless the parties agree or the AAA determines otherwise, the Expedited Procedures shall apply in any case in which no disclosed claim or counterclaim exceeds $100,000, exclusive of interest, attorneys' fees, and arbitration fees and costs. Parties may also agree to use these Procedures in larger cases. Unless the parties agree otherwise, these Procedures will not apply in cases involving more than two parties. The Expedited Procedures shall be applied as described in Procedures E-1 through E-10, in addition to any other portion of these Rules that is not in conflict with the Expedited Procedures.

**(c)** Unless the parties agree otherwise, the Procedures for Large, Complex Commercial Disputes shall apply to all cases in which the disclosed claim or counterclaim of any party is at least $1,000,000, exclusive of claimed interest, attorneys' fees, arbitration fees and costs. Parties may also agree to use the Procedures in cases involving claims or counterclaims under $1,000,000 or in nonmonetary cases. The Procedures for Large, Complex Commercial Disputes shall be applied as described in Procedures L-1 through L-3 in addition to any other portion of these Rules that is not in conflict with the Procedures for Large, Complex Commercial Disputes.

**(d)** Parties may, by agreement, apply the Expedited Procedures; the Procedures for Large, Complex Commercial Disputes; or the Procedures for the Resolution of Disputes Through Document Submission (Procedure E-6) to any dispute.

**(e)** All other cases shall be administered in accordance with Rules R-1 through R-60 of these Rules.

** The AAA will apply the Employment/Workplace Rules to any dispute between an individual employee or an independent contractor (working or performing as an individual and not incorporated) and a business or organization and the dispute involves work or work-related claims, including any statutory claims and including work-related claims under independent contractor agreements. Should a contract call for the Consumer Rules, and the dispute is not between a consumer and a business, the AAA has the discretion to apply the Commercial Rules and Commercial Fee schedule. (Revised 5/1/25)*

** Beginning June 1, 2021, the AAA will apply the Consumer Arbitration Fee Schedule to any dispute between an online marketplace or platform and an individual user or subscriber (using or subscribed to the service as an individual and not incorporated) and the dispute does not involve work or work-related claims.*



Copy from re:SearchTX

## R-2. AAA, Delegation of Duties, Conduct of Parties, Administrative Review Council

**(a)** When parties agree to arbitrate under these Rules, or when they provide for arbitration by the AAA and an arbitration is initiated under these Rules, they thereby authorize the AAA to administer the arbitration.

**(b)** The authority and duties of the AAA are prescribed in the agreement of the parties and in these Rules, and may be carried out through such of the AAA's representatives as it may direct. The AAA may, in its discretion, assign the administration of an arbitration to any of its offices. Arbitrations administered under these Rules shall only be administered by the AAA or by an individual or organization authorized by the AAA to do so.

**(c)** The AAA requires that parties and their representatives conduct themselves in accordance with the AAA's *Standards of Conduct for Parties and Representatives* when utilizing the AAA's services. Failure to do so may result in the AAA's declining to further administer a particular case or caseload.

**(d)** For cases proceeding under the Procedures for Large, Complex Commercial Disputes, and for other cases where the AAA, in its sole discretion, deems it appropriate, the AAA may act through its Administrative Review Council to take the following administrative actions:

- **i)** determine challenges to the appointment or continuing service of an arbitrator;
- **ii)** make an initial determination as to the locale of the arbitration, subject to the power of the arbitrator to make a final determination; or
- **iii)** decide whether a party has met the administrative requirements to file an arbitration under these Rules.

## R-3. National Roster of Arbitrators

The AAA shall establish and maintain a National Roster of Arbitrators ("National Roster") and shall appoint arbitrators as provided in these Rules. The term "arbitrator" in these Rules refers to the arbitration panel, constituted for a particular case, whether composed of one or more arbitrators, or to an individual arbitrator, as the context requires.

## R-4. Filing Requirements and Procedures

**(a)** Filing Requirements

- **i)** Arbitration under an arbitration provision in a contract shall be initiated by the initiating party ("claimant") filing with the AAA a Demand for Arbitration, the administrative filing fee, and a copy of the applicable arbitration agreement from the parties' contract which provides for arbitration. The filing fee must be paid before a matter is considered properly filed.



Copy from re:SearchTX

**ii)** Arbitration pursuant to a court order shall be initiated by the initiating party filing with the AAA a Demand for Arbitration, the administrative filing fee, and a copy of any applicable arbitration agreement from the parties' contract which provides for arbitration.

**a)** The filing party shall include a copy of the court order.

**b)** The filing fee must be paid before a matter is considered properly filed. If the court order directs that a specific party is responsible for the filing fee, it is the responsibility of the filing party to either make such payment to the AAA and seek reimbursement as directed in the court order or to make other such arrangements so that the filing fee is submitted to the AAA with the Demand.

**c)** The party filing the Demand with the AAA is the claimant and the opposing party is the respondent regardless of which party initiated the court action. Parties may request that the arbitrator alter the order of proceedings if necessary pursuant to Rule R-33.

**iii)** Parties to any existing dispute who have not previously agreed to use these Rules may commence an arbitration under these Rules by filing a written Submission Agreement and the administrative filing fee. To the extent that the parties' Submission Agreement contains any variances from these Rules, such variances should be clearly stated in the Submission Agreement.

**iv)** Information to be included with any arbitration filing includes:

**a)** the name of each party;

**b)** the address of each party and, if known, the telephone number and email address;

**c)** if applicable, the name, address, telephone number, and email address of any known representative for each party;

**d)** a statement setting forth the nature of the claim including the relief sought and the amount involved; and

**e)** the locale requested if the arbitration agreement does not specify one.

**(b)** Filing Procedures

**i)** The initiating party may file or submit a dispute to the AAA in the following manner:

**a)** through AAA WebFile®, located at www.adr.org;

**b)** by filing the complete Demand or Submission with any AAA office, regardless of the intended locale of hearing; or

**c)** by emailing the complete Demand or Submission to casefiling@adr.org, with payment to follow as directed by the AAA.

**ii)** The filing party shall simultaneously provide a copy of the Demand and any supporting documents to the opposing party.



Copy from re:SearchTX

**iii)** Any papers, notices, or process necessary or proper for the initiation of an arbitration under this Rule may be served on a party:

**a)** by mail addressed to the party or its authorized representative at their last known address;

**b)** by electronic service/email, with the prior agreement of the party being served;

**c)** by personal service; or

**d)** by any other service methods provided for under the applicable procedures of the courts of the state where the party to be served is located.

**iv)** The AAA shall provide notice to the parties (or their representatives if so named) of the receipt of a Demand or Submission when the administrative filing requirements have been satisfied. The date on which the filing requirements are satisfied shall establish the date of filing the dispute for administration. However, all disputes in connection with the AAA's determination of the date of filing may be decided by the arbitrator.

**v)** It is the responsibility of the filing party to ensure that any conditions precedent to the filing of a case are met prior to filing an arbitration, as well as any time requirements associated with the filing. Any dispute regarding whether a condition precedent has been met may be raised with the arbitrator for determination.

**vi)** The AAA has the authority to make an administrative determination whether the filing requirements set forth in this Rule have been met.

**vii)** If the filing does not satisfy the filing requirements set forth in Section (a) above, the AAA shall acknowledge to all named parties receipt of the incomplete filing, and the filing may be returned to the initiating party.

**(c)** *Authority of arbitrator.* Any decision made by the AAA regarding filing requirements and procedures shall not interfere with the arbitrator's authority to determine jurisdiction pursuant to Rule R-7.

## R-5. Answers and Counterclaims

**(a)** A respondent may file an answering statement with the AAA within 14 calendar days after notice of the filing of the Demand is sent by the AAA. The respondent shall, at the time of any such filing, send a copy of any answering statement to the claimant and to all other parties to the arbitration. If no answering statement is filed within the stated time, the respondent will be deemed to deny the claim. Failure to file an answering statement shall not operate to delay the arbitration.

**(b)** A respondent may file a counterclaim at any time after notice of the filing of the Demand is sent by the AAA, subject to the limitations set forth in Rule R-6. The respondent shall send a copy of the counterclaim to the claimant and all other parties to the arbitration. If a counterclaim is asserted, it shall include a statement setting forth the nature of the counterclaim including the relief sought and the



Copy from re:SearchTX

amount involved. The filing fee as specified in the applicable AAA Fee Schedule must be paid at the time of filing. The claimant may file an answering statement or reply in response to the counterclaim with the AAA within 14 calendar days after notice of the filing of the counterclaim is sent by the AAA.

**(c)** If the respondent alleges that a different arbitration provision is controlling, the matter will be administered in accordance with the arbitration provision submitted by the initiating party subject to a final determination by the arbitrator.

**(d)** If the counterclaim does not meet the requirements for filing a claim and the deficiency is not cured by the date specified by the AAA, it may be returned to the filing party.

## R-6. Changes of Claim

**(a)** A party may at any time prior to the close of the hearing or by any earlier date established by the arbitrator increase or decrease the amount of its claim or counterclaim. Written notice of the change of claim amount must be provided to the AAA and all parties. If the change of claim amount results in an increase in the administrative fee, the balance of the fee is due before the change of claim or counterclaim amount may be accepted by the arbitrator. After the arbitrator is appointed, however, a party may increase the amount of its claim or counterclaim, or alter its request for non-monetary relief, only with the arbitrator's consent.

**(b)** Any new or different claim or counterclaim, as opposed to an increase or decrease in the amount of a pending claim or counterclaim, shall be made in writing and filed with the AAA, and a copy shall be provided to the other party, who shall have 14 calendar days from the date of such transmittal within which to file an answer to the proposed change of claim or counterclaim with the AAA. After the arbitrator is appointed, however, no new or different claim or counterclaim may be submitted except with the arbitrator's consent.

**(c)** A party that filed a claim or counterclaim of an undisclosed or undetermined amount must specify the amount of the claim or counterclaim to the AAA, all parties, and the arbitrator at least seven calendar days prior to the commencement of the hearing or by any other date established by the arbitrator. If the disclosed amount of the claim or counterclaim results in an increased filing fee, that fee must be paid at the time the claim or counterclaim amount is disclosed. For good cause shown and with the consent of the arbitrator, a party may proceed to the hearing with an undisclosed or undetermined claim or counterclaim, provided that the final amount of the claim or counterclaim is set forth in a post-hearing brief or submission and any appropriate filing fee is paid.

## R-7. Jurisdiction

**(a)** The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim, without any need to refer such matters first to a court.



Copy from re:SearchTX

**(b)** The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

**(c)** A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

## R-8. Consolidation and Joinder

**(a)** Consolidation

**i)** Two or more arbitrations may be consolidated if all parties to all of the arbitrations to be consolidated so agree.

**ii)** Unless all parties agree to consolidation, the party requesting consolidation of two or more arbitrations must file with the AAA and serve on all other parties a written request for consolidation with the supporting reasons for such request within 90 days of the date the AAA determines that all administrative filing requirements were satisfied for the last-filed case that is part of the consolidation request. Such time limit may be extended by the arbitrator appointed in the first-filed case upon a showing of good cause for the late request. The other parties to the arbitrations shall provide their written responses to the consolidation request within 10 calendar days after the AAA sends notice of receipt of the request.

**iii)** At its discretion, the AAA either may direct that the consolidation request be decided by the arbitrator appointed in the first-filed case or may appoint a consolidation arbitrator for the sole purpose of deciding the consolidation request.

**iv)** The arbitrator deciding consolidation may order consolidation of two or more cases for all purposes or for such limited purposes and under such conditions as the arbitrator may direct.

**v)** Absent agreement of all parties, an arbitrator appointed for the sole purpose of deciding the consolidation request shall have no further power to act, and shall be removed from the case, after the consolidation request is decided.

**vi)** In deciding whether to consolidate, the arbitrator or consolidation arbitrator shall take into account all relevant circumstances, including:

**a)** the terms and compatibility of the agreements to arbitrate,

**b)** applicable law,

**c)** the timeliness of the request to consolidate and the progress already made in the arbitrations,

**d)** whether the arbitrations raise common issues of law and/or fact, and



Copy from re:SearchTX

e) whether consolidation of the arbitrations would serve the interests of justice and efficiency.

**(b)** Joinder

**i)** Additional parties may be joined to an arbitration if all parties to the arbitration and the parties proposed to be joined so agree.

**ii)** Absent such consent, all requests for joinder must be submitted to the AAA prior to the appointment of an arbitrator pursuant to these Rules or within 90 days of the date the AAA determines that all administrative filing requirements have been satisfied. The arbitrator may extend this deadline on a showing of good cause for the late request.

**iii)** If the existing parties and the parties proposed to be joined are unable to agree to the joinder of those additional parties to an ongoing arbitration, the arbitrator shall decide whether parties should be joined. If an arbitrator has not yet been appointed in the case, the AAA may appoint an arbitrator for the sole purpose of deciding the joinder request. Absent agreement of all parties, the arbitrator appointed for the sole purpose of deciding the joinder request shall have no further power to act, and shall be removed from the case, after the joinder request is decided.

**iv)** The party requesting the joinder of one or more parties to a pending arbitration must file with the AAA a written request that provides the names and contact information for such parties; the names and contact information for the parties' representatives, if known; and the supporting reasons for such request, including applicable law. The requesting party must provide a copy of the joinder request to all parties in the arbitration and all parties it seeks to join at the same time it files the request with the AAA. The other parties to the arbitration and the parties sought to be joined shall provide their written responses to the joinder request within 14 days after the AAA sends notice of receipt of the request for joinder.

**v)** The requesting party shall comply with the provisions of Rule R-4(a) as to all parties sought to be joined.

**(c)** If an arbitrator determines that separate arbitrations shall be consolidated or that the joinder of additional parties is permissible, that arbitrator may also determine:

**i)** whether any arbitrator previously appointed to an existing case that was consolidated shall remain on the newly constituted case;

**ii)** whether any arbitrator previously appointed to a case where additional parties have been joined shall remain;

**iii)** if appropriate, a process for selecting the arbitrator(s) to fill any vacancies; and

**iv)** unless agreed otherwise by the parties, the allocation among the parties of arbitrator compensation and expenses, subject to reapportionment by the arbitrator appointed to the ongoing or newly constituted case in the final award.



Copy from re:SearchTX

**(d)** The AAA may take reasonable administrative actions to accomplish any consolidation or joinder ordered by the arbitrator or as agreed to by the parties. Pending the determination on a consolidation or joinder request, the AAA shall have the authority to stay the arbitration or arbitrations impacted by the consolidation or joinder request, at its sole discretion.

## R-9. Interpretation and Application of Rules

The arbitrator shall interpret and apply these Rules insofar as they relate to the arbitrator's powers and duties. When there is more than one arbitrator and a difference arises among them concerning the meaning or application of these Rules, it shall be decided by a majority vote. If that is not possible, either an arbitrator or a party may refer the question to the AAA for final decision. All other rules shall be interpreted and applied by the AAA.

## R-10. Mediation

In all cases where a claim or counterclaim exceeds $100,000, upon the AAA's administration of the arbitration or at any time while the arbitration is pending, the parties shall mediate their dispute pursuant to the applicable provisions of the AAA's Commercial Mediation Procedures, or as otherwise agreed by the parties. Absent an agreement of the parties to the contrary, the mediation shall take place concurrently with the arbitration and shall not serve to delay the arbitration proceedings. However, any party to an arbitration may unilaterally }opt out of this Rule upon notification to the AAA and the other parties to the arbitration. The parties shall confirm the completion of any mediation or any decision to opt out of this Rule to the AAA. Unless agreed to by all parties and the mediator, the mediator shall not be appointed as an arbitrator to the case.

## R-11. Administrative Conference

At the request of any party or upon the AAA's own initiative, the AAA may conduct an administrative conference, in person, by videoconference or by telephone, with the parties and/or their representatives. The conference may address such issues as arbitrator selection, mediation of the dispute, potential exchange of information, a timetable for hearings, and any other administrative matters.

## R-12. Fixing of Locale

The parties may mutually agree on the locale where the arbitration is to be held. When the parties' arbitration agreement requires a specific locale, absent the parties' agreement to change it, or a determination by the arbitrator that



Copy from re:SearchTX

applicable law requires a different locale, the locale shall be that specified in the arbitration agreement.

Any disputes regarding the locale that are to be decided by the AAA must be submitted to the AAA and all other parties within 14 calendar days after the AAA sends notice of the filing of the Demand or by the date established by the AAA. Disputes regarding locale shall be determined in the following manner:

**(a)** When the parties' arbitration agreement is silent with respect to locale, and if the parties disagree as to the locale, the AAA shall initially determine the locale of arbitration, subject to the power of the arbitrator after appointment to make a final determination on the locale.

**(b)** If the reference to a locale in the arbitration agreement is ambiguous, and the parties are unable to agree to a specific locale, the AAA shall determine the locale, subject to the power of the arbitrator to finally determine the locale.

**(c)** If the parties' arbitration agreement specifies more than one possible locale, the filing party may select any of the specified locales at the time of filing, subject to the power of the arbitrator to finally determine the locale.

The arbitrator, at the arbitrator's sole discretion, shall have the authority to conduct special hearings for document production purposes or otherwise at other locations if reasonably necessary and beneficial to the process.

## R-13. Appointment from National Roster

If the parties have not appointed an arbitrator and have not provided any other method of appointment, the arbitrator shall be appointed in the following manner:

**(a)** The AAA shall send simultaneously to each party to the dispute an identical list of 10 (unless the AAA decides that a different number is appropriate) names of persons chosen from the National Roster. The parties are encouraged to agree to an arbitrator from the submitted list and to advise the AAA of their agreement.

**(b)** If the parties are unable to agree upon an arbitrator, each party to the dispute shall have 14 calendar days from the transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA. At its discretion, the AAA may limit the number of strikes permitted. The parties are not required to exchange selection lists. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable to that party. From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve. If the parties fail to agree on any of the persons named, or if acceptable arbitrators are unable to act, or if



Copy from re:SearchTX

for any other reason the appointment cannot be made from the submitted lists, the AAA shall have the power to make the appointment from among other members of the National Roster without the submission of additional lists.

**(c)** Unless the parties agree otherwise, when there are two or more claimants or two or more respondents, the AAA may appoint all the arbitrators.

## R-14. Direct Appointment by Party

**(a)** If the agreement of the parties names an arbitrator or specifies a method of appointing an arbitrator, that designation or method shall be followed. If a party selects an arbitrator for appointment, it shall file the name, address, telephone number, and email address of the arbitrator with the AAA. Upon the request of any appointing party, the AAA shall submit a list of members of the National Roster from which the party may, if it so desires, make the appointment.

**(b)** Where the parties have agreed that each party is to name one arbitrator, the arbitrators so named must meet the standards of Rule R-19 with respect to impartiality and independence unless the parties have specifically agreed pursuant to Rule R-19(b) that the party-appointed arbitrators are to be non-neutral and need not meet those standards.

**(c)** If the agreement specifies a period of time within which an arbitrator shall be appointed and any party fails to make the appointment within that period, the AAA shall make the appointment.

**(d)** If no period of time is specified in the agreement, the AAA shall notify the party to make the appointment. If within 14 calendar days after such notice has been sent, an arbitrator has not been appointed by a party, the AAA shall make the appointment.

## R-15. Appointment of Chairperson by Party-Appointed Arbitrators, Parties, or the AAA

**(a)** Where there is a panel of three or more arbitrators, one arbitrator will be designated as the panel chairperson. Such designation will be according to the terms of the parties' arbitration agreement. However, if the parties' arbitration agreement does not specify how the chairperson is to be selected, the chairperson can be designated, at the AAA's discretion, by the party-appointed arbitrators, the parties, the panel, or the AAA.

**(b)** If the arbitration agreement specifies a period of time for appointment of the chairperson and no appointment is made within that period or any agreed extension, the AAA may appoint the chairperson. If no period of time is specified for appointment of the chairperson, and the party-appointed arbitrators or the parties do not make the appointment within 14 calendar days from the date of the appointment of the last party-appointed arbitrator, the AAA may appoint the chairperson.



Copy from re:SearchTX

**(c)** Absent the agreement of the parties, the chairperson shall be appointed from the National Roster, and the AAA shall furnish to the party-appointed arbitrators, in the manner provided in Rule R-13, a list selected from the National Roster, and the appointment of the chairperson shall be made as provided in that Rule.

## R-16. Nationality of Arbitrator

Where the parties are nationals of different countries, the AAA, at the request of any party or on its own initiative, may appoint as arbitrator a national of a country other than that of any of the parties. The request must be made before the time set for the appointment of the arbitrator as agreed by the parties or set by these Rules.

## R-17. Number of Arbitrators

**(a)** The parties may agree on the number of arbitrators to hear and determine the case. If the arbitration agreement does not specify the number of arbitrators or is ambiguous, and the parties do not otherwise agree, the dispute shall be heard and determined by one arbitrator, unless the AAA, in its discretion, directs that three arbitrators be appointed. A party may request three arbitrators in the Demand or Answer, which request the AAA will consider in exercising its discretion regarding the number of arbitrators appointed to the dispute.

**(b)** Use of terms such as "the arbitrator", "an arbitrator", or "the arbitrators" in the arbitration agreement, without further specifying the number of arbitrators, shall not be deemed by the AAA to reflect an agreement as to the number of arbitrators.

**(c)** Any request for a change in the number of arbitrators as a result of an increase or decrease in the amount of a claim or a new or different claim must be made to the AAA and other parties to the arbitration no later than seven calendar days after receipt of the Rule R-6-required notice of change of claim amount. If the parties are unable to agree with respect to the request for a change in the number of arbitrators, the AAA shall make that determination.

## R-18. Disclosure

**(a)** Any person appointed or to be appointed as an arbitrator, as well as the parties and their representatives, shall disclose to the AAA any circumstance likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives. Such obligation shall remain in effect throughout the arbitration. Failure on the part of a party or a representative to comply with the requirements of this Rule may result in the waiver of the right to object to an arbitrator in accordance with Rule R-42.



Copy from re:SearchTX

**(b)** Upon receipt of such information from the arbitrator or another source, the AAA shall communicate the information to the parties and, if it deems it appropriate to do so, to the arbitrator and others.

**(c)** Disclosure of information pursuant to this Rule R-18 is not an indication that the arbitrator considers the disclosed circumstance likely to affect impartiality or independence.

## R-19. Disqualification of Arbitrator

**(a)** Any arbitrator shall be impartial and independent and shall perform his or her duties with diligence and in good faith, and shall be subject to disqualification for:

- **i)** partiality or lack of independence,
- **ii)** inability or refusal to perform his or her duties with diligence and in good faith, and
- **iii)** any grounds for disqualification provided by applicable law.

**(b)** The parties may agree in writing, however, that arbitrators directly appointed by a party pursuant to Rule R-14 shall be non-neutral, in which case such arbitrators need not be impartial or independent and shall not be subject to disqualification for partiality or lack of independence.

**(c)** Upon objection of a party to the continued service of an arbitrator, or on its own initiative, the AAA shall determine whether the arbitrator should be disqualified on the grounds set out above, and shall inform the parties of its decision, which decision shall be conclusive.

## R-20. Communication with Arbitrator

**(a)** No party and no one acting on behalf of any party shall communicate *ex parte* with an arbitrator or a candidate for arbitrator concerning the arbitration, except that a party, or someone acting on behalf of a party, may communicate *ex parte* with a candidate for direct appointment pursuant to Rule R-14 in order to advise the candidate of the general nature of the controversy and of the anticipated proceedings and to discuss the candidate's qualifications, availability, or independence in relation to the parties or to discuss the suitability of candidates for selection as a third arbitrator where the parties or party-designated arbitrators are to participate in that selection.

**(b)** Rule R-20(a) does not apply to arbitrators directly appointed by the parties who, pursuant to Rule R-19(b), the parties have agreed in writing are non-neutral. Where the parties have so agreed under Rule R-19(b), the AAA shall as an administrative practice suggest to the parties that they agree further that Rule R-20(a) should nonetheless apply prospectively.

**(c)** As set forth in Rule R-44, unless otherwise instructed by the AAA, in the Rules, or by the arbitrator, any documents submitted by any party to the AAA or to the arbitrator shall simultaneously be provided to the other party or parties to the arbitration.



Copy from re:SearchTX

## R-21. Vacancies

**(a)** If for any reason an arbitrator is unable or unwilling to perform the duties of the office, the AAA may, on proof satisfactory to it, declare the office vacant. Vacancies shall be filled in accordance with the applicable provisions of these Rules.

**(b)** In the event of a vacancy in a panel of neutral arbitrators after the hearings have commenced, the remaining arbitrator or arbitrators may continue with the hearing and determination of the controversy, unless the parties agree otherwise.

**(c)** In the event of the appointment of a substitute arbitrator, the panel of arbitrators shall determine in its sole discretion whether it is necessary to repeat all or part of any prior hearings.

## R-22. Preliminary Hearing

**(a)** At the discretion of the arbitrator, and depending on the size and complexity of the arbitration, a preliminary hearing should be scheduled as soon as practicable after the arbitrator has been appointed. The parties should be invited to attend the preliminary hearing along with their representatives. The preliminary hearing may be conducted in person, by video conference or by telephone.

**(b)** At the preliminary hearing, the parties and the arbitrator should be prepared to discuss and establish a procedure for the conduct of the arbitration that is appropriate to achieve a fair, efficient, and economical resolution of the dispute. Procedures P-1 and P-2 of these Rules address the issues to be considered at the preliminary hearing.

## R-23. Pre-Hearing Exchange and Production of Information

**(a)** *Authority of arbitrator.* The arbitrator shall manage any necessary exchange of information among the parties with a view to achieving an efficient and economical resolution of the dispute, while at the same time promoting equality of treatment and safeguarding each party's opportunity to fairly present its claims and defenses.

**(b)** *Documents.* The arbitrator may, on application of a party or on the arbitrator's own initiative:

**i)** require the parties to exchange documents in their possession or custody on which they intend to rely;

**ii)** require the parties to update their exchanges of the documents on which they intend to rely as such documents become known to them;

**iii)** require the parties, in response to reasonable document requests, to make available to the other party documents in the responding party's possession or custody, not otherwise readily available to the party seeking the documents, and reasonably believed by the party seeking the documents to exist and to be relevant and material to the outcome of disputed issues; and



Copy from re:SearchTX

**iv)** require the parties, when documents to be exchanged or produced are maintained in electronic form, to make such documents available in the form most convenient and economical for the party in possession of such documents, unless the arbitrator determines that there is good cause for requiring the documents to be produced in a different form. The parties should attempt to agree in advance upon, and the arbitrator may determine, reasonable search parameters to balance the need for production of electronically stored documents relevant and material to the outcome of disputed issues against the cost of locating and producing them.

## R-24. Enforcement Powers of Arbitrator

The arbitrator shall have the authority to issue any orders necessary to enforce the provisions of Rules R-22 and R-23 and any other rule or procedure and to otherwise achieve a fair, efficient and economical resolution of the case, including, without limitation:

**(a)** conditioning any exchange or production of confidential documents and information, and the admission of confidential evidence at the hearing, on appropriate orders to preserve such confidentiality;

**(b)** imposing reasonable search parameters for electronic and other documents if the parties are unable to agree;

**(c)** allocating costs of producing documentation, including electronically stored documentation;

**(d)** in the case of willful non-compliance with any order issued by the arbitrator, drawing adverse inferences, excluding evidence and other submissions, and/or making special allocations of costs or an interim award of costs arising from such non-compliance; and

**(e)** issuing any other enforcement orders which the arbitrator is empowered to issue under applicable law.

## R-25. Date, Time, Place, and Method of Hearing

The arbitrator shall set the date, time, place, and method (including video, audio or other electronic means when appropriate) for each hearing. The parties shall respond to requests for hearing dates in a timely manner, be cooperative in scheduling the earliest practicable date, and adhere to the established hearing schedule. The AAA shall send a notice of hearing to the parties at least 10 calendar days in advance of the hearing date, unless otherwise agreed by the parties.



Copy from re:SearchTX

## R-26. Attendance at Hearing

The arbitrator and the AAA shall maintain the privacy of the hearings unless the law provides to the contrary. Any person having a direct interest in the arbitration is entitled to attend hearings. The arbitrator shall otherwise have the power to require the exclusion of any witness, other than a party or other essential person, during the testimony of any other witness. It shall be discretionary with the arbitrator to determine the propriety of the attendance of any other person.

## R-27. Representation

Any party may participate without representation (*pro se*), or by counsel or any other representative of the party's choosing, unless such choice is prohibited by applicable law. A party intending to be so represented shall notify the other party and the AAA of the name, telephone number and address, and email address if available, of the representative at least seven calendar days prior to the date set for the hearing at which that person is first to appear. When such a representative initiates an arbitration or responds for a party, notice is deemed to have been given.

## R-28. Oaths

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if it is required by law or requested by any party, shall do so.

## R-29. Official Record of Proceedings

**(a)** Any party desiring a transcribed record of a hearing shall make arrangements directly with a transcriber or transcription service and shall notify the arbitrator and the other parties of these arrangements at least seven calendar days in advance of the hearing. The requesting party or parties shall pay the cost of the record.

**(b)** No other means of recording any proceeding will be permitted absent the agreement of the parties or per the direction of the arbitrator.

**(c)** If the transcript or any other recording is agreed by the parties or determined by the arbitrator to be the official record of the proceeding, it must be provided to the arbitrator and made available to the other parties at the direction of the arbitrator.

**(d)** The arbitrator may resolve any disputes with regard to apportionment of the costs of the transcription or other recording.



Copy from re:SearchTX

## R-30. Interpreters

Any party wishing an interpreter shall make all arrangements directly with the interpreter and shall assume the costs of the service.

## R-31. Postponements

The arbitrator may postpone any hearing upon agreement of the parties, upon request of a party for good cause shown, or upon the arbitrator's own initiative.

## R-32. Arbitration in the Absence of a Party or Representative

Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement. An award shall not be made solely on the default of a party. The arbitrator shall require the party who is present to submit such evidence as the arbitrator may require for the making of an award.

## R-33. Conduct of Proceedings

**(a)** The claimant shall present evidence to support its claim. The respondent shall then present evidence to support its defense. Witnesses for each party shall also submit to questions from the arbitrator and the adverse party. The arbitrator has the discretion to vary this procedure, provided that the parties are treated with equality and that each party has the right to be heard and is given a fair opportunity to present its case.

**(b)** The arbitrator, exercising his or her discretion, shall conduct the proceedings with a view to expediting the resolution of the dispute and may direct the order of proof, bifurcate proceedings and direct the parties to focus their presentations on issues the decision of which could dispose of all or part of the case.

**(c)** The arbitrator may also allow for some or all of the presentation of evidence by alternative means including video, audio or other electronic means other than an in-person presentation. Such alternative means must afford a full opportunity for all parties to present any evidence that the arbitrator deems material and relevant to the resolution of the dispute and, when involving witnesses, provide an opportunity for cross-examination.

**(d)** The parties may agree to waive oral hearings in any case and may also agree to utilize the *Procedures for Resolution of Disputes Through Document Submission*, found in Procedure E-6.



Copy from re:SearchTX

## R-34. Dispositive Motions

**(a)** The arbitrator may allow the filing of and make rulings upon a dispositive motion only if the arbitrator determines the moving party has shown that the motion is likely to succeed and to dispose of or narrow the issues in the case.

**(b)** Consistent with the goal of achieving an efficient and economical resolution of the dispute, the arbitrator shall consider the time and cost associated with the briefing of a dispositive motion in deciding whether to allow any such motion.

**(c)** Fees, expenses, and compensation associated with a motion or an application to make a motion may be assessed as provided for in Rule R-49(c).

## R-35. Evidence

**(a)** The parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator may deem necessary to an understanding and determination of the dispute. Conformity to legal rules of evidence shall not be necessary. All evidence shall be taken in the presence of all of the arbitrators and all of the parties, except where any of the parties is absent, in default, or has waived the right to be present.

**(b)** The arbitrator shall determine the admissibility, relevance, and materiality of the evidence offered and may exclude evidence deemed by the arbitrator to be cumulative or irrelevant.

**(c)** The arbitrator shall take into account applicable principles of legal privilege, such as those involving the confidentiality of communications between a lawyer and client.

**(d)** An arbitrator or other person authorized by law to subpoena witnesses or documents may do so upon the request of any party or independently.

## R-36. Evidence by Written Statements and Post-Hearing Filing of Documents or Other Evidence

**(a)** At a date agreed upon by the parties or ordered by the arbitrator, the parties shall give written notice for any witness or expert witness who has provided a written witness statement to appear in person at the arbitration hearing for examination. If such notice is given, and the witness fails to appear, the arbitrator may disregard the written witness statement and/or expert report of the witness or make such other order as the arbitrator may consider to be just and reasonable.

**(b)** If a witness whose testimony is represented by a party to be essential is unable or unwilling to testify at the hearing, either in person or through electronic or other means, either party may request that the arbitrator order the witness to appear in person for examination before the arbitrator at a time and location where the witness is willing and able to appear voluntarily or can legally be compelled to do so. Any such order may be conditioned upon payment by the requesting party of all reasonable costs associated with such examination.



Copy from re:SearchTX

**(c)** If the parties agree or the arbitrator directs that documents or other evidence be submitted to the arbitrator after the hearing, the documents or other evidence shall be filed with the AAA for transmission to the arbitrator. All parties shall be afforded an opportunity to examine and respond to such documents or other evidence.

## R-37. Inspection or Investigation

An arbitrator finding it necessary to make an inspection or investigation in connection with the arbitration shall direct the AAA to so advise the parties. The arbitrator shall set the date and time and the AAA shall notify the parties. Any party who so desires may be present at such an inspection or investigation. In the event that one or all parties are not present at the inspection or investigation, the arbitrator shall make an oral or written report to the parties and afford them an opportunity to comment.

## R-38. Interim Measures

**(a)** The arbitrator may take whatever interim measures he or she deems necessary, including injunctive relief and measures for the protection or conservation of property and disposition of perishable goods.

**(b)** Such interim measures may take the form of an interim award, and the arbitrator may require security for the costs of such measures.

**(c)** A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

## R-39. Emergency Measures of Protection

**(a)** Unless the parties agree otherwise, the provisions of this Rule shall apply to arbitrations conducted under arbitration clauses or agreements entered on or after October 1, 2013. This Rule shall not apply to cases administered pursuant to the Expedited Procedures.

**(b)** A party in need of emergency relief prior to the constitution of the panel shall notify the AAA and all other parties in writing of the nature of the relief sought and the reasons why such relief is required on an emergency basis. The application shall also set forth the reasons why the party is entitled to such relief. Such notice may be given by facsimile or email or other reliable means, but must include a statement certifying that all other parties have been notified or an explanation of the steps taken in good faith to notify other parties.



Copy from re:SearchTX

**(c)** Within one business day of receipt of notice from the AAA initiating the request referenced in section (b), the AAA shall appoint a single emergency arbitrator designated to rule on emergency applications. The emergency arbitrator shall expeditiously disclose any circumstance likely, on the basis of the facts disclosed on the application, to affect such arbitrator's impartiality or independence. Any challenge to the appointment of the emergency arbitrator must be made within one business day of the communication by the AAA to the parties of the appointment of the emergency arbitrator and the circumstances disclosed.

**(d)** The emergency arbitrator shall as soon as possible, but in any event within two business days of appointment, establish a schedule for consideration of the application for emergency relief. Such a schedule shall provide a reasonable opportunity to all parties to be heard, but may provide for proceeding by telephone or video conference or on written submissions as alternatives to a formal hearing. The emergency arbitrator shall have the authority vested in the tribunal under Rule R-7, including the authority to rule on her or his own jurisdiction, and shall resolve any disputes over the applicability of this Rule R-39.

**(e)** If, after consideration, the emergency arbitrator is satisfied that the party seeking the emergency relief has shown that immediate and irreparable loss or damage shall result in the absence of emergency relief, and that such party is entitled to such relief under applicable law, the emergency arbitrator may enter an interim order or award granting the relief and stating the reason therefore.

**(f)** Any application to modify an interim award of emergency relief must be based on changed circumstances and may be made to the emergency arbitrator until the non-emergency ("merits") arbitrator is appointed; thereafter such a request shall be addressed to the merits arbitrator. The emergency arbitrator shall have no further power to act after the merits arbitrator is appointed unless the emergency arbitrator is named as the merits arbitrator or as a member of the panel.

**(g)** Any interim award of emergency relief may be conditioned on provision by the party seeking such relief for appropriate security.

**(h)** A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with this Rule, the agreement to arbitrate or a waiver of the right to arbitrate. If the AAA is directed by a judicial authority to nominate a special master to consider and report on an application for emergency relief, the AAA shall proceed as provided in this Rule, and the references to the emergency arbitrator shall be read to mean the special master, except that the special master shall issue a report rather than an interim award.

**(i)** The costs associated with applications for emergency relief shall initially be apportioned by the emergency arbitrator or special master, subject to the power of the merits arbitrator to determine finally the apportionment of such costs. The emergency arbitrator may take into consideration whether the request for emergency relief was made in good faith.



Copy from re:SearchTX

## R-40. Closing of Hearing

**(a)** The arbitrator shall specifically inquire of all parties whether they have any further proofs to offer or witnesses to be heard. Upon receiving negative replies or if satisfied that the record is complete, the arbitrator shall declare the hearing closed.

**(b)** If documents or responses are to be filed as provided in Rule R-36, or if briefs are to be filed, the hearing shall be declared closed as of the date the arbitrator is satisfied that the record is complete, and such date shall occur no later than seven calendar days from the date of receipt of the last such submissions or hearing transcript.

**(c)** The time limit within which the arbitrator is required to make the award shall commence, in the absence of other agreements by the parties, upon the closing of the hearing. The AAA may extend the time limit for rendering of the award only in unusual and extreme circumstances.

## R-41. Reopening of Hearing

The hearing may be reopened on the arbitrator's initiative, or by the direction of the arbitrator upon application of a party, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed to by the parties in the arbitration agreement, the matter may not be reopened unless the parties agree to an extension of time. When no specific date is fixed by agreement of the parties, the arbitrator shall have 30 calendar days from the closing of the reopened hearing within which to make an award (or 14 calendar days if the case is governed by the Expedited Procedures).

## R-42. Waiver of Rules

Any party who proceeds with the arbitration after knowledge that any provision or requirement of these Rules has not been complied with and who fails to state an objection in writing shall be deemed to have waived the right to object.

## R-43. Extensions of Time

The parties may modify by mutual agreement any period of time established by these Rules or the parties' arbitration agreement. The AAA or the arbitrator may for good cause extend any period of time established by these Rules, except the time for making the award. The AAA shall notify the parties of any extension.



Copy from re:SearchTX

## R-44. Serving of Notice and Communications

**(a)** The service methods set forth in Rule R-4(b)(iii) may also be used for the delivery of any filing, notice or communication throughout the course of the arbitration proceeding.

**(b)** The AAA, the arbitrator, and the parties may also use alternative methods of communication or other platforms as directed by the AAA or as agreed by the parties or directed by the arbitrator to exchange any communication or other notice required by these Rules during the course of the arbitration.

**(c)** Unless otherwise instructed by the AAA or by the arbitrator, any party submitting any document or written communication to another party, the AAA or the arbitrator, shall simultaneously provide that material to all other participants, including the AAA.

**(d)** Failure to provide the other party with copies of communications provided to the AAA or the arbitrator may prevent the AAA or the arbitrator from acting on any requests or objections contained therein.

**(e)** The AAA may direct that any oral or written communications sent by a party or their representative shall be sent in a particular manner. The failure of a party or their representative to comply with any such direction may result in the AAA's refusal to consider the issue raised in the communication

**(f)** The AAA may initiate administrative communications with the parties or their representatives either jointly or individually.

**(g)** Any method of service on or notice to a party must be made in such a manner to provide that party with reasonable opportunity to be heard with regard to the dispute.

## R-45. Confidentiality

**(a)** Unless otherwise required by applicable law, court order, or the parties' agreement, the AAA and the arbitrator shall keep confidential all matters relating to the arbitration or the award.

**(b)** Upon the agreement of the parties or the request of any party, the arbitrator may make orders concerning the confidentiality of the arbitration proceedings or of any other matters in connection with the arbitration and may take measures for protecting trade secrets and confidential information.

## R-46. Majority Decision

**(a)** When the panel consists of more than one arbitrator, unless required by law or by the arbitration agreement or section (b) of this Rule, a majority of the arbitrators must make all decisions.

**(b)** Where there is a panel of three arbitrators, absent an objection of a party or another member of the panel, the chairperson of the panel is authorized to



Copy from re:SearchTX

resolve any disputes related to the exchange of information or procedural matters without the need to consult the full panel.

**(c)** Absent an objection of a party or another member of the panel, the chairperson may sign any order on behalf of the panel.

## R-47. Time of Award

The award shall be made promptly by the arbitrator and, unless otherwise agreed by the parties or specified by law, no later than 30 calendar days from the date of closing the hearing, or, if oral hearings have been waived, from the due date set for receipt of the parties' final statements and proofs.

## R-48. Form of Award

**(a)** Any award shall be in writing and signed by a majority of the arbitrators. Signatures may be executed in electronic or digital form. The award shall be executed in the form and manner required by law.

**(b)** The arbitrator need not render a reasoned award unless the parties request such an award in writing prior to appointment of the arbitrator or unless the arbitrator determines that a reasoned award is appropriate.

## R-49. Scope of Award

**(a)** The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract.

**(b)** In addition to a final award, the arbitrator may make other decisions, including interim, interlocutory, or partial rulings, orders, and awards. In any interim, interlocutory, or partial award, the arbitrator may assess and apportion the fees, expenses, and compensation related to such award as the arbitrator determines is appropriate.

**(c)** In the final award or any order disposing of all of the case, the arbitrator shall assess the fees, expenses, and compensation provided in Rules R-55, R-56, and R-57. The arbitrator may also assess such fees, expenses, and compensation in any order or award disposing of part of the case. The arbitrator may apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate.

**(d)** The award of the arbitrator may include:

- **i)** interest at such rate and from such date as the arbitrator may deem appropriate; and
- **ii)** an award of attorneys' fees if all parties have requested such an award or it is authorized by law or the parties' arbitration agreement.



Copy from re:SearchTX

## R-50. Award Upon Settlement – Consent Award

**(a)** If the parties settle their dispute during the course of the arbitration and if the parties so request, the arbitrator may set forth the terms of the settlement in a "consent award." A consent award must include an allocation of arbitration costs, including administrative fees and expenses as well as arbitrator fees and expenses as set forth in Rule R-49(c).

**(b)** The consent award shall not be released to the parties until all administrative fees and all arbitrator compensation have been paid in full.

## R-51. Delivery of Award to Parties

Parties shall accept as notice and delivery of the award the placing of the award or a true copy thereof in the mail addressed to the parties or their representatives at their last known addresses, personal or electronic service of the award, or the filing of the award in any other manner that is permitted by law.

## R-52. Modification of Award

**(a)** Within 20 calendar days after the transmittal of any award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, interpret the award or correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to re-determine the merits of any claim already decided. The other parties shall be given 10 calendar days to respond to the request. The arbitrator shall dispose of the request within 20 calendar days after transmittal by the AAA to the arbitrator of the request and any response thereto.

**(b)** If the arbitrator has established a different schedule for such requests, responses, and disposition, the arbitrator's schedule will supersede the deadlines set forth in this Rule.

## R-53. Release of Documents for Judicial Proceedings

The AAA shall, upon the written request of a party to the arbitration, furnish to the party, at its expense, copies or certified copies of any papers in the AAA's possession that are not determined by the AAA to be privileged or confidential.

## R-54. Applications to Court and Exclusion of Liability

**(a)** No judicial proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate.

**(b)** Neither the AAA nor any arbitrator in a proceeding under these Rules is a necessary or proper party in any judicial proceedings relating to the arbitration or any other services provided by the AAA.



Copy from re:SearchTX

**(c)** Parties to an arbitration under these Rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof.

**(d)** Parties to an arbitration under these Rules shall be deemed to have consented that the AAA shall not be liable to any party in any action for damages, or injunctive or other relief, for any act or omission in connection with any arbitration administered in whole or in part by the AAA or conducted under these Rules. Parties shall also be deemed to have consented that the arbitrator shall not be liable to any party in any action for damages, or injunctive or other relief, for an act or omission in connection with any arbitration administered in whole or in part by the AAA.

**(e)** Parties to an arbitration under these Rules may not call the arbitrator, the AAA, or AAA employees as a witness in litigation or any other proceeding relating to the arbitration. The arbitrator, the AAA and AAA employees are not competent to testify as witnesses in any such proceeding.

## R-55. Administrative Fees

As a not-for-profit organization, the AAA shall prescribe administrative fees to compensate it for the cost of providing administrative services. The fee schedule in effect when the Demand is filed will apply throughout the pendency of the case. The administrative fees shall be paid initially by the party or parties making a claim or counterclaim, subject to final apportionment by the arbitrator in the award. The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees.

## R-56. Expenses

The expenses of witnesses for either side shall be paid by the party producing such witnesses. All other expenses of the arbitration, including required travel and other expenses of the arbitrator, AAA representatives, and any witness and the cost of any proof produced at the direct request of the arbitrator, shall be borne equally by the parties, unless they agree otherwise or unless the arbitrator in the award assesses such expenses or any part thereof against any specified party or parties.

## R-57. Neutral Arbitrator's Compensation

**(a)** Arbitrators shall be compensated at a rate consistent with the arbitrator's stated rate of compensation at the time their AAA resume is presented to the parties for consideration pursuant to Rule R-13, unless otherwise determined by the AAA. Such compensation will be consistent with the provisions of the arbitrator's executed *Notice of Compensation Arrangements.*



Copy from re:SearchTX

**(b)** If there is disagreement concerning the terms of compensation, an appropriate rate shall be established with the arbitrator by the AAA and confirmed to the parties.

**(c)** Any arrangement for the compensation of a neutral arbitrator shall be made through the AAA and not directly between the parties and the arbitrator.

## R-58. Deposits

**(a)** The AAA will require the parties to deposit in advance of any hearings such sums of money as it deems necessary to cover the expense of the arbitration, including the arbitrator's compensation and expenses, if any, and shall render an accounting to the parties and return any unexpended balance at the conclusion of the case. A party's failure to make the requested deposits by the date established by the AAA may result in the AAA's or the arbitrator's taking any appropriate steps as set forth in Rule R-59.

**(b)** Other than in cases where the arbitrator serves for a flat fee, deposit amounts requested will be based on estimates provided by the arbitrator. The arbitrator will determine the estimated amount of deposits using the information provided by the parties with respect to the complexity of each case.

**(c)** The AAA shall request from the arbitrator an itemization or explanation for the arbitrator's request for deposits.

**(d)** The AAA will allocate the deposits requested among the parties and will establish due dates for the collection of those deposits.

## R-59. Remedies for Nonpayment

If arbitrator compensation or expenses or the AAA's administrative fees have not been paid in full, the AAA may so inform the parties so that one of them may advance the required payment.

**(a)** Upon receipt of information from the AAA that payment for administrative fees or deposits for arbitrator compensation or expense have not been paid in full, to the extent the law allows, a party may request that the arbitrator take specific measures relating to a party's non-payment. Such measures may include, but are not limited to:

**i)** limiting a party's ability to assert or pursue its claim, and

**ii)** prohibiting a non-paying party from filing any motion.

**(b)** In no event, however, shall a party be precluded from defending a claim or counterclaim.

**(c)** The arbitrator must provide the party opposing a request for such measures with the opportunity to respond prior to making any ruling regarding the same.



Copy from re:SearchTX

**(d)** In the event that the arbitrator grants any request for relief which limits any party's participation in the arbitration, the arbitrator shall require the party who is making a claim and who has made appropriate payments to submit such evidence as the arbitrator may require for the making of an award.

**(e)** Upon receipt of information from the AAA that full payments have not been received, the arbitrator, on the arbitrator's own initiative or at the request of the AAA or a party, may order the suspension of the arbitration. If no arbitrator has yet been appointed, the AAA may suspend the proceedings.

**(f)** If the arbitration has been suspended by either the AAA or the arbitrator and the parties have failed to make the full payments requested within the time provided after the suspension, the arbitrator, or the AAA if an arbitrator has not been appointed, may terminate the proceedings.

## R-60. Sanctions

**(a)** The arbitrator may, upon a party's request, order appropriate sanctions where a party fails to comply with its obligations under these Rules or with an order of the arbitrator. In the event that the arbitrator enters a sanction that limits any party's participation in the arbitration or results in an adverse determination of an issue or issues, the arbitrator shall explain that order in writing and shall require the submission of evidence and legal argument prior to making of an award. The arbitrator may not enter a default award as a sanction.

**(b)** The arbitrator must provide a party that is subject to a sanction request with the opportunity to respond prior to making any determination regarding the sanctions application.



Copy from re:SearchTX

# Preliminary Hearing Procedures

## P-1. General

**(a)** In all but the simplest cases, holding a preliminary hearing as early in the process as possible will help the parties and the arbitrator organize the proceeding in a manner that will maximize efficiency and economy, and will provide each party a fair opportunity to present its case.

**(b)** Care must be taken to avoid importing procedures from court systems, as such procedures may not be appropriate to the conduct of arbitrations as an alternative form of dispute resolution that is designed to be simpler, less expensive and more expeditious.

## P-2. Checklist

**(a)** The following checklist suggests subjects that the parties and the arbitrator should address at the preliminary hearing, in addition to any others that the parties or the arbitrator believe to be appropriate to the particular case. The items to be addressed in a particular case will depend on the size, subject matter, and complexity of the dispute, and are subject to the discretion of the arbitrator:

- **i)** the possibility of other non-adjudicative methods of dispute resolution, including mediation pursuant to Rule R-10;
- **ii)** whether all necessary or appropriate parties are included in the arbitration;
- **iii)** whether a party will seek a more detailed statement of claims, counterclaims or defenses;
- **iv)** whether there are any anticipated amendments to the parties' claims, counterclaims, or defenses;
- **v)** which
  - **a)** arbitration rules;
  - **b)** procedural law; and
  - **c)** substantive law govern the arbitration;
- **vi)** issues related to cybersecurity, privacy and data protection to provide for an appropriate level of security and compliance in connection with the proceeding;
- **vii)** whether there are any threshold or dispositive issues that can efficiently be decided without considering the entire case, including without limitation,
  - **a)** any preconditions that must be satisfied before proceeding with the arbitration;
  - **b)** whether any claim or counterclaim falls outside the arbitrator's jurisdiction or is otherwise not arbitrable;



Copy from re:SearchTX

**c)** consolidation of the claims or counterclaims with another arbitration; or

**d)** bifurcation of the proceeding.

**viii)** whether the parties will exchange documents, including electronically stored documents, on which they intend to rely in the arbitration, and/or make written requests for production of documents within defined parameters;

**ix)** whether to establish any additional procedures to obtain information that is relevant and material to the outcome of disputed issues;

**x)** how costs of any searches for requested information or documents that would result in substantial costs should be borne;

**xi)** whether any measures are required to protect confidential information;

**xii)** Whether the parties shall disclose:

**a)** whether any non-party (such as a third-party funder or an insurer) has undertaken to pay or to contribute to the cost of a party's participation in the arbitration, and if so, to identify the person or entity concerned and to describe the nature of the undertaking; and

**b)** whether any non-party (such as a funder, insurer, parent company, or ultimate beneficial owner) has an economic interest in the outcome of the arbitration, and if so, to identify the person or entity concerned and to describe the nature of the interest;

**xiii)** whether the parties intend to present evidence from expert witnesses, and if so, whether to establish a schedule for the parties to identify their experts and exchange expert reports;

**xiv)** whether, according to a schedule set by the arbitrator, the parties will:

**a)** identify all witnesses, the subject matter of their anticipated testimonies, exchange written witness statements, and determine whether written witness statements will replace direct testimony at the hearing;

**b)** exchange and pre-mark documents that each party intends to submit; and

**c)** exchange pre-hearing submissions, including exhibits;

**xv)** the date, time and place of the arbitration hearing;

**a)** whether, at the arbitration hearing,

**b)** testimony may be presented in person, in writing, by videoconference, via the internet, telephonically, or by other reasonable means;

**xvi)** there will be a stenographic transcript or other record of the proceeding and, if so, who will make arrangements to provide it;

**xvii)** whether any procedure needs to be established for the issuance of subpoenas;

**xviii)** the identification of any ongoing, related litigation or arbitration;

**xix)** whether post-hearing submissions will be filed;



Copy from re:SearchTX

**xx)** the form of the arbitration award; and

**xxi)** any other matter the arbitrator considers appropriate or a party wishes to raise.

**(b)** The arbitrator shall issue a written order memorializing decisions made and agreements reached during or following the preliminary hearing.



Copy from re:SearchTX

# Expedited Procedures

## E-1. Limitation on Extensions

**(a)** Except in extraordinary circumstances, the AAA or the arbitrator may grant a party no more than one seven-day extension of time to respond to the Demand for Arbitration or counterclaim as provided in Rule R-5.

**(b)** Any other extension requests may be granted only after consideration of Procedure E-7.

## E-2. Changes of Claim or Counterclaim

A claim or counterclaim may be increased in amount, or a new or different claim or counterclaim added, any time prior to the appointment of the arbitrator. However, after the arbitrator is appointed, no new or different claim or counterclaim may be submitted except with the arbitrator's consent. If an increased claim or counterclaim exceeds $100,000, the case will be administered under the regular Commercial Arbitration Rules unless all parties and the arbitrator agree that the case may continue to be administered under the Expedited Procedures.

## E-3. Serving of Notice

In addition to notice provided by Rule R-44, the parties shall also accept notice by telephone. Telephonic notices by the AAA shall subsequently be confirmed in writing to the parties. Should there be a failure to confirm in writing any such oral notice, the proceeding shall nevertheless be valid if notice has, in fact, been given by telephone.

## E-4. Appointment and Qualifications of Arbitrator

**(a)** The AAA shall simultaneously submit to each party an identical list of five proposed arbitrators drawn from its National Roster from which one arbitrator shall be appointed.

**(b)** The parties are encouraged to agree to an arbitrator from this list and to advise the AAA of their agreement. If the parties are unable to agree upon an arbitrator, each party may strike two names from the list and return it to the AAA within seven days from the date of the AAA's mailing to the parties. If for any reason the appointment of an arbitrator cannot be made from the list, the AAA may make the appointment from other members of the panel without the submission of additional lists.

**(c)** The parties will be given notice by the AAA of the appointment of the arbitrator, who shall be subject to disqualification for the reasons specified in Rule R-19.



Copy from re:SearchTX

The parties shall notify the AAA within seven calendar days of any objection to the arbitrator appointed. Any such objection shall be for cause and shall be confirmed in writing to the AAA with a copy to the other party or parties.

## E-5. Discovery, Motions, and Conduct of Proceedings

**(a)** At least two business days prior to the hearing, the parties shall exchange copies of all exhibits they intend to submit at the hearing. The arbitrator shall resolve disputes concerning the exchange of exhibits.

**(b)** No other discovery shall be permitted except as allowed by the arbitrator for good cause shown. If the arbitrator allows additional discovery, the AAA, in consultation with the arbitrator, may remove the case from the Expedited Procedures.

**(c)** There shall be no motions except as allowed by the arbitrator for good cause shown.

## E-6. Proceedings on Documents and Procedures for the Resolution of Disputes Through Document Submission

Where no party's claim exceeds $25,000, exclusive of interest, attorneys' fees and arbitration costs, and other cases in which the parties agree, the dispute shall be resolved by submission of documents, unless any party requests an oral hearing, or the arbitrator determines that an oral hearing is necessary. Where cases are resolved by submission of documents, the following procedures may be utilized at the agreement of the parties or the discretion of the arbitrator:

**(a)** Within 14 calendar days of confirmation of the arbitrator's appointment, the arbitrator may convene a preliminary management hearing, via conference call, video conference, or internet, to establish a fair and equitable procedure for the submission of documents, and, if the arbitrator deems appropriate, a schedule for one or more telephonic or electronic conferences.

**(b)** The arbitrator has the discretion to remove the case from the documents-only process if the arbitrator determines that an in-person hearing is necessary.

**(c)** If the parties agree to in-person hearings after a previous agreement to proceed under this Procedure, the arbitrator shall conduct such hearings. If a party seeks to have in-person hearings after agreeing to this Procedure, but there is not agreement among the parties to proceed with in-person hearings, the arbitrator shall resolve the issue after the parties have been given the opportunity to provide their respective positions on the issue.

**(d)** The arbitrator shall establish the date for either written submissions or a final telephonic or electronic conference. Such date shall operate to close the hearing and the time for the rendering of the award shall commence.

**(e)** Unless the parties have agreed to a form of award other than that set forth in Rule R-48, when the parties have agreed to resolve their dispute by this Procedure, the



Copy from re:SearchTX

arbitrator shall render the award within 14 calendar days from the date the hearing is closed.

**(f)** If the parties agree to a form of award other than that described in Rule R-48, the arbitrator shall have 30 calendar days from the date the hearing is declared closed in which to render the award.

**(g)** The award is subject to all other provisions of the regular Commercial Arbitration Rules which pertain to awards.

## E-7. Date, Time, Place, and Method of Hearing

In cases in which a hearing is to be held, the arbitrator shall set the date, time, place, and method of the hearing, to be scheduled to take place no more than 60 days after the preliminary hearing or as otherwise mutually agreed to between the parties and the arbitrator. The AAA will notify the parties in advance of the hearing date.

## E-8. The Hearing

**(a)** Absent good cause shown, the hearing shall not exceed one day. Each party shall have equal opportunity to submit its proofs and complete its case. The arbitrator shall determine the order of the hearing, and may require further submission of documents within two business days after the hearing.

**(b)** For good cause shown, the arbitrator may schedule one additional day of hearings to be completed within seven business days after the initial day of hearing or as soon as practicable as determined by the arbitrator. In cases where the hearing is scheduled to exceed one day, the AAA, in consultation with the arbitrator, may remove the case from the Expedited Procedures.

**(c)** Generally, there will be no stenographic record. Any party desiring a transcribed record of the hearing may arrange for one pursuant to the provisions of Rule R-29.

## E-9. Time of Award

Unless otherwise agreed by the parties and arbitrator, the award shall be rendered not later than 14 calendar days from the date of the closing of the hearing or, if oral hearings have been waived, from the due date established for the receipt of the parties' final statements and proofs.

## E-10. Arbitrator's Compensation

**(a)** Arbitrators will receive compensation at a rate to be suggested by the AAA regional office.

**(b)** For cases that are removed from the Expedited Procedures after the preliminary hearing is held, the arbitrator shall be compensated pursuant to Rule R-57.



Copy from re:SearchTX

# Procedures for Large, Complex Commercial Disputes

## L-1. Administrative Conference

Prior to the dissemination of a list of potential arbitrators, the AAA may, unless the parties agree otherwise, conduct an administrative conference with the parties and/or their attorneys or other representatives by conference call or video conference. The conference will take place as soon as practicable after the commencement of the arbitration. In the event the parties are unable to agree on a mutually acceptable time for the conference, the AAA may contact the parties individually to discuss the issues contemplated herein. Such administrative conference shall be conducted for the following purposes and for such additional purposes as the parties or the AAA may deem appropriate:

**(a)** to obtain additional information about the nature and magnitude of the dispute and the anticipated length of hearing and scheduling;

**(b)** to discuss the views of the parties about the technical and other qualifications of the arbitrators;

**(c)** to obtain conflicts statements from the parties; and

**(d)** to consider, with the parties, whether mediation or other non-adjudicative methods of dispute resolution might be appropriate.

## L-2. Arbitrators

**(a)** Large, complex commercial cases shall be heard and determined by either one or three arbitrators, as may be agreed upon by the parties. With the exception in paragraph (b) below, if the parties do not agree upon the number of arbitrators and a claim or counterclaim involves at least $3,000,000 then three arbitrators shall hear and determine the case; otherwise one arbitrator shall hear and determine the case.

**(b)** In cases involving the financial hardship of a party or other circumstance, the AAA at its discretion may require that only one arbitrator hear and determine the case, regardless of the amount of the claim and counterclaim.

**(c)** The AAA shall appoint the arbitrator as agreed by the parties. If they are unable to agree on a method of appointment, the AAA shall appoint arbitrators from the Large, Complex Commercial Case Panel, in the manner provided in the regular Commercial Arbitration Rules. Absent agreement of the parties, the arbitrator shall not have served as the mediator in the mediation phase of the instant proceeding.



Copy from re:SearchTX

## L-3. Management of Proceedings

**(a)** The arbitrator shall take such steps as deemed necessary or desirable to avoid delay and to achieve a fair, speedy and cost-effective resolution of a Large, Complex Commercial Dispute.

**(b)** As promptly as practicable after the selection of the arbitrator(s), a preliminary hearing shall be scheduled in accordance with Procedures P-1 and P-2 of these rules.

**(c)** The parties shall exchange copies of all exhibits they intend to submit at the hearing at least 10 calendar days prior to the hearing unless the arbitrator determines otherwise.

**(d)** The parties and the arbitrator shall address issues pertaining to the pre-hearing exchange and production of information in accordance with Rule R-23 of the AAA Commercial Rules, and the arbitrator's determinations on such issues shall be included within a scheduling order.

**(e)** The arbitrator, or any single member of the panel, shall be authorized to resolve any disputes concerning the pre-hearing exchange and production of documents and information by any reasonable means within their discretion, including, without limitation, the issuance of orders set forth in Rules R-23 and R-24 of the AAA Commercial Rules.

**(f)** In exceptional cases, at the discretion of the arbitrator, upon good cause shown and consistent with the expedited nature of arbitration, the arbitrator may order depositions to obtain the testimony of a person who may possess information determined by the arbitrator to be relevant and material to the outcome of the case. The arbitrator may allocate the cost of taking such a deposition.

**(g)** Generally, hearings will be scheduled on consecutive days or in blocks of consecutive days in order to maximize efficiency and minimize costs.

# Administrative Fee Schedule

FOR THE CURRENT ADMINISTRATIVE FEE SCHEDULE, PLEASE VISIT www.adr.org/feeschedule.



Copy from re:SearchTX

# Commercial Mediation Procedures

## M-1. Agreement of Parties*

Whenever, by stipulation or in their contract, the parties have provided for mediation or conciliation of existing or future disputes under the auspices of the American Arbitration Association or under these procedures, the parties and their representatives, unless agreed otherwise in writing, shall be deemed to have made these procedural guidelines, as amended and in effect as of the date of filing of a request for mediation, a part of their agreement and designate the AAA as the administrator of their mediation.

The parties by mutual agreement may vary any part of these procedures including, but not limited to, agreeing to conduct the mediation via telephone or other electronic or technical means.

## M-2. Initiation of Mediation

Any party or parties to a dispute may initiate mediation under the AAA's auspices by making a request for mediation to any of the AAA's regional offices or case management centers via telephone, email, regular mail or fax. Requests for mediation may also be filed online via AAA WebFile at www.adr.org.

The party initiating the mediation shall simultaneously notify the other party or parties of the request. The initiating party shall provide the following information to the AAA and the other party or parties as applicable:

**(i)** A copy of the mediation provision of the parties' contract or the parties' stipulation to mediate.

**(ii)** The names, regular mail addresses, email addresses, and telephone numbers of all parties to the dispute and representatives, if any, in the mediation.

**If a contract calls for the Commercial Mediation Procedures, and the dispute is between a consumer and a business or between an online marketplace or platform and an individual user or subscriber (using or subscribed to the service as an individual and not incorporated) and the dispute does not involve work or work-related claims, the AAA has the discretion to apply the Consumer Mediation Procedures and Consumer Fee Schedule.*

*If the dispute is between an individual employee or an independent contractor (working or performing as an individual and not incorporated) and a business or organization and the dispute involves work or work-related claims, including any statutory claims and including work-related claims under independent contractor agreements, the AAA has the discretion to apply the Employment/Workplace Mediation Procedures and Employment/Workplace Fee Schedule.*

*If a contract calls for the Consumer Mediation Procedures, and the dispute is not between a consumer and a business, the AAA has the discretion to apply the Commercial Mediation Procedures and Commercial Fee schedule*



Copy from re:SearchTX

**(iii)** A brief statement of the nature of the dispute and the relief requested.

**(iv)** Any specific qualifications the mediator should possess.

## M-3. Representation

Subject to any applicable law, any party may be represented by persons of the party's choice. The names and addresses of such persons shall be communicated in writing to all parties and to the AAA.

## M-4. Appointment of the Mediator

If the parties have not agreed to the appointment of a mediator and have not provided any other method of appointment, the mediator shall be appointed in the following manner:

**(i)** Upon receipt of a request for mediation, the AAA will send to each party a list of mediators from the AAA's Panel of Mediators. The parties are encouraged to agree to a mediator from the submitted list and to advise the AAA of their agreement.

**(ii)** If the parties are unable to agree upon a mediator, each party shall strike unacceptable names from the list, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all mediators on the list shall be deemed acceptable. From among the mediators who have been mutually approved by the parties, and in accordance with the designated order of mutual preference, the AAA shall invite a mediator to serve.

**(iii)** If the parties fail to agree on any of the mediators listed, or if acceptable mediators are unable to serve, or if for any other reason the appointment cannot be made from the submitted list, the AAA shall have the authority to make the appointment from among other members of the Panel of Mediators without the submission of additional lists.

## M-5. Mediator's Impartiality and Duty to Disclose

AAA mediators are required to abide by the *Model Standards of Conduct for Mediators* in effect at the time a mediator is appointed to a case. Where there is a conflict between the *Model Standards* and any provision of these Mediation Procedures, these Mediation Procedures shall govern. The Standards require mediators to (i) decline a mediation if the mediator cannot conduct it in an impartial manner, and (ii) disclose, as soon as practicable, all actual and potential conflicts of interest that are reasonably known to the mediator and could reasonably be seen as raising a question about the mediator's impartiality.



Copy from re:SearchTX

Prior to accepting an appointment, AAA mediators are required to make a reasonable inquiry to determine whether there are any facts that a reasonable individual would consider likely to create a potential or actual conflict of interest for the mediator. AAA mediators are required to disclose any circumstance likely to create a presumption of bias or prevent a resolution of the parties' dispute within the time-frame desired by the parties. Upon receipt of such disclosures, the AAA shall immediately communicate the disclosures to the parties for their comments.

The parties may, upon receiving disclosure of actual or potential conflicts of interest of the mediator, waive such conflicts and proceed with the mediation. In the event that a party disagrees as to whether the mediator shall serve, or in the event that the mediator's conflict of interest might reasonably be viewed as undermining the integrity of the mediation, the mediator shall be replaced.

## M-6. Vacancies

If any mediator shall become unwilling or unable to serve, the AAA will appoint another mediator, unless the parties agree otherwise, in accordance with section M-4.

## M-7. Duties and Responsibilities of the Mediator

**(i)** The mediator shall conduct the mediation based on the principle of party self-determination. Self-determination is the act of coming to a voluntary, uncoerced decision in which each party makes free and informed choices as to process and outcome.

**(ii)** The mediator is authorized to conduct separate or *ex parte* meetings and other communications with the parties and/or their representatives, before, during, and after any scheduled mediation conference. Such communications may be conducted via telephone, in writing, via email, online, in person or otherwise.

**(iii)** The parties are encouraged to exchange all documents pertinent to the relief requested. The mediator may request the exchange of memoranda on issues, including the underlying interests and the history of the parties' negotiations. Information that a party wishes to keep confidential may be sent to the mediator, as necessary, in a separate communication with the mediator.

**(iv)** The mediator does not have the authority to impose a settlement on the parties but will attempt to help them reach a satisfactory resolution of their dispute. Subject to the discretion of the mediator, the mediator may make



Copy from re:SearchTX

oral or written recommendations for settlement to a party privately or, if the parties agree, to all parties jointly.

**(v)** In the event a complete settlement of all or some issues in dispute is not achieved within the scheduled mediation session(s), the mediator may continue to communicate with the parties, for a period of time, in an ongoing effort to facilitate a complete settlement.

**(vi)** The mediator is not a legal representative of any party and has no fiduciary duty to any party.

## M-8. Responsibilities of the Parties

The parties shall ensure that appropriate representatives of each party, having authority to consummate a settlement, attend the mediation conference.

Prior to and during the scheduled mediation conference session(s) the parties and their representatives shall, as appropriate to each party's circumstances, exercise their best efforts to prepare for and engage in a meaningful and productive mediation.

## M-9. Privacy

Mediation sessions and related mediation communications are private proceedings. The parties and their representatives may attend mediation sessions. Other persons may attend only with the permission of the parties and with the consent of the mediator.

## M-10. Confidentiality

Subject to applicable law or the parties' agreement, confidential information disclosed to a mediator by the parties or by other participants (witnesses) in the course of the mediation shall not be divulged by the mediator. The mediator shall maintain the confidentiality of all information obtained in the mediation, and all records, reports, or other documents received by a mediator while serving in that capacity shall be confidential.

The mediator shall not be compelled to divulge such records or to testify in regard to the mediation in any adversary proceeding or judicial forum.

The parties shall maintain the confidentiality of the mediation and shall not rely on, or introduce as evidence in any arbitral, judicial, or other proceeding the following, unless agreed to by the parties or required by applicable law:



Copy from re:SearchTX

**(i)** Views expressed or suggestions made by a party or other participant with respect to a possible settlement of the dispute;

**(ii)** Admissions made by a party or other participant in the course of the mediation proceedings;

**(iii)** Proposals made or views expressed by the mediator; or

**(iv)** The fact that a party had or had not indicated willingness to accept a proposal for settlement made by the mediator.

## M-11. No Stenographic Record

There shall be no stenographic record of the mediation process.

## M-12. Termination of Mediation

The mediation shall be terminated:

**(i)** By the execution of a settlement agreement by the parties; or

**(ii)** By a written or verbal declaration of the mediator to the effect that further efforts at mediation would not contribute to a resolution of the parties' dispute; or

**(iii)** By a written or verbal declaration of all parties to the effect that the mediation proceedings are terminated; or

**(iv)** When there has been no communication between the mediator and any party or party's representative for 21 days following the conclusion of the mediation conference.

## M-13. Exclusion of Liability

Neither the AAA nor any mediator is a necessary party in judicial proceedings relating to the mediation. Neither the AAA nor any mediator shall be liable to any party for any error, act or omission in connection with any mediation conducted under these procedures.

## M-14. Interpretation and Application of Procedures

The mediator shall interpret and apply these procedures insofar as they relate to the mediator's duties and responsibilities. All other procedures shall be interpreted and applied by the AAA.



Copy from re:SearchTX

## M-15. Deposits

Unless otherwise directed by the mediator, the AAA will require the parties to deposit in advance of the mediation conference such sums of money as it, in consultation with the mediator, deems necessary to cover the costs and expenses of the mediation and shall render an accounting to the parties and return any unexpended balance at the conclusion of the mediation.

## M-16. Expenses

All expenses of the mediation, including required traveling and other expenses or charges of the mediator, shall be borne equally by the parties unless they agree otherwise. The expenses of participants for either side shall be paid by the party requesting the attendance of such participants.

## M-17. Cost of the Mediation

FOR THE CURRENT ADMINISTRATIVE FEE SCHEDULE, PLEASE VISIT www.adr.org/feeschedule.



Copy from re:SearchTX

*© 2025 American Arbitration Association, Inc. All rights reserved. These rules are the copyrighted property of the American Arbitration Association (AAA) and are intended to be used in conjunction with the AAA's administrative services. Any unauthorized use or modification of these rules may violate copyright laws and other applicable laws. Please contact 800.778.7879 or websitemail@adr.org for additional information.*

Copy from re:SearchTX

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Izabela Ramirez on behalf of Thomas Wright
Bar No. 22059400
ramirez@wrightclosebarger.com
Envelope ID: 112812676
Filing Code Description: Motion (No Fee)
Filing Description: DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY
Status as of 3/29/2026 8:07 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jeff Ray | | jray@raylaw.com | 3/24/2026 4:12:04 PM | SENT |
| Crystal DeLeon | | cdeleon@arnolditkin.com | 3/24/2026 4:12:04 PM | SENT |
| A. Arnold | | arnold@arnoldfreemanlaw.com | 3/24/2026 4:12:04 PM | SENT |
| Christopher Freeman | | cfreeman@arnoldfreemanlaw.com | 3/24/2026 4:12:04 PM | SENT |
| Abby Heath | | aheath@arnoldfreemanlaw.com | 3/24/2026 4:12:04 PM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 3/24/2026 4:12:04 PM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 3/24/2026 4:12:04 PM | SENT |
| Katherine Estrada | | kestrada@raylaw.com | 3/24/2026 4:12:04 PM | SENT |
| Laura Rua | | lrua@raylaw.com | 3/24/2026 4:12:04 PM | SENT |
| Linda Gonzales | | lgonzales@raylaw.com | 3/24/2026 4:12:04 PM | SENT |
| Mikal Watts | | mikal@wattsllp.com | 3/24/2026 4:12:04 PM | SENT |
| Kenneth Fair | | fair@wrightclosebarger.com | 3/24/2026 4:12:04 PM | SENT |
| Tom Wright | | wright@wrightclosebarger.com | 3/24/2026 4:12:04 PM | SENT |
| Jessica Barger | | barger@wrightclosebarger.com | 3/24/2026 4:12:04 PM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 3/24/2026 4:12:04 PM | SENT |
| Larry Matthys | | lmatthys@raylaw.com | 3/24/2026 4:12:04 PM | SENT |
| Lynn Castagna | | lynn@texasdefense.com | 3/24/2026 4:12:04 PM | SENT |
| Suzanne Goss | | goss@wrightclosebarger.com | 3/24/2026 4:12:04 PM | SENT |
| Eva Castaneda | | ecastaneda@arnolditkin.com | 3/24/2026 4:12:04 PM | SENT |
| Joshua Fiveson | | jfiveson@wcbglaw.com | 3/24/2026 4:12:04 PM | SENT |

Copy from re:SearchTX

04/01/2026 03:35:28 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976

**MAYA GUERRA GAMBLE**
**Judge, 459th District Court**
**Travis County Civil and Family Courts Facility, P.O. Box 1748**
**Austin, Texas 78767**
**512-854-9384**

April 1, 2026

Bradley E. Beckworth
Christina Yarnell
Nix Patterson, LLP
8701 Bee Cave Rd.
Seven Oaks East, Suite 500
Austin, TX 78746
*Via email:* bbeckworth@nixlaw.com
*Via email:* cyarnell@nixlaw.com

Mikal Watts
Watts Law Firm LLP
110 Tributary Ranch Rd.
Mountain Home, TX 78058
*Via email:* mikal@wattsllp.com

Blair Townsend
The Townsend Law Firm, LLC
50 SW Pine St., Suite 400
Portland, OR 97204
*Via email:* blair@thetownsendlawfirm.com

Jeff Ray
Ray Pena P.C.
9601 McAllister Fwy., Suite 901
San Antonio, TX 78216
*Via email:* jray@raylaw.com

Thomas C. Wright
Jessica Z. Barger
Kenneth J. Fair
Wright Close Barger & Guzman, LLP
1 Riverway, Suite 2200
Houston, TX 77056
*Via email:* wright@wrightclosebarger.com
*Via email:* barger@wrightclosebarger.com
*Via email:* fair@wrightclosebarger.com

Lynn S. Castagna
CASTAGNA SCOTT LLP
1120 S. Capital of TX Hwy, Bldg. 2, Suite 300
Austin, TX 78746
*Via email:* lynn@texasdefense.com

R. Paul Yetter
Justin P. Tschoepe
J. Reid Simpson
Shannon N. Smith
YETTER COLEMAN LLP
811 Main St., Suite 4100
Houston, TX 77002
*Via email:* pyetter@yettercoleman.com
*Via email:* jtschoepe@yettercoleman.com
*Via email:* jrsimpson@yettercoleman.com
*Via email:* ssmith@yettercoleman.com

John W. Stevenson, Jr.
W. Robert Hand
STEVENSON & MURRAY
24 Greenway Plaza, Suite 750
Houston, TX 77046
*Via email:* jstevenson@stevensonmurray.com
*Via email:* rhand@stevensonmurray.com

Copy from re:SearchTX

Kurt Arnold
J. Kyle Findley
Kala F. Sellers
John G. Grinnan
Arnold & Itkin, LLP
6009 Memorial Dr.
Houston, TX 77007
*Via email:* e-service@arnolditkin.com

Daniel C. Bitting
Ferguson Braswell Fraser Kubasta PC
4301 Westbank Dr., Bldg. A, Suite 225
Austin, TX 78746
*Via email:* dbitting@fbfk.law

Randy R. Howry
Sean E. Breen
Howry Breen & Herman, LLP
1900 Pearl St.
Austin, TX 78705
*Via email:* rhowry@howrybreen.com
*Via email:* sbreen@howrybreen.com

Jarom Tefteller
TEFTELLER LAW, PLLC
403 W. Tyler St.
Gilmer, TX 75644
*Via email:* jt@tlaw-pllc.com

Ron Armstrong, II
The Armstrong Firm, PLLC
109 Yoalana St., Suite 210
Boerne, TX 78006
*Via email:* rwaii@tafpllc.com

W. Mark Lanier
Sam E. Taylor, II
Sara E. Abston
Lanier Law Firm, PC
10940 W. Sam Houston Pkwy N., Suite 100
Houston, TX 77064
*Via email:* mark.lanier@lanierlawfirm.com
*Via email:* sam.taylow@lanierlawfirm.com
*Via email:* sara.abston@lanierlawfirm.com

**Re:**

**Cause No. D-1-GN-26-000758; Will Steward, et al v. Camp Mystic, Inc.,** et al. *in the 200th Judicial District, Travis County, Texas;*

**Cause No. D-1-GN-25-009963; Warren Bellows, et al v. Camp Mystic, Inc.,** et al. *in the 455th Judicial District, Travis County, Texas;*

**Cause No. D-1-GN-25-009976; Ellen Elizabeth Getten, et al v. Camp Mystic, Inc., et al.** *in the 459th Judicial District, Travis County, Texas*

**Cause No. D-1-GN-25-009983; Timothy Peck, et al v. Camp Mystic, Inc.,** et al.*in the 261st Judicial District, Travis County, Texas*

**Cause No. D-1-GN-25-010016; Cole Naylor, et al v. Camp Mystic, Inc., et al.** *in the 200th Judicial District, Travis County, Texas*

Dear Counsel:

Due to the nature and complexity of these cases, I have set aside a date each month when the parties may request a setting. The dates are as follows:

- Wednesday, May 13
- Wednesday, June 10
- Wednesday, July 15

Copy from re:SearchTX

- Thursday, August 13
- Thursday, September 24
- Thursday, October 22
- Monday, November 23
- Monday, December 21

Any request can be confirmed by contacting my Judicial Executive Assistant, Ms. Shannon Matusek-Steele, through an email that includes all parties to the case(s) seeking a hearing. Any motion(s) to be discussed must be provided to my office at least 2 weeks in advance. Instructions on how to provide copies of documents were provided in assignment letters that have already been provided to the parties. These hearings may be cancelled if they are unnecessary; however, I anticipate that we may need some of these days to act as a status conference of sorts and therefore request that each party arrange for at least one attorney to be available on each of these dates. Your cooperation is greatly appreciated, and I look forward to a just resolution to these cases in an efficient manner.

Very Truly Yours,

Maya Guerra Gamble
Judge, 459th District Court

cc: Velva Price, District Clerk

Copy from re:SearchTX

04/09/2026 02:35:09 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976

**CAUSE NO. D-1-GN-25-009976**

| | | |
|---|---|---|
| **Ellen Elizabeth Getten, Deceased by and through Douglas Getten, Individually and on behalf of the Estate of Ellen Elizabeth Getten and Jennifer Getten** | § | **IN THE DISTRICT COURT OF** |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **459TH DISTRICT COURT** |
| | § | |
| **Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC., Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III** | § | |
| **Defendants.** | § | **TRAVIS COUNTY, TEXAS** |

**ORDER ALLOWING AUDIO RECORDINGS OF COURT PROCEEDINGS**

On this day, the Court considered Non-Party San Antonio Express-News' Request to Allow Audio Recording of Court Proceedings pursuant to Tex. R. Civ. Proc. 18c and Travis County Local Rule 16 ("Request"). After considering the Request and the relevant factors, the Court finds that the Request should be and is hereby GRANTED.

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that San Antonio Express-News' Request to Allow Audio Recording of Court Proceedings pursuant to Tex. R. Civ. P, 18c and Travis County Local Rule 16 is GRANTED.

IT IS FURTHER ORDERED that the San Antonio Express-News is entitled to record and broadcast all proceedings in the above-captioned lawsuit through audio[1] coverage.

[1] Pursuant to Travis County Local Rule 16.1, "audio coverage" shall mean coverage by equipment that has the capacity to reproduce or broadcast sounds, and includes digital, tape, and cassette sound recorders, and radio and video equipment.

The San Antonio Express-News shall be entitled to install equipment in the courtroom for the purpose of such coverage, such equipment subject to further restrictions by the Court. The use of any equipment shall not disturb the court proceedings and can be revoked by the Court at any time.

IT IS FURTHER ORDERED that should other news organizations (other stations or outlets) also solicit access to the Court for these same proceedings that a sharing agreement will be ordered.

IT IS FURTHER ORDERED all media personnel covering the proceedings will comply with applicable provisions of the Texas Rules of Civil Procedure and Travis County Local Rules.

IT IS SO ORDERED.

SIGNED on this 9th day of April 2026.

[signature]
Maya Guerra Gamble
Judge Presiding

04/09/2026 02:34:24 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976

**CAUSE NO. D-1-GN-25-009976**

| | | |
|---|---|---|
| **Ellen Elizabeth Getten, Deceased by and through Douglas Getten, Individually and on behalf of the Estate of Ellen Elizabeth Getten and Jennifer Getten** | § | **IN THE DISTRICT COURT OF** |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **459TH DISTRICT COURT** |
| | § | |
| **Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC., Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III** | § | |
| **Defendants.** | § | **TRAVIS COUNTY, TEXAS** |

**ORDER ALLOWING RECORDING OF COURT PROCEEDINGS**

On this day, the Court considered Non-Party Margaret (Maisie) Frances Crow, Abigail (Abbie) Perrault, and Out of Nowhere LLC's Request to Record Proceedings Pursuant to Travis County District Court Local Rule 16 ("Request"). After considering the Request and the relevant factors, the Court finds that the Request should be and is hereby GRANTED.

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that Margaret (Maisie) Frances Crow, Abigail (Abbie) Perrault, and Out of Nowhere LLC's Request pursuant to Tex. R. Civ. P, 18c and Travis County Local Rule 16 is GRANTED.

IT IS FURTHER ORDERED that Margaret (Maisie) Frances Crow, Abigail (Abbie) Perrault, and Out of Nowhere LLC is entitled to record and broadcast all proceedings in the above-captioned lawsuits through both visual[1] coverage and audio[2] coverage.

Margaret (Maisie) Frances Crow, Abigail (Abbie) Perrault, and Out of Nowhere LLC shall be entitled to install equipment in the courtroom for the purpose of such coverage, such equipment subject to further restrictions by the Court. The use of any equipment shall not disturb the court proceedings and can be revoked by the Court at any time.

IT IS FURTHER ORDERED all media personnel covering the proceedings will comply with applicable provisions of the Texas Rules of Civil Procedure and Travis County Local Rules.

IT IS SO ORDERED.

SIGNED on this 9th day of April 2026.

Maya Guerra Gamble
Judge Presiding

[1] Pursuant to Travis County Local Rule 16.1, "visual coverage" shall mean and include coverage by equipment that has the capacity to reproduce or telecast an image and includes still and moving picture photographic equipment and video equipment.
[2] Pursuant to Travis County Local Rule 16.1, "audio coverage" shall mean coverage by equipment that has the capacity to reproduce or broadcast sounds, and includes digital, tape, and cassette sound recorders, and radio and video equipment.

04/09/2026 02:29:27 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976

**CAUSE NO. D-1-GN-25-009976**

| | | |
|---|---|---|
| **Ellen Elizabeth Getten, Deceased by and through Douglas Getten, Individually and on behalf of the Estate of Ellen Elizabeth Getten and Jennifer Getten** | § | **IN THE DISTRICT COURT OF** |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **459TH DISTRICT COURT** |
| | § | |
| **Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC., Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III** | § | |
| **Defendants.** | § | **TRAVIS COUNTY, TEXAS** |

**ORDER ALLOWING STILL PHOTOGRAPHY OF COURT PROCEEDINGS**

On this day, the Court considered Non-Party Austin American-Statesman's Request to Allow Still Photography of Court Proceedings pursuant to Tex. R. Civ. Proc. 18c and Travis County Local Rule 16 ("Request"). After considering the Request and the relevant factors, the Court finds that the Request should be and is hereby GRANTED.

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that Austin American-Statesman's Request to Allow Still Photography of Court Proceedings pursuant to Tex. R. Civ. P, 18c and Travis County Local Rule 16 is GRANTED.

IT IS FURTHER ORDERED that the Austin American-Statesman is entitled to record and broadcast all proceedings in the above-captioned lawsuits through visual[1] coverage.

[1] Pursuant to Travis County Local Rule 16.1, "visual coverage" shall mean and include coverage by equipment that has the capacity to reproduce or telecast an image and includes still and moving picture photographic equipment and video equipment.

The Austin American-Statesman shall be entitled to install equipment in the courtroom for the purpose of such coverage, such equipment subject to further restrictions by the Court. The use of any equipment shall not disturb the court proceedings and can be revoked by the Court at any time.

IT IS FURTHER ORDERED that should other news organizations (other stations or outlets) also solicit access to the Court for these same proceedings that a sharing agreement will be ordered.

IT IS FURTHER ORDERED all media personnel covering the proceedings will comply with applicable provisions of the Texas Rules of Civil Procedure and Travis County Local Rules.

IT IS SO ORDERED.

SIGNED on this 9th day of April 2026.

Maya Guerra Gamble
Judge Presiding

04/13/2026 04:27:18 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976

**CAUSE NO. D-1-GN-25-009976**

| | | |
|---|---|---|
| **Ellen Elizabeth Getten, Deceased by and through Douglas Getten, Individually and on behalf of the Estate of Ellen Elizabeth Getten and Jennifer Getten** | § | **IN THE DISTRICT COURT OF** |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **459TH DISTRICT COURT** |
| | § | |
| **Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC., Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III** | § | |
| **Defendants.** | § | **TRAVIS COUNTY, TEXAS** |

**ORDER ALLOWING RECORDING OF COURT PROCEEDINGS**

On this day, the Court considered Non-Party Dateline NBC's Request to Record Proceedings Pursuant to Travis County District Court Local Rule 16 ("Request"). After considering the Request and the relevant factors, the Court finds that the Request should be and is hereby GRANTED.

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that Dateline NBC's Request pursuant to Tex. R. Civ. P, 18c and Travis County Local Rule 16 is GRANTED.

IT IS FURTHER ORDERED that Dateline NBC is entitled to record and broadcast all proceedings in the above-captioned lawsuits through both visual[1] coverage and audio[2] coverage.

[1] Pursuant to Travis County Local Rule 16.1, "visual coverage" shall mean and include coverage by equipment that has the capacity to reproduce or telecast an image and includes still and moving picture photographic equipment and video equipment.

[2] Pursuant to Travis County Local Rule 16.1, "audio coverage" shall mean coverage by equipment that has the capacity to reproduce or broadcast sounds, and includes digital, tape, and cassette sound recorders, and radio and video equipment.

Dateline NBC shall be entitled to install equipment in the courtroom for the purpose of such coverage, such equipment subject to further restrictions by the Court. The use of any equipment shall not disturb the court proceedings and can be revoked by the Court at any time.

IT IS FURTHER ORDERED all media personnel covering the proceedings will comply with applicable provisions of the Texas Rules of Civil Procedure and Travis County Local Rules.

IT IS SO ORDERED.

SIGNED on this 13 day of April 2026.

Maya Guerra Gamble
Judge Presiding

04/13/2026 04:26:00 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976

**CAUSE NO. D-1-GN-25-009976**

| | | |
|---|---|---|
| **Ellen Elizabeth Getten, Deceased by and through Douglas Getten, Individually and on behalf of the Estate of Ellen Elizabeth Getten and Jennifer Getten** | § | **IN THE DISTRICT COURT OF** |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **459TH DISTRICT COURT** |
| | § | |
| **Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC., Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III** | § | |
| **Defendants.** | § | **TRAVIS COUNTY, TEXAS** |

**ORDER ALLOWING RECORDING OF COURT PROCEEDINGS**

On this day, the Court considered Non-Party KXAN News; Nexstar Media Group, Inc.'s Request to Record Proceedings Pursuant to Travis County District Court Local Rule 16 ("Request"). After considering the Request and the relevant factors, the Court finds that the Request should be and is hereby GRANTED.

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that KXAN News; Nexstar Media Group, Inc.'s Request pursuant to Tex. R. Civ. P, 18c and Travis County Local Rule 16 is GRANTED.

IT IS FURTHER ORDERED that KXAN News; Nexstar Media Group, Inc. is entitled to record and broadcast all proceedings in the above-captioned lawsuits through both visual[1] coverage and audio[2] coverage.

KXAN News; Nexstar Media Group, Inc. shall be entitled to install equipment in the courtroom for the purpose of such coverage, such equipment subject to further restrictions by the Court. The use of any equipment shall not disturb the court proceedings and can be revoked by the Court at any time.

IT IS FURTHER ORDERED all media personnel covering the proceedings will comply with applicable provisions of the Texas Rules of Civil Procedure and Travis County Local Rules.

IT IS SO ORDERED.

SIGNED on this 13 day of April 2026.

Maya Guerra Gamble
Judge Presiding

[1] Pursuant to Travis County Local Rule 16.1, "visual coverage" shall mean and include coverage by equipment that has the capacity to reproduce or telecast an image and includes still and moving picture photographic equipment and video equipment.

[2] Pursuant to Travis County Local Rule 16.1, "audio coverage" shall mean coverage by equipment that has the capacity to reproduce or broadcast sounds, and includes digital, tape, and cassette sound recorders, and radio and video equipment.

4/27/2026 2:30 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Melissa Romero

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten; Linnie Anne McCown, Deceased, by and through Michael McCown, individually and on behalf of the Estate of Linnie Anne McCown, and Callie McCown; Abby Lynn Pohl, Deceased, by and through Matthew Pohl, Individually and on behalf of the Estate of Abby Lynn Pohl, and Kristin Pohl; Margaret Gaffney Sheedy, Deceased, by and through Andrew Sheedy, individually and on behalf of the Estate of Margaret Gaffney Sheedy, and Ellen Sheedy; Mary Barrett Stevens, Deceased, by and through Johnny Stevens, individually and on behalf of the Estate of Mary Barrett Stevens, and Stacy Stevens; Greta Katherine Toranzo, Deceased, by and through Jorge Toranzo, Individually and on behalf of the Estate of Greta Katherine Toranzo, and Ellen Toranzo | § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III | § | |
| *Defendants*. | § | 459th JUDICIAL DISTRICT |

**NOTICE OF IN-PERSON HEARING**

PLEASE TAKE NOTICE that a Hearing on *Defendant Stacy Eastland's Motion for*



Copy from re:SearchTX

*Sanctions* will take place in the 459th Civil District Court of The Honorable Maya Guerra Gamble on **Tuesday, May 5, 2026, at 2:00 p.m. in person**. The hearing is estimated to take 3 hours.

Respectfully submitted,

**FERGUSON BRASWELL FRASER KUBASTA PC**

*/s/ Dan Bitting*
Dan Bitting
State Bar No. 02362480
**dbitting@fbfk.law**
4301 Westbank Dr., Building A, Suite 225
Phone: (512) 703-1400
Facsimile: 972-378-9115

**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I certify that on this 27th day of April 2026, this document was served in accordance with the Texas Rules of Civil Procedure, via e-service.

/s/ *Dan Bitting*
Dan Bitting



Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacob Mendoza on behalf of Daniel Bitting
Bar No. 2362480
jmendoza@fbfk.law
Envelope ID: 114150677
Filing Code Description: Notice
Filing Description: NOTICE OF IN-PERSON HEARING
Status as of 4/28/2026 12:33 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jeff Ray | | jray@raylaw.com | 4/27/2026 2:30:44 PM | SENT |
| Crystal DeLeon | | cdeleon@arnolditkin.com | 4/27/2026 2:30:44 PM | SENT |
| A. Arnold | | arnold@arnoldfreemanlaw.com | 4/27/2026 2:30:44 PM | SENT |
| Christopher Freeman | | cfreeman@arnoldfreemanlaw.com | 4/27/2026 2:30:44 PM | SENT |
| Abby Heath | | aheath@arnoldfreemanlaw.com | 4/27/2026 2:30:44 PM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 4/27/2026 2:30:44 PM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 4/27/2026 2:30:44 PM | SENT |
| Katherine Estrada | | kestrada@raylaw.com | 4/27/2026 2:30:44 PM | SENT |
| Laura Rua | | lrua@raylaw.com | 4/27/2026 2:30:44 PM | SENT |
| Linda Gonzales | | lgonzales@raylaw.com | 4/27/2026 2:30:44 PM | SENT |
| Mikal Watts | | mikal@wattsllp.com | 4/27/2026 2:30:44 PM | SENT |
| Kenneth Fair | | fair@wrightclosebarger.com | 4/27/2026 2:30:44 PM | SENT |
| Tom Wright | | wright@wrightclosebarger.com | 4/27/2026 2:30:44 PM | SENT |
| Jessica Barger | | barger@wrightclosebarger.com | 4/27/2026 2:30:44 PM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 4/27/2026 2:30:44 PM | SENT |
| Larry Matthys | | lmatthys@raylaw.com | 4/27/2026 2:30:44 PM | SENT |
| Lynn Castagna | | lynn@texasdefense.com | 4/27/2026 2:30:44 PM | SENT |
| Suzanne Goss | | goss@wrightclosebarger.com | 4/27/2026 2:30:44 PM | SENT |
| Eva Castaneda | | ecastaneda@arnolditkin.com | 4/27/2026 2:30:44 PM | SENT |
| Joshua Fiveson | | jfiveson@wcbglaw.com | 4/27/2026 2:30:44 PM | SENT |

Copy from re:SearchTX

4/27/2026 5:03 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Jennifer Lucas

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten; Linnie Anne McCown, Deceased, by and through Michael McCown, individually and on behalf of the Estate of Linnie Anne McCown, and Callie McCown; Abby Lynn Pohl, Deceased, by and through Matthew Pohl, Individually and on behalf of the Estate of Abby Lynn Pohl, and Kristin Pohl; Margaret Gaffney Sheedy, Deceased, by and through Andrew Sheedy, individually and on behalf of the Estate of Margaret Gaffney Sheedy, and Ellen Sheedy; Mary Barrett Stevens, Deceased, by and through Johnny Stevens, individually and on behalf of the Estate of Mary Barrett Stevens, and Stacy Stevens; Greta Katherine Toranzo, Deceased, by and through Jorge Toranzo, Individually and on behalf of the Estate of Greta Katherine Toranzo, and Ellen Toranzo | § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III | § | |
| *Defendants*. | § | 459th JUDICIAL DISTRICT |

**<u>SUPPLEMENT TO MOTION FOR SANCTIONS</u>**

Defendant S. Stacy Eastland, ("Stacy") files this Supplement to Defendant Seaborn Stacy Eastland's Motion for Sanctions filed on December 29, 2025 ("Motion") and respectfully shows



Copy from re:SearchTX

the Court the following:

## I. Plaintiffs[1] Kept Pursuing Groundless Claims Against Stacy For Over Three Years After Knowing That He Had Nothing To Do With The Camp Since 2012.

Before filing the Motion, Stacy's counsel repeatedly told Plaintiffs' counsel that Stacy has had nothing to do with Camp Mystic since 2012, some 13 years before the tragic flooding in July, 2025. Stacy's counsel told Plaintiffs' counsel that before Stacy even filed an answer. *See* November 26, 2025 email from Dan Bitting to Kurt Arnold, Kyle Findley, Kala Sellers and John Grinnan, attached to the Motion as Exhibit 1. Bitting asked Plaintiffs' counsel to explain their basis for including Stacy in the lawsuit. They did not do so.

On December 5, 2025, Stacy filed his answer. Rather than simply file in a general denial, Stacy attached the document showing that he had transferred his stock in Natural Fountains Properties ("NFP")–the company that owns the land on which the camp operates–back to the company in 2012.

When Plaintiffs' counsel again did not respond, Bitting followed up with another email to them dated December 11, 2025. Bitting reiterated that, as the answer showed, Stacy transferred all of his ownership interest in NFP back to the company at the end of 2012. He asked Plaintiffs to immediately drop Stacy from the lawsuit. *See id.*

Rather than dismissing the claims against Stacy, however, Plaintiffs' counsel Kyle Findley responded with an email on December 12, 2025, claiming that Plaintiffs have documents showing that Stacy still had some sort of financial interest in NFP. (Of course, even if he did, that standing

[1] While Stacy refers to Plaintiffs, he believes that Plaintiffs's attorneys rather than Plaintiffs themselves are accountable for pursuing groundless claims against him. Stacy assumes that the Plaintiffs themselves relied on their lawyers to not pursue groundless claims against a person like Stacy who had nothing to do with the tragic loss of life.



Copy from re:SearchTX

alone would not be a basis for suing Stacy.) *See id.* Bitting immediately asked to see these purported documents and offered to get on a call. Bitting waited another two weeks for a response. *See id.* Receiving none, Stacy filed the Motion on December 29, 2025.

Even then Plaintiffs did not drop Stacy from the suit. Nor did Plaintiffs ever articulate even a colorful argument for keeping Stacy in the suit. Instead, Plaintiffs grasped at the flimsiest of straws to justify keeping Stacy in the suit. By email dated January 13, 2026, Plaintiffs' counsel Kala Sellers claimed that a petition in intervention that Stacy filed in **2008** when he still was an NFP shareholder suggested that he was "presumably… heavily involved in decisions regarding use of the real property that was affected by the July 2025 flood…" *See* email dated January 13, 2026 from Kala Sellers to Dan Bitting, attached hereto as Exhibit 2. Sellers did not identify what those alleged decisions were or when they were made.

Notably, Plaintiffs have not pled this theory. But even if they had and even if Stacy were a shareholder in NFP, that, without more, would not make him liable for NFP's alleged acts or omissions. *See* Tex. Bus. Org. Code. Sec. 21.233. But as Plaintiffs undeniably knew by this point, Stacy had not been a shareholder in NFP since 2012.

Sellers also referred to a 2019 subordination agreement indicating a lease between Camp Mystic Inc. ("CMI") and NFP. *See id.* But, so what?. That a least existed between CMI and NFP in 2019 (and likely exists even today) does not prove that Stacy has had any role in NFP or Camp Mystic since 2012. He has not.

Finally, Sellers suggested that Plaintiffs were attempting to pierce the corporate veil against Stacy. *See id.* But Plaintiffs had not pled, nor do they have any facts to show, that *Stacy* used NFP "for the purpose of perpetrating and did perpetrate an actual fraud on" *Plaintiffs* "primarily for the direct personal benefit of" *Stacy*. *See* Tex. Bus. Org. Code. Sec. 21.233. Stacy had nothing



Copy from re:SearchTX

to do with Plaintiffs attending Camp Mystic in 2025 and certainly did not use NFP to perpetrate an actual fraud on Plaintiffs for Stacy's benefit, and Plaintiffs never pleaded that he did.

Ultimately, Plaintiffs apparently abandoned these flimsy, unpleaded bases for keeping Stacy in the suit, non-suiting him without prejudice on March 6, 2026. In short, Plaintiffs kept Stacy in the suit for another over three months after learning that he had nothing to do with the camp since 2012. As a result, Stacy incurred substantial attorney's fees. But perhaps even worse, his name was and continues to be associated with a horrible tragedy that he had nothing to do with.

## II. Plaintiffs' Suit Was Groundless And Brought In Bad Faith.

As shown in the Motion and this Supplement and as confirmed by the non-suit of Stacy, Plaintiffs' claims against him always were groundless. And they were also brough in bad faith and/or for the purpose of harassment.

A. <u>Plaintiffs' keeping Stacy in the suit for over three months after knowing he has had nothing to do with the Camp since 2012 demonstrates bad faith and harassment.</u>

As shown above, Plaintiffs knew on November 26, 2025 that Stacy had nothing to do with the camp since 2012. They could have easily non-suited him and if the facts turned out to be different, brought him back in well before limitations expired. Instead, they kept him the suit for months. There is no explanation for that other than Plaintiffs were acting in bad faith and/or wanted to harass Stacy.

B. <u>That Plaintiffs sued Stacy but not his sister or his cousins George and Philip Stacy even though they stood in exactly the same position, demonstrates Plaintiffs' bad faith and harassment.</u>

From the death of their mother in 2005 until 2012, Stacy and his sister Nancy Leaton ("Nancy") had exactly the same ownership interest in NFP: approximately 22%. *See* Affidavit of Stacy



Copy from re:SearchTX

Eastland ("Stacy Aff"), attached as Exhibit 3, at ¶ 8, 11. Over this same time their cousins, George Stacy ("George") and Philip Stacy ("Philip"), each owned approximately 2%. *See id.* at ¶ 8. Stacy, Nancy, George and Philip all served as directors of NFP until 2008 when their brother/cousin Dick Eastland ("Dick") removed them from the board due to litigation. *See id.* at ¶ 8.At the end of 2012, Stacy, Nancy, George and Philip all relinquished their ownership in NFP. *Id.* at 1.

All the supposed reasons Plaintiffs gave for pursuing Stacy–that he was a stockholder in NFP and was "presumably" involved in the decisions were related to the flood–equally applied to Nancy, George and Philip. Yet, Plaintiffs chose only to sue Stacy. Why? Because his last name is Eastland? Because they think he has deeper pockets? Because he lives in Houston where three of the Plaintiffs' families live? Whatever the reason, it had nothing to do with the merits (or lack thereof) of the claims against Stacy. That Plaintiffs chose only to sue Stacy and not his similarly-situated sister or cousins demonstrates that Plaintiffs acted in bad faith and/or for the purpose of harassment.

C. <u>Out of five sets of plaintiffs in five separate suits, only Plaintiffs sued Stacy, proving bad faith and harassment.</u>

As this Court knows, there are five separate lawsuits filed in Travis County arising out of the tragic flooding at Camp Mystic. They have all been consolidated in front of the honorable Judge Maya Guerra Gamble. Of the five sets of plaintiffs who have sued in Travis County, only Plaintiffs in this case named Stacy as a defendant. Stacy asks the Court to take judicial notice of the pleadings in these five suits. None of the plaintiffs in the other suits felt they had any grounds to include Stacy in their suits. That Plaintiffs here alone chose to pursue the groundless claims against Stacy demonstrates their bad faith and harassment.



Copy from re:SearchTX

## III. Plaintiffs Did Not Reasonably Investigate The Claims Against Stacy And Ignored The Facts Showing His Utter Lack Of Involvment In This Tragedy.

Under Tex. Civ. Prac. & Rem. Code § 10.0001, the signer of a pleading or motion certifies that each claim, each allegation, and each denial is based on the signatory's best knowledge, information, and belief, *formed after reasonable inquiry*. The statute dictates that each claim and each allegation be individually evaluated for support. . . . The fact that an allegation or claim is alleged against several defendants—so-called "group pleadings"—does not relieve the party from meeting the express requirements of Chapter 10. Each claim against each defendant must satisfy Chapter 10. *Low v. Henry*, 221 S.W.3d 609, 614-15 (Tex. 2007); *Powell v. Grimes*, No. 01-23-00129-CV, 2025 WL 626428, at *9-12 (Tex. App.—Houston [1st Dist.] Feb. 27, 2025, no pet. h.) (explaining that to determine groundlessness under Chapter 10 of the Texas Civil Practice & Remedies Code, the trial court "must objectively ask whether the party and counsel made a reasonable inquiry into the legal and factual bases of the claim at the time the document in question was filed).Unlike Tex. R. Civ. P. 13, Chapter 10 does not require a finding of bad faith or harassment.

Here, Plaintiffs did no investigation into Stacy's role, if any, in the tragic events surrounding did July 4, 2025 flood. Shortly after Stacy was sued, his attorney asked Plaintiffs' attorneys to specify the basis for including Stacy in the suit. *See* Exhibit 1. None of Plaintiffs' four lawyers were able to do so. Later, Plaintiffs' counsel claimed to have documents indicating that Stacy had a financial interest in NFP. *See id.* But when requested to produce them, counsel was unable to.

Ultimately, Plaintiffs were only able to produce a petition in invention filed in 2008–17 years before the tragic flood–and claim that Stacy "presumably" was involved in decisions relevant to the tragic flood. But "presumptions" do not constitute a reasonable inquiry. To the contrary, had



Copy from re:SearchTX

counsel made a reasonable inquiry, they wouldn't have to presume that Stacy was involved in any decision making relevant to the flood; instead, they'd know that he wasn't.

Not only did Plaintiffs do no inquiry themselves, they ignored the undisputed facts presented to them showing that Stacy has not been involved in NFP or Camp Mystic after 2012. When presented with the documents showing that Stacy transferred his stock in NFP back to the company in 2012, Plaintiffs simply ignored them. Notably, Plaintiffs did not seek any discovery or additional information from Stacy. Nor did Plaintiffs challenge the stock transfer on any basis. Further, Plaintiffs did not do any discovery of the other defendants to confirm Stacy's role or lack of role in decisions relevant to the flood.

That Plaintiffs filed a groundless suit against Stacy in bad faith and for the purpose of harassment is evident. But even if this Court does not find bad faith or harassment, it can and should issue sanctions under Chapter 10 based on Plaintiffs' failure to make a reasonable inquiry.

## IV. Plaintiffs' Groundless Suit Has Caused Stacy to Incur Substantial Attorney's Fees And Suffer Distress By Being Linked To A Horrible Tragedy He Had Nothing To Do With.

By being forced to defend a groundless suit, Stacy incurred substantial attorney's fees. *See* Stacy Aff, at ¶ 17. These fees will be proven up at hearing.

But perhaps worse than the monetary damage has been the emotional and psychological toil of being named in this lawsuit has caused Stacy. For many years starting at his childhood, Camp Mystic was an integral part of Stacy life. He hunted and fished there. *See id.* at ¶ 2. He celebrated birthdays, holidays and other family gatherings with his children. *See id.* at ¶ 6. *See also* affidavit of Tara Leclerc ("Leclerc Aff"), attached as Exhibit 3, at. ¶ 2. His wife, Tara, is one of the most honored campers in history. *See* Stacy Aff. at ¶ 4. His daughter also was a decorated camper. *See*



Copy from re:SearchTX

*id* at ¶ 5. He and wife Tara built a house at the camp (to be owned by NFP) for Stacy and his family to enjoy. *Id.* at ¶ 9.

Stacy took the mission and stewardship of Camp Mystic very seriously. *See id.* at ¶ 3.

In 2012 after litigation with his brother Dick, Stacy's connection with Camp Mystic ended. In 2008, he was removed from the board of NFP. And then and at the end of 2012 he (along with his sister and cousins) transferred all of his stock in NFP back to the company. *See id.* at ¶¶ 10-11.

After 2012, he had absolutely no involvement with the camp. *See id.* at ¶ 12. Yet in 2025 Plaintiffs, without any basis, dragged Stacy into this lawsuit, suggesting that he had something to do with a horrible tragedy that took 27 young lives. The effect on him has been devastating. See *id.* .at ¶¶ 15-20; Leclerc Aff at ¶and Affidavit of Seaborn Gardner Eastland ("Garner Aff), attached as Exhibit 4, at ¶¶ 3-6. A man who was in Tennesse praying with his minister the night of the fateful floods was accused of failing to save lives over 1000 miles away. Church members and other friends are constantly asking him about the tragedy. *See* Stacy Aff. at ¶ 17. A father once known for his good cheer now cries. *See* Gardner Aff. at ¶¶ 2, 5. A 77 year-old man battling a life-threatening illness and needing to care for himself and his wife with a serious illness is instead having to answer questions about a tragedy he had nothing to do with.

The non-suit did not eliminate the distress of being wrongfully included in this lawsuit for almost four months. And it won't keep Stacy from being associated with this tragedy in the future. Stacy's name will continue to be in the style of the case and in the petitions on file, availble to anyone searching the public records. As a result of Plaintiffs' groundless and false pleadings, the media continues to contend that Stacy still owns an interest in NFP and suggest that he was somehow involved in an effort to protect Dick and Tweety Eastland's assets from the victims of



Copy from re:SearchTX

the flood. *See* "Same Flood, Different Cases: Inside The Five Camp Mystic Wrongful Death Petitions", by Trish Whitcomb, attached as Exhibit 6.

In addition to awarding Stacy his attorney's fees as sanctions, this Court can and should, compensate him for the emotional and mental distress that being falsely included in the suit has caused.

**Prayer**

WHEREFORE PREMISES CONSIDERED, Defendant S. Stacy Eastland, prays that this Court issue sansctions against Plaintiffs' counsel and grant him such other and further relief to which he may be entitled.

Respectfully submitted,

**FERGUSON BRASWELL FRASER KUBASTA PC**

BY:
*/s/Dan Bitting*______________________________
Dan Bitting
State Bar No. 02362480
**dbitting@fbfk.law**
4301 Westbank Dr., Building A, Suite 225
Austin, Texas 78746
(512) 703-1400 Telephone
(972) 378-9115 Facsimile

**ATTORNEY FOR DEFENDANT**
**S. STACY EASTLAND**

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this document was served on all counsel of record, via e-service, pursuant to the Texas Rules of Civil Procedure on April 27 , 2026.

*/s/ Dan Bitting*____________________
Dan Bitting



Copy from re:SearchTX

**From:** Dan Bitting <dbitting@fbfk.law>
**Sent:** Friday, December 12, 2025 3:02 PM
**To:** Kyle Findley <KFindley@ArnoldItkin.com>; Kurt Arnold <karnold@ArnoldItkin.com>; Kala Sellers <ksellers@arnolditkin.com>; John Grinnan <jgrinnan@ArnoldItkin.com>
**Cc:** Jacob Mendoza <jmendoza@fbfk.law>; Camp Team <camp@arnolditkin.com>
**Subject:** Re: Cause no. D-1-GN-25-009976, Geffen, et al v. Stacy Eastland, et al

Obviously I'd like to see those documents, Kyle.

I'm available Monday afternoon; Tuesday morning or Tuesday 4:00 pm
Or later.

**DAN BITTING**
Attorney / Shareholder
FBFK Law

**FBFK LAW**
(512) 703-1400 Office
4301 Westbank Drive, Building A, Suite 225
Austin, TX 78746
dbitting@fbfk.law
www.fbfk.law | Pay Your Bill

The FBFK Way - Our Culture of Service and Success

Members of LEInternational

IMPORTANT/CONFIDENTIAL: This message contains information from the law firm of Ferguson Braswell Fraser Kubasta PC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. If you have received this communication in error, please notify us immediately at our Dallas telephone number: (972) 378-9111.

---

**From:** Kyle Findley <KFindley@ArnoldItkin.com>
**Sent:** Friday, December 12, 2025 1:40:20 PM
**To:** Dan Bitting <dbitting@fbfk.law>; Kurt Arnold <karnold@ArnoldItkin.com>; Kala Sellers <ksellers@arnolditkin.com>; John Grinnan <jgrinnan@ArnoldItkin.com>
**Cc:** Jacob Mendoza <jmendoza@fbfk.law>; Camp Team <camp@arnolditkin.com>

Copy from re:SearchTX

**Subject:** RE: Cause no. D-1-GN-25-009976, Geffen, et al v. Stacy Eastland, et al

Hey Dan – thanks for the email.

We have documents that indicate that Stacy still has some sort of financial interest in NFP. Happy to talk through it and run this issue down. I am wrapped up traveling today.

I am available most of the day on Monday or Tuesday of next week.

Let me know a good time.

Thanks,
Kyle

**Kyle Findley**
Trial Lawyer

**From:** Dan Bitting <dbitting@fbfk.law>
**Sent:** Thursday, December 11, 2025 2:21 PM
**To:** Kurt Arnold <karnold@ArnoldItkin.com>; Kyle Findley <KFindley@ArnoldItkin.com>; Kala Sellers <ksellers@arnolditkin.com>; John Grinnan <jgrinnan@ArnoldItkin.com>
**Cc:** Jacob Mendoza <jmendoza@fbfk.law>
**Subject:** RE: Cause no. D-1-GN-25-009976, Geffen, et al v. Stacy Eastland, et al

Counsel, you never responded to this email. (If I have missed an email, let me know.) Accordingly, last Friday I filed a motion to transfer venue, original answer and special exceptions on behalf of Stacy Eastland. You should have been e–served with this pleading.

Copy from re:SearchTX

As the answer and exhibits show, Stacy Eastland transferred all his ownership interests in Natural Fountains Properties ("NFP") back to the company at the end of 2012. He has not had any involvement with NFP or Camp Mystic since then. Of course, even if he still were a stockholder in NFP, that standing alone would not be a basis to sue him for the recent tragic events. But given his lack of ownership in NFP and his lack of any other involvement with the camp since 2012, any claims against him are groundless. There is absolutely no basis to have him in this lawsuit.

Giving you the benefit of the doubt, I assume that you were unaware of Stacy's lack of ownership interest in NFP and lack of involvement with the camp since 2012. But with knowledge of Stacy's lack of involvement since 2012, continuing the litigation against Stacy would constitute bringing groundless claims either in bad faith and/or for the purpose of harassment. Thus, these claims are sanctionable under Tex. R. Civ. P. 13. I have not filed a motion for sanctions to this point because, as noted, I was giving you the benefit of the doubt. But I do demand that you immediately drop Stacy from the suit. Please let me know by end of business on tomorrow if and when you will nonsuit the claims against Stacy. Otherwise, I will take appropriate action.

I look forward to your response.

Thanks,

Dan Bitting

**DAN BITTING**
Attorney / Shareholder
FBFK Law

**FBFK LAW**
(512) 703-1400 Office
4301 Westbank Drive, Building A, Suite 225
Austin, TX 78746
dbitting@fbfk.law
www.fbfk.law | Pay Your Bill

The FBFK Way - Our Culture of Service and Success

Members of LEInternational

IMPORTANT/CONFIDENTIAL: This message contains information from the law firm of Ferguson Braswell Fraser Kubasta PC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. If you have received this communication in error, please notify us immediately at our Dallas telephone number: (972) 378-9111.

Copy from re:SearchTX

**From:** Dan Bitting
**Sent:** Wednesday, November 26, 2025 11:50 AM
**To:** karnold@arnolditkin.com; kfindley@arnolditkin.com; ksellers@arnolditkin.com; jgrinnan@arnolditkin.com
**Cc:** Jacob Mendoza <jmendoza@fbfk.law>
**Subject:** Cause no. D-1-GN-25-009976, Geffen, et al v. Stacy Eastland, et al

Counsel, I represent Stacy Eastland in this lawsuit.

First, I would like to confirm his answer date. There is some confusion because apparently he was served twice with the same petition, the first amended petition. Can we agree that his answer is due by the end of business on Monday, December 15, 2025?

Second, Stacy Eastland transferred his stock in NFP back to the company in 2012. He has had no formal or informal involvement with the camp since that time. I would like to know your basis for including him in this lawsuit, because I believe there is none.

Thank you for your cooperation and please give me call with any questions.

Dan Bitting

**DAN BITTING**
Attorney / Shareholder
FBFK Law

**FBFK LAW**
(512) 703-1400 Office
4301 Westbank Drive, Building A, Suite 225
Austin, TX 78746
dbitting@fbfk.law
www.fbfk.law | Pay Your Bill

The FBFK Way - Our Culture of Service and Success

Members of LEInternational

IMPORTANT/CONFIDENTIAL: This message contains information from the law firm of Ferguson Braswell Fraser Kubasta PC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. If you have received this communication in error, please notify us immediately at our Dallas telephone number: (972) 378-9111.

Copy from re:SearchTX

EXHIBIT 2

**From:** Dan Bitting
**To:** Jacob Mendoza
**Subject:** Fw: Cause no. D-1-GN-25-009976, Geffen, et al v. Stacy Eastland, et al
**Date:** Tuesday, January 13, 2026 4:25:42 PM
**Attachments:** 2008.01.30 First Amended Petition in Intervention (1).pdf
SUbordination Agreement 2019.pdf
Kerr CAD Property Search 18941 NFP.pdf
Kerr CAD Property Search 21590 NFP.pdf
Kerr CAD Property Search 21587 NFP.pdf
Kerr CAD Property Search 22727 NFP.pdf
Kerr CAD Property Search 19022 NFP.pdf
Kerr CAD Property Search 18940 NFP.pdf
Kerr CAD Property Search 18507 NFP.pdf
Kerr CAD Property Search 29678 NFP.pdf
Kerr CAD Property Search 29667 NFP.pdf

---

**DAN BITTING**
Attorney / Shareholder
FBFK Law

**FBFK LAW**
(512) 703-1400 Office
4301 Westbank Drive, Building A, Suite 225
Austin, TX 78746
dbitting@fbfk.law
www.fbfk.law | Pay Your Bill

The FBFK Way - Our Culture of Service and Success

Members of LEInternational

IMPORTANT/CONFIDENTIAL: This message contains information from the law firm of Ferguson Braswell Fraser Kubasta PC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. If you have received this communication in error, please notify us immediately at our Dallas telephone number: (972) 378-9111.

---

**From:** Kala Sellers <ksellers@arnolditkin.com>
**Sent:** Tuesday, January 13, 2026 4:04:58 PM
**To:** Dan Bitting <dbitting@fbfk.law>
**Cc:** Kyle Findley <KFindley@ArnoldItkin.com>
**Subject:** Cause no. D-1-GN-25-009976, Geffen, et al v. Stacy Eastland, et al

Dan,

Apologies for the delay on my end. Sick kids took priority last week unfortunately.

Please see attached documents which represent the information we were able to access and had available to us at the time of filing. As you can see, your client was listed as a significant shareholder in Natural Fountain Properties, and presumably, was heavily involved in decisions regarding use of the real property that was affected by the July 2025 flood. This should come as no surprise given Stacy Eastland was an owner of the property with a few other members of his family in the family run business since at least 1998. It is also clear he had been a director of NFP, both individually and as a trustee, and was still an owner in 2011-2012. Additionally, we were able to find a subordination agreement from 2019 further indicating that a landlord/tenant lease agreement exists between Camp Mystic and NFP which would further allocate duties and responsibilities to NFP. Considering NFP is still listed as the owner of the property per the Appraisal District, this landlord/tenant agreement is relevant related to the 2025 flood.

I think that the confusion stems from the fact that the documents you produced showing a sale of Stacy Eastland's stock appears to be an internal document you and/or your client possessed that was not readily available in our investigation and instead, would have been disclosed in the normal course of discovery as in every other case. We did not ever have a document showing that Stacy Eastland ever relinquished the ownership he had in NFP at any time prior to the 2025 flood.

Which is why we were surprised by your sanction motion.

As I'm sure you are aware, there are multiple avenues to pierce the corporate veil especially in this case, and Texas law provides for potential liability against not only current property owners, but also prior property owners where there was failure to disclose a dangerous condition. Furthermore, the documents you provided from the UCC indicate Stacy Eastland's ownership was still intact in 2013 during the time that we believe FEMA appeals were being made to issue rezoning decisions. I'm sure you can understand that the decision-making process of NFP and its ownership in appealing to FEMA is highly relevant to the causes of action in this litigation.

However, our preference would be to discuss and see if we can come to some middle ground. As Kyle previously stated, we are not in the business of holding parties in a case that are not meant to be there. However, you must also appreciate that much of the information you are utilizing to support your rapidly filed sanctions motion comes from attorney-client privileged documents and details from an unrelated litigation we were not

Copy from re:SearchTX

part of a decade ago.

Let me know a good time that you can discuss a way to resolve. I have an idea that may work for your client and ours.

**Kala Sellers**
Of Counsel

Copy from re:SearchTX

EXHIBIT 3

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten; Linnie Anne McCown, Deceased, by and through Michael McCown, individually and on behalf of the Estate of Linnie Anne McCown, and Callie McCown; Abby Lynn Pohl, Deceased, by and through Matthew Pohl, Individually and on behalf of the Estate of Abby Lynn Pohl, and Kristin Pohl; Margaret Gaffney Sheedy, Deceased, by and through Andrew Sheedy, individually and on behalf of the Estate of Margaret Gaffney Sheedy, and Ellen Sheedy; Mary Barrett Stevens, Deceased, by and through Johnny Stevens, individually and on behalf of the Estate of Mary Barrett Stevens, and Stacy Stevens; Greta Katherine Toranzo, Deceased, by and through Jorge Toranzo, Individually and on behalf of the Estate of Greta Katherine Toranzo, and Ellen Toranzo | § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III | § | |
| *Defendants*. | § | 459th JUDICIAL DISTRICT |

**DECLARATION OF SEABORN STACY EASTLAND**



Copy from re:SearchTX

STATE OF TEXAS §
§
COUNTY OF HARRIS §

1. My name is Seaborn Stacy Eastland. I am over 21 years of age, of sound mind and capable of making this declaration. I have never been convicted of a felony, or a crime involving moral turpitude. I have personal knowledge of the facts stated herein, and they are true and correct.

2. Camp Mystic was founded in 1926. My grandparents, Ag and Pop Stacy, acquired Camp Mystic in 1939. Almost from my birth in 1948, the camp was an integral part of my life. I would hunt and fish there as did my late brother, Dick Eastland ("Dick"), and my cousins George Stacy ("George") and Philip Stacy ("Philip") and my son Gardner ("Gardner"), among others. As a teenager in the late 1960s, I worked there.

3. I acquired my stock in the company that owned the land and ran the camp through gifts and bequests from my mother, father and grandmother. I was taught to have a keen sense of stewardship with that ownership. I really came to appreciate the values of Mystic during my employment there in the summers of 1967-70.

4. While working at the camp, I met the girl who would become my wife of going-on 54 years, Tara. Tara, may be the most decorated camper Mystic ever had. Tara went to Camp Mystic for six years as a camper. Tara was elected Honor Camper or Cup Girl. She was one of the youngest campers ever elected "M" girl. Mystic's competition between the campers is organized between two teams or tribes: Kiowas and Tonkawas. Tara held Kiowa officer positions including the highest: Kiowa Tribe Captain.

5. My daughter, also named Tara, was a Camp Mystic camper too. She was a Tonkawa Tribe Captain. She was also a counselor.

6. Over the years my wife and I and our family spent many holidays, birthdays and



Copy from re:SearchTX

other family gatherings at Camp Mystic.

7. In the late 1990s, the family decided to separate the ownership of land from the operations of the camp. The old Camp Mystic corporation that owned the land (Camp Mystic, Inc.) changed its name to Natural Fountains Properties, Inc. ("NFP"). A new Camp Mystic Inc. ("CMI") was formed to operate the camp. NFP leased the land to CMI.

8. My sister Nancy Leaton ("Nancy") and my cousins George and Philip were minority owners in NFP. After my mother Anne passed away in 2005, Nancy and I each owned approximately 22% of NFP; Dick owned around 52%. And George and Philip owned around 2% each. Dick, Nancy, George, Phillp and I were all on the Board of Directors of NFP. NFP did not operate the camp; CMI did. I never had any role in CMI.

9. In the 2000s, Tara and I built a house at Camp Mystic. Our family spent many wonderful times there. Although I paid for the house, it was to be NFP's property.

10. In 2007, NFP, CMI, Dick, Nancy and I became embroiled in litigation. Shortly after the litigation began, Dick as majority shareholder in NFP removed Nancy, George, Philip and me from the NFP board. I believe that occurred in 2008. I have not had any board, officer or other managerial position with NFP since that time. I have never had any board, officer or other managerial position with CMI.

11. Ultimately that litigation resolved. In 2012 Nancy, George, Philip and I conveyed our shares in NFP back to the company.

12. In addition to giving up my ownership of NFP, my wife Tara and I gave up our house that we had built on the property. Since 2012, I have had no involvement with NFP, CMI or any of the operations of the camp. I've never set foot on the Camp since 2012. In fact, the only time I have set foot in Kerr County at all since then was for the funeral of my



Copy from re:SearchTX

nephew, James Eastland.

13. On the evening of July 4, 2025, when I heard about the tragic flooding at Camp Mystic, I was staying with my family in Tennessee, over 1000 miles from Camp Mystic. I called one of my ministers. My minister and I prayed for Dick, his wife Tweety, my nephews Edward and Britt and their families, and especially for those precious little girls and counselors. As we now know, many were swept into Jesus's arms.

14. Having had nothing to do with NFP, CMI or the camp since 2012, I was shocked when I was named in one of the lawsuits against Camp Mystic after the tragic flooding on July 4, 2025.

15. The events of July 4th, and the false narrative of my involvement causing those deaths, have profoundly affected me.

16. Being named in a lawsuit has required me to incur significant attorney's fees in defending these groundless claims, even after my lawyer repeatedly told the other side and presented evidence showing that I have had no involvement with the camp since 2012.

17. Even worse than the monetary effect has been the psychological and emotional effect. I'm 77-years old; my wife Tara is 75-years old. We are both battling serious, life-threatening illnesses. Rather than tending to myself and my wife and enjoying time with my children and grandchildren, I'm frequently having to answer questions about my role in the tragic flood. I am often asked by members of my church and others about the tragedy. I have also had to deal with news coverage that incorrectly portrays me as continuing to have a role in the NFP when I do not and have not since 2012.

18. To be unfairly accused of violating the stewardship that I and all my family felt to the camp and the little girls it nourished, and the Mystic values, has cut me to the bone.



Copy from re:SearchTX

19. After resolution of the earlier lawsuit, I was estranged from my brother Dick for some time. I'm happy to say that we reconnected in later years. Of course, I'm very sad to have lost my brother in this tragedy. And I grieve for his wife, Tweety, who lost her husband, and my nephews who've lost their father, and Dick's grandchildren who have lost their grandfather.

20. Being associated with this tragedy has been particularly hard on me because for the last 13 years I've had none of the positive associations that I used to have with the camp. But now I'm associated with the most negative event at the camp that one could imagine, one that I had absolutely nothing to do with.

Stacy Eastland

**VERIFICATION BY UNSWORN DECLARATION**

My name is STACY EASTLAND, my date of birth is 10/27/1948, and my address is 3663 Woodvalley Drive Houston Texas 77025 United States. I declare under penalty of perjury that the foregoing statements in this affidavit are true and correct and that no material fact or circumstance has been omitted from the document.

Executed in Harris County, State of Texas, on the 21st day of April, 2026.



Copy from re:SearchTX

EXHIBIT 4

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten; Linnie Anne McCown, Deceased, by and through Michael McCown, individually and on behalf of the Estate of Linnie Anne McCown, and Callie McCown; Abby Lynn Pohl, Deceased, by and through Matthew Pohl, Individually and on behalf of the Estate of Abby Lynn Pohl, and Kristin Pohl; Margaret Gaffney Sheedy, Deceased, by and through Andrew Sheedy, individually and on behalf of the Estate of Margaret Gaffney Sheedy, and Ellen Sheedy; Mary Barrett Stevens, Deceased, by and through Johnny Stevens, individually and on behalf of the Estate of Mary Barrett Stevens, and Stacy Stevens; Greta Katherine Toranzo, Deceased, by and through Jorge Toranzo, Individually and on behalf of the Estate of Greta Katherine Toranzo, and Ellen Toranzo | § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III | § | |
| *Defendants*. | § | 459th JUDICIAL DISTRICT |

**DECLARATION OF SEABORN "GARDNER" EASTLAND**

SGE



Copy from re:SearchTX

STATE OF TEXAS §

§

COUNTY OF HARRIS §

1. My name is S. Gardner Eastland. I am over 21 years of age, of sound mind and capable of making this declaration. I have never been convicted of a felony, or a crime involving moral turpitude. I have personal knowledge of the facts stated herein, and they are true and correct.

2. I am the son of S. Stacy Eastland. My Dad is almost always in good spirits. So much so, that one of his favorite sayings is, "Go with good cheer!" He has a great sense of humor and jokes around quite a bit.

3. Since the tragedy at Mystic and his being named a responsible defendant, Dad's good cheer has noticeably weakened. He's sad. His focus is off.

4. Dad almost never lets things get him down. He always says, "Give it to God." Or "It's gonna be okay." However, being dragged into this lawsuit has really hurt him. Dad's positive outlook is now dampened.

5. Dad seldom cries. However, being added to this case has brought him to tears. Dad reports that many friends have called to ask about the lawsuit. Even my contemporaries are asking me about it.

6. To the layman, if you're sued, you did something wrong. This is what's made this so difficult for Dad, my sister, Tara, and me: the presumption of guilt that came with my Dad being named a defendant in one of the suits arising out of the tragic July 4, 2025



SGE

Copy from re:SearchTX

flood that killed so many young girls. It is grossly unfair to my Dad and his family.

Seaborn "Gardner" Eastland

**VERIFICATION BY UNSWORN DECLARATION**

My name is Seaborn "Gardner" Eastland, my date of birth is 11/23/1976, and my address is ______________________, United States. I declare under penalty of perjury that the foregoing statements in this affidavit are true and correct and that no material fact or circumstance has been omitted from the document.

Executed in Harris County, State of Texas, on the 22nd day of April, 2026.

Seaborn "Gardner" Eastland

6207 Meadow Lake
Houston, TX 77057



Copy from re:SearchTX

EXHIBIT 5

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten; Linnie Anne McCown, Deceased, by and through Michael McCown, individually and on behalf of the Estate of Linnie Anne McCown, and Callie McCown; Abby Lynn Pohl, Deceased, by and through Matthew Pohl, Individually and on behalf of the Estate of Abby Lynn Pohl, and Kristin Pohl; Margaret Gaffney Sheedy, Deceased, by and through Andrew Sheedy, individually and on behalf of the Estate of Margaret Gaffney Sheedy, and Ellen Sheedy; Mary Barrett Stevens, Deceased, by and through Johnny Stevens, individually and on behalf of the Estate of Mary Barrett Stevens, and Stacy Stevens; Greta Katherine Toranzo, Deceased, by and through Jorge Toranzo, Individually and on behalf of the Estate of Greta Katherine Toranzo, and Ellen Toranzo | § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III | § | |
| *Defendants*. | § | 459th JUDICIAL DISTRICT |

## **DECLARATION OF TARA LECLERC**



Copy from re:SearchTX

STATE OF TENNESSEE §
§
COUNTY OF DAVIDSON §

1. My name is Tara Leclerc. I am over 21 years of age, of sound mind and capable of making this declaration. I have never been convicted of a felony, or a crime involving moral turpitude. I have personal knowledge of the facts stated herein, and they are true and correct.

2. I am the daughter of S. Stacy Eastland. My Dad grew up going to Camp Mystic for holidays and family gatherings not just summers. His parents and Grandmother had houses there. I have many childhood memories of being with my Dad there. My brother Seaborn Gardner Eastland and I spent many Thanksgivings, Christmases and birthday celebrations there outside of the summer months. My Mom and Dad built a house on the property, and all four of my children spent lots of time there before everything came to a screeching halt in 2010 because of a family dispute.

3. I also spent 10 years as a camper and one as a counselor. I slept in two of the very cabins where girls drowned in the horrific July 4, 2025 flood. I know parents whose children died in the flood. It is so tragic and keeps me up at night. It is hard to comprehend that a river and peaceful place which brought so much joy also caused such devastation! I feel terrible and heartbroken for all of the parents who lost children and surviving campers that experienced trauma too.

4. I am also sad about the legacy of Camp Mystic and all the stress and heartache it has caused my Dad. It is very painful to have had Dad's name on a lawsuit. It is terrible to think that friends and people we know who lost children or experienced trauma might believe that my Dad night have had anything to do with this tragedy. As a result of litigation



Copy from re:SearchTX

between my Dad and my Uncle Dick Eastland (whom we also lost in the flood) years ago, my Dad has had nothing to do with Camp Mystic since 2012. I know that losing his connection with Mystic hurt my Dad (and my Mom) greatly.

5. This has taken an awful emotional toll on my Dad and all who love him. He merely inherited stock in a company that owned the land and was not involved in the camp business. He had nothing to do with decisions leading up to the flood and after the flood. He has not been to the camp since he gave up his house and conveyed his shares back to the land-owning company. To have his good name associated with this tragedy is particularly upsetting since his name was already drug through the mud during the previous Mystic litigation.

6. Dad is battling a serious, life-threatening illness. He is also caretaking for my mom who also suffers from a serious, life-threatening illness. The stress of this on top of everything else on his plate is unbearable at times. I hate that this unfair litigation and subsequent press coverage has given him and all who love him extra anguish.

**VERIFICATION BY UNSWORN DECLARATION**

My name is TARA LECLERC, my date of birth is April 8, 1975, and my address is ______________________, United States. I declare under penalty of perjury that the foregoing statements in this affidavit are true and correct and that no material fact or circumstance has been omitted from the document.

Executed in Davison County, State of Tennessee, on the 23rd day of April, 2026.

[signature]
Tara Leclerc



311 Sunnyside Drive
Nashville, TN 37205

Copy from re:SearchTX

# Same Flood, Different Cases: Inside the Five Camp Mystic Wrongful Death Petitions

The five wrongful death petitions filed against Camp Mystic tell different stories about th same morning.



TRISH WHITCOMB
MAR 21, 2026

8 1 Share

*Editor's note, March 31, 2026: A reader contacted this publication to note that Renee Smajstrla, a Camp Mystic camper who died in the July 4 flood, was omit from the closing paragraph of this article. Her family has not filed a lawsuit. Mary Kathryn Jacobe was also omitted. Her family is a plaintiff in the federal action against Texas health officials. Both names have been added. This publication regrets the omissions.*

Twenty-seven campers and counselors died at Camp Mystic on the morning of July 4, 2025, when the Guadalupe River overran the camp's low-lying cabins in t Texas Hill Country. Within months, families had retained lawyers and filed suit The cases sit in the same courthouse, assigned to the same judge, grounded in t same facts. They are not the same lawsuit.

Five separate petitions are now on file in Travis County District Court, each brought by a different law firm, each naming a slightly different set of defendar and each built on a legal architecture that reflects distinct strategic choices. Or of the November petitions was amended three days after filing, expanding from one family to six. Reading them together, the differences are not cosmetic. In a least one case, the gap between petitions could translate directly into how muc money a jury is permitted to award.

Copy from re:SearchTX

The petitions raise a simple question: why did families file separately? The ans is part circumstance, part strategy, and part timing.

## The Court and the Venue

Every petition is filed in Travis County, not Kerr County where the camp sits. That is not an accident. Under Texas venue law, a plaintiff may sue where a defendant resides. Willetta Eastland, known to the camp community as Tweety longtime co-director of Camp Mystic alongside her late husband Richard, is lis at 2404 Scenic Drive in Austin. The camp's family partnership and its management company also maintain registered offices in Travis County. Every petition in this litigation cites those facts to anchor venue in Austin.

The defense has contested that anchor. On December 12, 2025, attorneys for th camp and the Eastland family filed a motion to transfer the cases to Kerr Coun arguing that all relevant events occurred there and that potential witnesses, including camp staff and local officials, are based there. The motion contends t Mystic Camps Family Partnership and Mystic Camps Management are estate planning vehicles with no employees and no operational role, and that they we named solely to establish Travis County jurisdiction. Defense attorneys also sta that Willetta Eastland was living in Kerr County at the time of the flood and remains a Kerr County resident. Dick Eastland's estate is being administered ir Kerr County. That motion remains pending.

The venue dispute did not prevent the cases from moving forward in Travis County. Around the time of the March 4 hearing in the Steward case, the Travi County district court judges assigned to the various Camp Mystic filings consolidated all of them before Judge Maya Guerra Gamble of the 459th Distric Court. Judge Guerra Gamble now presides over all Camp Mystic litigation. The venue question remains unresolved beneath her.

Copy from re:SearchTX

The choice matters because Travis County juries and Travis County judges are Kerr County juries and Kerr County judges. Camp Mystic has operated in the H Country since 1926. The Eastland family has been part of that community since 1939. That history carries weight in Kerrville. It carries less in Austin.

## What the Eastlands Built

Before turning to the lawsuits themselves, it helps to understand the corporate structure the petitions are trying to dismantle, because that structure did not emerge overnight, and it did not go uncontested within the family.

Richard and Willetta Eastland (Dick and Tweety) did not simply run a summer camp. Over decades, they built a layered ownership arrangement that separatec the land from the operations and channeled profits upward through a family limited partnership. Camp Mystic LLC ran the day-to-day operations. Natural Fountains Properties Inc. owned the land on which the camp operated and collected lease payments from the LLC. Mystic Camps Family Partnership Ltd. owned both of those entities. Mystic Camps Management LLC served as the general partner of the family partnership. At every level of that structure, the controlling names were Richard and Willetta Eastland.

Copy from re:SearchTX




Copy from re:SearchTX

One petition describes the arrangement plainly: the idea was that the family co keep getting paid from the camp's lucrative summers while insulating the land from liability if the camp's operations produced a lawsuit. The flaw in that structure, the petition argues, is that the Eastlands insisted on maintaining control. Decisions about cabin location, the camp's layout, and its operating policies required the approval of the land company. You cannot have both the insulation and the control, the argument goes, and so the corporate separation should be disregarded entirely.

Stacy Eastland, a minority shareholder in Natural Fountains Properties, spent s years in litigation against Dick over control of that same land company. Arnold and Itkin named him as a defendant in November 2025. No other petition did.

At every level of that structure, the controlling names were Richard and Willett Eastland. None of the four entities listed a registered agent in Texas as requirec law. Every petition served them through the Texas Secretary of State.

## The Five Petitions

Four petitions landed on November 10, 2025, the same day. A fifth followed on February 4, 2026. The families they represent, the firms that filed them, and the legal theories they advance are each distinct.

### Yetter Coleman: Seven Families, Six Counts

The largest single petition was filed by Yetter Coleman, a Houston litigation fi on behalf of seven families. Six of those families live in Harris County. Six of th seven victims were in Bubble Inn: campers Anna Margaret Bellows, known as Margaret; Molly DeWitt; Lainey Landry; and Lila Bonner, of Dallas County; anc counselors Chloe Childress and Katherine Ferruzzo. The seventh, Blakely McCrory, was a camper in the Twins cabins.

Copy from re:SearchTX

The petition names all four corporate entities and four individual defendants: Willetta Eastland, George Albritton Eastland as representative of Richard Eastland's estate, Edward Eastland, and Mary Liz Eastland. It pleads six counts negligence, negligence per se under Texas Administrative Code Section 265.15( negligent undertaking, premises liability, gross negligence, and intentional infliction of emotional distress, along with wrongful death and survival claims.

The negligence per se count is significant on its own. Texas Administrative Co Section 265.15(k) required Camp Mystic to maintain a written disaster plan tha included evacuation procedures for every occupied building, to post that plan i each building, and to train staff on it. The petition alleges the camp did none o those things. Instead, the posted flood policy directed campers and counselors stay in their cabins. Those words appear in the petition verbatim: "All cabins a constructed on high, safe locations." That statement, the petition argues, was false, and the Eastlands knew it was false.

The intentional infliction of emotional distress count is grounded in the camp's post-flood conduct: telling parents their daughters were "unaccounted for" whe camp leadership already knew some had died, announcing a reopening while C Steward remained missing, and using the names of deceased counselors in recruiting materials for the following summer.

**Lanier Law Firm: Six Families, Two Unusual Theories**

W. Mark Lanier's firm, based in Houston, consolidated six families into a singl petition filed the same day. The victims came from both Bubble Inn and the Tw cabins. Virginia Wynne Naylor, age 8, and Jane Hunt, age 9, were in Bubble Inn Hadley Hanna, age 8, and Virginia Hollis, age 8, were in Twins II. Lucy Dillon, 8, and Kellyanne Lytal, age 8, were in Twins I. Their families are spread across Dallas, Austin County, Harris, and Bexar counties.

Copy from re:SearchTX

Lanier's petition names all four corporate entities and all four individual Eastla defendants, making it the only November 10 filing to include the estate of Rich Eastland. The causes of action overlap substantially with the other petitions, bu Lanier adds two theories that appear nowhere else in this litigation: breach of express and implied warranty, and breach of fiduciary duty.

Warranty claims in the context of a summer camp are uncommon. The theory i that the camp made specific representations to families at enrollment, in contracts or written communications, and those representations were false. If t camp told parents their daughters would be safe, and if that promise is treated a warranty rather than mere advertising, a warranty claim follows from its brea Fiduciary duty is a harder theory still, but it opens damages conversations that ordinary negligence does not.

**Howry Breen: One Family, Three Theories No One Else Filed**

Timothy and Melissa Peck, of Dallas County, lost their eight-year-old daughter Eloise, known as Lulu, in Bubble Inn. Their petition was filed by Howry Breen Herman in Austin, working alongside Tefteller Law from Gilmer and the Armstrong Firm from Boerne.

The Howry Breen petition is the most restrained on individual defendants. Of t Eastland family members, it names only Willetta. Richard's estate, Edward, and Mary Liz are not included.

Where the Howry Breen petition stands apart is in three theories that no other petition deploys: assisting and encouraging, assisting and participating, and concert of action. These are coordinated tortfeasor theories. They do not requi proof that a particular defendant directly caused the harm. They require proof t the defendant participated in a common scheme or substantially assisted anoth actor whose conduct was tortious. Applied here, the argument is that the web c

Copy from re:SearchTX

corporate entities and family actors did not merely fail to act on July 4 but activ participated, over years, in a scheme that made the deaths foreseeable. The corporate structure itself becomes part of the instrument of harm.

**Arnold and Itkin: Six Families, Two Defendants No One Else Named**

Douglas and Jennifer Getten lost their nine-year-old daughter Ellen Elizabeth c July 4. It was her first summer at Camp Mystic. Her body was recovered two da after the flood. Their attorneys at Arnold and Itkin, one of the most prominent plaintiff-side firms in Houston, filed suit on November 10. Three days later, on November 13, the firm filed a first amended petition adding five families: Mich and Callie McCown, whose eight-year-old daughter Linnie Anne was the only g in a family of brothers; Matthew and Kristin Pohl, whose eight-year-old daught Abby attended camp alongside her two older sisters; Andrew and Ellen Sheedy, whose eight-year-old daughter Margaret Gaffney was her parents' only daughte Johnny and Stacy Stevens, whose eight-year-old daughter Mary Barrett, known May May, was making her first summer at camp; and Jorge and Ellen Toranzo, whose ten-year-old daughter Greta Katherine was on her third summer at Myst when the river rose.

The Arnold and Itkin petition names all four corporate entities, Willetta, Edwa and Mary Liz, but not Richard Eastland's estate. It adds two names found in no other November filing: William Neely Bonner III, president of Natural Fountai Properties, and Seaborn Stacy Eastland. Bonner's role as president of the land company makes his inclusion a straightforward extension of the alter ego theor Stacy Eastland's inclusion is more layered.

Stacy holds a 22 percent minority stake in Natural Fountains Properties, the lar company at the center of every petition's alter ego argument. He is of counsel a Houston law firm Ytterberg Deery and Knull. And he spent years in active

Copy from re:SearchTX

litigation against Dick Eastland over control of that same land company, arguir in court that Dick had structured the lease between Natural Fountains and the operating company to underpay the land company and benefit himself at the minority shareholders' expense. In other words, Stacy Eastland went to trial arguing that Dick ran Natural Fountains as a vehicle for his own benefit. Arnol and Itkin is now making a structurally identical argument in a wrongful death case. Whether Stacy is named because of his ownership stake, his prior knowle of the corporate structure's inner workings, or both, his presence in this petitio is not incidental.

The causes of action otherwise parallel the other November filings: negligence, gross negligence, premises liability, joint enterprise, respondeat superior, ratification, veil piercing, and intentional infliction of emotional distress. Exemplary damages are sought under the standard Chapter 41 cap.

**Nix Patterson: The February Filing and the Uncapped Damages Theory**

Will and CiCi Steward live in Travis County. Their daughter Cecilia, known as Cile, was still missing when the four November petitions were filed. Her body l not been recovered. The camp announced its plans to reopen the following summer while that search continued. Nix Patterson, an Austin firm working alongside Portland attorney Blair Townsend, filed the Stewards' petition on February 4, 2026, nearly three months after the November cluster.

The Steward petition is the longest and most exhaustively pleaded of the five. I names the most complete defendant roster: all four corporate entities, Richard' estate, Willetta, Edward, Mary Liz, and William Neely Bonner III. It pleads negligence per se on a broader statutory foundation than any other petition, invoking Texas Administrative Code Sections 265.15(k), 265.13(a), and 265.12(d), and the Texas Health and Safety Code Section 141.011. More statutory hooks

Copy from re:SearchTX

mean more avenues to establish the standard of care through the violation itsel rather than through expert testimony alone.

The most consequential distinction in the entire set of five petitions, however, single statutory citation: Texas Penal Code Section 22.04(a), injury to a child. Under Texas Civil Practice and Remedies Code Section 41.008(c)(7), when a defendant's conduct constitutes that criminal offense, the standard cap on exemplary damages does not apply. Every other petition in this litigation is cap under the Chapter 41 formula, which ties exemplary damages to a multiple of actual damages. The Steward petition is not. If the theory holds, a jury could award whatever it believes the evidence warrants.

The Steward IIED count is also the most specifically pleaded of any petition. It does not rely on the camp's general post-flood conduct. It documents acts direc at the Steward family specifically: Willetta Eastland invoking Cile's memory in camp communications without the family's consent, the camp's announcement reopening plans while the Stewards were still waiting to recover their daughter body, and escalating contact with traumatized child survivors after the family h asked for it to stop.

## Why Separate Lawsuits

The legal differences between these petitions reflect the strategic judgments of five different firms working the same facts from different angles. Each firm cho its defendants, built its own theory of liability, and made its own calculation ab which arguments to advance. The result is not one unified case but five distinct frameworks pointed at the same morning.

Separate filings also produce distinct legal records. Each petition is its own opening theory of the case. The statutory violations it pleads, the defendants it names, and the damages model it advances can shape how discovery unfolds an

Copy from re:SearchTX

how the case is ultimately valued. These are not merely administrative docume They are five different arguments about what happened on the morning of July and what it is worth to prove it.

The legal differences that resulted are real, not cosmetic. A family represented Nix Patterson has access, at least at the pleading stage, to uncapped exemplary damages that a family represented by any of the other four firms does not. A family whose petition pleads negligence per se on four statutory grounds has a broader path to establishing liability than one whose petition rests solely on common law negligence. A family whose petition deploys concert of action and assisting and encouraging theories is making a different argument about the corporate structure's role in the deaths than one whose petition relies on stand alter ego.

There is also a timing dimension the Steward case makes plain. Filing later is n always a disadvantage. Nix Patterson had nearly three months after the Novem cluster to gather facts, document the camp's post-flood conduct toward the Stewards specifically, and construct the uncapped damages theory. The petitio shows the result of that time.

## What Happens Next

All five cases are now before Judge Guerra Gamble in the 459th. The consolida resolves the question of separate tracks, at least administratively. In a coordina proceeding, the most aggressive theories in any one petition can shape the litigation for everyone. Discovery directed at one damages theory or statutory violation becomes part of the shared factual record the other cases can draw on The venue transfer motion filed by the defense in December remains pending before the same judge who is now managing the full docket. Whether the cases ultimately merge into a single proceeding is a separate question. Each retains i own docket number, parties, and legal theories. The most likely near-term step

Copy from re:SearchTX

shared discovery rather than a true merger. The Steward petition's uncapped damages framework alone makes full consolidation legally complicated. And if defense prevails on its venue transfer motion, the cases move to Kerr County under a different judge entirely.

The uncapped damages theory in the Steward petition is the element most wor watching. Texas Penal Code Section 22.04 requires proof that the defendants' conduct constituted intentional, knowing, or reckless injury to a child. That is a higher bar than ordinary negligence. If the Stewards' lawyers can clear it, the damages conversation in this litigation changes entirely.

On March 4, 2026, Judge Guerra Gamble held a daylong hearing on the Stewarc family's request for a temporary injunction. Edward Eastland, Dick's son and th Guadalupe camp's director, was the only witness called. He testified that counselors were trained only to keep campers away from floodwater, not to execute a broader evacuation, and that no one was monitoring the camp's secur cameras when the flooding began. The judge granted the injunction. The Guadalupe River campus is now sealed. Camp Mystic cannot demolish, repair, alter any structure where the deaths occurred. Whether the separate Cypress La site reopens this summer depends on a state licensing decision still pending as publication.

Filings in the Steward case also placed a Texas Rangers affidavit in the record confirming that a criminal investigation remains open and that its results may presented to a grand jury. Steward family attorneys alleged that before the injunction issued, cabins had been stripped to the studs, high-water marks in th recreation hall had been removed, and the interior of Cile's cabin had been cleaned and emptied. Edward Eastland confirmed under oath that some buildir had been repaired and remodeled before the order took effect.

Copy from re:SearchTX

Camp Mystic has described the July 4 flood publicly as an act of God. Mikal Wa one of Texas's most prominent plaintiff's attorneys and a Kerr County resident, has agreed to defend the camp and the Eastland family **pro bono**, an arrangeme that is itself unusual in high-stakes wrongful death litigation. Watts argued bef the Texas Senate Select Committee on Disaster Preparedness that the tragedy resulted from failures in regional flood warning systems rather than negligence camp leadership. What the record shows, the FEMA filings, the posted cabin policy, the 2013 requests to remove cabins from the floodplain maps, the minut by-minute timeline from the early hours of July 4, will be the terrain on which t defense is tested.

Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory Chloe Childress, Katherine Ferruzzo, Virginia Naylor, Hadley Hanna, Virginia Hollis, Jane Hunt, Lucy Dillon, Kellyanne Lytal, Eloise Peck, Ellen Getten, Linn McCown, Abby Pohl, Margaret Sheedy, Mary Barrett Stevens, Greta Toranzo, C Steward, Sarah Marsh, Mary Kathryn Jacobe, and Renee Smajstrla. Twenty-four names. Twenty-one are plaintiffs in Travis County wrongful death petitions. Sa Marsh and Mary Kathryn Jacobe's families filed separately in federal court agai Texas health officials. The families of Hanna and Rebecca Lawrence, Mary Gra Baker, and Renee Smajstrla have not filed suit. The lawsuits carry different theories and different potential outcomes, but they point toward the same morning, the same river, and the same cabins that the court records say should never have been where they were.

***Case citations: D-1-GN-25-009963 (Yetter Coleman); D-1-GN-25-010016 (Lanier); D-GN-25-009983 (Howry Breen); D-1-GN-25-009976 (Arnold and Itkin); D-1-GN-26-000758 (Nix Patterson). All filed in Travis County District Court.***

---

**Subscribe to Juris Journal**

Copy from re:SearchTX

By Trish Whitcomb · Launched 3 years ago

Stories from courts in Houston, Harris County and occasionally beyond. Deep dives on legal happenings civil courts.

Upgrade to paid

8 Likes · 1 Restack

← Previous

Next

## Discussion about this post

Comments Restacks

Write a comment...

© 2026 Trish Whitcomb · Privacy · Terms · Collection notice
Substack is the home for great culture

Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacob Mendoza on behalf of Daniel Bitting
Bar No. 2362480
jmendoza@fbfk.law
Envelope ID: 114167743
Filing Code Description: Motion (No Fee)
Filing Description: SUPPLEMENT TO MOTION FOR SANCTIONS
Status as of 4/28/2026 3:03 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jeff Ray | | jray@raylaw.com | 4/27/2026 5:03:00 PM | SENT |
| Crystal DeLeon | | cdeleon@arnolditkin.com | 4/27/2026 5:03:00 PM | SENT |
| A. Arnold | | arnold@arnoldfreemanlaw.com | 4/27/2026 5:03:00 PM | SENT |
| Christopher Freeman | | cfreeman@arnoldfreemanlaw.com | 4/27/2026 5:03:00 PM | SENT |
| Abby Heath | | aheath@arnoldfreemanlaw.com | 4/27/2026 5:03:00 PM | SENT |
| Daniel C.Bitting | | dbitting@fbfk.law | 4/27/2026 5:03:00 PM | SENT |
| Jacob Mendoza | | jmendoza@fbfk.law | 4/27/2026 5:03:00 PM | SENT |
| Katherine Estrada | | kestrada@raylaw.com | 4/27/2026 5:03:00 PM | SENT |
| Laura Rua | | lrua@raylaw.com | 4/27/2026 5:03:00 PM | SENT |
| Linda Gonzales | | lgonzales@raylaw.com | 4/27/2026 5:03:00 PM | SENT |
| Mikal Watts | | mikal@wattsllp.com | 4/27/2026 5:03:00 PM | SENT |
| Kenneth Fair | | fair@wrightclosebarger.com | 4/27/2026 5:03:00 PM | SENT |
| Tom Wright | | wright@wrightclosebarger.com | 4/27/2026 5:03:00 PM | SENT |
| Jessica Barger | | barger@wrightclosebarger.com | 4/27/2026 5:03:00 PM | SENT |
| Kurt Arnold | | e-service@arnolditkin.com | 4/27/2026 5:03:00 PM | SENT |
| Larry Matthys | | lmatthys@raylaw.com | 4/27/2026 5:03:00 PM | SENT |
| Lynn Castagna | | lynn@texasdefense.com | 4/27/2026 5:03:00 PM | SENT |
| Suzanne Goss | | goss@wrightclosebarger.com | 4/27/2026 5:03:00 PM | SENT |
| Eva Castaneda | | ecastaneda@arnolditkin.com | 4/27/2026 5:03:00 PM | SENT |
| Joshua Fiveson | | jfiveson@wcbglaw.com | 4/27/2026 5:03:00 PM | SENT |

Copy from re:SearchTX

4/28/2026 8:25 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009976
Susan Schmidt

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten | § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III | § | |
| *Defendants*. | § | 459th JUDICIAL DISTRICT |

**PLAINTIFFS' RESPONSE TO SEABORN STACY EASTLAND'S**
**MOTION FOR SANCTIONS**

COME NOW Plaintiffs[1] and file this Response to Seaborn Stacy Eastland's ("Stacy Eastland") Motion for Sanctions. Plaintiffs respectfully ask that this Court deny Stacy Eastland's meritless motion for sanctions for the following reasons:

- There is no basis in law or facts that would ever warrant sanctions being awarded against Plaintiffs in this matter. Plaintiffs voluntarily nonsuited without

[1] Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten; Linnie Anne McCown, Deceased, by and through Michael McCown, individually and on behalf of the Estate of Linnie Anne McCown, and Callie McCown; Abby Lynn Pohl, Deceased, by and through Matthew Pohl, individually and on behalf of the Estate of Abby Lynn Pohl, and Kristin Pohl; Margaret Gaffney Sheedy, Deceased, by and through Andrew Sheedy, individually and on behalf of the Estate of Margaret Gaffney Sheedy, and Ellen Sheedy; Mary Barrett Stevens, Deceased, by and through Johnny Stevens, individually and on behalf of the Estate of Mary Barrett Stevens, and Stacy Stevens; and, Greta Katherine Toranzo, Deceased, by and through Jorge Toranzo, individually and on behalf of the Estate of Greta Katherine Toranzo, and Ellen Toranzo (collectively "Plaintiffs").



Copy from re:SearchTX

prejudice based solely on the representations of Stacy Eastland's counsel without the benefit of discovery as a courtesy.

- Despite this, Stacy Eastland moves for Chapter 10 and Rule 13 sanctions. His reason for doing so is purportedly based on information which was not available at the time of Plaintiffs' filings and which Stacy Eastland did not provide to Plaintiffs until after the time of Plaintiffs' filing.
- At the time of filing, Plaintiffs' information showed that Stacy Eastland was a substantial owner in NFP, had always been an owner and significant member of the Camp Mystic organization, and would have been involved around the time Camp Mystic was imploring FEMA to remove the cabins at issue in this case from the floodplain maps. Furthermore, Stacy Eastland, as a director and owner of NFP, ostensibly would have been involved in the determination and approval of cabin locations at Camp Mystic.
- Considering only the facts and evidence available to Plaintiffs at the time their pleadings were filed, Stacy Eastland cannot overcome the presumption of good faith or meet its burden of proof under either Chapter 10 or Rule 13, and its motion should be denied.
- Alternatively, this Court should strike Stacy Eastland's motion for failure to make reasonable efforts to confer with Plaintiffs regarding the subject of its motion as required under Local Rule 2.2.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

### A. Incident Background and Plaintiffs' Filings

As the Court is aware, this wrongful death and survival action arises out of a July 4, 2025, flash flood at Camp Mystic that killed twenty-seven people, including the six young campers named as decedents in this case. *See* Pl.'s First Am. Pet. at ¶¶ 2, 48, and 54. Camp Mystic is a private summer camp for girls established in 1926 along the Guadalupe River in Hunt, Texas. *Id*. at ¶ 39. The Eastland family acquired Camp Mystic in 1939 and has managed it for three generations. *Id*. Richard "Dick" Eastland and his wife, Defendant Willetta "Tweety" Eastland, were the Owners and Executive Directors of Camp Mystic since 1974.[2]

[2] Dick Eastland passed away in the July 4, 2025, floods.



Copy from re:SearchTX

*Id*. The Eastland family is now in its fourth generation of operations, with Defendants Edward and Mary Liz Eastland acting as Directors of Camp Mystic. *Id*. At the time of the flood, National Fountains Properties, Inc. ("NFP") owned the real property where Camp Mystic operated. *Id*. Defendant William Neely Bonner III is the President of NFP. *Id*. And, upon information and belief at the time of the filing of Plaintiff's Original and First Amended Petitions, Stacy Eastland had been an owner of NFP since at least 1998 and also operated as a director. *Id*. Furthermore, Stacy Eastland was an owner in Camp Mystic, Inc. for years prior to the reorganization of the entities in 1998.

For years before this deadly incident, Defendants knew Camp Mystic's cabins and facilities were in or near FEMA-designated flood zones and areas Kerr County deemed extremely hazardous, yet continued operations without adequate protections or warnings. *Id*. at ¶¶ 40–45. In fact, Defendants undertook a $5 million construction project about six years prior to this incident and chose to build or keep cabins in high-risk flood areas and even in the river's floodway, placing young campers in foreseeable danger. *Id*. at ¶ 45. Moreover, Defendants appealed to remove "100-year floodplain" designations from dozens of buildings to avoid insurance and regulatory burdens, which further concealed risks from parents and the public. *Id*. at ¶ 46.

In the days leading up to the flood, statewide and local alerts warned of heavy rain and flash flooding, but Defendants failed to timely evacuate despite ample notice. ¶¶ 48–50. At 1:14 a.m. on Friday, July 4, 2025, the National Weather Service predictably issued a flash flood warning for the area and the river continued to rise at a rapid rate. *Id*. at ¶ 51. Staffers at Camp Mystic began a delayed and inadequate evacuation "plan" around 2:30 a.m., evacuating one cabin at a time and leaving the youngest children in the Bubble Inn cabin without timely



Copy from re:SearchTX

assistance. *Id*. at ¶¶ 51–52. The camp's minimal, outdated emergency instructions falsely asserted all cabins were on "high, safe locations," relied on loudspeakers that failed with power loss, and left teenage counselors without communication or training. *Id*. at ¶¶ 57–59. As the waters rose, campers began climbing as high as they could within the cabins to avoid the water, but the overpowering waters finally did the inevitable by tearing children away and propelling them down the raging river. *Id*. at ¶¶ 53–54. Ellen, Linnie, Abby, Margaret, Mary, and Greta were some of the twenty-seven lives taken on July 4, 2025, at Camp Mystic. *Id*. at ¶ 54. Many of their bodies were not recovered for several days. *Id*.

Plaintiffs filed their Original Petition on November 10, 2025, bringing claims against NFP, the relevant Camp Mystic partnerships and LLCs, and individual defendants whom Plaintiffs identified, after a reasonable investigation, to be vicariously or jointly liable to Plaintiffs for their wrongful conduct—including Stacy Eastland. *See* Pls.' Original Pet. On November 13, 2025, Plaintiffs filed a First Amended Original Petition which included claims from additional plaintiffs. *See generally* Pls.' First Am. Original Pet.

**B. Stacy Eastland's Motion for Sanctions**

*After* Plaintiffs filed their pleadings, Dan Bitting ("Mr. Bitting"), counsel for Stacy Eastland, contacted undersigned counsel via e-mail seeking clarification of the answer deadline and notifying Plaintiffs, for the first time, that Stacy Eastland allegedly "transferred his NFP stock back to the company in 2012" and "has had no formal or informal involvement with the camp since that time." Ex. A, Email Correspondence 1 at 4. Notably, this e-mail was sent on November 26, 2025, the day before Thanksgiving. *Id*. Thereafter, on December 5, 2025, Stacy Eastland filed his Motion to Transfer Venue and Original Answer and attached documents showing Stacy Eastland purportedly transferred 3,000 shares of stock back to NFP



Copy from re:SearchTX

in 2012. *See* Stacy Eastland Motion to Transfer Venue and Original Answer at attached Exhibit 1. Notably, no proof of payment for those purportedly transferred shares has ever been produced by counsel, and instead, Plaintiffs have simply had to rely on his representations following the filing of Defendant's motion for sanctions.

A week later, Mr. Bitting sent an e-mail asking for the basis of Plaintiffs' claims against Stacy Eastland and threatening sanctions if Plaintiffs did not immediately drop his client from the lawsuit. Ex. A, Email Correspondence 1 at 2–3. The next day, Plaintiffs' counsel responded as follows:

> We have documents that indicate that Stacy still has some financial interest in NFP. Happy to talk through it and run this issue down. I am wrapping up travel today. I am available most of the day on Monday or Tuesday of next week. Let me know a good time.

*Id*. at 2. Mr. Bitting sent a single response stating he would like to see the documents and offering availability for a phone call. *Id*. Then, rather than make any real attempt to follow up and discuss or resolve this issue, he filed his Motion for Sanctions with the Court on December 29, 2025. *See generally* Def. Mot. Specifically, Mr. Bitting failed to set a meeting – zoom, in person, or otherwise – to confer prior to filing a motion for sanctions based on his singular opinion that his client could not be a proper party to this tragic lawsuit, despite knowing his client was intimately involved in Camp Mystic and NFP for decades.

In continued efforts to resolve this issue, undersigned counsel followed up with Mr. Bitting via e-mail on January 13, 2026. *See* Ex. B, Email Correspondence 2 at 2–3. Counsel attached documents representing the information Plaintiffs were able to confirm at the time of filing. *Id*. As counsel explained:

> As you can see, your client was listed as a significant shareholder in National Foundation Properties, and presumably, was heavily involved



Copy from re:SearchTX

> in decisions regarding use of the real property that was affected by the Jul 2025 flood. This should come as no surprise given Stacy Eastland was an owner of the property with a few other members of his family in the family run business since at least 1998. It is also clear he had been a director of NFP, both individually and as a trustee, and was still an owner in 2011-2012. Additionally, we were able to find a subordination agreement from 2019 further indicating that a landlord/tenant lease agreement exists between Camp Mystic and NFP which would further allocate duties and responsibilities to NFP. Considering NFP is still listed as the owner of the property per the Appraisal District, this landlord/tenant agreement is relevant related to the 2025 flood.

*Id*. Counsel specifically told Mr. Bitting that the documents provided by Stacy Eastland appeared to be confidential records from a prior litigation which were *not* available to Plaintiffs before filing:

> I think that the confusion stems from the fact that the documents you produced showing a sale of Stacy Eastland's stock appears to be an internal document you and/or your client possessed that was not readily available in our investigation and instead, would have been disclosed in the normal course of discovery as in every other case. We did not ever have a document showing that Stacy Eastland ever relinquished the ownership he had in NFP at any time prior to the 2025 flood.

*Id*. As counsel explained, Texas law provides for potential liability against not only current property owners, but also prior property owners where there was failure to disclose a dangerous condition. *Id*. Counsel also noted that despite Mr. Bitting's assertion that Stacy Eastland had transferred ownership allegedly effective November 15, 2012, UCC documents still showed Stacy Eastland as a secured party for the land in January of 2013 during the time FEMA appeals were being made to issue rezoning decisions to remove some of the very cabins at issue in this case from the FEMA floodplain. *Id.*; *see also* Ex. C, FEMA Letters of Map Amendment from 2011–2014; Ex. D, UCC Financing Statement. Stacy Eastland is also listed on a Deed of Trust dated November 19, 2012—after the dates on the transfer documents attached to Stacy Eastland's Original Answer. *See* Ex. E, Second Lien Deed of Trust; *see also*



Copy from re:SearchTX

Stacy Eastland Motion to Transfer Venue and Original Answer at attached Exhibit 1. Nevertheless, undersigned counsel tried diligently to resolve these contradictions and Stacy Eastland's complaints with Mr. Bitting:

> [O]ur preference would be to discuss and see if we can come to some middle ground. As Kyle previously stated, we are not in the business of holding parties in a case that are not meant to be there. However, you must also appreciate that much of the information you are utilizing to support your rapidly filed sanctions motion comes from attorney-client privileged documents and details from an unrelated litigation we were not part of a decade ago.

*Id*.

Notably, despite Plaintiffs continuing attempts to resolve the issue without incurring any time and expense, Mr. Bitting continued to refuse to cooperate or allow for the initiation of the discovery process. Mr. Bitting disallowed efforts for further meaningful discussion, insisting that contradictory and unverified information produced for the first time after Plaintiffs' filing constituted sanctionable conduct, and stating that "the longer you keep Stacy in the suit, the greater his attorney's fees which, among other things, we are seeking as sanctions." *Id* at 1. Thereafter, undersigned counsel conferred with Mr. Bitting via phone and offered to nonsuit Stacy Eastland without prejudice pending the completion of discovery to verify Mr. Bitting's assertions, but Mr. Bitting again refused to resolve the matter. *See id*. Instead, Mr. Bitting demanded a non-suit with prejudice and a payment for attorney fees that never had to be incurred. Plaintiffs received discovery responses from the Camp Mystic Defendants on February 27, 2026, and following a thorough review of the relevant documents produced therein, filed a timely nonsuit dismissing Plaintiffs' claims against Stacy Eastland without prejudice on March 10, 2026. *See* Ex. F, Discovery Extension Emails; *see also* Notice



Copy from re:SearchTX

of Partial Nonsuit filed March 10, 2026. Most importantly, Plaintiff filed the non-suit without prejudice because discovery had just begun and it still remains unclear the extent of Stacy Eastland's involvement in the creation of evacuation plans (or lack thereof), placement of the cabins, the potential perpetration of undercapitalization of the Camp Mystic entities, and executive decisions that ultimately led to this incident.

Later that same day, undersigned counsel again reached out to Mr. Bitting to confer on the pending sanctions motion, again noting that Plaintiffs had no information related to Stacy Eastland's transfer of ownership prior to the filing of this suit and had only recently received initial discovery responses. *See* Ex. G, Email Correspondence 3 at 2–3. Mr. Bitting continued to insist on pursuing sanctions, indicating he would only agree to withdraw the motion "in exchange for payment of attorney fees and a public apology." *Id.* 1–2.

Stacy Eastland moves for Chapter 10 and Rule 13 sanctions based on information which was not publicly available at the time of Plaintiffs' filings and which Stacy Eastland did not provide to Plaintiffs until after the time of filing. As discussed further below, Plaintiffs had both a factual basis for their allegations and a reasonable belief that discovery would yield evidentiary support. Considering the facts and evidence available at the time of filing, Plaintiffs' pleadings are not groundless, made in bad faith, or brought for the purpose of harassment. As even Mr. Bitting has previously admitted, Stacy Eastland was part of a very successful family operated private summer camp – a summer camp that resulted in the deaths of 27 girls. Stacy Eastland cannot overcome the presumption of good faith or meet its burden of proof under either Chapter 10 or Rule 13.

Moreover, counsel for Stacy Eastland has repeatedly failed to meaningfully confer with Plaintiffs in good faith with respect to the instant motion. Plaintiffs have provided Mr. Bitting



Copy from re:SearchTX

with more than sufficient information to show how and why their investigation properly identified Stacy Eastland as a potentially liable party in this lawsuit at the time of filing and continued to try and diligently resolve Stacy Eastland's complaints even after he filed for sanctions. Indeed, Stacy Eastland was nonsuited from this case on March 10, 2026, as a courtesy and merely relying on his counsel's representations without the benefit of full discovery.

Stacy Eastland's motion is wholly without merit and should be denied. Alternatively, Stacy Eastland's motion should be struck for failure to confer in violation of Local Rule 2.2.

## II.
## LEGAL STANDARD

In considering both Rule 13 and Chapter 10 sanctions, there is a presumption that pleadings are filed in good faith. *Reynolds Energy Transp., LLC v. Plains Mktg., L.P.*, 706 S.W.3d 845, 874 (Tex. App.—San Antonio 2024, no pet.) (citing *Nath v. Tex. Children's Hosp*., 446 S.W.3d 355, 362 (Tex. 2014) and *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007)). The party seeking sanctions bears the burden of overcoming this presumption of good faith. *Id*. (quoting *Low*, 221 S.W.3d at 614). "To overcome the good faith presumption, the party must prove that the filing is 'the conscious doing of a wrong for dishonest, discriminatory, or malicious purposes.'" *Id*. (quoting *Elkins v. Stotts-Brown*, 103 S.W.3d 664, 668–69 (Tex. App.—Dallas 2003, no pet.)). Moreover, "whether determining sanctions under Rule 13 or Chapter 10, a trial court should only assess the evidentiary support available to the attorney *at the time the pleading is filed*." *Id*. (emphasis added). Where the moving party relies on subsequent evidence, sanctions are not appropriate:

> Considering evidence developed subsequently would "chill litigation in cases where claimants in good faith believe they possess a claim." If the



Copy from re:SearchTX

> party later learns through discovery that no factual support for the contention exists and continues to pursue litigation, then such conduct may be sanctioned as abusive of the discovery process, not the filing of pleadings under Chapter 10.

*Id*. (internal quotations and citations omitted). Against these standards, Stacy Eastland's motion for sanctions must be denied.

## III.
## ARGUMENT

As an initial matter, Plaintiffs note that many of Stacy Eastland's arguments challenge the sufficiency of the pleadings and are not a proper basis for a sanctions motion. For example, the motion asserts that Plaintiffs' First Amended Petition fails to specify acts or omissions by Stacy Eastland because it contains allegations against "Defendants" collectively. *See* Def. Mot. at 3–5. While Plaintiffs maintain that this argument is without merit, if Stacy Eastland wishes to raise such challenges, the proper procedure would be to file a motion to dismiss pursuant to Rule 91a and the fair-notice pleading standard. *See* TEX. R. CIV. P. 91a.1; *see also Reaves v. City of Corpus Christi*, 518 S.W.3d 594, 600 (Tex. App.—Corpus Christi 2017, no pet.). Of course, Stacy Eastland has already been nonsuited from this lawsuit. *See* Notice of Nonsuit filed March 10, 2026. Nevertheless, Stacy Eastland continues to pursue the instant motion for sanctions, arguing that Plaintiffs' filing of this suit against Stacy Eastland violates TEX. CIV. PRAC. & REM. CODE § 10.001(3) and TEX. R. CIV. P. 13. There is simply no basis for such a request.

### A. Plaintiff's pleading was not signed in violation of TEX. CIV. PRAC. & REM. CODE § 10.001.

Section 10.001 provides, in relevant part, that a person who signs a pleading or a motion certifies "that to the signatory's best knowledge, information, and belief, formed after



Copy from re:SearchTX

reasonable inquiry . . . each allegation or other factual contention in the pleading or motion has evidentiary support or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery[.]" TEX. CIV. PRAC. & REM. CODE § 10.001(3). A pleading is sanctionable under this section only when the allegations "do not have factual support and it is not likely they will have evidentiary support in light of the evidence the attorney has *when he filed the pleadings*." *Reynolds* 706 S.W.3d at 873 (Tex. App.—San Antonio 2024, no pet.) (emphasis added) (quoting *Nath v. Tex. Children's Hosp.*, 446 S.W.3d 355, 369 (Tex. 2014)).

Plaintiffs conducted a reasonable inquiry and had evidentiary support for each allegation or factual contention against Stacy Eastland at the time of filing their Original and First Amended Original Petitions. As discussed above, Camp Mystic has been an Eastland family business for nearly 90 years. *See* Ex. H, Eastland Original Petition 2011 at ¶ A. The Eastland family formed the corporation Camp Mystic, Inc. in 1956 and operated the camp as a single corporation for over 40 years. *Id*. at ¶¶ 7–9. Stacy Eastland was an owner of the original Camp Mystic, Inc. entity that owned and operated the camp, until Mr. Eastland recommended restructuring in 1998 to protect the camp from potential liability in lawsuits. *Id*. at ¶ B. In 1998, the corporation changed its name to NFP and formed a new corporation, also called Camp Mystic, to operate the camp. *Id*. In court filings from July 2011, Stacy Eastland describes himself as "a shareholder and former director of NFP," indicating he owned 22% of NFP both individually and in trust. *Id*. at 1, ¶ 13. Between 2011 and 2014, NFP made several appeals to FEMA to remove floodplain designations from Camp Mystic buildings. *See* Ex. C, FEMA Letters of Map Amendment from 2011–2014. Stacy Eastland was listed as a lender on a Deed of Trust lien dated November 19, 2012, and continued to be listed as a secured party on NFP's



Copy from re:SearchTX

UCC Financing Statements until at least January 14, 2013. *See* Ex. D, UCC Financing Statement; Ex. E, Second Lien Deed of Trust. Plaintiffs conducted a diligent search and found no publicly available information indicating Stacy Eastland's ownership interest had changed at the time of filing their Original and First Amended Petitions on November 10, 2025, and November 13, 2025, respectively.

In support of the instant motion, Stacy Eastland cites to e-mails sent to Plaintiffs' counsel on November 26, 2025, and December 11, 2025, as well as documents attached to his Motion to Transfer Venue and Original Answer filed on December 5, 2025. All of these occurred *after* the filing of Plaintiffs' pleadings. Importantly, the documents attached to Stacy Eastland's venue motion and answer which purport to show transfer of his NFP ownership in 2012 are privileged documents – assumedly received during the attorney-client relationship between Mr. Bitting and Mr. Eastland – which were not publicly available to Plaintiffs at the time of filing. *See* Stacy Eastland Mot. to Transfer Venue and Original Answer at attached Exhibit 1; *see also* Ex. B, Email Correspondence 2 at 2–3. At the time of filing, Plaintiffs' due diligence indicated that Stacy Eastland was still a substantial owner in NFP and was heavily involved in both Camp Mystic and NFP for decades, including around the time requests were being submitted to FEMA to remove cabins from the floodplain designation, and when policies and procedures involving the camp would have been created or in place. *See* Ex. C, FEMA Letters of Map Amendment from 2011–2014; Ex. D, UCC Financing Statement; Ex. E, Second Lien Deed of Trust.

Plaintiffs' First Amended Petition includes joint and vicarious liability claims against Stacy Eastland and other individual defendants under the theory that the Camp Mystic Defendants are mere shams or alter egos organized and operated by the named members of



Copy from re:SearchTX

Eastland family and Defendant Bonner, the President of NFP. *See* Pls.' First Am. Original Pet. at ¶¶ 82–88. Considering only the facts available to Plaintiffs at the time their pleadings were filed, Plaintiffs have shown, at the very least, that their allegations were "likely to have evidentiary support after a reasonable opportunity for further investigation or discovery[.]" TEX. CIV. PRAC. & REM. CODE § 10.001(3); *see also Reynolds*, 706 S.W.3d at 873–74. Stacy Eastland's motion for Chapter 10 sanctions is without merit and must be denied.

**B. Plaintiff's pleading was not signed in violation of TEX. R. CIV. P. 13.**

Under Rule 13, an attorney who signs a pleading, motion, or other document certifies that the signatory read the instrument and "that to the best of their knowledge, information, and belief formed after reasonable inquiry the instrument is not groundless and brought in bad faith or groundless and brought for the purpose of harassment." TEX. R. CIV. P. 13; *see also KB Home Lone Star Inc. v. Gordon*, 629 S.W.3d 649, 658 (Tex. App.—San Antonio 2021, no pet.). Thus, a party seeking Rule 13 sanctions must first establish that the complained-of pleading is groundless. *Reynolds*, 706 S.W.3d at 871. Sanctions under Rule 13 may not be imposed except for good cause, the particulars of which must be stated in the sanction order. *See* TEX. R. CIV. P. 13.

**1. Plaintiff's pleading is not groundless because counsel made a reasonable inquiry into the legal and factual basis of the claim at the time the suit was filed.**

"Groundless" for purposes of Rule 13 means "no basis in law or fact and not warranted by good faith argument for extension, modification, or reversal of existing law." TEX. R. CIV. P. 13.The test to determine whether a pleading is groundless is objective. *Loeffler v. Lytle Indep. Sch. Dist.*, 211 S.W.3d 331, 348 (Tex. App.—San Antonio 2006, pet. denied). A pleading is *not* groundless if counsel "made a reasonable inquiry into the legal and factual



Copy from re:SearchTX

basis of the claim at the time the suit was filed." *Id*. "To answer such an inquiry, the court will look to the facts available to the litigant and the circumstances *at the time the instrument was filed*." *Reynolds*, 706 S.W.3d at 871 (Tex. App.—San Antonio 2024, no pet.) (emphasis in original) (internal quotation omitted and changes adopted).

Plaintiffs hereby incorporate their above arguments regarding the factual basis for Plaintiffs' claims against Stacy Eastland. Counsel for Plaintiffs made reasonable inquiry into the legal and factual basis of Plaintiffs' claims against Stacy Eastland prior to filing the instant suit. The results of this inquiry indicated that Stacy Eastland was an owner of Camp Mystic, and at the very least, was involved in NFP decisions relevant to central issues in this case. *See* Ex. C, FEMA Letters of Map Amendment from 2011–2014; Ex. D, UCC Financing Statement; Ex. E, Second Lien Deed of Trust. This would not be surprising considering the family owned and operated nature of the very profitable Camp Mystic companies. Stacy Eastland simply cannot show that Plaintiffs' pleadings have no basis in law or fact based on the evidentiary support available to Plaintiffs at the time of filing. Because Plaintiffs' pleading is not groundless, the Rule 13 inquiry stops here. *See* TEX. R. CIV. P. 13 (stating attorney signature certifies the pleading is not "groundless *and* brought in bad faith" or "groundless *and* brought for the purpose of harassment.") (emphasis added). Nevertheless, Stacy Eastland also cannot show the requisite bad faith or harassment necessary to support an award of sanctions under Rule 13.

**2. Plaintiffs' pleading was not brought in bad faith or for the purpose of harassment.**

If a pleading is found to be groundless, the conduct is not sanctionable unless accompanied by bad faith, brought for the purpose of harassment, or false when signed.



Copy from re:SearchTX

*Reynolds*, 706 S.W.3d at 871 (citing *Nath v. Tex. Children's Hosp.*, 446 S.W.3d 355, 363 (Tex. 2014)). "Courts shall presume that pleadings, motions, and other papers are filed in good faith." TEX. R. CIV. P. 13. A party alleging bad faith must show "more than mere errors in judgment, lack of diligence, unreasonableness, or even gross negligence." *Id*. Bad faith is only proven by "an intent to engage in conduct for an impermissible reason, willful noncompliance, or willful ignorance of facts" and includes "conscious doing of a wrong for a dishonest, discriminatory, or malicious purpose." *Id*. (quoting *Brewer v. Lennox Hearth Products, LLC*, 601 S.W.3d 704, 718–19 (Tex. 2020). Harassment occurs when an instrument is filed with the intent to annoy, alarm, and abuse another person. *Id*.

Even if Stacy Eastland could show that Plaintiffs' pleading was groundless, he cannot show the requisite bad faith or harassment that must accompany such a finding for sanctions under Rule 13. Stacy Eastland's *only* ground for an argument of bad faith or harassment is based on information provided to Plaintiffs *after* the relevant pleadings were filed, which is improper for a Rule 13 consideration. *See Reynolds*, 706 S.W.3d at 871, 874. Even if Plaintiffs' post-filing conduct were proper for consideration under either Chapter 10 or Rule 13, there is simply no evidence of bad faith here. Based on prior e-mail correspondence, Plaintiffs anticipate that Mr. Bitting may attempt to assert arguments related to Plaintiffs' failure to immediately dismiss Stacy Eastland upon receipt of Mr. Bitting's representations and the documents attached to Stacy Eastland's Original Answer. But as discussed herein, the documents provided after filing contradicted available information related to the timing of Stacy Eastland's ownership and involvement in NFP and his decades-long ownership and direction in Camp Mystic business. *See* Ex. D, UCC Financing Statement; Ex. E, Second Lien Deed of Trust. Plaintiffs were entitled to complete discovery confirming whether Stacy



Copy from re:SearchTX

Eastland was involved with any of these decisions. Further, even though discovery could only barely begin prior to Defendants filing their Motion to Compel Arbitration, Plaintiffs promptly nonsuited Stacy Eastland from this case as a courtesy while discovery was ongoing. *See* Notice of Partial Nonsuit filed March 10, 2026; *see also* Ex. G, Email Correspondence 3 at 3. Thus, there is absolutely no evidence that Plaintiffs acted in bad faith at any time.

In sum, Stacy Eastland's contentions do not even come close to the extraordinarily high bar for bad faith or harassment, particularly given the presumption of good faith afforded to Plaintiffs under Rule 13. *See* TEX. R. CIV. P. 13. Because Plaintiffs' pleadings are neither groundless nor accompanied by bad faith or harassment, Stacy Eastland's request for sanctions under Rule 13 must be denied.

**C. Stacy Eastland has failed to make reasonable efforts to confer with Plaintiffs regarding the subject of its motion as required under Local Rule 2.2.**

Finally, Stacy Eastland has failed to include the required certificate of conference or confer with Plaintiffs regarding the subject of its motion as required under Local Rule 2.2, which states as follows:

> **2.2 <u>Certification Requirements</u>**
>
> Prior to setting a hearing, the parties must make reasonable efforts to *actually speak* to one another regarding the date, time, and format (i.e., whether in-person or remote) of a hearing or trial and the substance of the motion in a genuine effort to narrow their disputes before seeking court intervention. To that end, every motion must include a certification that "counsel has conferred with (or made reasonable efforts to confer with) all parties about the date, time, and format of the setting," and every motion (other than dispositive motions) must also certify either:
>
> **(a)** "Counsel has conferred with all parties who may be affected by the relief sought in this motion in a good faith effort to resolve or narrow the issues raised.;" or



Copy from re:SearchTX

> **(b)** "Counsel has made reasonable efforts to confer with all parties who may be affected by the relief sought in this motion but has been unable to do so."
>
> The court retains discretion to strike any setting in which the motion (or an amended version of the motion) does not include such certificates.

Travis County Local Rules of Civ. P. and Rules of Decorum 2.2. As discussed above, counsel for Stacy Eastland sent one e-mail to undersigned counsel during the holidays before threatening sanctions if Plaintiffs did not immediately dismiss their claims against his Eastland client. *See* Ex. A, Email Correspondence 1. Although undersigned counsel expressed a desire to resolve these issues, Mr. Bitting made no real attempt to "actually speak" with undersigned counsel before filing the instant motion as required under Rule 2.2. *Id*. Indeed, Stacy Eastland's motion does not even contain the requisite Certificate of Conference. *See* Def. Mot.

Subsequent to Stacy Eastland's filing of the instant motion, undersigned counsel conferred with Mr. Bitting via phone and e-mail and offered to nonsuit Stacy Eastland without prejudice pending the completion of discovery to verify his involvement and the timing of his formal exit from NFP, but Mr. Bitting refused to withdraw his groundless request for sanctions. *See* Ex. B, Email Correspondence 2. While Mr. Bitting continued to refuse Plaintiffs' efforts to resolve the issue, Plaintiffs nevertheless acted in good faith by nonsuiting Stacy Eastland after reviewing discovery. *See* Ex. G, Email Correspondence 3; *see also* Notice of Nonsuit filed March 10, 2026. However, even after Plaintiffs' nonsuit, Mr. Bitting continues to demand sanctions in the form of attorney's fees and a "public apology." *Id*. at 2.

Mr. Bitting has been unreasonable at every turn. Plaintiffs submit that any attorney fees he has incurred are the result of his own frivolous motion and refusal to make good faith attempts to cooperate with undersigned counsel. Stacy Eastland's motion is brought in



Copy from re:SearchTX

violation of both the text and the spirit of Local Rule 2.2. For all of the reasons discussed herein, Stacy Eastland's motion should be denied on the merits. Alternatively, however, Plaintiffs ask that Stacy Eastland's motion be struck for failure to comply with Local Rule 2.2.

**IV.**
**CONCLUSION**

WHEREFORE, Plaintiffs respectfully request that the Court deny Seaborn Stacy Eastland's Motion for Sanctions and for any and all other relief to which they may be rightly entitled.

Respectfully submitted,

ARNOLD & ITKIN LLP

*/s/ Kyle Findley*

Kurt B. Arnold
SBN: 24036150
karnold@arnolditkin.com
J. Kyle Findley
SBN: 24076382
kfindley@arnolditkin.com
Kala F. Sellers
SBN: 24087519
ksellers@arnolditkin.com
John G. Grinnan
SBN: 24087633
jgrinnan@arnolditkin.com
6009 Memorial Drive
Houston, Texas 77007
Tel: 713.222.3800
Fax: 713.222.3850
e-service@arnolditkin.com

**ATTORNEYS FOR PLAINTIFFS**



Copy from re:SearchTX

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served to all counsel of record in accordance with Texas Rule of Civil Procedure 21 on the 28th day of April, 2026.

*/s/ Kyle Findley*
J, Kyle Findley



Copy from re:SearchTX

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased,<br>by and through Douglas Getten,<br>individually and on behalf of the<br>Estate of Ellen Elizabeth Getten,<br>and Jennifer Getten<br><br>*Plaintiffs*, | §<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT OF |
| v. | §<br>§<br>§ | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc.<br>DBA Camp Mystic, Inc., Mystic<br>Camps Family Partnership, LTD.,<br>Mystic Camps Management, LLC,<br>Camp Mystic, LLC, Willetta Eastland,<br>Edward Eastland, Mary Liz Eastland,<br>Seaborn Stacy Eastland, and<br>William Neely Bonner III<br><br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | 459th JUDICIAL DISTRICT |

**ORDER DENYING DEFENDANT SEABORN STACY EASTLAND'S MOTION FOR SANCTIONS**

The Court has considered Seaborn Stacy Eastland's Motion for Sanctions, all responsive briefing, and/or the arguments of counsel and finds that Seaborn Stacy Eastland's motion should be **DENIED.**

It is therefore **ORDERED** that Seaborn Stacy Eastland's Motion for Sanctions is in all things **DENIED**.

SIGNED on this _____ day of _______________________, 2026.

_______________________________
Presiding Judge



Copy from re:SearchTX

# Exhibit A

Copy from re:SearchTX

**From:** Dan Bitting <dbitting@fbfk.law>
**Sent:** Friday, December 12, 2025 3:02 PM
**To:** Kyle Findley <KFindley@ArnoldItkin.com>; Kurt Arnold <karnold@ArnoldItkin.com>; Kala Sellers <ksellers@arnolditkin.com>; John Grinnan <jgrinnan@ArnoldItkin.com>
**Cc:** Jacob Mendoza <jmendoza@fbfk.law>; Camp Team <camp@arnolditkin.com>
**Subject:** Re: Cause no. D-1-GN-25-009976, Geffen, et al v. Stacy Eastland, et al

Obviously I'd like to see those documents, Kyle.

I'm available Monday afternoon; Tuesday morning or Tuesday 4:00 pm
Or later.

**DAN BITTING**
Attorney / Shareholder
FBFK Law

**FBFK LAW**
(512) 703-1400 Office
4301 Westbank Drive, Building A, Suite 225
Austin, TX 78746
dbitting@fbfk.law
www.fbfk.law | Pay Your Bill

The FBFK Way - Our Culture of Service and Success

Members of LEInternational

IMPORTANT/CONFIDENTIAL: This message contains information from the law firm of Ferguson Braswell Fraser Kubasta PC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. If you have received this communication in error, please notify us immediately at our Dallas telephone number: (972) 378-9111.

**From:** Kyle Findley <KFindley@ArnoldItkin.com>
**Sent:** Friday, December 12, 2025 1:40:20 PM
**To:** Dan Bitting <dbitting@fbfk.law>; Kurt Arnold <karnold@ArnoldItkin.com>; Kala Sellers <ksellers@arnolditkin.com>; John Grinnan <jgrinnan@ArnoldItkin.com>
**Cc:** Jacob Mendoza <jmendoza@fbfk.law>; Camp Team <camp@arnolditkin.com>



Copy from re:SearchTX

**Subject:** RE: Cause no. D-1-GN-25-009976, Geffen, et al v. Stacy Eastland, et al

Hey Dan – thanks for the email.

We have documents that indicate that Stacy still has some sort of financial interest in NFP. Happy to talk through it and run this issue down. I am wrapped up traveling today.

I am available most of the day on Monday or Tuesday of next week.

Let me know a good time.

Thanks,
Kyle

**Kyle Findley**
Trial Lawyer

**From:** Dan Bitting <dbitting@fbfk.law>
**Sent:** Thursday, December 11, 2025 2:21 PM
**To:** Kurt Arnold <karnold@ArnoldItkin.com>; Kyle Findley <KFindley@ArnoldItkin.com>; Kala Sellers <ksellers@arnolditkin.com>; John Grinnan <jgrinnan@ArnoldItkin.com>
**Cc:** Jacob Mendoza <jmendoza@fbfk.law>
**Subject:** RE: Cause no. D-1-GN-25-009976, Geffen, et al v. Stacy Eastland, et al

Counsel, you never responded to this email. (If I have missed an email, let me know.) Accordingly, last Friday I filed a motion to transfer venue, original answer and special exceptions on behalf of Stacy Eastland. You should have been e–served with this pleading.



Copy from re:SearchTX

As the answer and exhibits show, Stacy Eastland transferred all his ownership interests in Natural Fountains Properties (“NFP") back to the company at the end of 2012. He has not had any involvement with NFP or Camp Mystic since then. Of course, even if he still were a stockholder in NFP, that standing alone would not be a basis to sue him for the recent tragic events. But given his lack of ownership in NFP and his lack of any other involvement with the camp since 2012, any claims against him are groundless. There is absolutely no basis to have him in this lawsuit.

Giving you the benefit of the doubt, I assume that you were unaware of Stacy's lack of ownership interest in NFP and lack of involvement with the camp since 2012. But with knowledge of Stacy's lack of involvement since 2012, continuing the litigation against Stacy would constitute bringing groundless claims either in bad faith and/or for the purpose of harassment. Thus, these claims are sanctionable under Tex. R. Civ. P. 13. I have not filed a motion for sanctions to this point because, as noted, I was giving you the benefit of the doubt. But I do demand that you immediately drop Stacy from the suit. Please let me know by end of business on tomorrow if and when you will nonsuit the claims against Stacy. Otherwise, I will take appropriate action.

I look forward to your response.

Thanks,

Dan Bitting

**DAN BITTING**
Attorney / Shareholder
FBFK Law

**FBFK LAW**
(512) 703-1400 Office
4301 Westbank Drive, Building A, Suite 225
Austin, TX 78746
dbitting@fbfk.law
www.fbfk.law | Pay Your Bill

The FBFK Way - Our Culture of Service and Success

Members of LEInternational

IMPORTANT/CONFIDENTIAL: This message contains information from the law firm of Ferguson Braswell Fraser Kubasta PC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. If you have received this communication in error, please notify us immediately at our Dallas telephone number: (972) 378-9111.



Copy from re:SearchTX

**From:** Dan Bitting
**Sent:** Wednesday, November 26, 2025 11:50 AM
**To:** karnold@arnolditkin.com; kfindley@arnolditkin.com; ksellers@arnolditkin.com; jgrinnan@arnolditkin.com
**Cc:** Jacob Mendoza <jmendoza@fbfk.law>
**Subject:** Cause no. D-1-GN-25-009976, Geffen, et al v. Stacy Eastland, et al

Counsel, I represent Stacy Eastland in this lawsuit.

First, I would like to confirm his answer date. There is some confusion because apparently he was served twice with the same petition, the first amended petition. Can we agree that his answer is due by the end of business on Monday, December 15, 2025?

Second, Stacy Eastland transferred his stock in NFP back to the company in 2012. He has had no formal or informal involvement with the camp since that time. I would like to know your basis for including him in this lawsuit, because I believe there is none.

Thank you for your cooperation and please give me call with any questions.

Dan Bitting

**DAN BITTING**
Attorney / Shareholder
FBFK Law

**FBFK LAW**
(512) 703-1400 Office
4301 Westbank Drive, Building A, Suite 225
Austin, TX 78746
dbitting@fbfk.law
www.fbfk.law | Pay Your Bill

The FBFK Way - Our Culture of Service and Success

Members of LEInternational

IMPORTANT/CONFIDENTIAL: This message contains information from the law firm of Ferguson Braswell Fraser Kubasta PC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. If you have received this communication in error, please notify us immediately at our Dallas telephone number: (972) 378-9111.



Copy from re:SearchTX

# Exhibit B

Copy from re:SearchTX

**From:** Kala Sellers
**Sent:** Wednesday, February 4, 2026 8:08 PM
**To:** Dan Bitting
**Cc:** Kyle Findley; Jacob Mendoza
**Subject:** Re: Cause no. D-1-GN-25-009976, Geffen, et al v. Stacy Eastland, et al

Dan,

I'm in trial right now but was waiting for you to respond about your availability to call. I should be done this week - let me know your availability for next week.

**Kala Sellers**
Of Counsel

ARNOLD & ITKIN
TRIAL LAWYERS

t (713) 222-3800 6009 Memorial Drive
f (713) 222-3850 Houston, TX 77007

arnolditkin.com

On Feb 4, 2026, at 6:15 PM, Dan Bitting <dbitting@fbfk.law> wrote:

Kala, I'm not sure I replied to this. I hope your kids are better.

I'm generally available to talk tomorrow before 3:00 pm and Friday morning.

As I said previously, I did not immediately move for sanctions because, giving you the benefit of the doubt, I assumed that you didn't know that Stacy had relinquished his interest in NFP in 2012. But you have maintained the suit after receiving proof that he transferred his interest in NFP back to the company in 2012. He had no role in NFP in 2013, when the FEMA appeals (which were probably done by Camp Mystic, not NFP) were purportedly pursued.

And the fact that a lease apparently existed between Camp Mystic and NFP in 2019—7 years after Stacy transferred his stock in NFP--certainly doesn't show that Stacy had anything to do with the lease.

As you know, piercing the corporate veil requires proof of actual fraud. You have no pleading, much less any evidence, that Stacy used the corporate form to perpetrate an actual fraud on your clients.

I'm happy to talk. But the longer you keep Stacy in the suit, the greater his attorney's fees which, among other things, we are seeking as sanctions.



Copy from re:SearchTX

Dan

**DAN BITTING**
Attorney / Shareholder

FBFK LAW
Transactions/M&A
Litigation
IP

BEST LAW FIRMS 2026

**FBFK LAW**
(512) 703-1400 Office
4301 Westbank Drive, Building A, Suite 225
Austin, TX 78746
dbitting@fbfk.law
www.fbfk.law | Pay Your Bill

The FBFK Way - Our Culture of Service and Success

Members of LEInternational

IMPORTANT/CONFIDENTIAL: This message contains information from the law firm of Ferguson Braswell Fraser Kubasta PC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. If you have received this communication in error, please notify us immediately at our Dallas telephone number: (972) 378-9111.

**From:** Kala Sellers <ksellers@arnolditkin.com>
**Sent:** Tuesday, January 13, 2026 4:05 PM
**To:** Dan Bitting <dbitting@fbfk.law>
**Cc:** Kyle Findley <KFindley@ArnoldItkin.com>
**Subject:** Cause no. D-1-GN-25-009976, Geffen, et al v. Stacy Eastland, et al

Dan,

Apologies for the delay on my end. Sick kids took priority last week unfortunately.

Please see attached documents which represent the information we were able to access and had available to us at the time of filing. As you can see, your client was listed as a significant shareholder in Natural Fountain Properties, and presumably, was heavily involved in decisions regarding use of the real property that was affected by the July 2025 flood. This should come as no surprise given Stacy Eastland was an owner of the property with a few other members of his family in the family run business since at least 1998. It is also clear he had been a director of NFP, both individually and as a trustee, and was still an owner in 2011-2012. Additionally, we were able to find a subordination agreement from 2019 further indicating that a landlord/tenant lease agreement exists between Camp Mystic and NFP which would further allocate duties and responsibilities to NFP. Considering NFP is still listed as the owner of the property per the Appraisal District, this landlord/tenant agreement is relevant related to the 2025 flood.



Copy from re:SearchTX

I think that the confusion stems from the fact that the documents you produced showing a sale of Stacy Eastland's stock appears to be an internal document you and/or your client possessed that was not readily available in our investigation and instead, would have been disclosed in the normal course of discovery as in every other case. We did not ever have a document showing that Stacy Eastland ever relinquished the ownership he had in NFP at any time prior to the 2025 flood.

Which is why we were surprised by your sanction motion.

As I'm sure you are aware, there are multiple avenues to pierce the corporate veil especially in this case, and Texas law provides for potential liability against not only current property owners, but also prior property owners where there was failure to disclose a dangerous condition. Furthermore, the documents you provided from the UCC indicate Stacy Eastland's ownership was still intact in 2013 during the time that we believe FEMA appeals were being made to issue rezoning decisions. I'm sure you can understand that the decision-making process of NFP and its ownership in appealing to FEMA is highly relevant to the causes of action in this litigation.

However, our preference would be to discuss and see if we can come to some middle ground. As Kyle previously stated, we are not in the business of holding parties in a case that are not meant to be there. However, you must also appreciate that much of the information you are utilizing to support your rapidly filed sanctions motion comes from attorney-client privileged documents and details from an unrelated litigation we were not part of a decade ago.

Let me know a good time that you can discuss a way to resolve. I have an idea that may work for your client and ours.

**Kala Sellers**
Of Counsel

ARNOLD & ITKIN
TRIAL LAWYERS

t (713) 222-3800 6009 Memorial Drive
f (713) 222-3850 Houston, TX 77007

arnolditkin.com



Copy from re:SearchTX

# Exhibit C

Copy from re:SearchTX

Case 1:26-cv-01919-RP Document 1-1 Filed 07/13/26 Page 434 of 502

Federal Emergency Management Agency
Washington, D.C. 20472

# LETTER OF MAP AMENDMENT DETERMINATION DOCUMENT (REMOVAL)

| COMMUNITY AND MAP PANEL INFORMATION | | LEGAL PROPERTY DESCRIPTION |
|---|---|---|
| COMMUNITY | KERR COUNTY, TEXAS (Unincorporated Areas) | A portion of the H. Lange Survey, Abstract No. 234, as described in the Warranty Deed, recorded as Instrument No. 006523, in Volume 1618, Pages 738 through 741, in the Office of the County Clerk, Kerr County, Texas |
| | COMMUNITY NO.: 480419 | |
| AFFECTED MAP PANEL | NUMBER: 48265C0450F | |
| | DATE: 3/3/2011 | |

**FLOODING SOURCE: SOUTH FORK GUADALUPE RIVER TRIBUTARY**

**APPROXIMATE LATITUDE & LONGITUDE OF PROPERTY: 30.038, -99.369**
**SOURCE OF LAT & LONG: ESRI: FEMA GEOCODE/GOOGLE MAPS** **DATUM: NAD 83**

## DETERMINATION

| LOT | BLOCK/ SECTION | SUBDIVISION | STREET | **OUTCOME** WHAT IS REMOVED FROM THE SFHA | FLOOD ZONE | 1% ANNUAL CHANCE FLOOD ELEVATION (NAVD 88) | LOWEST ADJACENT GRADE ELEVATION (NAVD 88) | LOWEST LOT ELEVATION (NAVD 88) |
|---|---|---|---|---|---|---|---|---|
| -- | -- | -- | 185 Lange Ravine Road | Structure (RV Barn) | X (unshaded) | 1831.2 feet | 1835.7 feet | -- |

**Special Flood Hazard Area (SFHA)** - The SFHA is an area that would be inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood).

ADDITIONAL CONSIDERATIONS (Please refer to the appropriate section on Attachment 1 for the additional considerations listed below.)

PORTIONS REMAIN IN THE SFHA
ZONE A

This document provides the Federal Emergency Management Agency's determination regarding a request for a Letter of Map Amendment for the property described above. Using the information submitted and the effective National Flood Insurance Program (NFIP) map, we have determined that the structure(s) on the property(ies) is/are not located in the SFHA, an area inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood). This document amends the effective NFIP map to remove the subject property from the SFHA located on the effective NFIP map; therefore, the Federal mandatory flood insurance requirement does not apply. However, the lender has the option to continue the flood insurance requirement to protect its financial risk on the loan. A Preferred Risk Policy (PRP) is available for buildings located outside the SFHA. Information about the PRP and how one can apply is enclosed.

This determination is based on the flood data presently available. The enclosed documents provide additional information regarding this determination. If you have any questions about this document, please contact the FEMA Map Assistance Center toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, LOMC Clearinghouse, 6730 Santa Barbara Court, Elkridge, MD 21075.

Luis Rodriguez, P.E., Chief
Engineering Management Branch
Federal Insurance and Mitigation Administration

Copy from re:SearchTX

Case 1:26-cv-01919-RP Document 1-1 Filed 07/13/26 Page 435 of 502

Federal Emergency Management Agency

Washington, D.C. 20472

# LETTER OF MAP AMENDMENT
# DETERMINATION DOCUMENT (REMOVAL)

ATTACHMENT 1 (ADDITIONAL CONSIDERATIONS)

**PORTIONS OF THE PROPERTY REMAIN IN THE SFHA (This Additional Consideration applies to the preceding 1 Property.)**

Portions of this property, but not the subject of the Determination/Comment document, may remain in the Special Flood Hazard Area. Therefore, any future construction or substantial improvement on the property remains subject to Federal, State/Commonwealth, and local regulations for floodplain management.

**ZONE A (This Additional Consideration applies to the preceding 1 Property.)**

The National Flood Insurance Program map affecting this property depicts a Special Flood Hazard Area that was determined using the best flood hazard data available to FEMA, but without performing a detailed engineering analysis. The flood elevation used to make this determination is based on approximate methods and has not been formalized through the standard process for establishing base flood elevations published in the Flood Insurance Study. This flood elevation is subject to change.

This attachment provides additional information regarding this request. If you have any questions about this attachment, please contact the FEMA Map Assistance Center toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, LOMC Clearinghouse, 6730 Santa Barbara Court, Elkridge, MD 21075.

Luis Rodriguez, P.E., Chief
Engineering Management Branch
Federal Insurance and Mitigation Administration

Copy from re:SearchTX

Case 1:26-cv-01919-RP Document 1-1 Filed 07/13/26 Page 436 of 502

# Federal Emergency Management Agency

Washington, D.C. 20472

# LETTER OF MAP AMENDMENT DETERMINATION DOCUMENT (OUT AS SHOWN)

| COMMUNITY AND MAP PANEL INFORMATION | | LEGAL PROPERTY DESCRIPTION |
|---|---|---|
| COMMUNITY | KERR COUNTY, TEXAS (Unincorporated Areas) | A portion of the H. Lange Survey, Abstract No. 234, as described in the Warranty Deed, recorded as Instrument No. 006523, in Volume 1618, Pages 738 through 741, in the Office of the County Clerk, Kerr County, Texas |
| | COMMUNITY NO.: 480419 | |
| AFFECTED MAP PANEL | NUMBER: 48265C0450F | |
| | DATE: 3/3/2011 | |

**FLOODING SOURCE: SOUTH FORK GUADALUPE RIVER TRIBUTARY**

**APPROXIMATE LATITUDE & LONGITUDE OF PROPERTY: 30.038, -99.369**
**SOURCE OF LAT & LONG: ESRI: FEMA GEOCODE/GOOGLE MAPS DATUM: NAD 83**

## DETERMINATION

| LOT | BLOCK/ SECTION | SUBDIVISION | STREET | **OUTCOME** WHAT IS OUTSIDE OF THE SFHA | FLOOD ZONE | 1% ANNUAL CHANCE FLOOD ELEVATION (NAVD 88) | LOWEST ADJACENT GRADE ELEVATION (NAVD 88) | LOWEST LOT ELEVATION (NAVD 88) |
|---|---|---|---|---|---|---|---|---|
| -- | -- | -- | 185 Lange Ravine Road | Structure (Residence) | X (unshaded) | -- | -- | -- |

**Special Flood Hazard Area (SFHA)** - The SFHA is an area that would be inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood).

ADDITIONAL CONSIDERATIONS (Please refer to the appropriate section on Attachment 1 for the additional considerations listed below.)

PORTIONS REMAIN IN THE SFHA
ZONE A

This document provides the Federal Emergency Management Agency's determination regarding a request for a Letter of Map Amendment for the property described above. Using the information submitted and the effective National Flood Insurance Program (NFIP) map, we have determined that the structure(s) on the property(ies) is/are not located in the SFHA, an area inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood). The subject property is correctly shown outside the SFHA located on the effective NFIP map; therefore, the Federal mandatory flood insurance requirement does not apply. If the policy has been written using an incorrect zone, it can be endorsed to correct the zone for the current policy year and one prior policy term. Please contact the insurance agent or company involved to request endorsement of the policy. However, the lender has the option to continue the flood insurance requirement to protect its financial risk on the loan. A Preferred Risk Policy (PRP) is available for buildings located outside the SFHA. Information about the PRP and how one can apply is enclosed.

This determination is based on the flood data presently available. The enclosed documents provide additional information regarding this determination. If you have any questions about this document, please contact the FEMA Map Assistance Center toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, LOMC Clearinghouse, 6730 Santa Barbara Court, Elkridge, MD 21075.

Luis Rodriguez, P.E., Chief
Engineering Management Branch
Federal Insurance and Mitigation Administration

Copy from re:SearchTX

Case 1:26-cv-01919-RP Document 1-1 Filed 07/13/26 Page 437 of 502

Federal Emergency Management Agency
Washington, D.C. 20472

# LETTER OF MAP AMENDMENT DETERMINATION DOCUMENT (OUT AS SHOWN)

ATTACHMENT 1 (ADDITIONAL CONSIDERATIONS)

**PORTIONS OF THE PROPERTY REMAIN IN THE SFHA (This Additional Consideration applies to the preceding 1 Property.)**

Portions of this property, but not the subject of the Determination/Comment document, may remain in the Special Flood Hazard Area. Therefore, any future construction or substantial improvement on the property remains subject to Federal, State/Commonwealth, and local regulations for floodplain management.

**ZONE A (This Additional Consideration applies to the preceding 1 Property.)**

The National Flood Insurance Program map affecting this property depicts a Special Flood Hazard Area that was determined using the best flood hazard data available to FEMA, but without performing a detailed engineering analysis. The flood elevation used to make this determination is based on approximate methods and has not been formalized through the standard process for establishing base flood elevations published in the Flood Insurance Study. This flood elevation is subject to change.

This attachment provides additional information regarding this request. If you have any questions about this attachment, please contact the FEMA Map Assistance Center toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, LOMC Clearinghouse, 6730 Santa Barbara Court, Elkridge, MD 21075.

Luis Rodriguez, P.E., Chief
Engineering Management Branch
Federal Insurance and Mitigation Administration

Copy from re:SearchTX

# Federal Emergency Management Agency

Washington, D.C. 20472

# LETTER OF MAP AMENDMENT DETERMINATION DOCUMENT (REMOVAL)

| COMMUNITY AND MAP PANEL INFORMATION | | LEGAL PROPERTY DESCRIPTION |
|---|---|---|
| **COMMUNITY** | **KERR COUNTY, TEXAS (Unincorporated Areas)** | A parcel of land, as described in the Special Warranty Deed with Vendor's Lien recorded as Document No. 003145, in the Office of the County Clerk, Kerr County, Texas |
| | **COMMUNITY NO.: 480419** | |
| **AFFECTED MAP PANEL** | **NUMBER: 48265C0450F** | |
| | **DATE: 3/3/2011** | |
| **FLOODING SOURCE: NORTH FORK GUADALUPE RIVER** | | **APPROXIMATE LATITUDE & LONGITUDE OF PROPERTY: 30.075, -99.339**<br>**SOURCE OF LAT & LONG: WGS84 SURVEY OBSERVATION** **DATUM: NAD 83** |

## DETERMINATION

| LOT | BLOCK/ SECTION | SUBDIVISION | STREET | **OUTCOME** WHAT IS REMOVED FROM THE SFHA | FLOOD ZONE | 1% ANNUAL CHANCE FLOOD ELEVATION (NAVD 88) | LOWEST ADJACENT GRADE ELEVATION (NAVD 88) | LOWEST LOT ELEVATION (NAVD 88) |
|---|---|---|---|---|---|---|---|---|
| -- | -- | -- | 203 FM 1340 | Structure | X (shaded) | -- | 1771.5 feet | -- |

**Special Flood Hazard Area (SFHA)** - The SFHA is an area that would be inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood).

ADDITIONAL CONSIDERATIONS (Please refer to the appropriate section on Attachment 1 for the additional considerations listed below.)

eLOMA DETERMINATION

This document provides the Federal Emergency Management Agency's determination regarding a request for a Letter of Map Amendment for the property described above. Using the information submitted and the effective National Flood Insurance Program (NFIP) map, we have determined that the structure(s) on the property(ies) is/are not located in the SFHA, an area inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood). This document amends the effective NFIP map to remove the subject property from the SFHA located on the effective NFIP map; therefore, the Federal mandatory flood insurance requirement does not apply. However, the lender has the option to continue the flood insurance requirement to protect its financial risk on the loan. A Preferred Risk Policy (PRP) is available for buildings located outside the SFHA. Information about the PRP and how one can apply is enclosed.

This determination is based on the flood data presently available. The enclosed documents provide additional information regarding this determination. If you have any questions about this document, please contact the FEMA Map Assistance Center toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, Attn: RAMPP eLOMA Coordinator, 8401 Arlington Blvd, Fairfax, VA 22031-2666, Fax: 800-684-6860.

Luis Rodriguez, P.E., Chief
Engineering Management Branch
Federal Insurance and Mitigation Administration

eLOMA

Copy from re:SearchTX

Case 1:26-cv-01919-RP Document 1-1 Filed 07/13/26 Page 439 of 502

Federal Emergency Management Agency
Washington, D.C. 20472

# LETTER OF MAP AMENDMENT
# DETERMINATION DOCUMENT (REMOVAL)

ATTACHMENT 1 (ADDITIONAL CONSIDERATIONS)

**Structure Removal:**
The following considerations may or may not apply to the determination for your Structure:

**PORTIONS OF THE PROPERTY REMAIN IN THE SFHA and/or FLOODWAY -** Portions of this property, but not the subject of the Determination document, may remain in the Special Flood Hazard Area (SFHA) and/or the regulatory floodway for the flooding source indicated on the Determination Document. The NFIP regulatory floodway is the area that must remain unobstructed in order to prevent unacceptable increases in base flood elevations. Therefore, no construction may take place in an NFIP regulatory floodway that may cause an increase in the base flood elevation. Therefore, any future construction or substantial improvement on the property remains subject to Federal, State/Commonwealth, and local regulations for floodplain management. The NFIP regulatory flood way is provided to the community as a tool to regulate floodplain development. Modifications to the NFIP regulatory floodway must be accepted by both the Federal Emergency Management Agency (FEMA) and the community involved. Appropriate community actions are defined in Paragraph 60.3(d) of the NFIP regulations. Any proposed revision to the NFIP regulatory floodway must be submitted to FEMA by community officials. The community should contact either the Regional Director (for those communities in Regions I-IV, and VI-X), or the Regional Engineer (for those communities in Region V) for guidance on the data which must be submitted for a revision to the NFIP regulatory floodway. Contact information for each regional office can be obtained by calling the FEMA Map Assistance Center toll free at (877) 336-2627 (877-FEMA MAP) or from our web site at http://www.fema.gov/aboutiregoff.htm.

**STUDY UNDERWAY -** This determination is based on the flood data presently available. However, the Federal Emergency Management Agency may be currently revising the National Flood Insurance Program (NFIP) map for the community. New flood data could be generated that may affect this property. When the new NFIP map is issued it will supersede this determination. The Federal requirement for the purchase of flood insurance will then be based on the newly revised NFIP map.

**EXTRATERRITORIAL JURISDICTION -** The subject of the determination is shown on the National Flood Insurance Program map and may be located in an Extraterritorial Jurisdiction area for the community indicated on the Determination Document.

**LEVEE -** The subject property may be located in an area protected from the 1-percent annual chance flood (base flood) by a levee or other structure subject to possible failure or overtopping by a flood larger than the base flood.

This attachment provides additional information regarding this request. If you have any questions about this attachment, please contact the FEMA Map Assistance Center toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, Attn: RAMPP eLOMA Coordinator, 8401 Arlington Blvd, Fairfax, VA 22031-2666, Fax: 800-684-6860.

Luis Rodriguez, P.E., Chief
Engineering Management Branch
Federal Insurance and Mitigation Administration

Copy from re:SearchTX

Case 1:26-cv-01919-RP Document 1-1 Filed 07/13/26 Page 440 of 502

Federal Emergency Management Agency

Washington, D.C. 20472

# LETTER OF MAP AMENDMENT DETERMINATION DOCUMENT (REMOVAL)

ATTACHMENT 1 (ADDITIONAL CONSIDERATIONS)

**GROUND SUBSIDENCE** - The location of this request may be in an area subject to ground subsidence, the lowering of the ground as a result of natural occurrences such as soil settlement, or artificial occurrences such as the extraction of water or oil from the ground. While the elevations submitted with this request show the subject property is currently above the Base Flood Elevation (BFE), the property may "subside" with the passage of time to the extent that property elevations would be below the BFE and flood insurance may be required.

**GREAT LAKES** - The Federal Emergency Management Agency (FEMA) has based this determination on elevation data, which is published in the current Flood Insurance Study for the community. However, the elevations established in the U.S. Army Corps of Engineers (USACE) reports on the Great Lakes are the best available data known to us. If in the future there are any subsequent map revisions to the national Flood Insurance Program map and the USACE reports remain the best available data known, FEMA will use those elevations for any such revisions. Further, be advised that the elevations on the Flood Insurance Rate Map (FIRM) may only reflect the Stillwater elevation for the lake and may not account for the effects of wind driven waves or wave run-up. On-site conditions such as wind speed, wind direction, fetch distance, water depth and the slope of the beach or bluff may result in significant increases to the base flood elevation. Therefore, it is strongly recommended that the requestor be aware of these circumstances and, if warranted, evaluate the effects of wind driven waves along the shoreline of the property.

**STATE AND LOCAL CONSIDERATIONS** - Please note that this document does not override or supersede any State or local procedural or substantive provisions which may apply to floodplain management requirements associated with amendments to State or local floodplain zoning ordinances, maps, or State or local procedures adopted under the National Flood Insurance Program.

**COASTAL BARRIER RESOURCE SYSTEM** - The subject of this determination may be located within the Coastal Barrier Resource System (CBRS). Federal financial assistance, including Federal flood insurance, is not available in CBRS areas for new construction or substantial improvements occurring after the date on which the area was declared by Congress to be part of the CBRS or otherwise protected area as required by the Coastal Barrier Resources Act (Public Law 97-348) and the Coastal Barrier Improvement Act 1990 (Public Law 101-591). This date is indicated on the National Flood Insurance Program map. For further information on this property and the CBRS or otherwise protected area designation, contact the U.S. Department of the Interior.

This attachment provides additional information regarding this request. If you have any questions about this attachment, please contact the FEMA Map Assistance Center toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, Attn: RAMPP eLOMA Coordinator, 8401 Arlington Blvd, Fairfax, VA 22031-2666, Fax: 800-684-6860.

Luis Rodriguez, P.E., Chief
Engineering Management Branch
Federal Insurance and Mitigation Administration

Copy from re:SearchTX

Federal Emergency Management Agency
Washington, D.C. 20472

# ADDITIONAL INFORMATION REGARDING LETTERS OF MAP AMENDMENT

When making determinations on requests for Letters of Map Amendment (LOMAs), the Department of Homeland Security's Federal Emergency Management Agency (FEMA) bases its determination on the flood hazard information available at the time of the determination. Requesters should be aware that flood conditions may change or new information may be generated that would supersede FEMA's determination. In such cases, the community will be informed by letter.

Requesters also should be aware that removal of a property (parcel of land or structure) from the Special Flood Hazard Area (SFHA) means FEMA has determined the property is not subject to inundation by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood). This does not mean the property is not subject to other flood hazards. The property could be inundated by a flood with a magnitude greater than the base flood or by localized flooding not shown on the effective National Flood Insurance Program (NFIP) map.

The effect of a LOMA is it removes the Federal requirement for the lender to require flood insurance coverage for the property described. The LOMA *is not* a waiver of the condition that the property owner maintain flood insurance coverage for the property. *Only* the lender can waive the flood insurance purchase requirement because the lender imposed the requirement. *The property owner must request and receive a written waiver from the lender before canceling the policy*. The lender may determine, on its own as a business decision that it wishes to continue the flood insurance requirement to protect its financial risk on the loan.

The LOMA provides FEMA's comment on the mandatory flood insurance requirements of the NFIP as they apply to a particular property. A LOMA is not a building permit, nor should it be construed as such. Any development, new construction, or substantial improvement of a property impacted by a LOMA must comply with all applicable State and local criteria and other Federal criteria.

If a lender releases a property owner from the flood insurance requirement, and the property owner decides to cancel the policy and seek a refund, the NFIP will refund the premium paid for the current policy year, provided that no claim is pending or has been paid on the policy during the current policy year. The property owner must provide a written waiver of the insurance requirement from the lender to the property insurance agent or company servicing his or her policy. The agent or company will then process the refund request.

Copy from re:SearchTX

Even though structures are not located in an SFHA, as mentioned above, they could be flooded by a flooding event with a greater magnitude than the base flood. In fact, more than 25 percent of all claims paid by the NFIP are for policies for structures located outside the SFHA in Zones B, C, X (shaded), or X (unshaded). More than one-fourth of all policies purchased under the NFIP protect structures located in these zones. The risk to structures located outside SFHAs is just not as great as the risk to structures located in SFHAs. Finally, approximately 90 percent of all federally declared disasters are caused by flooding, and homeowners insurance does not provide financial protection from this flooding. Therefore, FEMA encourages the widest possible coverage under the NFIP.

The NFIP offers two types of flood insurance policies to property owners: the low-cost Preferred Risk Policy (PRP) and the Standard Flood Insurance Policy (SFIP). The PRP is available for 1- to 4-family residential structures located outside the SFHA with little or no loss history. The PRP is available for townhouse/rowhouse-type structures, but is not available for other types of condominium units. The SFIP is available for all other structures. Additional information on the PRP and how a property owner can quality for this type of policy may be obtained by calling the Flood Insurance Information Hotline, toll free, at 1-800-427-4661. Before making a final decision about flood insurance coverage, FEMA strongly encourages property owners to discuss their individual flood risk situations and insurance needs with an insurance agent or company.

FEMA has established "Grandfather" rules to benefit flood insurance policyholders who have maintained continuous coverage. Property owners may wish to note also that, if they live outside but on the fringe of the SFHA shown on an effective NFIP map and the map is revised to expand the SFHA to include their structure(s), their flood insurance policy rates will not increase as long as the coverage for the affected structure(s) has been continuous. Property owners would continue to receive the lower insurance policy rates.

LOMAs are based on minimum criteria established by the NFIP. State, county, and community officials, based on knowledge of local conditions and in the interest of safety, may set higher standards for construction in the SFHA. If a State, county, or community has adopted more restrictive and comprehensive floodplain management criteria, these criteria take precedence over the minimum Federal criteria.

In accordance with regulations adopted by the community when it made application to join the NFIP, letters issued to amend an NFIP map must be attached to the community's official record copy of the map. That map is available for public inspection at the community's official map repository. Therefore, FEMA sends copies of all such letters to the affected community's official map repository.

When a restudy is undertaken, or when a sufficient number of revisions or amendments occur on particular map panels, FEMA initiates the printing and distribution process for the affected panels. FEMA notifies community officials in writing when affected map panels are being physically revised and distributed. In such cases, FEMA attempts to reflect the results of the LOMA on the new map panel. If the results of particular LOMAs cannot be reflected on the new map panel because of scale limitations, FEMA notifies the community in writing and revalidates the LOMAs in that letter. LOMAs revalidated in this way usually will become effective 1 day after the effective date of the revised map.

Copy from re:SearchTX

Case 1:26-cv-01919-RP Document 1-1 Filed 07/13/26 Page 443 of 502

# Federal Emergency Management Agency

Washington, D.C. 20472

# LETTER OF MAP AMENDMENT
# DETERMINATION DOCUMENT (REMOVAL)

| COMMUNITY AND MAP PANEL INFORMATION | | LEGAL PROPERTY DESCRIPTION |
|---|---|---|
| COMMUNITY | KERR COUNTY, TEXAS (Unincorporated Areas) | A parcel of land, H.F Pope Survey No. 1590, Abstract No. 856, as described in the Warranty Deed with Vendor's Lien, recorded in Volume 1266, Pages 0159 through 0166, in the Office of the County Clerk, Kerr County, Texas |
| | COMMUNITY NO.: 480419 | |
| AFFECTED MAP PANEL | NUMBER: 48265C0450F | |
| | DATE: 3/3/2011 | |

**FLOODING SOURCE: GUADALUPE RIVER TRIBUTARY**

**APPROXIMATE LATITUDE & LONGITUDE OF PROPERTY: 30.077, -99.313**
**SOURCE OF LAT & LONG: GOOGLE EARTH PRO** **DATUM: NAD 83**

## DETERMINATION

| LOT | BLOCK/ SECTION | SUBDIVISION | STREET | **OUTCOME** WHAT IS REMOVED FROM THE SFHA | FLOOD ZONE | 1% ANNUAL CHANCE FLOOD ELEVATION (NAVD 88) | LOWEST ADJACENT GRADE ELEVATION (NAVD 88) | LOWEST LOT ELEVATION (NAVD 88) |
|---|---|---|---|---|---|---|---|---|
| -- | -- | -- | 242 Cardinal Hill Lane | Structure (Residence) | X (unshaded) | 1781.4 feet | 1789.7 feet | -- |

**Special Flood Hazard Area (SFHA)** - The SFHA is an area that would be inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood).

ADDITIONAL CONSIDERATIONS (Please refer to the appropriate section on Attachment 1 for the additional considerations listed below.)

DETERMINATION TABLE (CONTINUED)
PORTIONS REMAIN IN THE SFHA
ZONE A

This document provides the Federal Emergency Management Agency's determination regarding a request for a Letter of Map Amendment for the property described above. Using the information submitted and the effective National Flood Insurance Program (NFIP) map, we have determined that the structure(s) on the property(ies) is/are not located in the SFHA, an area inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood). This document amends the effective NFIP map to remove the subject property from the SFHA located on the effective NFIP map; therefore, the Federal mandatory flood insurance requirement does not apply. However, the lender has the option to continue the flood insurance requirement to protect its financial risk on the loan. A Preferred Risk Policy (PRP) is available for buildings located outside the SFHA. Information about the PRP and how one can apply is enclosed.

This determination is based on the flood data presently available. The enclosed documents provide additional information regarding this determination. If you have any questions about this document, please contact the FEMA Map Assistance Center toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, Engineering Library, 847 South Pickett Street, Alexandria, VA 22304-4605.

Luis Rodriguez, P.E., Chief
Engineering Management Branch
Federal Insurance and Mitigation Administration

Copy from re:SearchTX

Case 1:26-cv-01919-RP Document 1-1 Filed 07/13/26 Page 444 of 502

# Federal Emergency Management Agency
Washington, D.C. 20472

# LETTER OF MAP AMENDMENT
# DETERMINATION DOCUMENT (REMOVAL)
ATTACHMENT 1 (ADDITIONAL CONSIDERATIONS)

**DETERMINATION TABLE (CONTINUED)**

| LOT | BLOCK/ SECTION | SUBDIVISION | STREET | **OUTCOME** WHAT IS REMOVED FROM THE SFHA | FLOOD ZONE | 1% ANNUAL CHANCE FLOOD ELEVATION (NAVD 88) | LOWEST ADJACENT GRADE ELEVATION (NAVD 88) | LOWEST LOT ELEVATION (NAVD 88) |
|---|---|---|---|---|---|---|---|---|
| -- | -- | -- | 242 Cardinal Hill Lane | Structure (Garage) | X (unshaded) | 1781.4 feet | 1791.1 feet | -- |

**PORTIONS OF THE PROPERTY REMAIN IN THE SFHA (This Additional Consideration applies to the preceding 2 Properties.)**
Portions of this property, but not the subject of the Determination/Comment document, may remain in the Special Flood Hazard Area. Therefore, any future construction or substantial improvement on the property remains subject to Federal, State/Commonwealth, and local regulations for floodplain management.

**ZONE A (This Additional Consideration applies to the preceding 2 Properties.)**

The National Flood Insurance Program map affecting this property depicts a Special Flood Hazard Area that was determined using the best flood hazard data available to FEMA, but without performing a detailed engineering analysis. The flood elevation used to make this determination is based on approximate methods and has not been formalized through the standard process for establishing base flood elevations published in the Flood Insurance Study. This flood elevation is subject to change.

This attachment provides additional information regarding this request. If you have any questions about this attachment, please contact the FEMA Map Assistance Center toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, Engineering Library, 847 South Pickett Street, Alexandria, VA 22304-4605.

Luis Rodriguez, P.E., Chief
Engineering Management Branch
Federal Insurance and Mitigation Administration

Copy from re:SearchTX

# Federal Emergency Management Agency

Washington, D.C. 20472

# LETTER OF MAP AMENDMENT
## DETERMINATION DOCUMENT (REMOVAL)

| COMMUNITY AND MAP PANEL INFORMATION | | LEGAL PROPERTY DESCRIPTION |
|---|---|---|
| COMMUNITY | **KERR COUNTY, TEXAS (Unincorporated Areas)** | A parcel of land, as described in the Deed, filed for record on July 10, 1962, in the Office of the County Clerk, Kerr County, Texas |
| | **COMMUNITY NO.: 480419** | |
| AFFECTED MAP PANEL | **NUMBER: 48265C0450F** | |
| | **DATE: 3/3/2011** | |

**FLOODING SOURCE: CYPRESS CREEK; EDMUNSON CREEK; SOUTH FORK GUADALUPE RIVER**

**APPROXIMATE LATITUDE & LONGITUDE OF PROPERTY:30.009000, -99.370000**
**SOURCE OF LAT & LONG: GOOGLE EARTH PRO** **DATUM: NAD 83**

## DETERMINATION

| LOT | BLOCK/ SECTION | SUBDIVISION | STREET | OUTCOME WHAT IS REMOVED FROM THE SFHA | FLOOD ZONE | 1% ANNUAL CHANCE FLOOD ELEVATION (NAVD 88) | LOWEST ADJACENT GRADE ELEVATION (NAVD 88) | LOWEST LOT ELEVATION (NAVD 88) |
|---|---|---|---|---|---|---|---|---|
| -- | -- | -- | 2689 Highway 39 | Structure (Building 13) | X (shaded) | 1838.5 feet | 1843.5 feet | -- |

**Special Flood Hazard Area (SFHA)** - The SFHA is an area that would be inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood).

ADDITIONAL CONSIDERATIONS (Please refer to the appropriate section on Attachment 1 for the additional considerations listed below.)

DETERMINATION TABLE (CONTINUED)
PORTIONS REMAIN IN THE FLOODWAY

This document provides the Federal Emergency Management Agency's determination regarding a request for a Letter of Map Amendment for the property described above. Using the information submitted and the effective National Flood Insurance Program (NFIP) map, we have determined that the structure(s) on the property(ies) is/are not located in the SFHA, an area inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood). This document amends the effective NFIP map to remove the subject property from the SFHA located on the effective NFIP map; therefore, the Federal mandatory flood insurance requirement does not apply. However, the lender has the option to continue the flood insurance requirement to protect its financial risk on the loan.

This determination is based on the flood data presently available. The enclosed documents provide additional information regarding this determination. If you have any questions about this document, please contact the FEMA Mapping and Insurance eXchange (FMIX) toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, LOMC Clearinghouse, 3601 Eisenhower Avenue, Suite 500, Alexandria, VA 22304-6426.

Luis V. Rodriguez, P.E., Director
Engineering and Modeling Division
Federal Insurance and Mitigation Administration

Copy from re:SearchTX

Case 1:26-cv-01919-RP Document 1-1 Filed 07/13/26 Page 446 of 502

# Federal Emergency Management Agency

Washington, D.C. 20472

## LETTER OF MAP AMENDMENT DETERMINATION DOCUMENT (REMOVAL)

ATTACHMENT 1 (ADDITIONAL CONSIDERATIONS)

**DETERMINATION TABLE (CONTINUED)**

| LOT | BLOCK/ SECTION | SUBDIVISION | STREET | OUTCOME WHAT IS REMOVED FROM THE SFHA | FLOOD ZONE | 1% ANNUAL CHANCE FLOOD ELEVATION (NAVD 88) | LOWEST ADJACENT GRADE ELEVATION (NAVD 88) | LOWEST LOT ELEVATION (NAVD 88) |
|---|---|---|---|---|---|---|---|---|
| -- | -- | -- | 2689 Highway 39 | Structure (Building 19) | X (unshaded) | 1839.9 feet | 1855.7 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 27) | X (shaded) | 1839.0 feet | 1844.7 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 20) | X (shaded) | 1838.5 feet | 1842.5 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 26) | X (shaded) | 1838.5 feet | 1844.0 feet | -- |

**PORTIONS OF THE PROPERTY REMAIN IN THE FLOODWAY (This Additional Consideration applies to the preceding 5 Properties.)**

A portion of this property is located within the Special Flood Hazard Area and the National Flood Insurance Program (NFIP) regulatory floodway for the flooding source indicated on the Determination/Comment Document while the subject of this determination is not. The NFIP regulatory floodway is the area that must remain unobstructed in order to prevent unacceptable increases in base flood elevations. Therefore, no construction may take place in an NFIP regulatory floodway that may cause an increase in the base flood elevation, and any future construction or substantial improvement on the property remains subject to Federal, State/Commonwealth, and local regulations for floodplain management. The NFIP regulatory floodway is provided to the community as a tool to regulate floodplain development. Modifications to the NFIP regulatory floodway must be accepted by both the Federal Emergency Management Agency (FEMA) and the community involved. Appropriate community actions are defined in Paragraph 60.3(d) of the NFIP regulations. Any proposed revision to the NFIP regulatory floodway must be submitted to FEMA by community officials. The community should contact either the Regional Director (for those communities in Regions I-IV, and VI-X), or the Regional Engineer (for those communities in Region V) for guidance on the data which must be submitted for a revision to the NFIP regulatory floodway. Contact information for each regional office can be obtained by calling the FEMA Mapping and Insurance eXchange toll free at (877) 336-2627 (877-FEMA MAP) or from our web site at http://www.fema.gov/about/regoff.htm.

This attachment provides additional information regarding this request. If you have any questions about this attachment, please contact the FEMA Mapping and Insurance eXchange (FMIX) toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, LOMC Clearinghouse, 3601 Eisenhower Avenue, Suite 500, Alexandria, VA 22304-6426.

Luis V. Rodriguez, P.E., Director
Engineering and Modeling Division
Federal Insurance and Mitigation Administration

Copy from re:SearchTX

Case 1:26-cv-01919-RP Document 1-1 Filed 07/13/26 Page 447 of 502

# Federal Emergency Management Agency

Washington, D.C. 20472

# LETTER OF MAP AMENDMENT
## DETERMINATION DOCUMENT (REMOVAL)

| COMMUNITY AND MAP PANEL INFORMATION | | LEGAL PROPERTY DESCRIPTION |
|---|---|---|
| COMMUNITY | KERR COUNTY, TEXAS (Unincorporated Areas) | A parcel of land, as described in the Deed, filed for record on July 10, 1962, in the Office of the County Clerk, Kerr County, Texas |
| | COMMUNITY NO.: 480419 | |
| AFFECTED MAP PANEL | NUMBER: 48265C0450F | |
| | DATE: 3/3/2011 | |
| FLOODING SOURCE: CYPRESS CREEK; EDMUNSON CREEK; SOUTH FORK GUADALUPE RIVER | | APPROXIMATE LATITUDE & LONGITUDE OF PROPERTY:30.009000, -99.370000<br>SOURCE OF LAT & LONG: GOOGLE EARTH PRO DATUM: NAD 83 |

## DETERMINATION

| LOT | BLOCK/ SECTION | SUBDIVISION | STREET | OUTCOME WHAT IS REMOVED FROM THE SFHA | FLOOD ZONE | 1% ANNUAL CHANCE FLOOD ELEVATION (NAVD 88) | LOWEST ADJACENT GRADE ELEVATION (NAVD 88) | LOWEST LOT ELEVATION (NAVD 88) |
|---|---|---|---|---|---|---|---|---|
| -- | -- | -- | 2689 Highway 39 | Structure (Building 28) | X (unshaded) | 1838.9 feet | 1840.8 feet | -- |

**Special Flood Hazard Area (SFHA)** - The SFHA is an area that would be inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood).

ADDITIONAL CONSIDERATIONS (Please refer to the appropriate section on Attachment 1 for the additional considerations listed below.)

DETERMINATION TABLE (CONTINUED)
PORTIONS REMAIN IN THE FLOODWAY
ZONE A

This document provides the Federal Emergency Management Agency's determination regarding a request for a Letter of Map Amendment for the property described above. Using the information submitted and the effective National Flood Insurance Program (NFIP) map, we have determined that the structure(s) on the property(ies) is/are not located in the SFHA, an area inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood). This document amends the effective NFIP map to remove the subject property from the SFHA located on the effective NFIP map; therefore, the Federal mandatory flood insurance requirement does not apply. However, the lender has the option to continue the flood insurance requirement to protect its financial risk on the loan.

This determination is based on the flood data presently available. The enclosed documents provide additional information regarding this determination. If you have any questions about this document, please contact the FEMA Mapping and Insurance eXchange (FMIX) toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, LOMC Clearinghouse, 3601 Eisenhower Avenue, Suite 500, Alexandria, VA 22304-6426.

Luis V. Rodriguez, P.E., Director
Engineering and Modeling Division
Federal Insurance and Mitigation Administration

Copy from re:SearchTX

# Federal Emergency Management Agency

Washington, D.C. 20472

## LETTER OF MAP AMENDMENT DETERMINATION DOCUMENT (REMOVAL)

ATTACHMENT 1 (ADDITIONAL CONSIDERATIONS)

**DETERMINATION TABLE (CONTINUED)**

| LOT | BLOCK/ SECTION | SUBDIVISION | STREET | **OUTCOME** WHAT IS REMOVED FROM THE SFHA | FLOOD ZONE | 1% ANNUAL CHANCE FLOOD ELEVATION (NAVD 88) | LOWEST ADJACENT GRADE ELEVATION (NAVD 88) | LOWEST LOT ELEVATION (NAVD 88) |
|---|---|---|---|---|---|---|---|---|
| -- | -- | -- | 2689 Highway 39 | Structure (Building 22) | X (unshaded) | 1839.5 feet | 1849.0 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 35) | X (unshaded) | 1840.3 feet | 1848.0 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 14) | X (unshaded) | 1843.0 feet | 1847.8 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 38) | X (unshaded) | 1844.5 feet | 1849.9 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 37) | X (unshaded) | 1845.6 feet | 1852.0 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 39) | X (unshaded) | 1852.7 feet | 1856.2 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 36) | X (unshaded) | 1854.5 feet | 1856.4 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 7) | X (unshaded) | 1862.7 feet | 1867.0 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 18) | X (unshaded) | 1864.8 feet | 1866.5 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 2) | X (unshaded) | 1839.2 feet | 1861.1 feet | -- |

This attachment provides additional information regarding this request. If you have any questions about this attachment, please contact the FEMA Mapping and Insurance eXchange (FMIX) toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, LOMC Clearinghouse, 3601 Eisenhower Avenue, Suite 500, Alexandria, VA 22304-6426.

Luis V. Rodriguez, P.E., Director
Engineering and Modeling Division
Federal Insurance and Mitigation Administration

Copy from re:SearchTX

Case 1:26-cv-01919-RP Document 1-1 Filed 07/13/26 Page 449 of 502

# Federal Emergency Management Agency

Washington, D.C. 20472

## LETTER OF MAP AMENDMENT DETERMINATION DOCUMENT (REMOVAL)

ATTACHMENT 1 (ADDITIONAL CONSIDERATIONS)

| LOT | BLOCK/ SECTION | SUBDIVISION | STREET | OUTCOME WHAT IS REMOVED FROM THE SFHA | FLOOD ZONE | 1% ANNUAL CHANCE FLOOD ELEVATION (NAVD 88) | LOWEST ADJACENT GRADE ELEVATION (NAVD 88) | LOWEST LOT ELEVATION (NAVD 88) |
|---|---|---|---|---|---|---|---|---|
| -- | -- | -- | 2689 Highway 39 | Structure (Building 33) | X (unshaded) | 1839.2 feet | 1856.7 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 3) | X (unshaded) | 1839.6 feet | 1844.3 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 11) | X (unshaded) | 1840.0 feet | 1845.3 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 15) | X (unshaded) | 1840.2 feet | 1845.5 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 30) | X (unshaded) | 1840.4 feet | 1846.9 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 43) | X (unshaded) | 1843.1 feet | 1854.5 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 45) | X (unshaded) | 1843.6 feet | 1853.2 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 4) | X (unshaded) | 1843.3 feet | 1852.1 feet | -- |

This attachment provides additional information regarding this request. If you have any questions about this attachment, please contact the FEMA Mapping and Insurance eXchange (FMIX) toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, LOMC Clearinghouse, 3601 Eisenhower Avenue, Suite 500, Alexandria, VA 22304-6426.

Luis V. Rodriguez, P.E., Director
Engineering and Modeling Division
Federal Insurance and Mitigation Administration

Copy from re:SearchTX

# Federal Emergency Management Agency

Washington, D.C. 20472

## LETTER OF MAP AMENDMENT DETERMINATION DOCUMENT (REMOVAL)

ATTACHMENT 1 (ADDITIONAL CONSIDERATIONS)

**PORTIONS OF THE PROPERTY REMAIN IN THE FLOODWAY (This Additional Consideration applies to the preceding 19 Properties.)**

A portion of this property is located within the Special Flood Hazard Area and the National Flood Insurance Program (NFIP) regulatory floodway for the flooding source indicated on the Determination/Comment Document while the subject of this determination is not. The NFIP regulatory floodway is the area that must remain unobstructed in order to prevent unacceptable increases in base flood elevations. Therefore, no construction may take place in an NFIP regulatory floodway that may cause an increase in the base flood elevation, and any future construction or substantial improvement on the property remains subject to Federal, State/Commonwealth, and local regulations for floodplain management. The NFIP regulatory floodway is provided to the community as a tool to regulate floodplain development. Modifications to the NFIP regulatory floodway must be accepted by both the Federal Emergency Management Agency (FEMA) and the community involved. Appropriate community actions are defined in Paragraph 60.3(d) of the NFIP regulations. Any proposed revision to the NFIP regulatory floodway must be submitted to FEMA by community officials. The community should contact either the Regional Director (for those communities in Regions I-IV, and VI-X), or the Regional Engineer (for those communities in Region V) for guidance on the data which must be submitted for a revision to the NFIP regulatory floodway. Contact information for each regional office can be obtained by calling the FEMA Mapping and Insurance eXchange toll free at (877) 336-2627 (877-FEMA MAP) or from our web site at http://www.fema.gov/about/regoff.htm.

**ZONE A (This Additional Consideration applies to the preceding 19 Properties.)**

The National Flood Insurance Program map affecting this property depicts a Special Flood Hazard Area that was determined using the best flood hazard data available to FEMA, but without performing a detailed engineering analysis. The flood elevation used to make this determination is based on approximate methods and has not been formalized through the standard process for establishing base flood elevations published in the Flood Insurance Study. This flood elevation is subject to change.

This attachment provides additional information regarding this request. If you have any questions about this attachment, please contact the FEMA Mapping and Insurance eXchange (FMIX) toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, LOMC Clearinghouse, 3601 Eisenhower Avenue, Suite 500, Alexandria, VA 22304-6426.

Luis V. Rodriguez, P.E., Director
Engineering and Modeling Division
Federal Insurance and Mitigation Administration

Copy from re:SearchTX

Case 1:26-cv-01919-RP Document 1-1 Filed 07/13/26 Page 451 of 502

# Federal Emergency Management Agency

Washington, D.C. 20472

# LETTER OF MAP REVISION FLOODWAY DETERMINATION DOCUMENT (REMOVAL)

| COMMUNITY AND MAP PANEL INFORMATION | | LEGAL PROPERTY DESCRIPTION |
|---|---|---|
| COMMUNITY | KERR COUNTY, TEXAS (Unincorporated Areas) | A parcel of land, as described in the Deed, filed for record on July 10, 1962, in the Office of the County Clerk, Kerr County, Texas |
| | COMMUNITY NO.: 480419 | |
| AFFECTED MAP PANEL | NUMBER: 48265C0450F | |
| | DATE: 3/3/2011 | |

**FLOODING SOURCE: CYPRESS CREEK; EDMUNSON CREEK; SOUTH FORK GUADALUPE RIVER**

**APPROXIMATE LATITUDE & LONGITUDE OF PROPERTY: 30.009, -99.370**
**SOURCE OF LAT & LONG: GOOGLE EARTH PRO** **DATUM: NAD 83**

## DETERMINATION

| LOT | BLOCK/ SECTION | SUBDIVISION | STREET | OUTCOME WHAT IS REMOVED FROM THE SFHA | FLOOD ZONE | 1% ANNUAL CHANCE FLOOD ELEVATION (NAVD 88) | LOWEST ADJACENT GRADE ELEVATION (NAVD 88) | LOWEST LOT ELEVATION (NAVD 88) |
|---|---|---|---|---|---|---|---|---|
| -- | -- | -- | 2689 Highway 39 | Structure (Building 42) | X (shaded) | 1838.4 feet | 1843.4 feet | -- |

**Special Flood Hazard Area (SFHA)** - The SFHA is an area that would be inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood).

ADDITIONAL CONSIDERATIONS (Please refer to the appropriate section on Attachment 1 for the additional considerations listed below.)

DETERMINATION TABLE (CONTINUED)
INADVERTENT INCLUSION FLOODWAY 1
PORTIONS REMAIN IN THE SFHA

This document provides the Federal Emergency Management Agency's determination regarding a request for a Letter of Map Revision for the property described above. Using the information submitted and the effective National Flood Insurance Program (NFIP) map, we have determined that the structure(s) on the property(ies) is/are not located in the NFIP regulatory floodway or the SFHA, an area inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood). This document revises the effective NFIP map to remove the subject property from the NFIP regulatory floodway and the SFHA located on the effective NFIP map; therefore, the Federal mandatory flood insurance requirement does not apply. However, the lender has the option to continue the flood insurance requirement to protect its financial risk on the loan. A Preferred Risk Policy (PRP) is available for buildings located outside the SFHA. Information about the PRP and how one can apply is enclosed.

This determination is based on the flood data presently available. The enclosed documents provide additional information regarding this determination. If you have any questions about this document, please contact the FEMA Map Assistance Center toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, LOMC Clearinghouse, 847 South Pickett Street, Alexandria, VA 22304-4605.

Luis Rodriguez, P.E., Chief
Engineering Management Branch
Federal Insurance and Mitigation Administration

Copy from re:SearchTX

Case 1:26-cv-01919-RP Document 1-1 Filed 07/13/26 Page 452 of 502

# Federal Emergency Management Agency

Washington, D.C. 20472

# LETTER OF MAP REVISION FLOODWAY DETERMINATION DOCUMENT (REMOVAL)

ATTACHMENT 1 (ADDITIONAL CONSIDERATIONS)

**DETERMINATION TABLE (CONTINUED)**

| LOT | BLOCK/ SECTION | SUBDIVISION | STREET | OUTCOME WHAT IS REMOVED FROM THE SFHA | FLOOD ZONE | 1% ANNUAL CHANCE FLOOD ELEVATION (NAVD 88) | LOWEST ADJACENT GRADE ELEVATION (NAVD 88) | LOWEST LOT ELEVATION (NAVD 88) |
|---|---|---|---|---|---|---|---|---|
| -- | -- | -- | 2689 Highway 39 | Structure (Building 41) | X (shaded) | 1838.5 feet | 1842.3 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 40) | X (shaded) | 1838.4 feet | 1840.8 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 32) | X (shaded) | 1839.0 feet | 1841.1 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 25) | X (shaded) | 1838.9 feet | 1831.7 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 24) | X (shaded) | 1839.9 feet | 1847.5 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 23) | X (shaded) | 1838.4 feet | 1839.0 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 21) | X (shaded) | 1838.5 feet | 1842.3 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 16) | X (shaded) | 1838.4 feet | 1840.4 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 9) | X (shaded) | 1838.5 feet | 1840.9 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 5) | X (shaded) | 1838.5 feet | 1843.0 feet | -- |

This attachment provides additional information regarding this request. If you have any questions about this attachment, please contact the FEMA Map Assistance Center toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, LOMC Clearinghouse, 847 South Pickett Street, Alexandria, VA 22304-4605.

Luis Rodriguez, P.E., Chief
Engineering Management Branch
Federal Insurance and Mitigation Administration

Copy from re:SearchTX

Case 1:26-cv-01919-RP Document 1-1 Filed 07/13/26 Page 453 of 502

Federal Emergency Management Agency

Washington, D.C. 20472

# LETTER OF MAP REVISION FLOODWAY DETERMINATION DOCUMENT (REMOVAL)

ATTACHMENT 1 (ADDITIONAL CONSIDERATIONS)

| LOT | BLOCK/ SECTION | SUBDIVISION | STREET | OUTCOME WHAT IS REMOVED FROM THE SFHA | FLOOD ZONE | 1% ANNUAL CHANCE FLOOD ELEVATION (NAVD 88) | LOWEST ADJACENT GRADE ELEVATION (NAVD 88) | LOWEST LOT ELEVATION (NAVD 88) |
|---|---|---|---|---|---|---|---|---|
| -- | -- | -- | 2689 Highway 39 | Structure (Building 44) | X (shaded) | 1838.2 feet | 1842.8 feet | -- |
| -- | -- | -- | 2689 Highway 39 | Structure (Building 1) | X (shaded) | 1839.9 feet | 1858.1 feet | -- |
| -- | -- | -- | 2690 Highway 39 | Structure (Building 10) | X (shaded) | 1839.9 feet | 1854.3 feet | -- |
| -- | -- | -- | 2691 Highway 39 | Structure (Building 34) | X (shaded) | 1839.9 feet | 1854.4 feet | -- |

**INADVERTENT INCLUSION IN THE FLOODWAY 1 (PORTIONS OF THE PROPERTY REMAIN IN THE FLOODWAY) (This Additional Consideration applies to the preceding 15 Properties.)**

A portion of this property is located within the National Flood Insurance Program (NFIP) regulatory floodway for the flooding source indicated on the Determination Document, while the subject of this determination is not. The NFIP regulatory floodway is the area that must remain unobstructed in order to prevent unacceptable increases in base flood elevations. Therefore, no construction may take place in an NFIP regulatory floodway that may cause an increase in the base flood elevation, and any future construction or substantial improvement on the property remains subject to Federal, State/Commonwealth, and local regulations for floodplain management. The NFIP regulatory floodway is provided to the community as a tool to regulate floodplain development. Therefore, the NFIP regulatory floodway modification described in the Determination Document, while acceptable to the Federal Emergency Management Agency (FEMA), must also be acceptable to the community and adopted by appropriate community action, as specified in Paragraph 60.3(d) of the NFIP regulations. Any proposed revision to the NFIP regulatory floodway must be submitted to FEMA by community officials. The community should contact either the Regional Director (for those communities in Regions I-IV, and VI-X), or the Regional Engineer (for those communities in Region V) for guidance on the data which must be submitted for a revision to the NFIP regulatory floodway. Contact information for each regional office can be obtained by calling the FEMA Map Assistance Center toll free at (877) 336-2627 (877-FEMA MAP) or from our web site at http://www.fema.gov/about/regoff.htm.

This attachment provides additional information regarding this request. If you have any questions about this attachment, please contact the FEMA Map Assistance Center toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, LOMC Clearinghouse, 847 South Pickett Street, Alexandria, VA 22304-4605.

Luis Rodriguez, P.E., Chief
Engineering Management Branch
Federal Insurance and Mitigation Administration

Copy from re:SearchTX

Case 1:26-cv-01919-RP Document 1-1 Filed 07/13/26 Page 454 of 502

Federal Emergency Management Agency
Washington, D.C. 20472

# LETTER OF MAP REVISION FLOODWAY DETERMINATION DOCUMENT (REMOVAL)

ATTACHMENT 1 (ADDITIONAL CONSIDERATIONS)

**PORTIONS OF THE PROPERTY REMAIN IN THE SFHA (This Additional Consideration applies to the preceding 15 Properties.)**

Portions of this property, but not the subject of the Determination/Comment document, may remain in the Special Flood Hazard Area. Therefore, any future construction or substantial improvement on the property remains subject to Federal, State/Commonwealth, and local regulations for floodplain management.

This attachment provides additional information regarding this request. If you have any questions about this attachment, please contact the FEMA Map Assistance Center toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, LOMC Clearinghouse, 847 South Pickett Street, Alexandria, VA 22304-4605.

Luis Rodriguez, P.E., Chief
Engineering Management Branch
Federal Insurance and Mitigation Administration

Copy from re:SearchTX

Case 1:26-cv-01919-RP Document 1-1 Filed 07/13/26 Page 455 of 502

# Federal Emergency Management Agency

Washington, D.C. 20472

# LETTER OF MAP AMENDMENT DETERMINATION DOCUMENT (REMOVAL)

| COMMUNITY AND MAP PANEL INFORMATION | | LEGAL PROPERTY DESCRIPTION |
|---|---|---|
| COMMUNITY | KERR COUNTY, TEXAS (Unincorporated Areas) | Charles Eller Survey No. 634, Abstract No. 134, as described in the Deed of Trust, recorded as on October 31, 2013, in the Office of the County Clerk, Kerr County, Texas |
| | COMMUNITY NO.: 480419 | |
| AFFECTED MAP PANEL | NUMBER: 48265C0450F | |
| | DATE: 3/3/2011 | |

**FLOODING SOURCE: NORTH FORK GUADALUPE RIVER**

**APPROXIMATE LATITUDE & LONGITUDE OF PROPERTY: 30.065, -99.372**
**SOURCE OF LAT & LONG: GOOGLE EARTH PRO** **DATUM: NAD 83**

## DETERMINATION

| LOT | BLOCK/ SECTION | SUBDIVISION | STREET | OUTCOME WHAT IS REMOVED FROM THE SFHA | FLOOD ZONE | 1% ANNUAL CHANCE FLOOD ELEVATION (NAVD 88) | LOWEST ADJACENT GRADE ELEVATION (NAVD 88) | LOWEST LOT ELEVATION (NAVD 88) |
|---|---|---|---|---|---|---|---|---|
| -- | -- | -- | 685 FM 1340 | Structure | X (shaded) | -- | 1821.3 feet | -- |

**Special Flood Hazard Area (SFHA)** - The SFHA is an area that would be inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood).

ADDITIONAL CONSIDERATIONS (Please refer to the appropriate section on Attachment 1 for the additional considerations listed below.)

PORTIONS REMAIN IN THE FLOODWAY

This document provides the Federal Emergency Management Agency's determination regarding a request for a Letter of Map Amendment for the property described above. Using the information submitted and the effective National Flood Insurance Program (NFIP) map, we have determined that the structure(s) on the property(ies) is/are not located in the SFHA, an area inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood). This document amends the effective NFIP map to remove the subject property from the SFHA located on the effective NFIP map; therefore, the Federal mandatory flood insurance requirement does not apply. However, the lender has the option to continue the flood insurance requirement to protect its financial risk on the loan. A Preferred Risk Policy (PRP) is available for buildings located outside the SFHA. Information about the PRP and how one can apply is enclosed.

This determination is based on the flood data presently available. The enclosed documents provide additional information regarding this determination. If you have any questions about this document, please contact the FEMA Map Assistance Center toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, LOMC Clearinghouse, 847 South Pickett Street, Alexandria, VA 22304-4605.

Luis Rodriguez, P.E., Chief
Engineering Management Branch
Federal Insurance and Mitigation Administration

Copy from re:SearchTX

Case 1:26-cv-01919-RP Document 1-1 Filed 07/13/26 Page 456 of 502

Federal Emergency Management Agency
Washington, D.C. 20472

# LETTER OF MAP AMENDMENT
# DETERMINATION DOCUMENT (REMOVAL)

ATTACHMENT 1 (ADDITIONAL CONSIDERATIONS)

**PORTIONS OF THE PROPERTY REMAIN IN THE FLOODWAY (This Additional Consideration applies to the preceding 1 Property.)**

A portion of this property is located within the Special Flood Hazard Area and the National Flood Insurance Program (NFIP) regulatory floodway for the flooding source indicated on the Determination/Comment Document while the subject of this determination is not. The NFIP regulatory floodway is the area that must remain unobstructed in order to prevent unacceptable increases in base flood elevations. Therefore, no construction may take place in an NFIP regulatory floodway that may cause an increase in the base flood elevation, and any future construction or substantial improvement on the property remains subject to Federal, State/Commonwealth, and local regulations for floodplain management. The NFIP regulatory floodway is provided to the community as a tool to regulate floodplain development. Modifications to the NFIP regulatory floodway must be accepted by both the Federal Emergency Management Agency (FEMA) and the community involved. Appropriate community actions are defined in Paragraph 60.3(d) of the NFIP regulations. Any proposed revision to the NFIP regulatory floodway must be submitted to FEMA by community officials. The community should contact either the Regional Director (for those communities in Regions I-IV, and VI-X), or the Regional Engineer (for those communities in Region V) for guidance on the data which must be submitted for a revision to the NFIP regulatory floodway. Contact information for each regional office can be obtained by calling the FEMA Map Assistance Center toll free at (877) 336-2627 (877-FEMA MAP) or from our web site at http://www.fema.gov/about/regoff.htm.

This attachment provides additional information regarding this request. If you have any questions about this attachment, please contact the FEMA Map Assistance Center toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, LOMC Clearinghouse, 847 South Pickett Street, Alexandria, VA 22304-4605.

Luis Rodriguez, P.E., Chief
Engineering Management Branch
Federal Insurance and Mitigation Administration

Copy from re:SearchTX

# Exhibit D

Copy from re:SearchTX

[redacted]

13-002559

13-0001572746
01/14/2013 05:00 PM
FILED
TEXAS SECRETARY OF STATE
SOS
461172440002

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

% S. STACY EASTLAND, S. STACY EASTLAND, TRUSTEE OF THE S. STACY EASTLAND QSS TRUST, ET AL
3730 Piping Rock
Houston, Texas 77027

RECEIVED JAN 14 2013 CLK 62

NIL

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| NATURAL FOUNTAINS PROPERTIES, INC. | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2689 Highway 39 | Hunt | TX | 78024 | USA |
| 1d. SEE INSTRUCTIONS / ADD'L INFO RE ORGANIZATION DEBTOR / 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | | |
| corporation | Texas | 0013315900 | | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |
| 2d. SEE INSTRUCTIONS / ADD'L INFO RE ORGANIZATION DEBTOR / 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| EASTLAND | S. | STACY | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| %3730 Piping Rock | Houston | TX | 77027 | USA |

4. This FINANCING STATEMENT covers the following collateral:

3b continued> and S. STACY EASTLAND, TRUSTEE OF THE S. STACY EASTLAND QSS TRUST; NANCY E. LEATON AND NANCY E. LEATON, TRUSTEE OF THE NANCY E. LEATON QSS TRUST; GEORGE STACY AND PHILIP STACY

The Collateral more particularly described in Schedule I, attached hereto and incorporated herein by reference;

A portion of the Collateral may be affixed to the real property more particularly described in Exhibit "I" attached hereto and incorporated herein by reference.

NIL

5. ALTERNATIVE DESIGNATION [if applicable]: ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

6. ☑ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

Natural Fountains Properties, Inc. $7,250,000 Loan



Copy from re:SearchTX

## SCHEDULE I

## COLLATERAL

All of the right, title and interest of Debtor in and to the following types or items of property now or hereafter acquired by Debtor and all accessions or substitutions therefore and all products or proceeds thereof:

1. All improvements now or hereafter attached to or placed, erected, constructed or developed on the Land (collectively, the "Improvements");

2. All equipment, fixtures, furnishings, inventory, and articles of personal property leased or owned by Debtor (the "Personal Property") now or hereafter attached to or used in or about the Improvements or that are necessary or useful for the complete and comfortable use and occupancy of the Improvements for the purposes for which they were or are to be attached, placed, erected, constructed or developed, or which personal property is or may be used in or related to the planning, development, financing or operation of the Improvements, and all renewals of or replacements or substitutions for any of the foregoing, whether or not the same are or shall be attached to the Land or Improvements;

3. All water, and water rights, utility capacity (including any offer of reservation which may be granted by any governmental subdivision), timber, crops, and mineral interest pertaining to the Land;

4. All building materials and equipment now or hereafter delivered to and intended to be installed in or on the Land or the Improvements except items which are fixtures;

5. All plans and specifications for the Improvements if any;

6. All contracts relating to the Land, the Improvements or the Personal Property;

7. All deposits, bank accounts, funds, documents, contract rights, accounts, accounts receivable, commitments, construction contracts, architectural agreements, general intangibles (including, without limitation, trademarks, trade names and symbols) and instruments, notes or chattel paper arising from or by virtue of any transaction related to the Land, the Improvements or the Personal Property;

8. All permits, licenses, franchises, certificates, and other rights and privileges obtained in connection with the Land, the Improvements and the Personal Property;

9. All proceeds arising from or by virtue of the sale, lease or other disposition of the Land, the Improvements or the Personal Property;

10. All proceeds (including premium refunds) of each policy of insurance relating to the Land, the Improvements, or the Personal Property;



UNOFFICIAL

Copy from re:SearchTX

11. All proceeds from the taking of any of the Land, the Improvements, the Personal Property or any rights appurtenant thereto by right of domain or by probate or other purchase in lieu thereof, including change of grade of streets, curb cuts, or other rights of access, for any public or quasi-public use under any law;

12. All right, title, and interest of Debtor in and to all streets, roads, public places, easements, and rights-of-way, existing or proposed, public or private, adjacent to or used in connection with, belonging or pertaining to the Land;

13. All of the leases, rents, royalties, bonuses, issues, profits, revenues or the benefits of the Land, the Improvements or the Personal Property, including, without obligation, cash, or securities deposited pursuant to leases to secure performance by the lessees of their obligations there under;

14. All consumer goods located in, on or about the Land, Improvements or used in connection with the use or operation thereof;

15. All rights, interests, and appurtenances pertaining to the foregoing; and

16. All other interests of every kind and character that Debtor now has or at any time hereafter acquires in and to the Land, Improvements, and Personal Property described herein and all rights of ingress and egress and all reversionary rights or interests of Debtor with respect to such property.

UNOFFICIAL



Copy from re:SearchTX

EXHIBIT "A"

LEGAL

Tract I:
All that certain tract or parcel of land, lying and being situated in the County of Kerr, State of Texas, and being 720.05 acres of land, more or less, and being more fully described in Exhibit "A" attached hereto and made a part hereof.

Tract II:
All that certain tract or parcel of land, lying and being situated in the County of Kerr, State of Texas, and being 5.21 acres of land, more or less, and being more fully described in Exhibit "B" attached hereto and made a part hereof.

UNOFFICIAL

Copy from re:SearchTX

Tract 1: Exhibit "A"

FIELD NOTES DESCRIPTION FOR 720.05 ACRES OF THE CAMP MYSTIC LAND ON STATE HIGHWAY NO. 39 IN KERR COUNTY, TEXAS

Being all of a certain tract or parcel of land comprising approximate acreage out of various Original Patent Surveys in Kerr County, Texas as follows:

| Survey No. | Survey | Abstract No. | Acres |
|---|---|---|---|
| 1224 | Walter Griffin | 1568 | 315.53 |
| N½1226 | Cleveland Griffin | 1566 | 67.76 |
| E½ S. Mid. Pt.1226 | Walter Griffin | 1567 | 77.37 |
| W½ S. Mid. Pt.1226 | Walter Griffin | 2051 | 42.44 |
| 1357 | J. P. Edmonds | 739 | 160.09 |
| 1497 | W. R. Anderson | 724 | 56.86 |

comprising 1) part of 555.55 conveyed to Camp Mystic, Inc. from Mrs. Agnes D. Neff, et vir, by a Warranty Deed executed the 4th day of July, 1962 and recorded in Volume 112 at Page 606 of the Deed Records of Kerr County, Texas, 2) all of 0.515 acre conveyed to Camp Mystic, Inc. from Kerr County, Texas by a Quitclaim Deed executed the 13th day of January, 1975 and recorded in Volume 177 at Page 282 of the Deed Records of Kerr County, Texas, 3) part of 152.52 acres as "A" and all of 0.25 acre as "C" conveyed to Camp Mystic, Inc. from W. G. Stacy by a Warranty Deed executed the 12th day of November, 1979 and recorded in Volume 228 at Page 186 of the Deed Records of Kerr County, Texas, 4) all of 37.75 acres as Tract I, 0.17 acre as Tract II and 2.08 acres as Tract III conveyed to Camp Mystic, Inc. from Eileen L. Griffin by a Warranty Deed executed the 9th day of February, 1982 and recorded in Volume 257 at Page 480 of the Deed Records of Kerr County, Texas, and 5) all of 10.29 acres conveyed to Camp Mystic, Inc. from Eileen L. Griffin by a Warranty Deed executed the 9th day of November, 1987 and recorded in Volume 452 at Page 237 of the Real Property Records of Kerr County, Texas; and being more particularly described by metes and bounds as follows (record calls shown in parentheses):

BEGINNING at a four-way fence cornerpost for the easterly northeast corner of the herein described tract and said 555.55 acres, the northwest corner of 320.30 acres conveyed as Tract 4 to Cool Water, L.L.C. from Texas R & S Properties, Ltd. by a Special Warranty Deed executed the 19th day of April, 2000 and recorded in Volume 1061 at Page 130 of the Real Property Records of Kerr County, Texas; which point is at or near the northeast corner of said Survey No. 1224;

THENCE, along a fence with the common line between said 555.55 acres and said 320.30 acres: S.00°32'58"E. 2237.78 ft. (S.00°33'33"E. 2237.25 ft.) to an anglepost; and S.00°54'34"W. 347.32 ft. (S.00°51'08"W. 347.33 ft.) to a three-way cornerpost for the easterly southeast corner of the herein described tract and said 555.55 acres, the northeast corner of 2505.43 acres conveyed as Tract 1 to Cool Water, L.L.C. from Texas R & S Properties, Ltd. by said Special Warranty Deed executed the 19th day of April, 2000 and recorded in Volume 1061 at Page 130 of the Real Property Records of Kerr County, Texas, which point is at or near the southeast corner of said Survey No. 1224;

THENCE, along a fence with the common line between said 555.55 acres and said 2505.43 acres: N.89°11'16"W. 5321.57 ft. (N.89°10'59"W. 5322.11 ft.) to a cornerpost for a reentrant corner of the herein described tract and said 555.55 acres, a northwesterly corner of said 2505.43 acres, which point is at or near the southwest corner of said Survey No. 1224; S.00°56'52"W. 343.49 ft. (S.00°49'37"W. 344.55 ft.) to a cornerpost for the southerly southeast corner of the herein described tract and said 555.55 acres, a reentrant corner of said 2505.43 acres; and N.89°23'08"W. 654.03 ft. (N.89°17'42"W. 654.18 ft.) to a cornerpost at the southeast corner of 0.17 acre conveyed to Cool Water Lane, L.L.C. from Natural Fountain Properties, Inc. by a Special Warranty Deed executed the 23rd day of April, 2002 and recorded in Volume 1186 at Page 191 of the Real Property Records of Kerr County, Texas;

THENCE, upon, over and across said 555.55 acres: along a fence with the northeast line of said 0.17 acre, N.14°49'53"W. 231.14 ft. (N.14°57'12"W. 230.49 ft.) to a cornerpost at the northeast corner of said 0.17 acre for a reentrant corner of the herein described tract; and northwest of and diverging with said fence, S.68°41'59"W. 30.00 ft. (S.68°40'22"W. 30.00 ft.) to a ½" iron stake set at the northwest corner of said 0.17 acre, a reentrant corner of said



Copy from re:SearchTX

555.55 acres, the northeast corner of 1.37 acres conveyed to Cool Water Lane, L.L.C. from Natural Fountain Properties, Inc. by said Special Warranty Deed executed the 23rd day of April, 2002 and recorded in Volume 1186 at Page 191 of the Real Property Records of Kerr County, Texas;

THENCE, northwest of and converging with said fence, with the common line between said 555.55 acres and said 1.37 acres, S.69°07'50"W. 571.85 ft. (S.69°06'12"W. 572.42 ft.) to a fence anglepost in the north line of said 2505.43 acres;

THENCE, along a fence with the common line between said 555.55 acres and said 2505.43 acres, the north line of said 1.37 acres, N.89°19'03"W. 733.75 ft. (N.89°15'26"W. 733.63 ft.) to a ½" iron stake found at the northwest corner of said 1.37 acres;

THENCE, along a fence with the common line between said 555.55 acres and said 2505.43 acres, N.89°16'36"W. 1035.15 ft. (N.89°15'26"W. 1034.53 ft.) to a post at the northeast corner of 3.73 acres conveyed as First Tract to the County of Kerr, State of Texas from Mrs. Agnes D. Stacy, et al, by a Deed executed the 6th day of January, 1955 and recorded in Volume 98 at Page 51 of the Deed Records of Kerr County, Texas;

THENCE, along a fence with the northeast line of said 3.73 acres, each point marked with an anglepost: N.89°35'27"W., with the south line of said 555.55 acres, at approximately 200 ft. passing the southerly common corner of said 555.55 acres and said 152.52 acres, then with the south line of said 152.52 acres for a total distance of 1277.51 ft. (N.89°38'00"W. 1278.44 ft.); and with the southwest line of said 152.52 acres, N.70°02'19"W. (N.71°07'W.) 58.32 ft., N.36°01'18"W. (N.37°38'W.) 55.23 ft., N.17°27'14"W. (N.18°44'W.) 155.03 ft., N.15°14'12"W. (N.16°06'W.) 638.49 ft., N.26°53'26"W. (N.28°01'W.) 181.19 ft., N.41°12'44"W. (N.42°23'W.) 182.37 ft., N.37°52'34"W. (N.38°41'W.) 142.02 ft., N.24°37'12"W. (N.25°34'W.) 292.75 ft., N.09°10'17"W. (N.09°12'W.) 223.07 ft., and N.01°06'52"W. (N.02°20'W.) 827.00 ft. to a cornerpost for the westerly northwest corner of the herein described tract in the southeast right-of-way line of State Highway No. 39 in a 10°33'15" curve concave to the southeast having a radius of 542.90 ft.;

THENCE, along a fence with the southeast right-of-way line of said State Highway No. 39: 5.72 ft. with an arc of said 10°33'15" curve subtended by a central angle of 00°36'13" [long chord = N.63°38'32"E. 5.72 ft.] to a ½" iron stake found at its end; N.63°56'40"E. 234.80 ft. (N.62°45'E. 234.8 ft.) to a ½" iron stake set at the beginning of a 04°40'48" curve concave to the northwest having a radius of 1224.37 ft.; 337.19 ft. with an arc of said 04°40'48" curve subtended by a central angle of 15°46'44" [long chord = N.56°03'18"E. 336.12 ft.] to a ½" iron stake set at its end; N.48°09'56"E. 230.20 ft. (N.45°52'E. 230.2 ft.) to a ½" iron stake set at the beginning of a 04°29'33" curve concave to the southeast having a radius of 1275.48 ft.; and 78.42 ft. with an arc of said 04°29'33" curve subtended by a central angle of 03°31'22" [long chord = N.49°55'37"E. 78.41 ft.] to an unmarked point in the southwest line of 0.057 acre conveyed to Hill Country Telephone Cooperative, Inc. from Camp Mystic, Inc. by a Warranty Deed with Reverter Provision executed the 14th day of June, 1985 and recorded in Volume 330 at Page 439 of the Real Property Records of Kerr County, Texas, which point bears 2.42 ft. S.37°17'44"E. from a ½" iron stake found at the west corner of said 0.057 acre;

THENCE, upon, over and across said 152.52 acres: with the southwest line of said 0.057 acre, S.37°17'44"E. (S.40°32'E.) 47.72 to a ½" iron stake found at the south corner of said 0.057 acre for a reentrant corner of the herein described tract; with the southeast line of said 0.057 acre, N.53°03'47"E. 50.08 ft. (N.49°28'E. 50.0 ft.) to a ½" iron stake found at the east corner of said 0.057 acre for a reentrant corner of the herein described tract; and with the northeast line of said 0.057 acre, N.37°19'31"W. (N.40°32'W.) 47.94 to an unmarked point in or near a fence along the southeast right-of-way line of State Highway No. 39 in a 04°29'33" curve concave to the southeast having a radius of 1275.48 ft., which point bears 2.54 ft. S.37°19'31"E. from a ½" iron stake found at the north corner of said 0.057 acre;



Copy from re:SearchTX

THENCE, along a fence with the southeast right-of-way line of said State Highway No. 39: 80.45 ft. with an arc of said 04°29'33" curve subtended by a central angle of 03°36'50" [long chord = N.55°44'38"E. 80.44 ft.] to a ½" iron stake set at its end; N.57°33'03"E. 98.20 ft. (N.56°54'E. 98.2 ft.) to a ½" iron stake set at the beginning of a 06°18'54" curve concave to the southeast having a radius of 907.35 ft.; 235.56 ft. with an arc of said 06°18'54" curve subtended by a central angle of 14°52'29" [long chord = N.64°59'17"E. 234.90 ft.] to a ½" iron stake set at its end; N.72°25'32"E. (N.71°36'E.) 480.40 ft. to a set ½" iron stake; N.88°48'02"E. 291.00 ft. (N.86°56'E. 291.0 ft.) to a set ½" iron stake; N.28°05'33"E. 8.30 ft. (S.26°27'E. 8.3 ft.) to a set ½" iron stake; S.75°49'27"E. 71.00 ft. (S.77°28'E. 71.0 ft.) to a set ½" iron stake; and S.76°41'07"E. 121.81 ft. (S.79°29'E. 121.9 ft.) to a ½" iron stake set at the most westerly corner of said 0.515 acre, Volume 177 Page 282;

THENCE, along a fence continuing with the southeast right-of-way line of said State Highway No. 39, the northwest line of said 0.515 acre, N.61°10'09"E. 299.10 ft. (N.59°39'E. 299.1 ft.) to a ½" iron stake set at the north corner of said 0.515 acre, the west corner of said 0.17 acre, Tract II, Volume 257 Page 480, at the beginning of a 31°51'48" curve concave to the south having a radius of 179.83 ft.;

THENCE, continuing with the southerly right-of-way line of said State Highway No. 39: along a fence, 173.81 ft. with an arc of said 31°51'48" curve subtended by a central angle of 55°22'46" [long chord = N.88°51'32"E. 167.13 ft.] to a ½" iron stake set at its end; S.76°15'28"E. 71.58 ft. (S.77°07'E. 71.4 ft.) to a concrete right-of-way marker; S.63°26'55"E. 264.88 ft. (S.65°00'E. 264.9 ft.) to a concrete right-of-way marker; S.60°32'10"E. 333.52 ft. (S.62°05'E. 333.3 ft.) to a concrete right-of-way marker; S.65°29'36"E. 100.65 ft. (S.66°49'E. 99.4 ft.) to a concrete right-of-way marker; S.61°52'49"E. 78.15 ft. (S.63°28'E. 78.3 ft.) to a set ½" iron stake; S.61°22'35"E. 26.65 ft. (S.62°58'E. 26.7 ft.) to a set ½" iron stake; S.65°46'35"E. 27.05 ft. (S.67°22'E. 27.1 ft.) to a set ½" iron stake; S.74°01'35"E. 32.83 ft. (S.75°37'E. 32.9 ft.) to a set ½" iron stake; S.73°53'35"E. 67.26 ft. (S.75°29'E. 67.4 ft.) to a set ½" iron stake; S.70°47'35"E. 76.84 ft. (S.72°23'E. 77.0 ft.) to a set ½" iron stake; S.82°18'35"E. 104.19 ft. (S.83°54'E. 104.4 ft.) to a set ½" iron stake; N.86°11'25"E. 99.20 ft. (N.84°36'E. 99.4 ft.) to a set ½" iron stake; N.81°55'25"E., partly along a fence, 204.67 ft. (N.80°20'E. 205.1 ft.) to a found ½" iron stake; and along a fence, N.74°22'48"E. 53.45 ft. (N.72°49'E. 53.5 ft.) to a found ½" iron stake, N.79°18'58"E. 54.42 ft. (N.77°28'E. 54.2 ft.) to a found ½" iron stake, N.77°54'16"E. 102.86 ft. (N.76°27'E. 102.9 ft.) to an anglepost, N.76°22'22"E. 154.85 ft. (N.73°50'E. 154.6 ft.) to a found ½" iron stake, and N.72°28'49"E. 28.40 ft. (N.71°15'E. 28.5 ft.) to a ½" iron stake set at the westerly northwest corner of said 2.08 acres, Tract III, Volume 257 Page 480;

THENCE, along a fence, continuing with the southeasterly right-of-way line of said State Highway No. 39: with the northwest line of said 2.08 acres, N.59°36'48"E. 35.48 ft. (N.58°23'E. 35.6 ft.) to an anglepost, N.44°33'20"E. 200.55 ft. (N.43°03'E. 199.7 ft.) to an anglepost, and N.31°07'21"E., at approximately 84 ft. passing the northwesterly common corner of said 2.08 acres and said 10.29 acres, Volume 452 Page 237, then continuing with a northwest line of said 10.29 acres for a total distance of 210.98 ft. (N.29°55'E. 210.5 ft.) to a found ½" iron stake, N.30°43'23"E. 26.91 ft. (N.27°17'E. 27.2 ft.) to a found ½" iron stake, and N.20°39'16"E. 55.86 ft. (N.20°09'E. 55.6 ft.) to a ½" iron stake found for a reentrant corner of the herein described tract and said 10.29 acres;

THENCE, crossing said State Highway No. 39 with a southwest line of said 10.29 acres, N.70°12'22"W. 41.48 ft. (N.72°06'W. 41.6 ft.) to a ½" iron stake found at a fence anglepost in the northwest right-of-way line of said State Highway No. 39 for a reentrant corner of the herein described tract and said 10.29 acres;

THENCE, with the northwesterly right-of-way line of said State Highway No. 39: along a fence with a southeast line of said 10.29 acres, S.44°01'21"W. 82.02 ft. (S.42°23'W. 82.1 ft.) to a ½" iron stake found at the beginning of a 08°34'46" curve concave to the northwest having a radius of 667.87 ft.; along a fence with a southeast line of said 10.29 acres, at approximately 146.7 ft. passing the southeasterly common corner of said 10.29 acres and said 35.75 acres, Tract I, Volume 257 Page 480, then with the southerly line of said 35.75 acres for a total distance of 173.81 ft. with an arc of said 08°34'46" curve subtended by a central angle of 55°54'38" [long chord = S.53°55'09"W. 626.17 ft.] to a ½" iron stake found at its end; continuing with the southerly line of said 37.75 acres, S.81°52'27"W. 312.98 ft.



Copy from re:SearchTX

(S.80°20'W. 312.2 ft.) to a ½" iron stake found at the beginning of a 09°46'19" curve concave to the northeast having a radius of 586.37 ft., then 384.76 ft. with an arc of said 09°46'19" curve subtended by a central angle of 37°35'46" [long chord = N.79°19'40"W. 377.89 ft.] to a ½" iron stake found at its end, then N.60°31'47"W. 512.96 ft. (N.61°38'W. 512.89 ft.) to a found ½" iron stake, then N.63°27'05"W. 336.91 ft. (N.64°32'W. 336.99 ft.) to a ½" iron stake found at the beginning of a 20°28'36" curve concave to the south having a radius of 279.83 ft., then 270.47 ft. with an arc of said 20°28'36" curve subtended by a central angle of 55°22'46" [long chord = S.88°51'32"W. 260.06 ft.] to a ½" iron stake found at its end, and S.61°10'09"W., at approximately 72 ft. passing the south line of said 37.75 acres, then continuing for a total distance of 208.77 ft. (S.59°39'W. 210.5 ft.) to a ½" iron stake found at the beginning of a 24°19'59" curve concave to the northwest having a radius of 235.48 ft.; 165.30 ft. with an arc of said 24°19'59" curve subtended by a central angle of 40°13'10" [long chord = S.81°16'44"W. 161.93 ft.] to a ½" iron stake found at its end; S.73°36'49"W. 47.30 ft. (S.73°32'W. 47.3 ft.) to a set ½" iron stake; N.75°49'27"W. (N.74°46'W.) 61.46 ft. to a ½" iron stake set at the beginning of a 13°47'20" curve concave to the south having a radius of 415.55 ft.; and 138.64 ft. with an arc of said 13°47'20" curve subtended by a central angle of 19°06'59" [long chord = N.85°22'57"W. 138.00 ft.] to a ½" iron stake set at its end at the southerly common corner of said 0.25 acre, Tract C, Volume 228 Page 186, and Lot No. 1 of Holcombe-Fields Properties, a subdivision of record in Volume 50 at Page 566 of the Deed Records of Kerr County, Texas and in Volume 2 at Page 8A of the Plat Records of Kerr County, Texas, the southeast corner of the land conveyed to Willie B. Kipp from Donald E. Kipp by a Special Warranty Deed executed the 22nd day of September, 1958 and recorded in Volume 103 at Page 466 of the Deed Records of Kerr County, Texas;

THENCE, with the common line between said 0.25 acre and said Kipp land, North, with the east line of said Lot No. 1, at approximately 140 ft. passing its northeast corner, then continuing for a total distance of 180.00 ft. (North 180 ft.) to the northwest corner of said 0.25 acre, the northeast corner of said Kipp land, in the approximate center of the South Fork of the Guadalupe River in the south line of 411.75 acres conveyed to The Estate of Oscar F. Holcombe from Mary Grey Holcombe by a Warranty Deed executed the 1st day of January, 1969 and recorded in Volume 136 at Page 600 of the Deed Records of Kerr County, Texas;

THENCE, down the approximate center of the South Fork of said Guadalupe River with the common line between said 0.25 acre and said 411.75 acres, S.70°15'37"E. 111.22 ft. to the northeast corner of said 0.25 acre in the west line of said 37.75 acres;

THENCE, with the common line between said 37.75 acres and said 411.75 acres, N.01°18'04"E., at 222.66 ft. passing a fence endpost, then continuing along a fence for a total distance of 748.77 ft. (N.00°59'E. 748.77 ft.) to a ½" iron stake found at a three-way cornerpost for the northwest corner of said 37.75 acres, the southwest corner of 50.0 acres conveyed to Eric S. Greenfield, et ux, from Edna Thelma Robinson, et vir, by a Warranty Deed executed the 20th day of April, 1991 and recorded in Volume 590 at Page 40 of the Real Property Records of Kerr County, Texas;

THENCE, along a fence with the common line between said 37.75 acres and said 50.0 acres, S.78°22'25"E. 2027.73 ft. (S.79°29'E. 2028.61 ft.) to a fence post found at the northeasterly common corner of said 37.75 acres and said 10.29 acres;

THENCE, with the common line between said 10.29 acres and said 50.0 acres, S.78°22'25"E., along a fence, at approximately 820 ft. passing a three-way cornerpost in the northwest right-of-way line of said State Highway No. 39, then not along a fence crossing said State Highway No. 39, at 858 ft. passing a three-way cornerpost in the southeast right-of-way line of said State Highway No. 39, then partly along a fence, at 1131.2 ft. passing 0.7 ft. south of a ¼" iron stake near the northwest bank of said South Fork of the Guadalupe River, then continuing for a total distance of 1159.77 ft. (S.79°29'E. 1158.89 ft.) to the approximate center of said Guadalupe River at the southeasterly common corner of said 10.29 acres and said 50.0 acres in the northwest line of 100.9 acres conveyed to Glyn Griffin, et al, from Sibyl Griffin Brown by a Gift Deed executed the 20th day of October, 1997 and recorded in Volume 929 at Page 361 of the Real Property Records of Kerr County, Texas;



Copy from re:SearchTX

THENCE, up the approximate center of said Guadalupe River with the northwest line of said 100.9 acres: with the southeast line of said 10.29 acres, S.12°15'35"W. 127.84 ft. and S.38°42'35"W., at approximately 325 ft. passing the southeasterly common corner of said 10.29 acres and said 2.08 acres, then with the southeast line of said 2.08 acres for a total distance of 501.32 ft.; and continuing with the southeast line of said 2.08 acres, S.49°54'04"W. 463.01 ft. to the south corner of said 2.08 acres in the north line of said 555.55 acres;

THENCE, with the common line between said 555.55 acres and said 100.9 acres: S.06°18'55"W. 73.42 ft. to a ½" iron stake found at the southwest corner of said 100.9 acres; S.74°48'44"E., at 49.91 ft. passing a found ½" iron stake, then up a bluff, at 351.92 ft. passing a fence cornerpost, then continuing along a fence for a total distance of 798.01 ft. (S.75°47'58"E. 797.24 ft.) to a three-way cornerpost for a reentrant corner of the herein described tract; and continuing along a fence, N.01°36'48"E. 240.58 ft. (N.00°36'43"E. 240.58 ft.) to a cornerpost for a reentrant corner of said 100.9 acres and S.88°58'04"E. 2590.15 ft. (S.89°55'43"E. 2591.14 ft.) to a three-way cornerpost at the southeast corner of said 100.9 acres, the southwest corner of 171.57 acres conveyed to Cool Water, L.L.C. from Loren C. Jennings, et al, by a Special Warranty Deed executed the 31st day of July, 2003 and recorded in Volume 1289 at Page 222 of the Real Property Records of Kerr County, Texas;

THENCE, along a fence with the common line between said 555.55 acres and said 171.57 acres, each point marked with an anglepost: S.89°56'32"E. 121.02 ft. (N.89°56'37"E. 120.91 ft.); S.89°07'18"E. 134.17 ft. (S.88°57'23"E. 134.68 ft.); S.89°34'58"E. 207.21 ft. (S.89°39'33"E. 206.95 ft.); S.89°30'19"E. 110.86 ft. (S.89°19'13"E. 111.10 ft.); S.88°36'37"E. 348.50 ft. (S.88°38'31"E. 348.58 ft.); S.87°12'45"E. 158.75 ft. (S.87°14'39"E. 158.78 ft.); S.89°47'59"E. 58.61 ft. (S.89°38'44"E. 58.66 ft.); S.88°13'15"E. 83.94 ft. (S.88°14'31"E. 83.93 ft.); N.89°00'01"E. 138.48 ft. (N.88°58'45"E. 138.47 ft.); S.89°01'14"E. 62.03 ft. (S.88°34'09"E. 61.91 ft.); and S.88°50'44"E. 1369.49 ft. (S.88°49'18"E. 1364.39 ft. & S.89°02'01"E. 4.45 ft.) to the PLACE OF BEGINNING containing 720.05 acres of land, more or less, within these metes and bounds; INCLUDING approximately 0.2 acre within the right-of-way of State Highway No. 39; and SUBJECT TO THE RIGHTS OF THE STATE OF TEXAS, if any, to the land within the banks of said Guadalupe River.

I hereby certify that these field notes and accompanying plat are accurate descriptions of the property contained therein as determined by a survey made on the ground under my direction and supervision, and that all property corners are marked as stated. (Bearing basis = True north based on GPS observations)

Date surveyed: June 9, 2005 – April 10, 2007.

Dated this 29th day of October, 2012

Don W. Voelkel
Registered Professional Land Surveyor No. 3990

STATE OF TEXAS
REGISTERED
DON W. VOELKEL
3990
PROFESSIONAL
LAND SURVEYOR



Copy from re:SearchTX

Tract 2: Exhibit "B"

FIELD NOTES DESCRIPTION FOR 5.21 ACRES OF THE CAMP MYSTIC LAND ON STATE HIGHWAY NO. 39 IN KERR COUNTY, TEXAS

Being all of a certain tract or parcel of land comprising, approximately, 5.02 acres out of Cleveland Griffin N½ Survey No. 1226, Abstract No. 1566, and 0.19 acre out of R. C. Alexander Survey No. 1356, Abstract No. 877, in Kerr County, Texas; comprising all of 5.5 acres conveyed as Tract "B" to Camp Mystic, Inc. from W. G. Stacy by a Warranty Deed executed the 12th day of November, 1979 and recorded in Volume 228 at Page 186 of the Deed Records of Kerr County; including all of Lots No. 17, No. 18 and No. 18A of Holcombe-Fields Properties, a subdivision of record in Volume 50 at Page 566 of the Deed Records of Kerr County, Texas and in Volume 2 at Page 8A of the Plat Records of Kerr County, Texas; and being more particularly described by metes and bounds as follows (record calls shown in parentheses):

BEGINNING at a ½" iron stake set in the northwest right-of-way line of State Highway No. 39 for the east corner of the herein described tract and said 5.5 acres, the southeasterly common corner of Lots No. 16 and No. 17;

THENCE, with the southeast line of said 5.5 acres and said Lots No. 17, No. 18 and No. 18A, the northwest right-of-way line of said State Highway No. 39: S.63°56'40"W. (S.62°45'W.) 33.54 ft. to a ½" iron stake found at the beginning of a 09°30'15" curve concave to the southeast having a radius of 602.90 ft.; 448.09 ft. with an arc of said 09°30'15" curve subtended by a central angle of 42°35'00" (long chord = S.42°39'10"W. 437.85 ft.) to a ½" iron stake found at its end; and S.21°21'40"W. (S.20°10'W.), at approximately 140 ft. passing the northeast bank of the South Fork of the Guadalupe River, at approximately 190 ft. passing the approximate center of said river and the east line of 411.75 acres conveyed to The Estate of Oscar F. Holcombe from Mary Grey Holcombe by a Warranty Deed executed the 1st day of January, 1969 and recorded in Volume 136 at Page 600 of the Deed Records of Kerr County, Texas, then upon, over and across said 411.75 acres for a total distance of 242.18 ft. to the southwest bank of said river for the south corner of the herein described tract and said 5.5 acres;

THENCE, with the westerly line of said 5.5 acres, continuing upon, over and across said 411.75 acres with the westerly bank of said river: N.31°55'58"W. 190.34 ft.; N.18°54'50"W. 136.47 ft.; N.04°28'32"W. 181.92 ft.; N.00°08'17"W. 198.00 ft; and N.30°24'50"E. 182.47 ft. to the north corner of the herein described tract and said 5.5 acres;

THENCE, with the northeast line of said 5.5 acres, S.61°12'12"E. (S.63°30'E.), continuing upon, over and across said 411.75 acres, crossing said river, at approximately 73 ft. passing the approximate center of said river, the east line of said 411.75 acres, at 146.70 ft. passing a ½" iron stake found near the easterly bank of said river at the northwesterly common corner of said Lots No. 16 and No. 17, then continuing with the common line between said Lots No. 16 and No. 17 for a total distance of 550.27 ft. to the PLACE OF BEGINNING containing 5.21 acres of land, more or less, within these metes and bounds; INCLUDING approximately 0.9 acre also contained in the 411.75 acre tract; and SUBJECT TO THE RIGHTS of the State of Texas, if any, to the land within the banks of said Guadalupe River.

I hereby certify that these field notes and accompanying plat are accurate descriptions of the property contained therein as determined by a survey made on the ground under my direction and supervision, and that all property corners are marked as stated. (Bearing basis = True north based on GPS observations)

Date surveyed: June 9, 2005 – April 10, 2007

Dated this 29th day of October, 2012

STATE OF TEXAS REGISTERED DON W. VOELKEL 3990 PROFESSIONAL LAND SURVEYOR

Don W. Voelkel
Registered Professional Land Surveyor No. 3990

VOELKEL LAND SURVEYING, PLLC • PHONE: 830-257-3313 • 212 CLAY STREET, KERRVILLE, TEXAS 78028

Copy from re:SearchTX

UNOFFICIAL

THIS PAGE IS BEING ADDED SO THAT KERR COUNTY
WILL HAVE A PAGE TO ADD A FILE-STAMP

FILED AND RECORDED
AT 12:02 O'CLOCK PM
STATE OF TEXAS
COUNTY OF KERR

Apr 15, 2013

I hereby certify that this document was filed in the file numbered sequence on the date and time stamped hereon by me and was duly recorded in the Official Public Records of Kerr County, Texas
Jannett Pieper, Kerr County Clerk

By [signature] Deputy

Copy from re:SearchTX

# Exhibit E

Copy from re:SearchTX

12 - 7423

# SECOND LIEN DEED OF TRUST

116756

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## Terms

**Effective Date:** Nov 19, 2012

**Grantor:** NATURAL FOUNTAINS PROPERTIES, INC., a Texas corporation

**Grantor's Mailing Address:**

Attention: Richard G. Eastland
2689 Highway 39
Hunt, Kerr County, Texas 78024-3412

With copy of all notices to:

Bill Arnold
A. William Arnold, III & Associates
820 Main, Suite 100
Kerrville, Kerr County, Texas 78028

and

Timothy D. Zeiger
Shackelford Melton McKinley, LLP
3333 Lee Parkway
10th Floor
Dallas, Dallas County, Texas 75219

**Trustee: JEFFREY I. HOROWITZ, TRUSTEE**

**Trustee's Mailing Address:**

1401 McKinney, Suite 1700
Houston, Texas 77010

FILED BY AND RETURN TO:
33171
...COUNTY ABSTRACT & TITLE CO.
... Earl Garrett Street
...le, Texas 78028



UNOFFICIAL

Copy from re:SearchTX

**Lender:** S. STACY EASTLAND,

S. STACY EASTLAND, TRUSTEE OF THE S. STACY EASTLAND QSS TRUST,

NANCY E. LEATON,

NANCY E. LEATON, TRUSTEE OF THE NANCY E. LEATON QSS TRUST,

GEORGE B. STACY, and

PHILIP H. STACY

**Lender's Mailing Address:**

c/o S. Stacy Eastland and
S. Stacy Eastland, Trustee of the S. Stacy Eastland QSS Trust
3730 Piping Rock
Houston, Harris County, Texas 77027

With copy of all notices to:

Dan Bitting
Scott, Douglass & McConnico, LLP
600 Congress Avenue, Suite 1500
Austin, Travis County, Texas 78701-2589

and

C. Vance Christopher
Crain, Caton & James, PC
1401 McKinney, Suite 1700
Houston, Harris County, Texas 77010

Nancy E. Leaton and
Nancy E. Leaton, Nancy E. Leaton, Trustee of the Nancy E. Leaton QSS Trust
14121 Bluff Road
Brenham, Washington County, Texas 77833

With copy of all notices to:

Albert D. Pattillo, III
Pattillo Richards & Harpold



UNOFFICIAL

Copy from re:SearchTX

280 Thompson Drive
Kerrville, Kerr County, Texas 78028

Philip Stacy
P.O. Box 222
Hunt, Texas 78024

George Stacy
210 Rio Vista Road
P.O. Box 312
Ingram, Texas 78025

**Obligation:**

**The following ten (10) promissory notes**

1. Real Estate Lien Note of even date from Borrower payable to the order of S. Stacy Eastland in the original principal amount of $115,463.99;

2. Real Estate Lien Note of even date from Borrower payable to the order of S. Stacy Eastland, Trustee of the S. Stacy Eastland QSS Trust in the original principal amount of $188,925.30;

3. Real Estate Lien Note of even date from Borrower payable to the order of S. Stacy Eastland in the original principal amount of $1,144,154.27;

4. Real Estate Lien Note of even date from Borrower payable to the order of S. Stacy Eastland, Trustee of the S. Stacy Eastland QSS Trust in the original principal amount of $1,872,067.07;

5. Real Estate Lien Note of even date from Borrower payable to the order of Nancy Eastland Leaton in the original principal amount of $249,903.61;

6. Real Estate Lien Note of even date from Borrower payable to the order of Nancy Eastland Leaton, Trustee of the Nancy E. Leaton QSS Trust in the original principal amount of $54,485.68.

7. Real Estate Lien Note of even date from Borrower payable to the order of Nancy Eastland Leaton in the original principal amount of $2,476,317.73;

8. Real Estate Lien Note of even date from Borrower payable to the order of Nancy Eastland Leaton, Trustee of the Nancy E. Leaton QSS Trust in the original principal amount of $539,903.61;



UNOFFICIAL

Copy from re:SearchTX

9. Real Estate Lien Note of even date from Borrower payable to the order of George Stacy in the original principal amount of $304,389.37; and

10. Real Estate Lien Note of even date from Borrower payable to the order of Philip Stacy in the original principal amount of $304,389.37.

The rights of each Lender hereunder shall be *pari passu*. No Lender shall have any right or priority over any other Lender. Each Lender shall share equally in the benefit of this Deed of Trust.

**Property (including any improvements):**

The real property more particularly described in Exhibit "1," attached hereto and made a part hereof for all purposes.

**Prior Lien:**

Deed of Trust, Assignment of Rents, Security Agreement and Financing Statement from Borrower as Grantor to MIKE SOHN, TRUSTEE for the benefit of INTERNATIONAL BANK OF COMMERCE ("Prior Lender") to be recorded in the Official Public Records of Real Property of Kerr County, Texas (the "Prior Lien"), securing the payment of that certain Real Estate Lien Note (the "Prior Lien Note") of even date from Borrower to Prior Lender in the original principal amount of ONE MILLION AND NO/100 DOLLARS ($1,000,000.00) (the "Prior Lien Amount").

**Other Exceptions to Conveyance and Warranty:**

Those matters listed on Exhibit "2" and taxes for the current year not yet due and payable.

For value received and to secure payment of the Obligation, Grantor conveys the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property, subject to the Other Exceptions to Conveyance and Warranty. On payment of the Obligation and all other amounts secured by this deed of trust, this deed of trust will have no further effect, and Lender will release it at Grantor's expense.

**Clauses and Covenants**

**A. Grantor's Obligations**

Grantor agrees to—

1. keep the Property in good repair and condition in all material respects, normal wear and tear excepted, in a manner consistent with its operational history; however, so long as



UNOFFICIAL

Copy from re:SearchTX

the Prior Lien Note is unpaid, the satisfaction of the holder of the Prior Lien Note and the Prior Lien shall control;

2. pay all taxes and assessments on the Property before delinquency;

3. defend title to the Property subject to the Other Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;

4. maintain all insurance coverages with respect to the Property, revenues generated by the Property, and operations on the Property in accordance with the approved certificates of insurance delivered to Lender prior to the Effective Date ("Required Insurance Coverages"), and deliver evidence of the Required Insurance Coverages in a form ordinarily as provided by the insurer on or before the expiration of the Required Insurance Coverages, such insurance coverages to include liability insurance in such amounts as may be required by the Prior Lender. GRANTOR MAY FURNISH ANY INSURANCE REQUIRED BY THIS DEED OF TRUST EITHER THROUGH EXISTING POLICIES OWNED OR CONTROLLED BY GRANTOR, PROVIDED BY TENANT, OR THROUGH EQUIVALENT COVERAGE FROM ANY INSURANCE COMPANY AUTHORIZED TO TRANSACT BUSINESS IN TEXAS. Such policies shall name Lender as an additional insured or loss payee (and in connection with any property and casualty insurance, subject to the rights of the holder of the Prior Lien Note).

5. obey all laws, ordinances, and restrictive covenants applicable to the Property, however, so long as the Prior Lien Note is unpaid, the satisfaction of the holder of the Prior Lien Note and the Prior Lien shall control;

6. comply with all requirements of insurer of the Required Insurance Coverages;

7. pay or cause to be paid the Prior Lien Note according to its terms and abide by or cause to be abided by all security documents securing payment of the Prior Lien; however, so long as the Prior Lien Note is unpaid, the satisfaction of the holder of the Prior Lien Note and the Prior Lien shall control; and

8. notify Lender of any change of address.

9. furnish to Lender or other holder of the Obligation annually, before taxes become delinquent, copies of tax receipts showing that all taxes on the Property have been paid.

10. annually furnish to Lender or other holder of the Obligation evidence of current paid-up insurance naming Lender or other holder of the Obligation as an insured.

11. pursuant to two (2) business days advance written notice, allow Lender or Lender's agents to enter the Property at reasonable times and inspect it and any personal property in which Lender is granted a security interest by this deed of trust.



UNOFFICIAL

Copy from re:SearchTX

12. to execute, acknowledge, and deliver to Lender any necessary and proper document requested by Lender, at Lender's request from time to time, to (1) correct any defect, error, omission, or ambiguity in this deed of trust or in any other document executed in connection with the Obligation or this deed of trust; (2) comply with Grantor's obligations under this deed of trust and other documents; (3) perfect the liens and security interests of this deed of trust ; and (4) protect, perfect, or preserve the liens and the security interests of this deed of trust against third persons or make any recordings, file any notices, or obtain any consents requested by Lender in connection therewith. Grantor agrees to pay all costs of the foregoing.

**B. Lender's Rights**

1. Lender or Lender's mortgage servicer may appoint in writing one or more substitute trustees, succeeding to all rights and responsibilities of Trustee.

2. If the proceeds of the Obligation are used to pay any debt secured by prior liens, Lender is subrogated to all the rights and liens of the holders of any debt so paid.

3. Lender may apply any proceeds received under the property insurance policies covering the Property either to reduce the Obligation or to repair or replace damaged or destroyed improvements covered by the policy. With respect to any proceeds of $100,000 or less, if received by Lender, and if Grantor is not in default on the Obligation or this deed of trust, Lender will immediately make the property insurance proceeds available to Grantor for repairs. With respect to any proceeds greater than $100,000, if Grantor is not in default on the Obligation or this deed of trust, Lender and Grantor will jointly select a third party architect who will determine the amount necessary to repair the property and the draw schedule for construction, with any excess proceeds being applied to reduce the Obligation. If Grantor is in default at the time Lender receives any insurance proceeds, Lender may apply such proceeds to the Obligation.

4. If Lender receives any condemnation proceeds relating to improvements to the Property, and the Prior Note has been paid, Lender shall provide same to Grantor for the repair and restoration of such improvements as may be necessary and apply any remaining proceeds to the debt secured by this deed of trust.

5. Notwithstanding the terms of the Obligation to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantor with respect to the Obligation or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender with respect to the Obligation, to be applied to late charges, principal, or interest in the order Lender in its discretion determines.

6. If Grantor fails to perform any of Grantor's Obligations as set forth in Paragraph A above, Lender may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Obligation for matured, unpaid amounts. The amount to be



Copy from re:SearchTX

reimbursed will be secured by this deed of trust.

7. If there is a default on the Obligation or if Grantor fails to perform any of Grantor's Obligations as set forth in Paragraph A above, and the default continues after any required notice of the default and the time allowed to cure as provided in the Obligation, Lender may—

a. declare the unpaid principal balance and earned interest on the Obligation immediately due;

b. direct Trustee to foreclose this lien, in which case Lender or Lender's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

c. purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Obligation.

8. Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

**C. Trustee's Rights and Duties**

If directed by Lender to foreclose this lien, Trustee will—

1. either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

2. sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Prior Lien and to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

3. from the proceeds of the sale, pay, in this order—

a. expenses of foreclosure, including a reasonable commission to Trustee;

b. to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

c. any amounts required by law to be paid before payment to Grantor; and

d. to Grantor, any balance; and



UNOFFICIAL

Copy from re:SearchTX

4. be indemnified, held harmless, and defended by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

**D. General Provisions**

1. If any of the Property is sold pursuant to a foreclosure under this deed of trust, Grantor must immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor will become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2. Recitals in any trustee's deed conveying the Property will be presumed to be true.

3. Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4. This lien will remain superior to liens later created even if the time of payment of all or part of the Obligation is extended or part of the Property is released.

5. If any portion of the Obligation cannot be lawfully secured by this deed of trust, payments will be applied first to discharge that portion.

6. Subject to the rights of the holder of the Prior Note and Prior Lien, Grantor assigns to Lender all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees and court and other costs, Lender will either release any remaining amounts to Grantor or apply such amounts to reduce the Obligation. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately give Lender notice of any actual or threatened proceedings for condemnation of all or part of the Property.

7. Subject to the rights of the holder of the Prior Note and Prior Lien, Grantor assigns to Lender absolutely, not only as collateral, all present and future rent and other income and receipts from the Property. Grantor warrants the validity and enforceability of the assignment. Grantor may as Lender's licensee collect rent and other income and receipts as long as Grantor is not in default with respect to the Obligation or this deed of trust. Grantor will apply all rent and other income and receipts to payment of the installment payments set forth in the Prior Note and the Obligation and performance of the respective deeds of trust, but if the rent and other income and receipts exceed the amount due with respect to the installment payments set forth in the Prior Note and Obligation and the deed of trust, Grantor may retain the excess. If Grantor defaults in



COPY

Copy from re:SearchTX

Grantor defaults in payment of the Obligation or performance of this deed of trust which are not cured within the applicable cure period provided in the Prior Note or Obligation, Lender may terminate Grantor's license to collect rent and other income and then as Grantor's agent may rent the Property and collect all rent and other income and receipts. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under this paragraph without taking possession of the Property. Lender will apply all rent and other income and receipts collected under this paragraph first to expenses incurred in exercising Lender's rights and remedies and then to Grantor's obligations with respect to the Obligation and this deed of trust in the order determined by Lender. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies.

8. Interest on the debt secured by this deed of trust will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the debt.

9. In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

10. If Grantor sells, transfers, disposes of, assigns, or encumbers all or any part of the Property, whether voluntarily or by operation of law, without Lender's prior written consent (which consent may be withheld or conditioned in Lender's sole and absolute discretion), Lender may declare the Obligation immediately payable and invoke any remedies provided in this deed of trust for default.

11. Grantor may not cause or permit any Property to be encumbered by any liens, security interests, or encumbrances other than the liens securing the Prior Note, the Obligation, the liens securing ad valorem taxes not yet due and payable without the prior written consent of Lender, and any mechanic's or materialman's liens which are discharged within forty-five (45) days following their filing date. If granted, consent may be conditioned upon Grantor's executing, before granting such lien, a written modification agreement containing any terms Lender may require, such as a principal pay down on the Obligation, an increase in the rate of interest payable with respect to the Obligation, an approval fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligation.

12. Grantor agrees not to grant any lien or security interest in the Property or to permit any junior encumbrance to be recorded or any claim to otherwise become an encumbrance against the Property. If an involuntary encumbrance is filed against the Property, Grantor agrees, within forty-five (45) days, to either remove the involuntary encumbrance or provide a bond acceptable



Copy from re:SearchTX

acceptable to Lender against the involuntary encumbrance.

Moreover, Grantor may not cause or permit the dissolution, winding up, termination or conversion of Grantor or the sale, pledge, encumbrance, or assignment of any shares of Grantor's stock or other ownership interests without the prior written consent of Lender (which consent may be withheld or conditioned by Lender in its sole and absolute discretion); however, a conversion of NFP to a limited liability company, or any transfer (whether voluntary or involuntary) to a descendent of Agnes Doran Stacy, or a spouse of a descendant of Agnes Doran Stacy, or a trust created for a descendent of Agnes Doran Stacy or his or her spouse, shall not require the prior consent of Lender if after such conversion or transfer, together with any prior conversion or transfers, and so long as Richard G. Eastland is alive, (a) Richard G. Eastland retains sole direct control of the management of Grantor, and (b) Richard G. Eastland directly owns the majority of all classes of stock, limited liability company interests or other ownership interests of Grantor. In the event of a violation of this paragraph, Lender may declare the Obligation immediately payable and invoke any remedies provided in this deed of trust for default.

**E. Miscellaneous Provision**

1. When the context requires, singular nouns and pronouns include the plural.

2. The term Note or Obligation includes all extensions, modifications, and renewals of the Note or Obligation and all amounts secured by this deed of trust.

3. This deed of trust binds, benefits, and may be enforced by the successors in interest of all parties.

4. If Grantor and Borrower are not the same person, the term Grantor includes Borrower.

5. In the event of litigation of disputes arising out of this deed of trust the prevailing party shall be entitled to recover judgment for reasonable attorney's fees, and court and other costs of litigation from the non-prevailing party or parties.

6. If any provision of this deed of trust is determined to be invalid or unenforceable, the validity or enforceability of any other provision will not be affected.

7. The lien created by this deed of trust will be subordinate to the lien securing payment of the Prior Lien and any renewals, extensions, and modifications thereof only to the extent of the Prior Lien Amount and any unpaid interest accrued thereon or other amounts advanced by the Prior Lender necessary to protect the priority of the Prior Lien, and no other advances or other amounts exceeding unpaid principal balance of the Prior Lien Amount shall have secured priority over the lien of this deed of trust. Any act or occurrence that would constitute default under the terms of any lien superior to the lien securing the Obligation will



OFFICIAL

Copy from re:SearchTX

constitute a default under this Deed of Trust securing the Obligation. If default occurs in payment of any part of principal or interest of the note secured by the Prior Lien or in observance of any covenants of the Prior Lien which is not cured within the cure period provided thereunder, the entire debt secured by this deed of trust will immediately become payable at the option of Lender.

8. In addition to creating a deed of trust lien on all the Property, Grantor also grants to Lender a second priority security interest in all of Grantor's personal property located on the Property pursuant to and to the extent permitted by the Texas Uniform Commercial Code. In the event of a foreclosure sale under this deed of trust, Grantor agrees that all the Property may be sold as a whole at Lender's option.

9. Grantor will have full recourse liability for repayment of the principal and interest of the Obligation and the performance of all covenants and agreements of Grantor in this Deed of Trust.

NEXT PAGE IS THE SIGNATURE PAGE

UNOFFICIAL



Copy from re:SearchTX

Executed on the Effective Date.

NATURAL FOUNTAINS PROPERTIES, INC.
a Texas corporation

By: Richard Capps
RICHARD CAPPS
Title: President

STATE OF TEXAS §
§
COUNTY OF Bexar §

This instrument was acknowledged before me on 10.29, 2012, by RICHARD CAPPS, President of NATURAL FOUNTAINS PROPERTIES, INC., a Texas corporation, on behalf of said corporation.

SHELLY HENZE
Notary Public
State of Texas
My Comm. Expires 11-18-2015

Shelly Henze
Notary Public in and for the State of Texas

PRESIDIO TITLE
7373 BROADWAY, STE. 105
SAN ANTONIO, TEXAS 78209

UNOFFICIAL



Copy from re:SearchTX

## EXHIBIT "A"

## LEGAL

**Tract I:**
All that certain tract or parcel of land, lying and being situated in the County of Kerr, State of Texas, and being 720.05 acres of land, more or less, and being more fully described in Exhibit "A" attached hereto and made a part hereof.

**Tract II:**
All that certain tract or parcel of land, lying and being situated in the County of Kerr, State of Texas, and being 5.21 acres of land, more or less, and being more fully described in Exhibit "B" attached hereto and made a part hereof.

UNOFFICIAL

Copy from re:SearchTX

Tract 1: Exhibit "A"

FIELD NOTES DESCRIPTION FOR 720.05 ACRES OF THE CAMP MYSTIC LAND ON STATE HIGHWAY NO. 39 IN KERR COUNTY, TEXAS

Being all of a certain tract or parcel of land comprising approximate acreage out of various Original Patent Surveys in Kerr County, Texas as follows:

| Survey No. | Survey | Abstract No. | Acres |
|---|---|---|---|
| 1224 | Walter Griffin | 1568 | 315.53 |
| N½1226 | Cleveland Griffin | 1566 | 67.76 |
| E½ S. Mid. Pt.1226 | Walter Griffin | 1567 | 77.37 |
| W½ S. Mid. Pt.1226 | Walter Griffin | 2051 | 42.44 |
| 1357 | J. F. Edmonds | 739 | 160.09 |
| 1497 | W. R. Anderson | 724 | 56.86 |

comprising 1) part of 555.55 conveyed to Camp Mystic, Inc. from Mrs. Agnes D. Neff, et vir, by a Warranty Deed executed the 4th day of July, 1962 and recorded in Volume 112 at Page 606 of the Deed Records of Kerr County, Texas, 2) all of 0.515 acre conveyed to Camp Mystic, Inc. from Kerr County, Texas by a Quitclaim Deed executed the 13th day of January, 1975 and recorded in Volume 177 at Page 282 of the Deed Records of Kerr County, Texas, 3) part of 152.52 acres as "A" and all of 0.25 acre as "C" conveyed to Camp Mystic, Inc. from W. G. Stacy by a Warranty Deed executed the 12th day of November, 1979 and recorded in Volume 228 at Page 186 of the Deed Records of Kerr County, Texas, 4) all of 37.75 acres as Tract I, 0.17 acre as Tract II and 2.08 acres as Tract III conveyed to Camp Mystic, Inc. from Eileen L. Griffin by a Warranty Deed executed the 9th day of February, 1982 and recorded in Volume 257 at Page 480 of the Deed Records of Kerr County, Texas, and 5) all of 10.29 acres conveyed to Camp Mystic, Inc. from Eileen L. Griffin by a Warranty Deed executed the 9th day of November, 1987 and recorded in Volume 452 at Page 237 of the Real Property Records of Kerr County, Texas; and being more particularly described by metes and bounds as follows (record calls shown in parentheses):

BEGINNING at a four-way fence cornerpost for the easterly northeast corner of the herein described tract and said 555.55 acres, the northwest corner of 320.30 acres conveyed as Tract 4 to Cool Water, L.L.C. from Texas R & S Properties, Ltd. by a Special Warranty Deed executed the 19th day of April, 2000 and recorded in Volume 1061 at Page 130 of the Real Property Records of Kerr County, Texas; which point is at or near the northeast corner of said Survey No. 1224;

THENCE, along a fence with the common line between said 555.55 acres and said 320.30 acres: S.00°32'58"E. 2237.78 ft. (S.00°33'33"E. 2237.25 ft.) to an anglepost; and S.00°54'34"W. 347.32 ft. (S.00°51'08"W. 347.33 ft.) to a three-way cornerpost for the easterly southeast corner of the herein described tract and said 555.55 acres, the northeast corner of 2505.43 acres conveyed as Tract 1 to Cool Water, L.L.C. from Texas R & S Properties, Ltd. by said Special Warranty Deed executed the 19th day of April, 2000 and recorded in Volume 1061 at Page 130 of the Real Property Records of Kerr County, Texas, which point is at or near the southeast corner of said Survey No. 1224;

THENCE, along a fence with the common line between said 555.55 acres and said 2505.43 acres: N.89°11'16"W. 5321.57 ft. (N.89°10'59"W. 5322.11 ft.) to a cornerpost for a reentrant corner of the herein described tract and said 555.55 acres, a northwesterly corner of said 2505.43 acres, which point is at or near the southwest corner of said Survey No. 1224; S.00°56'52"W. 343.49 ft. (S.00°49'37"W. 344.55 ft.) to a cornerpost for the southerly southeast corner of the herein described tract and said 555.55 acres, a reentrant corner of said 2505.43 acres; and N.89°23'08"W. 654.03 ft. (N.89°17'42"W. 654.18 ft.) to a cornerpost at the southeast corner of 0.17 acre conveyed to Cool Water Lane, L.L.C. from Natural Fountain Properties, Inc. by a Special Warranty Deed executed the 23rd day of April, 2002 and recorded in Volume 1186 at Page 191 of the Real Property Records of Kerr County, Texas;

THENCE, upon, over and across said 555.55 acres: along a fence with the northeast line of said 0.17 acre, N.14°49'53"W. 231.14 ft. (N.14°57'12"W. 230.49 ft.) to a cornerpost at the northeast corner of said 0.17 acre for a reentrant corner of the herein described tract; and northwest of and diverging with said fence, S.68°41'59"W. 30.00 ft. (S.68°40'22"W. 30.00 ft.) to a ½" iron stake set at the northwest corner of said 0.17 acre, a reentrant corner of said



Copy from re:SearchTX

555.55 acres, the northeast corner of 1.37 acres conveyed to Cool Water Lane, L.L.C. from Natural Fountain Properties, Inc. by said Special Warranty Deed executed the 23rd day of April, 2002 and recorded in Volume 1186 at Page 191 of the Real Property Records of Kerr County, Texas;

THENCE, northwest of and converging with said fence, with the common line between said 555.55 acres and said 1.37 acres, S.69°07'50"W. 571.85 ft. (S.69°06'12"W. 572.42 ft.) to a fence anglepost in the north line of said 2505.43 acres;

THENCE, along a fence with the common line between said 555.55 acres and said 2505.43 acres, the north line of said 1.37 acres, N.89°19'03"W. 733.75 ft. (N.89°15'26"W. 733.63 ft.) to a ½" iron stake found at the northwest corner of said 1.37 acres;

THENCE, along a fence with the common line between said 555.55 acres and said 2505.43 acres, N.89°16'36"W. 1035.15 ft. (N.89°15'26"W. 1034.53 ft.) to a post at the northeast corner of 3.73 acres conveyed as First Tract to the County of Kerr, State of Texas from Mrs. Agnes D. Stacy, et al, by a Deed executed the 6th day of January, 1955 and recorded in Volume 98 at Page 51 of the Deed Records of Kerr County, Texas;

THENCE, along a fence with the northeast line of said 3.73 acres, each point marked with an anglepost: N.89°35'27"W., with the south line of said 555.55 acres, at approximately 200 ft. passing the southerly common corner of said 555.55 acres and said 152.52 acres, then with the south line of said 152.52 acres for a total distance of 1277.51 ft. (N.89°38'00"W. 1278.44 ft.); and with the southwest line of said 152.52 acres, N.70°02'19"W. (N.71°07'W.) 58.32 ft., N.36°01'18"W. (N.37°38'W.) 55.23 ft., N.17°27'14"W. (N.18°44'W.) 155.03 ft., N.15°14'12"W. (N.16°06'W.) 638.49 ft., N.26°53'26"W. (N.28°01'W.) 181.19 ft., N.41°12'44"W. (N.42°23'W.) 182.37 ft., N.37°52'34"W. (N.38°41'W.) 142.02 ft., N.24°37'12"W. (N.25°34'W.) 292.75 ft., N.09°10'17"W. (N.09°12'W.) 223.07 ft., and N.01°06'52"W. (N.02°20'W.) 827.00 ft. to a cornerpost for the westerly northwest corner of the herein described tract in the southeast right-of-way line of State Highway No. 39 in a 10°33'15" curve concave to the southeast having a radius of 542.90 ft.;

THENCE, along a fence with the southeast right-of-way line of said State Highway No. 39: 5.72 ft. with an arc of said 10°33'15" curve subtended by a central angle of 00°36'13" [long chord = N.63°38'32"E. 5.72 ft.] to a ½" iron stake found at its end; N.63°56'40"E. 234.80 ft. (N.62°45'E. 234.8 ft.) to a ½" iron stake set at the beginning of a 04°40'48" curve concave to the northwest having a radius of 1224.37 ft.; 337.19 ft. with an arc of said 04°40'48" curve subtended by a central angle of 15°46'44" [long chord = N.56°03'18"E. 336.12 ft.] to a ½" iron stake set at its end; N.48°09'56"E. 230.20 ft. (N.45°52'E. 230.2 ft.) to a ½" iron stake set at the beginning of a 04°29'33" curve concave to the southeast having a radius of 1275.48 ft.; and 78.42 ft. with an arc of said 04°29'33" curve subtended by a central angle of 03°31'22" [long chord = N.49°55'37"E. 78.41 ft.] to an unmarked point in the southwest line of 0.057 acre conveyed to Hill Country Telephone Cooperative, Inc. from Camp Mystic, Inc. by a Warranty Deed with Reverter Provision executed the 14th day of June, 1985 and recorded in Volume 330 at Page 439 of the Real Property Records of Kerr County, Texas, which point bears 2.42 ft. S.37°17'44"E. from a ½" iron stake found at the west corner of said 0.057 acre;

THENCE, upon, over and across said 152.52 acres: with the southwest line of said 0.057 acre, S.37°17'44"E. (S.40°32'E.) 47.72 to a ½" iron stake found at the south corner of said 0.057 acre for a reentrant corner of the herein described tract; with the southeast line of said 0.057 acre, N.53°03'47"E. 50.08 ft. (N.49°28'E. 50.0 ft.) to a ½" iron stake found at the east corner of said 0.057 acre for a reentrant corner of the herein described tract; and with the northeast line of said 0.057 acre, N.37°19'31"W. (N.40°32'W.) 47.94 to an unmarked point in or near a fence along the southeast right-of-way line of State Highway No. 39 in a 04°29'33" curve concave to the southeast having a radius of 1275.48 ft., which point bears 2.54 ft. S.37°19'31"E. from a ½" iron stake found at the north corner of said 0.057 acre;



Copy from re:SearchTX

THENCE, along a fence with the southeast right-of-way line of said State Highway No. 39: 80.45 ft. with an arc of said 04°29'33" curve subtended by a central angle of 03°36'50" [long chord = N.55°44'38"E. 80.44 ft.] to a ½" iron stake set at its end; N.57°33'03"E. 98.20 ft. (N.56°54'E. 98.2 ft.) to a ½" iron stake set at the beginning of a 06°18'54" curve concave to the southeast having a radius of 907.35 ft.; 235.56 ft. with an arc of said 06°18'54" curve subtended by a central angle of 14°52'29" [long chord = N.64°59'17"E. 234.90 ft.] to a ½" iron stake set at its end; N.72°25'32"E. (N.71°36'E.) 480.40 ft. to a set ½" iron stake; N.88°48'02"E. 291.00 ft. (N.86°56'E. 291.0 ft.) to a set ½" iron stake; N.28°05'33"E. 8.30 ft. (S.26°27'E. 8.3 ft.) to a set ½" iron stake; S.75°49'27"E. 71.00 ft. (S.77°28'E. 71.0 ft.) to a set ½" iron stake; and S.76°41'07"E. 121.81 ft. (S.79°29'E. 121.9 ft.) to a ½" iron stake set at the most westerly corner of said 0.515 acre, Volume 177 Page 282;

THENCE, along a fence continuing with the southeast right-of-way line of said State Highway No. 39, the northwest line of said 0.515 acre, N.61°10'09"E. 299.10 ft. (N.59°39'E. 299.1 ft.) to a ½" iron stake set at the north corner of said 0.515 acre, the west corner of said 0.17 acre, Tract II, Volume 257 Page 480, at the beginning of a 31°51'48" curve concave to the south having a radius of 179.83 ft.;

THENCE, continuing with the southerly right-of-way line of said State Highway No. 39: along a fence, 173.81 ft. with an arc of said 31°51'48" curve subtended by a central angle of 55°22'46" [long chord = N.88°51'32"E. 167.13 ft.] to a ½" iron stake set at its end; S.76°15'28"E. 71.58 ft. (S.77°07'E. 71.4 ft.) to a concrete right-of-way marker; S.63°26'55"E. 264.88 ft. (S.65°00'E. 264.9 ft.) to a concrete right-of-way marker; S.60°32'10"E. 333.52 ft. (S.62°05'E. 333.3 ft.) to a concrete right-of-way marker; S.65°29'36"E. 100.65 ft. (S.66°49'E. 99.4 ft.) to a concrete right-of-way marker; S.61°52'49"E. 78.15 ft. (S.63°28'E. 78.3 ft.) to a set ½" iron stake; S.61°22'35"E. 26.65 ft. (S.62°58'E. 26.7 ft.) to a set ½" iron stake; S.65°46'35"E. 27.05 ft. (S.67°22'E. 27.1 ft.) to a set ½" iron stake; S.74°01'35"E. 32.83 ft. (S.75°37'E. 32.9 ft.) to a set ½" iron stake; S.73°53'35"E. 67.26 ft. (S.75°29'E. 67.4 ft.) to a set ½" iron stake; S.70°47'35"E. 76.84 ft. (S.72°23'E. 77.0 ft.) to a set ½" iron stake; S.82°18'35"E. 104.19 ft. (S.83°54'E. 104.4 ft.) to a set ½" iron stake; N.86°11'25"E. 99.20 ft. (N.84°36'E. 99.4 ft.) to a set ½" iron stake; N.81°55'25"E., partly along a fence, 204.67 ft. (N.80°20'E. 205.1 ft.) to a found ½" iron stake; and along a fence, N.74°22'48"E. 53.45 ft. (N.72°49'E. 53.5 ft.) to a found ½" iron stake; N.79°18'58"E. 54.42 ft. (N.77°28'E. 54.2 ft.) to a found ½" iron stake, N.77°54'16"E. 102.86 ft. (N.76°27'E. 102.9 ft.) to an anglepost, N.76°22'22"E. 154.85 ft. (N.73°50'E. 154.6 ft.) to a found ½" iron stake, and N.72°28'49"E. 28.40 ft. (N.71°15'E. 28.5 ft.) to a ½" iron stake set at the westerly northwest corner of said 2.08 acres, Tract III, Volume 257 Page 480;

THENCE, along a fence, continuing with the southeasterly right-of-way line of said State Highway No. 39: with the northwest line of said 2.08 acres, N.59°36'48"E. 35.48 ft. (N.58°23'E. 35.6 ft.) to an anglepost, N.44°33'20"E. 200.55 ft. (N.43°03'E. 199.7 ft.) to an anglepost, and N.31°07'21"E., at approximately 84 ft. passing the northwesterly common corner of said 2.08 acres and said 10.29 acres, Volume 452 Page 237, then continuing with a northwest line of said 10.29 acres for a total distance of 210.98 ft. (N.29°55'E. 210.5 ft.) to a found ½" iron stake, N.30°43'23"E. 26.91 ft. (N.27°17'E. 27.2 ft.) to a found ½" iron stake, and N.20°39'16"E. 55.86 ft. (N.20°09'E. 55.6 ft.) to a ½" iron stake found for a reentrant corner of the herein described tract and said 10.29 acres;

THENCE, crossing said State Highway No. 39 with a southwest line of said 10.29 acres, N.70°12'22"W. 41.48 ft. (N.72°06'W. 41.6 ft.) to a ½" iron stake found at a fence anglepost in the northwest right-of-way line of said State Highway No. 39 for a reentrant corner of the herein described tract and said 10.29 acres;

THENCE, with the northwesterly right-of-way line of said State Highway No. 39: along a fence with a southeast line of said 10.29 acres, S.44°01'21"W. 82.02 ft. (S.42°23'W. 82.1 ft.) to a ½" iron stake found at the beginning of a 08°34'46" curve concave to the northwest having a radius of 667.87 ft.; along a fence with a southeast line of said 10.29 acres, at approximately 146.7 ft. passing the southeasterly common corner of said 10.29 acres and said 35.75 acres, Tract I, Volume 257 Page 480, then with the southerly line of said 35.75 acres for a total distance of 173.81 ft. with an arc of said 08°34'46" curve subtended by a central angle of 55°54'38" [long chord = S.53°55'09"W. 626.17 ft.] to a ½" iron stake found at its end; continuing with the southerly line of said 37.75 acres, S.81°52'27"W. 312.98 ft.



Copy from re:SearchTX

(S.80°20'W. 312.2 ft.) to a ½" iron stake found at the beginning of a 09°46'19" curve concave to the northeast having a radius of 586.37 ft., then 384.76 ft. with an arc of said 09°46'19" curve subtended by a central angle of 37°35'46" [long chord = N.79°19'40"W. 377.89 ft.] to a ½" iron stake found at its end, then N.60°31'47"W. 512.96 ft. (N.61°38'W. 512.89 ft.) to a found ½" iron stake, then N.63°27'05"W. 336.91 ft. (N.64°32'W. 336.99 ft.) to a ½" iron stake found at the beginning of a 20°28'36" curve concave to the south having a radius of 279.83 ft., then 270.47 ft. with an arc of said 20°28'36" curve subtended by a central angle of 55°22'46" [long chord = S.88°51'32"W. 260.06 ft.] to a ½" iron stake found at its end, and S.61°10'09"W., at approximately 72 ft. passing the south line of said 37.75 acres, then continuing for a total distance of 208.77 ft. (S.59°39'W. 210.5 ft.) to a ½" iron stake found at the beginning of a 24°19'59" curve concave to the northwest having a radius of 235.48 ft.; 165.30 ft. with an arc of said 24°19'59" curve subtended by a central angle of 40°13'10" [long chord = S.81°16'44"W. 161.93 ft.] to a ½" iron stake found at its end; S.73°36'49"W. 47.30 ft. (S.73°32'W. 47.3 ft.) to a set ½" iron stake; N.75°49'27"W. (N.74°46'W.) 61.46 ft. to a ½" iron stake set at the beginning of a 13°47'20" curve concave to the south having a radius of 415.55 ft.; and 138.64 ft. with an arc of said 13°47'20" curve subtended by a central angle of 19°06'59" [long chord = N.85°22'57"W. 138.00 ft.] to a ½" iron stake set at its end at the southerly common corner of said 0.25 acre, Tract C, Volume 228 Page 186, and Lot No. 1 of Holcombe-Fields Properties, a subdivision of record in Volume 50 at Page 566 of the Deed Records of Kerr County, Texas and in Volume 2 at Page 8A of the Plat Records of Kerr County, Texas, the southeast corner of the land conveyed to Willie B. Kipp from Donald E. Kipp by a Special Warranty Deed executed the 22nd day of September, 1958 and recorded in Volume 103 at Page 466 of the Deed Records of Kerr County, Texas;

THENCE, with the common line between said 0.25 acre and said Kipp land, North, with the east line of said Lot No. 1, at approximately 140 ft. passing its northeast corner, then continuing for a total distance of 180.00 ft. (North 180 ft.) to the northwest corner of said 0.25 acre, the northeast corner of said Kipp land, in the approximate center of the South Fork of the Guadalupe River in the south line of 411.75 acres conveyed to The Estate of Oscar F. Holcombe from Mary Grey Holcombe by a Warranty Deed executed the 1st day of January, 1969 and recorded in Volume 136 at Page 600 of the Deed Records of Kerr County, Texas;

THENCE, down the approximate center of the South Fork of said Guadalupe River with the common line between said 0.25 acre and said 411.75 acres, S.70°15'37"E. 111.22 ft. to the northeast corner of said 0.25 acre in the west line of said 37.75 acres;

THENCE, with the common line between said 37.75 acres and said 411.75 acres, N.01°18'04"E., at 222.66 ft. passing a fence endpost, then continuing along a fence for a total distance of 748.77 ft. (N.00°59'E. 748.77 ft.) to a ½" iron stake found at a three-way cornerpost for the northwest corner of said 37.75 acres, the southwest corner of 50.0 acres conveyed to Eric S. Greenfield, et ux, from Edna Thelma Robinson, et vir, by a Warranty Deed executed the 20th day of April, 1991 and recorded in Volume 590 at Page 40 of the Real Property Records of Kerr County, Texas;

THENCE, along a fence with the common line between said 37.75 acres and said 50.0 acres, S.78°22'25"E. 2027.73 ft. (S.79°29'E. 2028.61 ft.) to a fence post found at the northeasterly common corner of said 37.75 acres and said 10.29 acres;

THENCE, with the common line between said 10.29 acres and said 50.0 acres, S.78°22'25"E., along a fence, at approximately 820 ft. passing a three-way cornerpost in the northwest right-of-way line of said State Highway No. 39, then not along a fence crossing said State Highway No. 39, at 858 ft. passing a three-way cornerpost in the southeast right-of-way line of said State Highway No. 39, then partly along a fence, at 1131.2 ft. passing 0.7 ft. south of a ¼" iron stake near the northwest bank of said South Fork of the Guadalupe River, then continuing for a total distance of 1159.77 ft. (S.79°29'E. 1158.89 ft.) to the approximate center of said Guadalupe River at the southeasterly common corner of said 10.29 acres and said 50.0 acres in the northwest line of 100.9 acres conveyed to Glyn Griffin, et al, from Sibyl Griffin Brown by a Gift Deed executed the 20th day of October, 1997 and recorded in Volume 929 at Page 361 of the Real Property Records of Kerr County, Texas;



Copy from re:SearchTX

THENCE, up the approximate center of said Guadalupe River with the northwest line of said 100.9 acres: with the southeast line of said 10.29 acres, S.12°15'35"W. 127.84 ft. and S.38°42'35"W., at approximately 325 ft. passing the southeasterly common corner of said 10.29 acres and said 2.08 acres, then with the southeast line of said 2.08 acres for a total distance of 501.32 ft.; and continuing with the southeast line of said 2.08 acres, S.49°54'04"W. 463.01 ft. to the south corner of said 2.08 acres in the north line of said 555.55 acres;

THENCE, with the common line between said 555.55 acres and said 100.9 acres: S.06°18'55"W. 73.42 ft. to a ½" iron stake found at the southwest corner of said 100.9 acres; S.74°48'44"E., at 49.91 ft. passing a found ½" iron stake, then up a bluff, at 351.92 ft. passing a fence cornerpost, then continuing along a fence for a total distance of 798.01 ft. (S.75°47'58"E. 797.24 ft.) to a three-way cornerpost for a reentrant corner of the herein described tract; and continuing along a fence, N.01°36'48"E. 240.58 ft. (N.00°36'43"E. 240.58 ft.) to a cornerpost for a reentrant corner of said 100.9 acres and S.88°58'04"E. 2590.15 ft. (S.89°55'43"E. 2591.14 ft.) to a three-way cornerpost at the southeast corner of said 100.9 acres, the southwest corner of 171.57 acres conveyed to Cool Water, L.L.C. from Loren C. Jennings, et al, by a Special Warranty Deed executed the 31st day of July, 2003 and recorded in Volume 1289 at Page 222 of the Real Property Records of Kerr County, Texas;

THENCE, along a fence with the common line between said 555.55 acres and said 171.57 acres, each point marked with an anglepost: S.89°56'32"E. 121.02 ft. (N.89°56'37"E. 120.91 ft.); S.89°07'18"E. 134.17 ft. (S.88°57'23"E. 134.68 ft.); S.89°34'58"E. 207.21 ft. (S.89°39'33"E. 206.95 ft.); S.89°30'19"E. 110.86 ft. (S.89°19'13"E. 111.10 ft.); S.88°36'37"E. 348.50 ft. (S.88°38'31"E. 348.58 ft.); S.87°12'45"E. 158.75 ft. (S.87°14'39"E. 158.78 ft.); S.89°47'59"E. 58.61 ft. (S.89°38'44"E. 58.66 ft.); S.88°13'15"E. 83.94 ft. (S.88°14'31"E. 83.93 ft.); N.89°00'01"E. 138.48 ft. (N.88°58'45"E. 138.47 ft.); S.89°01'14"E. 62.03 ft. (S.88°34'09"E. 61.91 ft.); and S.88°50'44"E. 1369.49 ft. (S.88°49'18"E. 1364.39 ft. & S.89°02'01"E. 4.45 ft.) to the PLACE OF BEGINNING containing 720.05 acres of land, more or less, within these metes and bounds; INCLUDING approximately 0.2 acre within the right-of-way of State Highway No. 39; and SUBJECT TO THE RIGHTS OF THE STATE OF TEXAS, if any, to the land within the banks of said Guadalupe River.

I hereby certify that these field notes and accompanying plat are accurate descriptions of the property contained therein as determined by a survey made on the ground under my direction and supervision, and that all property corners are marked as stated. (Bearing basis = True north based on GPS observations)

Date surveyed: June 9, 2005 – April 10, 2007

Dated this 29th day of October, 2012

[signature]

Don W. Voelkel
Registered Professional Land Surveyor No. 3990

STATE OF TEXAS REGISTERED DON W. VOELKEL 3990 PROFESSIONAL LAND SURVEYOR

OFFICIAL



Copy from re:SearchTX

Tract 2: EXHIBIT "B"

FIELD NOTES DESCRIPTION FOR 5.21 ACRES OF THE CAMP MYSTIC LAND ON STATE HIGHWAY NO. 39 IN KERR COUNTY, TEXAS

Being all of a certain tract or parcel of land comprising, approximately, 5.02 acres out of Cleveland Griffin N½ Survey No. 1226, Abstract No. 1566, and 0.19 acre out of R. C. Alexander Survey No. 1356, Abstract No: 877, in Kerr County, Texas; comprising all of 5.5 acres conveyed as Tract "B" to Camp Mystic, Inc. from W. G. Stacy by a Warranty Deed executed the 12th day of November, 1979 and recorded in Volume 228 at Page 186 of the Deed Records of Kerr County; including all of Lots No. 17, No. 18 and No. 18A of Holcombe-Fields Properties, a subdivision of record in Volume 50 at Page 566 of the Deed Records of Kerr County, Texas and in Volume 2 at Page 8A of the Plat Records of Kerr County, Texas; and being more particularly described by metes and bounds as follows (record calls shown in parentheses):

BEGINNING at a ½" iron stake set in the northwest right-of-way line of State Highway No. 39 for the east corner of the herein described tract and said 5.5 acres, the southeasterly common corner of Lots No. 16 and No. 17;

THENCE, with the southeast line of said 5.5 acres and said Lots No. 17, No. 18 and No. 18A, the northwest right-of-way line of said State Highway No. 39: S.63°56'40"W. (S.62°45'W.) 33.54 ft. to a ½" iron stake found at the beginning of a 09°30'15" curve concave to the southeast having a radius of 602.90 ft.; 448.09 ft. with an arc of said 09°30'15" curve subtended by a central angle of 42°35'00" [long chord = S.42°39'10"W. 437.85 ft.] to a ½" iron stake found at its end; and S.21°21'40"W. (S.20°10'W.), at approximately 140 ft. passing the northeast bank of the South Fork of the Guadalupe River, at approximately 190 ft. passing the approximate center of said river and the east line of 411.75 acres conveyed to The Estate of Oscar F. Holcombe from Mary Grey Holcombe by a Warranty Deed executed the 1st day of January, 1969 and recorded in Volume 136 at Page 600 of the Deed Records of Kerr County, Texas, then upon, over and across said 411.75 acres for a total distance of 242.18 ft. to the southwest bank of said river for the south corner of the herein described tract and said 5.5 acres;

THENCE, with the westerly line of said 5.5 acres, continuing upon, over and across said 411.75 acres with the westerly bank of said river: N.31°55'58"W. 190.34 ft.; N.18°54'50"W. 136.47 ft.; N.04°28'32"W. 181.92 ft.; N.00°08'17"W. 198.00 ft; and N.30°24'50"E. 182.47 ft. to the north corner of the herein described tract and said 5.5 acres;

THENCE, with the northeast line of said 5.5 acres, S.61°12'12"E. (S.63°30'E.), continuing upon, over and across said 411.75 acres, crossing said river, at approximately 73 ft. passing the approximate center of said river, the east line of said 411.75 acres, at 146.70 ft. passing a ½" iron stake found near the easterly bank of said river at the northwesterly common corner of said Lots No. 16 and No. 17, then continuing with the common line between said Lots No. 16 and No. 17 for a total distance of 550.27 ft. to the PLACE OF BEGINNING containing 5.21 acres of land, more or less, within these metes and bounds; INCLUDING approximately 0.9 acre also contained in the 411.75 acre tract; and SUBJECT TO THE RIGHTS of the State of Texas, if any, to the land within the banks of said Guadalupe River.

I hereby certify that these field notes and accompanying plat are accurate descriptions of the property contained therein as determined by a survey made on the ground under my direction and supervision, and that all property corners are marked as stated. (Bearing basis = True north based on GPS observations)

Date surveyed: June 9, 2005 – April 10, 2007

Dated this 29th day of October, 2012

[signature]

Don W. Voelkel
Registered Professional Land Surveyor No. 3990

STATE OF TEXAS REGISTERED DON W. VOELKEL 3990 PROFESSIONAL LAND SURVEYOR

VOELKEL LAND SURVEYING, PLLC • PHONE: 830-257-3313 • 212 CLAY STREET, KERRVILLE, TEXAS 78028

OFFICIAL

Copy from re:SearchTX

**Exhibit 2**

**Exceptions to Conveyance and Warranty**

Easements and matters per plat of Holcombe Fields Properties, recorded in Volume 50, Page 554, Deed Records of Kerr County, Texas, and Volume 2, Page 8A, Plat Records of Kerr County, Texas.

Easements for ingress and egress for the purposes of building, maintaining and connecting water lines and erecting engine, as described in Volume 2, Page 353, Easement Records of Kerr County, Texas.

Road drainage easement to County of Kerr, as described in document recorded in Volume 3, Page 357, Easement Records of Kerr County, Texas.

Easement to LCRA, dated April 4, 1941, recorded in Volume 67, Page 515, Deed Records of Kerr County, Texas.

Easement to Hill Country Telephone Cooperative, Inc., dated March 22, 1954, recorded in Volume 16, Page 79, Easement Records of Kerr County, Texas.

Water Agreement and Easement by and between Edna Thelma Robinson, Clarence A. Griffin, Annie Pearle Sumner and B. E. Griffin, dated June 18, 1973, recorded in Volume 166, Page 314, Deed Records of Kerr County, Texas.

Easement and Right-of-way to Kerrville Public Utility Board and Hill Country Telephone Co-op, Inc., dated August 27, 1997, recorded in Volume 966, Page 578, Real Property Records of Kerr County, Texas.

Easement and Right-of-way to Kerrville Public Utility Board, dated October 5, 1998, recorded in Volume 1049, Page 188, Real Property Records of Kerr County, Texas.

Telephone line right-of-way easement to Hill County Telephone Cooperative, Inc., dated June 22, 2000, recorded in Volume 1074, Page 775, Real Property Records of Kerr County, Texas.

Telephone line right-of-way easement to Hill County Telephone Cooperative, Inc., dated June 16, 2000, recorded in Volume 1074, Page 777, Real Property Records of Kerr County, Texas.

Easement and Right-of-way to Kerrville Public Utility Board and Hill Country Telephone Co-op, Inc., dated November 30, 1998, recorded in Volume 1078, Page 149, Real Property Records of Kerr County, Texas.

Sanitary Control Easement recorded in Volume 1125, Page 583, Real Property Records of Kerr County, Texas.

Easement and Right-of-way to Kerrville Public Utility Board, dated February 1, 2001, recorded in



UNOFFICIAL COPY

Copy from re:SearchTX

Volume 1171, Page 208, Real Property Records of Kerr County, Texas.

Cross-Access Easement Agreement dated April 23, 2002, between Cool Water, LLC and Natural Fountains Properties, Inc., recorded in Volume 1186, Page 197, Real Property Records of Kerr County, Texas.

Telephone line right-of-way easement to Hill County Telephone Cooperative, Inc., recorded in Volume 1581, Page 400, Real Property Records of Kerr County, Texas.

Affidavit to Public regarding On-Site Sewerage Facilities, recorded in Volume 1733, Page 511, Official Public Records of Kerr County, Texas.

Right-of-way deed to the State of Texas, recorded in Volume 68, Page 549, Deed Records of Kerr County, Texas.

Certificate of Adjudication issued March 8, 1983, recorded in Volume 3, Page 334, Water Rights Records of Kerr County, Texas.

Telephone line right-of-way easement to Hill County Telephone Cooperative, Inc., dated June 12, 2012, recorded under File No. 12-5884, Official Public Records of Kerr County, Texas.

FILED AND RECORDED
At 2:55 o'clock P M
STATE OF TEXAS
COUNTY OF KERR

NOV 21 2012

I hereby certify that this instrument was filed in the file number sequence on the date and time stamped hereon by me and was duly recorded in the Official Public Records of Kerr County, Texas.
Jannett Pieper, Kerr County Clerk
Erica Villarreal Deputy

UNOFFICIAL



Copy from re:SearchTX

# Exhibit F

Copy from re:SearchTX

**From:** Kyle Findley
**Sent:** Wednesday, February 18, 2026 6:17 PM
**To:** Jeff Ray; Trevor Courtney
**Cc:** Mikal Watts; Katherine Estrada; Camp Team
**Subject:** RE: Getten et al v. Camp Mystic et al

That works – 7 day extension is fine.

**Kyle Findley**
Trial Lawyer

---

**From:** Jeff Ray <jray@raylaw.com>
**Sent:** Wednesday, February 18, 2026 5:06 PM
**To:** Trevor Courtney <tcourtney@ArnoldItkin.com>; Kyle Findley <KFindley@ArnoldItkin.com>
**Cc:** Mikal Watts <mikal@wattsllp.com>; Katherine Estrada <kestrada@raylaw.com>; Jeff Ray <jray@raylaw.com>
**Subject:** Getten et al v. Camp Mystic et al

Gentlemen:

We are working on discovery responses and request an extension for an additional 7 days, making our discovery due on Feb. 27th. I would appreciate your consideration of this additional time. As always, if you need extensions on any matters, I will work to accommodate your requests as well. Thanks for your consideration.



Copy from re:SearchTX

**Jeff Ray**

Ray | Pena | McChristian, PC

*Albuquerque | El Paso | Ft Worth | San Antonio*

---

**Direct** (866) 832-7272 **Cell** (915) 497-1244

Email: jray@raylaw.com Web:

https://url.avanan.click/v2/r01/___www.raylaw.com___.YXAzOmFybm9sZGl0a2luMTphOm86NjVmOWI



Copy from re:SearchTX

# Exhibit G

Copy from re:SearchTX

**From:** Dan Bitting <dbitting@fbfk.law>
**Sent:** Tuesday, March 24, 2026 8:17 AM
**To:** Kyle Findley <KFindley@ArnoldItkin.com>
**Cc:** Camp Team <camp@arnolditkin.com>; Kala Sellers <ksellers@arnolditkin.com>; Kurt Arnold <karnold@ArnoldItkin.com>; Jason Itkin <jitkin@ArnoldItkin.com>; Trevor Courtney <tcourtney@ArnoldItkin.com>; John Grinnan <jgrinnan@ArnoldItkin.com>
**Subject:** RE: Hearing - Stacy Eastland

Kyle,

First, I do not understand your continued insistence that I did not confer before filing motion for sanctions. To the contrary, I emailed you several times asking for your basis for including Stacy in the suit after I put you on notice that he had transferred his NFP stock back to the company in 2012. I also offered to get on the phone to discuss the matter. For the most part, you didn't respond and certainly never provided a legitimate basis for suing Stacy.

Second, I disagree that Plaintiffs acted in good faith. On November 26, 2026--before I filed anything—I notified you that Stacy had relinquished his interest in NFP 13 years before you filed suit. And while the specific document by which Stacy transferred his stock in NFP might not have been public, you had possession of it on December 5, 2025, when I attached it to our answer. Yet you kept Stacy in the case for another three months.

Further, while Plaintiffs' bad faith in keeping Stacy in the case is evident, bad faith is not a requirement for obtaining sanctions under text Tex. Civ. Prac. & Rem. Chapter



Copy from re:SearchTX

10. Sanctions are available under that statute if a party fails to do a reasonable investigation. Here, Plaintiffs did no investigation of Stacy's connection with the Camp and even ignored the evidence showing that he had no role in the camp since 2012.

As a result, Stacy has incurred substantial attorney's fees in defending a lawsuit that he never belonged in in the first place. Perhaps even worse, he's also had his name linked with a horrible tragedy that he had nothing to do with. This suit has caused him and his family immense distress when he should be enjoying his golden years with his children and grandchildren.

That said, I believe Stacy would willing to drop the motion for sanctions in exchange for payment of attorney fees and a public apology. Let me know if you want to discuss such a resolution.

Dan

**DAN BITTING**
Attorney / Shareholder

FBFK LAW Transactions/M&A Litigation IP

BEST LAW FIRMS UNITED STATES 2026

**FBFK LAW**
(512) 703-1400 Office
4301 Westbank Drive, Building A, Suite 225
Austin, TX 78746
dbitting@fbfk.law
www.fbfk.law | Pay Your Bill

The FBFK Way - Our Culture of Service and Success

Members of LEInternational

IMPORTANT/CONFIDENTIAL: This message contains information from the law firm of Ferguson Braswell Fraser Kubasta PC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. If you have received this communication in error, please notify us immediately at our Dallas telephone number: (972) 378-9111.

---

**From:** Kyle Findley <KFindley@ArnoldItkin.com>
**Sent:** Tuesday, March 10, 2026 11:18 AM
**To:** Dan Bitting <dbitting@fbfk.law>
**Cc:** Camp Team <camp@arnolditkin.com>; Kala Sellers <ksellers@arnolditkin.com>; Kurt Arnold <karnold@ArnoldItkin.com>; Jason Itkin <jitkin@ArnoldItkin.com>; Trevor Courtney <tcourtney@ArnoldItkin.com>; John Grinnan <jgrinnan@ArnoldItkin.com>
**Subject:** Hearing - Stacy Eastland



Copy from re:SearchTX

Dan – As you know, we don't agree with the sanctions motion that you filed without any conference.

As you also know, we just got discovery from Camp Mystic. You also produced documents that were confidential documents that you had in your possession that was not publicly available. Based on information that we have received and as you were told – we filed a nonsuit of the claims against your client.

Clearly there is no bad faith involved – especially considering that confidential documents had to be produced.

This should take care of and eliminate any need you have for a hearing – which at this point would no doubt be a waste of time, resources, etc.

I would expect this to take care of any need for a hearing - if you somehow think different – let me know.

Kyle

**Kyle Findley**
Trial Lawyer

ARNOLD & ITKIN
TRIAL LAWYERS

t (713) 222-3800 6009 Memorial Drive
f (713) 222-3850 Houston, TX 77007

arnolditkin.com



Copy from re:SearchTX

# Exhibit H

Copy from re:SearchTX

Filed
11 July 26 P4:32
Linda Uecker
District Clerk
Kerr District

CAUSE NO. 11,527B

| | | |
|---|---|---|
| S. STACY EASTLAND, NANCY EASTLAND LEATON | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | OF KERR COUNTY, TEXAS |
| | § | |
| CAMP MYSTIC, INC., RICHARD G. EASTLAND AND NATURAL FOUNTAINS PROPERTIES, INC., | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | 198TH JUDICIAL DISTRICT |

**STACY EASTLAND AND NANCY LEATON'S ORIGINAL PETITION AS REALIGNED PLAINTIFFS**

TO THE HONORABLE JUDGE OF SAID COURT:

Stacy Eastland, individually, derivatively on behalf of Natural Fountains Properties, Inc. and as a shareholder and former director of NFP (both individually and as a Trustee) and Nancy Eastland Leaton, individually, derivatively on behalf of NFP, and as a shareholder and former director of NFP (both individually and as a Trustee), file this Original Petition as Realigned Plaintiffs. This petition amends their Sixth Amended Counterclaim.

## I. PARTIES

1. Stacy Eastland ("Stacy") is an individual residing in Houston, Harris County, Texas. Stacy's sister, Nancy Leaton ("Nancy"), is an individual residing in Brenham, Washington County, Texas. They have appeared herein.

2. Defendant Richard G. Eastland ("Dick") is an individual residing in Hunt, Kerr County, Texas. He has appeared herein.



Copy from re:SearchTX

3. Defendant Camp Mystic, Inc. ("New CM") is a Texas corporation, incorporated on June 1, 1998, with its principal place of business in Kerr County, Texas. It has appeared herein.

4. Defendant Natural Fountains Properties, Inc. ("NFP") is a Texas corporation incorporated in 1956. Its principal place of business is in Kerr County, Texas. It has appeared herein.

## II. FACTS

**A. From 1939 until 1998 the Eastland family owned and operated Camp Mystic under one corporation and allocated 1/3 of the income to the camp operators and 2/3 to the owners.**

5. Camp Mystic is a very successful private summer camp for girls. It sits on approximately 750 acres on the Guadalupe River just south of Hunt, Kerr County, Texas. It has almost a mile of frontage on the Guadalupe River. Cypress Creek and several smaller creeks also flow through the property. It has a number of historic, well built cabins and buildings. It boasts thousands of satisfied alumnae and a well-known, widely recognized brand name. It enjoys tremendous good will and loyalty among its former campers, citizens of Texas and throughout the country. It has long been one of the most prestigious and successful private summer camps for girls in the United States. Thousands of its former campers have sent their daughters and granddaughters to Camp Mystic. Many of its campers return year after year, from ages 7 to 17, and return generation after generation. It has an excellent reputation and a waiting list for girls wishing to attend. It is quite profitable.

6. Camp Mystic was founded in 1926. Stacy, Nancy and Dick's grandparents, Ag and Pops Stacy, bought it in 1939. In the late 1940s, Inez and Frank Harrison became directors of the camp. They served as directors until the mid 1980s. In the mid 1970s Dick and his wife Tweety came to work at the camp fresh out of college. They apprenticed under the Harrisons until the



Copy from re:SearchTX

Harrisons retired. At that point, Dick and Tweety became the camp directors, positions they still hold.

7. In 1956 the family formed a corporation called Camp Mystic, Inc. ("Old CM"). Old CM both owned the land and buildings and operated the camp. Over the years Stacy, Nancy and Dick received gifts of stock in Old CM. In the 1980s Dick was also allowed to purchase, at a very favorable price to Dick, stock which Old CM redeemed from Dick's uncle Billy Stacy. By the 1990s the ownership of Old CM was approximately as follows:

| | |
|---|---|
| Anne Eastland (Dick, Stacy and Nancy's mom) as trustee: | 42% |
| Dick: | 38% |
| Stacy: | 8% |
| Nancy: | 8% |
| George Stacy (Dick, Stacy and Nancy's cousin) | 2% |
| Philip Stacy (Dick, Stacy and Nancy's cousin) | 2% |

8. When the family was operating the camp as one corporation, they had to decide how to allocate the camp income, after expenses, to reward both the camp directors or operators who ran the camp—first Frank and Inez and later Dick and Tweety—and the above owners of Old CM who owned the very valuable riverfront property that made a successful camp possible. The camp operators received an annual salary and bonus. The camp owners received, as dividends, the profits remaining after paying the camp operators' salary and bonus and other expenses.

9. As shown above by the 1990s Dick and his mother Anne together owned some 80% of Old CM stock, and they decided how much of the camp income to allocate as salary and bonus to Dick and Tweety for their work running the camp and how much to allocate to the owners of Old CM (which, of course, included Dick) which owned the property. Records for 1992-1997 show that Dick and Anne consistently allocated approximately 1/3 of the camp revenue as salary and bonus to



Copy from re:SearchTX

Dick and Tweety as camp operators and allocated the remaining 2/3 to the family owners of the camp assets, the Old CM shareholders.

**B. In 1998 the family sought to protect the camp assets from lawsuits while maintaining the same split of income between the owners and the operators by leasing the camp property to a new operating company.**

10. By January of 1996, the Eastland family was concerned about potential lawsuits against the camp that, if successful, could cause Old CM to lose some or all of its very valuable property. Anne and the other shareholders wanted to operate the camp in a way to shield its underlying assets from liability while maintaining the historical split of camp revenues between the camp owners and the camp operators.

11. To accomplish this, in the late 1990s, the family decided to set up a new company to operate the camp. Old CM changed its name to Natural Fountains Properties, Inc. On June 1, 1998 a new corporation, also called Camp Mystic, Inc. ("New CM"), was formed to operate the camp. It was wholly owned by Dick and Tweety. New CM leased the land and buildings needed for the camp from NFP ("the 1998 Lease"). NFP also conveyed to New CM the horses, saddles, dishes, canoes and other personal property and equipment New CM would need to run the camp.

12. The 1998 Lease between NFP and New CM required New CM to pay rent based on a percentage of the "Replacement Cost of the Demised Premises," which was defined to include the land and the improvements. The family thought that property values would increase at approximately the same rate as camp revenues. If so, then a rent based on a percentage of property values would allow the asset owners to receive approximately the same amount in rent as they would have received in camp profits under the historic 1/3-2/3 allocation formula. For the first full year of the lease, the family agreed that to a rent of $390,000. To determine the percentage for the rent





Copy from re:SearchTX